# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MARVIN G. JOHNSON,

      Petitioner,

v.

DAVID BOBBY, WARDEN,

      Respondent.

Case No.  2:08-cv-55
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Chelsey M. Vascura**

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action under 28 U.S.C. § 2254.  This matter is before the Court for consideration of Petitioner's Second Motion for Discovery (ECF No. 108), Respondent's Memorandum in Opposition (ECF No. 113), and Petitioner's Reply (ECF No. 116).[1]

### I.  Procedural History

This case was nearly decisional when the emergence of a new DNA report concerning old evidence effectively pressed the pause button on these proceedings.

On September 30, 2010, the Magistrate Judge[2] issued an Opinion and Order granting in part and denying in part Petitioner's first motion for leave to conduct discovery.  (ECF No. 39.)

---

[1]Concurrent with the instant motion, Petitioner also filed motions to amend his petition (ECF No. 109) and for stay and abeyance (ECF No. 110), both of which stem from the new DNA evidence that is the basis for the instant discovery motion.  Respondent filed memoranda in opposition (ECF Nos. 114 and 115), and Petitioner filed replies (ECF Nos. 117 and 118). Petitioner asks the Court to rule on his discovery motion before addressing the other two motions (ECF No. 108, at PageID 10583, n.1), but the Court is of the view that it can and should address all three motions together.

[2]The Honorable Terence P. Kemp was the presiding Magistrate Judge at that time.  The case was reassigned to the Honorable Chelsey M. Vascura upon Magistrate Judge Kemp's retirement.

While allowing depositions of Petitioner's state-court attorneys, the Court denied Petitioner's other requests—including his bid to test the rape kit of the victim's mother, Tina Bailey. Petitioner proceeded with depositions of his state-court attorneys (ECF Nos. 44, 45, 46, 47) and, despite Respondent's April 7, 2011 notice of additional authority, to wit: the decision of *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), Petitioner, on April 19, 2011, filed the four depositions (ECF No. 49). Ultimately, the Court overruled objections to the Magistrate Judge's decision allowing discovery (ECF No. 51).

Following a May 12, 2011 status conference, the Magistrate Judge issued a Scheduling Order giving Petitioner a deadline for filing any motions to expand the record, specifically directing the parties to address any impact of *Pinholster*. In *Pinholster*, the Supreme Court concluded that the district court had improvidently conducted an evidentiary hearing on a claim that the state courts had rejected on the merits, holding that "review under § 2243(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181-82.

On February 27, 2012, the Court issued an Opinion and Order allowing Petitioner to expand the record with the attorney depositions he had taken in February 2011, as well as an affidavit by a forensic pathologist. (ECF No. 65.) In so doing, the Court concluded that *Pinholster* was not applicable, but only because the Court elected, albeit reluctantly, to stay the case and hold the proceedings in abeyance so that Petitioner could return to the state courts to present his claims that were now "new" by virtue of being supported by new evidence developed during the discovery this Court allowed.

The case remained stayed for three years, with the parties regularly filing joint status

reports (ECF Nos. 67 through 79), until July 6, 2015, when the case was reinstated to the Court's active docket upon Petitioner's completion of state-court proceedings (ECF No. 80). The parties filed a joint proposed briefing schedule on July 29, 2015 (ECF No. 81), pursuant to which the state-court record was supplemented and re-filed in its entirety on October 2, 2015 (ECF Nos. 82 and 83).[3] Petitioner filed his Amended Petition on December 3, 2015 (ECF No. 86), and Respondent filed a Return of Writ on February 29, 2016 (ECF No. 91).

Prior to the scheduled filing of Petitioner's Traverse, however, Petitioner, on April 18, 2016, filed a motion for a 90-day extension of time in which he indicated that, on April 6, 2016, he received from Respondent a new DNA Report. (ECF No. 92.)[4] On that same day, Petitioner also filed an application for the payment of a DNA consultant to evaluate the DNA report. (ECF No. 93.) The Court granted Petitioner's Application for payment of a DNA consultant (ECF No. 98), and after several extensions of time, the Court issued an Order staying the briefing of the Traverse until completion of any investigation and briefing on the DNA report (ECF No. 100). After filing regular status reports (ECF Nos. 101 through 104), Petitioner filed an unopposed motion for a scheduling order, which this Court granted on January 11, 2017 (ECF No. 106). On January 24, 2017, Petitioner filed a Notice of the final report by his DNA consultant, Dr. Theodore D. Kessis. (ECF No. 107.) The filing consisted of Dr. Kessis's report (ECF No. 107-1), as well as an appendix containing Dr. Kessis's Curriculum Vitae and a document setting forth ten (10) exemplars (ECF No. 107-2).

The following motions are now fully briefed and before this Court: Petitioner's Second

---

[3] Portions of the state-court record continued to be filed after this time, presumably as the parties became aware of the omissions.

Motion for Discovery (ECF No. 108); Petitioner's Motion to Amend his Petition (ECF No. 109); and Petitioner's Reply in Support (ECF No. 118).

## II. The DNA Report

By way of background, and as noted by Dr. Kessis in his Report of Findings, one of the underlying felonies for which Petitioner was convicted and which made him eligible for the death penalty was rape. Specifically, the State alleged (and the jury found beyond a reasonable doubt) that Petitioner had forced or coerced the child-victim's mother, Tina Bailey, to perform oral sex on Petitioner in the morning hours before the body of her son, Daniel Bailey, was found in the basement of the home in which Tina and Daniel Bailey lived and Petitioner had formerly lived. Petitioner alleges in his eleventh ground for relief that his trial attorneys provided ineffective assistance when they failed to seek testing of Tina Bailey's rape kit. The state courts rejected that claim on the merits in postconviction. When Petitioner sought testing of that rape kit in his first motion for discovery in these proceedings, this Court denied that request, concluding that the only issue in dispute at trial was whether the oral sex was consensual or the result of force/coercion and that testing of the rape kit would not yield evidence tending to prove or disprove that element. (ECF No. 39, at PageID 548.) Dr. Kessis opines, to a reasonable degree of scientific certainty, that "the results of BCI's 2016 tests are inconsistent with the allegation made at trial that Ms. Bailey was forced to perform oral sex on Mr. Johnson." (ECF No. 107-1, at PageID 10542.) As the Court sets forth below, however, most of Dr. Kessis's opinions about BCI's 2016 testing are either wholly unremarkable or acutely undermined by express caveats.

---

[4] Several days later, on April 21, 2016, Respondent filed a formal Notice of having

Dr. Kessis begins by explaining that in the Fall of 2003, BCI tested three items of

evidence (two of which presumptively for blood) for DNA, that the two items presumptively

positive for blood demonstrated a profile consistent only with Daniel Bailey, and that the collar

of a green shirt revealed a mixture of DNA profiles from at least three individuals—Petitioner,

Daniel Bailey, and an unknown individual could not be excluded as contributors.  (ECF No. 107-

1, at PageID 10538-10539.)

Dr. Kessis then notes that in February 2016, "the trace analysis section of the BCI

laboratory received two previously untested rape kits containing twenty-two items of evidence

originally collected from Mr. Johnson and Ms. Bailey during the initial course of the

investigation."  (*Id.* at PageID 10539.)  Dr. Kessis continues:

> As would be expected, STR [Short Tandem Repeat] testing of Items 34.2 (Vaginal swabs), 34.4 (Perianal swabs), 34.6 (Oral swabs), 34.12 (Vulva swabs), and 34.13 (Labia minora swabs) demonstrated that Tina Bailey could not be excluded as a contributor of DNA detected on the items recovered from her rape kit.  In addition, STR testing demonstrated that Marvin Johnson could not be excluded as a potential contributor of the DNA detected in the sperm of Item 34.2 (Vaginal swabs).
>
> With respect to the ySTR [Y-Chromosome Short Tandem Repeat] testing performed by the laboratory, testing data revealed a lack of y-chromosome containing male DNA on Item 34.12 (Vulva swabs) and inconclusive results for Item 34.4 (Perianal swabs).  For items 34.2 (Vaginal swabs) and 34.6 (Oral swabs), Marvin Johnson could not be excluded as a potential contributor of the DNA detected on these items.  Of note, a mixture of DNA profiles from two males, including Mr. Johnson and an unknown male, was detected on Item 34.13 (Labia minora swabs).

(ECF No. 107-1, at PageID 10540.)

In the "Discussion – Observation" section of his Report, Dr. Kessis begins by noting that,

"[r]emarkably, BCI negligently failed to test several critical and clearly probative items of

---

provided to Petitioner the DNA report in question, dated February 25, 2016.  (ECF No. 94.)

evidence it had access to in 2003." (ECF No. 107-1, at PageID 10541.) These items, Dr. Kessis explains, included the rape kits collected from Ms. Bailey and Petitioner, as well as underwear collected from Petitioner. Dr. Kessis continues that, "[p]erhaps even more surprising is the fact that the laboratory failed in both 2003 and 2016 to test the penile swab contained in Mr. Johnson [sic] rape kit and his underwear, both collected at the time of the incident." (*Id.*)

Dr. Kessis proceeds to set forth examples "of the ultimate effects produced when a laboratory neglects to test certain items of evidence." (*Id.*) First, Dr. Kessis notes with some incredulity that BCI elected not to determine Tina Bailey's DNA profile in 2003, but eventually determined that profile in 2016 from her reference standard contained in the rape kit collected from her in 2003. He continues:

> Based on the DNA profile finally determined for Ms. Bailey in 2016, my analysis of the unknown profile detected on Item 16s4 [the collar from a green shirt] indicates that Tina Bailey cannot be excluded as unknown contributor of DNA found on this item in 2003. And while it's [sic] unknown what effect this lack of information may have had at trial, it is clear that the defense did not have the opportunity to explore any potential exculpatory value such a finding may have held at the time.

(ECF No. 107-1, at PageID 10542.)

A second example of the potential outcome-changing consequences associated with the failure to test evidence, according to Dr. Kessis, essentially amounts to questions concerning the handling of Ms. Bailey's rape kit. Dr. Kessis explains:

> Chain of custody documents provided to me show that Ms. Bailey's rape kit was not received by the BCI laboratory until February 2nd, 2016 **(Exemplar 8)**. Despite presumably being collected shortly after the incident in 2003, there is no record of Ms. Bailey's rape kit or its whereabouts anywhere in the chain of custody records for over 12 years until it appears in the record for the first time in early February of 2016. ***In my opinion, the lack of an adequate and continuous chain of custody for this rape kit, including the evidentiary items contained within, casts serious doubt on any serologic or DNA results generated in***

6

*__connection with the kit__*.

(ECF No. 107-1, at PageID 10542 (emphasis added).)

In his very next paragraph, however, Dr. Kessis proceeds to render opinions about the very results he dismissed as in "serious doubt." He states:

> If for a moment however, one were to accept the absence of Ms. Bailey's rape kit in the chain of custody record and attribute such to some sort of mere oversight, the results of BCI's 2016 tests are inconsistent with the allegation made at trial that Ms. Bailey was forced to perform oral sex on Mr. Johnson.

> For example, the laboratory's finding of a profile consistent with Mr. Johnson in the sperm fraction of Ms. Bailey's vaginal swabs (item 34.2) suggests that vaginal, not oral, sex occurred. This is further supported by the laboratory's finding of only a single sperm on her vaginal swab and the detection of only relatively low levels of his DNA. Such results are not only consistent with the occurrence of vaginal sex, but potentially consensual sex that had occurred days earlier.

> A second example of the contradictory nature of BCI's 2016 results is the finding on Ms. Bailey's oral swab (Item 34.6). Here the sample tested contained a very limited amount of DNA, yet a y-STR DNA profile consistent with Mr. Johnson was detected in the absence of a finding of semen or sperm. Such a result is not consistent with a claim of oral sex. If Mr. Johnson had ejaculated in Ms. Bailey's oral cavity, semen and sperm would likely have been found. Conversely, if he did not ejaculate into her oral cavity, it's unlikely his DNA would have been detected given the fact that the limited number of epithelial cell shed from his penis during the fact would have been quickly washed away. Given the clear lack in the record of any chain of custody history for the rape kit and how it was handled, one cannot rule out the possibility of cross-contamination between samples as an explanation for the results BCI produced for this item.

> A third contradiction in the DNA testing data is the laboratories [sic] finding for Ms. Bailey's Labia minora swabs (Item 34.13). For this example, no semen or sperm was detected, yet the DNA from two males, Mr. Johnson and an unknown male, was found on this item. Just as with the finding of Mr. Johnson on the vaginal swabs, this result is also at odds with the notion that Ms. Bailey only performed oral sex on Mr. Johnson. The finding of a second unknown male on the Labia minora swabs is also quite notable if not puzzling. The finding of this unknown male's DNA on Ms. Bailey's Labia minora would tend to indicate this individual had vaginal sex with her, perhaps even consensual in nature. However, the absence of this same unidentified individual's DNA on Ms.

7

Bailey's vaginal swabs is a discordant finding. Again, in light of such results, one cannot rule out cross-contamination of this sample as an explanation for the results BCI obtained here.

(ECF No. 107-1, at PageID 10542-10543.)

Finally, Dr. Kessis raises questions about the handling of Petitioner's rape kit—both by BCI and by the Campbridge Police Department. (ECF No. 107-1, at PageID 10543-10545.)

Dr. Kessis summarized his opinions, findings, and conclusions as follows:

> It is my opinion that the testing performed in 2016 by the BCI laboratory *is of limited probative value*. Given the history and handling of Ms. Bailey's rape kit, together with the nature of the findings, *one cannot rule out cross-contamination* between samples as an explanation for the results BCI reported. It is also my opinion that the lack of testing in 2003 by BCI on items contained in Ms. Bailey's rape kit, as well as the lack of testing in 2003 and 2016 on items contained in Mr. Johnson's rape kit, clearly limited the defendant's opportunity to explore any exculpatory valve [sic] such results may have had, not only at trial in 2003, but also today.

(ECF No. 107-1, at PageID 10545 (emphasis added).)

Respondent did not file a report drafted by a DNA consultant. But Respondent's interpretations of Dr. Kessis's report are evident in Respondent's Memorandum in Opposition to Petitioner's Second Motion for Discovery—specifically in response to Petitioner's argument that discovery concerning the rape kits would support the "prejudice prong" of his claim of ineffective assistance of trial counsel. Specifically, Respondent asserts as follows:

> First, the results of the recent testing of Ms. Bailey's "rape kit," which Johnson seeks to explore further, are of minimal relevance to the Eleventh Ground, even if they could be considered by the Court. Dr. Kessis, the expert employed by Johnson, opines in his report that the twelve-year gap between collection and testing "casts serious doubt on any serologic or DNA results generated in connection with the kit." Dr. Kessis also describes the findings as "contradictory" and "discordant." [Report of Findings (ECF No. 107-1), PAGEID# 10542-543]. The results therefore hardly amount to convincing evidence that testing done prior to trial would have yielded material or even helpful results. And, of course, the results are simply irrelevant to the

"performance prong" of Johnson's ineffective assistance of counsel claim.

Second, information concerning the chain of custody and handling of the materials recently tested plainly is irrelevant to Johnson's claim of ineffective assistance of counsel, or any other claim presently before the Court. Johnson does *not* claim that his rights were violated by the prosecution's handling of Ms. Bailey's "rape kit" or any "rape kit" or biological or physical evidence obtained from Johnson himself. And, even if some such claims were made, once again, information concerning the chain of custody and handling of the materials recently tested plainly is irrelevant. There is simply no reason to believe that the technicians who conducted the recent tests possess any knowledge as to why or how tests may or may not have been conducted prior to trial.

Third and finally, any testimony by trial counsel concerning the results of the recent testing at best would be purely speculative and at worst patently irrelevant. "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome." *Harrington v. Richter*, 562 U.S. 86, 109 (2011). Johnson seemingly acknowledges that the implications or significance of the results of the recent testing – whether the results ultimately will prove helpful or hurtful to Johnson – are far from clear. Apparently Johnson proposes to further explore the meaning or importance of the results, before deposing trial counsel (or deciding not to depose him). But trial counsel couldn't use this "wait and see" strategy; counsel had to weigh in advance the likelihood that testing would help the defense or reveal additional evidence of Johnson's guilt. As noted above, the results of the recent tests are irrelevant to reasonableness of that decision.

(ECF No. 113, at PageID 10628-10629.)

### III. Motion for Discovery

Petitioner seeks discovery in support of his eleventh ground for relief, wherein he argues that his trial attorneys provided ineffective assistance of counsel for failing to have the victim's rape kit tested. (ECF No. 86, at PageID 9287-9289.) Specifically, Petitioner seeks

1) Deposition of individual at BCI or individuals responsible for maintaining the chain of custody of Tina Bailey's rape kit. In the alternative, deposition of Detective Harbin.

2) Deposition of lab technician(s) regarding the importance of the 2016 DNA testing findings.

9

3) Deposition of lab technician(s) and custodian(s) as to Marvin Johnson's rape kit.

4) Deposition of an individual at BCI or individuals responsible for maintaining the chain of custody of the rape kit and related items related to February, 2009-May, 2010 testing.

5) Depositions of trial counsel.

(ECF No. 108, at PageID 10589-10592.)

The discovery processes contained in the Federal Rules of Civil Procedure do not automatically apply in habeas corpus actions. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In *Harris v. Nelson*, 394 U.S. 286, 295 (1969), the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure did not apply in habeas corpus proceedings. As a result of the holding in *Harris*, Congress promulgated the Rules Governing Section 2254 Cases In United States District Courts in 1976. Specifically, Rule 6(a) provides:

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his or her discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is . . . entitled to relief . . . .'" *Bracy*, 520 U.S. at 908-909 (quoting *Harris*, 394 U.S. at 300); *see also Williams v. Bagley*, 380 F.3d 932, 974-75 (6th Cir. 2004); *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001). In keeping with the well-settled principle that habeas petitioners are

not entitled to go on fishing expeditions in search of damaging evidence, this "good cause" standard requires the petitioner to at least attempt to identify what he expects to uncover through his discovery requests. *See Williams v. Bagley*, 380 F.3d at 976.

Petitioner argues that the need for discovery is particularly acute in capital cases. (ECF No. 108, at PageID 10587.) To that point, this Court notes that the Sixth Circuit has made clear that, "[e]ven in a death penalty case, 'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or require an evidentiary hearing.'" *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003) (quoting *Stanford v. Parker*, 266 F.3d at 460).

Another factor to consider in determining whether discovery is warranted is the inescapable impact of *Cullen v. Pinholster*, 563 U.S. 170 (2011). Pursuant to 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to *any claim that was adjudicated on the merits* in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an *unreasonable determination* of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d) (emphasis added). In *Pinholster*, the Supreme Court held "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. Although it has not expressly ruled that *Pinholster* should be considered with respect to a motion to conduct discovery, the Court of Appeals for the Sixth

Circuit has consistently held that *Pinholster* precludes consideration of new evidence developed in habeas corpus as to claims that the state courts adjudicated on the merits. *See, e.g., Loza v. Mitchell*, 766 F.3d 466, 494 (6th Cir. 2014); *Moore v. Mitchell*, 708 F.3d 760, 780-84 (6th Cir. 2013). That suggests to this Court that *Pinholster*'s holding must be taken into consideration in determining whether discovery is warranted. *See, e.g., Davis v. Bobby*, Case No. 2:10-cv-107, 2017 WL 2544083 (S.D. Ohio Jun. 13, 2017) (Jolson, M.J.).

Petitioner raises several arguments for why *Pinholster* does not preclude discovery. (ECF No. 116, at PageID 10640-10642.) This Court has considered those arguments and is aware of cases in which courts have adopted that position. *See Sampson v. Colson*, 958 F. Supp. 2d 865, 889 (W.D. Tenn. 2013) (agreeing that *Pinholster* did not preclude discovery because it did not alter the standards governing Rule 6 discovery and because the discovery sought by the petitioner related to potential *Brady* violations where introduction of new evidence does not violate *Pinholster*); *Conway v. Houk*, No. 2:07-cv-947, 2011 WL 2119373, at *3 (S.D. Ohio May 29, 2011) (King, M.J.) (allowing discovery because *Pinholster* did not alter Rule 6 discovery standards or preclude consideration of new evidence where a petitioner clears the 2254(d) showing without the new evidence).

But as the Court observed in *Davis*, "[s]ince *Conway*, the winds have blown mostly in one direction." *Davis*, 2017 WL 2544083, at *3. A review of case law in the intervening years confirms that courts, including several within this District, are increasingly concluding that *Pinholster*'s impact should be considered when determining whether discovery is warranted. *See Davis*, 2017 WL 2544083, at *3-4 (collecting cases); *Brenson v. Warden, Toledo Corr. Inst.*, No. 2:11-cv-1146, 2014 WL 897891, at *8 (S.D. Ohio Mar. 6, 2014) (Kemp, M.J.) ("*Conway v.*

12

*Houk* is not necessarily the final word in this District on the impact which *Pinholster* may have on discovery in habeas corpus actions.") (citing *Blevins v. Warden, Ross Corr. Inst.*, 2011 WL 6141062, *4 (S.D. Ohio Dec. 9, 2011) (Merz, M.J.) ("There cannot be good cause to collect evidence which cannot be presented.")); *see also Group v. Robinson*, 132 F. Supp. 3d 954, 959-60 (N.D. Ohio 2015) (considering the impact of *Pinholster* on the "good cause" determination because "[t]his Court does not apply Habeas Rule 6 in isolation."). In *Caudill v. Conover*, 871 F. Supp. 2d 639, 649-50 (E.D. Ky. 2012), the court opted to deny without prejudice motions for discovery, appointment of experts, and an evidentiary hearing, pending 2254(d) review, rather than allow time-consuming and costly development of evidence the court might never be able to consider. In *Skatzes v. Smith*, No. 3:09-cv-289, 2012 WL 604300 (S.D. Ohio Feb. 24, 2012), the court found that consideration of *Pinholster* in the discovery context was virtually unavoidable:

> Prior to the decision in *Pinholster*, it had been this Magistrate Judge's strong preference to maintain in capital habeas corpus litigation a close parallel to the processing of ordinary civil cases, to wit, pleading, followed by discovery, followed by an evidentiary hearing in most cases, followed by a recommendation on the merits. While the implications of *Pinholster* are not yet clear, it now appears more conducive to judicial economy to decide § 2254(d)(1) and (2) and procedural default defense issues first, at least before authorizing discovery as extensive as that sought in this case.

*Skatzes*, 2012 WL 604300, at *10.

Even *Conway v. Houk*, in declining to find that *Pinholster* precluded discovery, the Court acknowledged the "downside" of its decision: "namely the possibility that time and money will be expended discovery of evidence that this Court might never consider." *Conway*, 2011 WL 2119373, at *4. Although it was understandable to take that risk when the impact of *Pinholster* was uncertain, it is less so now, when it has become increasingly evident that *Pinholster*'s holding is inextricably intertwined with any determination of whether good cause exists for

13

conducting discovery.

None of Petitioner's arguments persuade this Court otherwise. First, relying on *Conway*, Petitioner argues that *Pinholster* did not alter or even speak to the traditional standards governing habeas corpus discovery. (ECF No. 116, at PageID 10640-10641.) Strictly speaking, that is true; but for the reasons discussed above, it has become impossible to ignore *Pinholster*'s impact on discovery, even if *Pinholster* itself did not address that matter at the time.

Petitioner also argues that *Pinholster* should not preclude discovery when there exist "'serious questions concerning the conduct of the trial'" (ECF No. 116, at PageID 10641 (quoting *Wellons v. Hall*, 558 U.S. 220, 220-21 (2010)), or when the state courts refuse to allow any or adequate factual development, *Id*. *Pinholster* did not expressly limit its holding in that fashion, and Petitioner has not pointed this Court to any decisions acknowledging such an exception to *Pinholster*.

Beyond the foregoing, the Court notes that there are circumstances under which a federal habeas court's consideration of new evidence does not contravene *Pinholster*. Such circumstances include if the Court determines from the existing record that the state courts' decision was unreasonable under § 2254(d); if a claim was not adjudicated on the merits but is otherwise properly before the Court for habeas review; or if the Court is considering whether to excuse a procedural default. *See, e.g., Caudill*, 871 F. Supp. 2d at 649. Put another way, the circumstances set forth above inform the determination whether discovery *can* proceed, while the traditional "Rule 6/good cause" analysis informs the determination whether discovery *should* proceed.

In the instant case, the discovery requests do not target a claim that was not adjudicated

14

on the merits but is otherwise properly before the Court, or speak to whether a procedural default should be excused. As Respondent points out and the record confirms, the ineffective assistance of counsel claim set forth in Petitioner's eleventh ground for relief was rejected on the merits by the state courts during postconviction proceedings. Although the Court has not yet formally determined whether that adjudication contravened or unreasonably applied clearly established federal law within the meaning of § 2254(d), nothing the Court has seen in the pleadings and state-court materials gives cause to question the reasonableness of the state courts' adjudication, though the Court certainly reserves the right to revise that initial impression.[5]

Although the foregoing is dispositive and would ordinarily counsel against further discussion, faced with recently completed DNA evidence in a capital habeas case, the Court would rather err on the side of saying too much rather than too little. And the DNA evidence in this case, as framed by Petitioner's own DNA consultant, falls considerably short of satisfying the good cause standard for conducting any further discovery.

The Court begins by identifying the essential elements of Petitioner's claim. The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

---

[5] In reaching the conclusion that *Pinholster* forecloses discovery in this case, the Court notes that its original decision granting in part Petitioner's first motion for discovery pre-dated *Pinholster*.

15

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the first prong of the *Strickland* test, the Court notes that, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

To establish the second prong of the *Strickland* test, Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the Court determine that Petitioner has failed to satisfy one prong, the Court need not consider the other. *Id.* at 697.

Petitioner asserts in his Reply that "had defense counsel had the rape kit tested, the result of the trial may have been different because the findings of the recent DNA testing are inconsistent with Tina Bailey's testimony at trial." (ECF No. 116, at PageID 10644.) That implicates the prejudice prong of the *Strickland* standard. Indulging Petitioner every benefit of the doubt, and recognizing that he need only show that the discovery he seeks would lead to relevant evidence in support of his claim, the Court simply cannot find that there is a reasonable probability that, but for counsel's failure to have the rape kits tested, the result of the proceedings would have been different. It bears reiterating that Petitioner's own DNA consultant opined to a reasonable degree of scientific certainty "that the testing performed in 2016 by the BCI laboratory is of limited probative value[]" (ECF No. 107-1, at PageID 10545) and that "the lack of an adequate and continuous chain of custody for [Tina Bailey's] rape kit, including evidentiary items contained within, casts serious doubt on any serologic or DNA results

16

generated in connection with the kit." (ECF No. 107-1, at PageID 10542.) Dr. Kessis's observations and conclusions are devoid of any definitive conclusions and are instead peppered with qualifying words such as "potential," "inconsistent with," "consistent with," and "would tend to indicate." And Dr. Kessis three times opined to a reasonable degree of scientific certainty that the possibility of cross-contamination could not be ruled out as an explanation for certain inconsistent or "puzzling" results.

Petitioner asserts in his Reply that defense counsel at trial disputed the rape charge/specification, making it all the more questionable why counsel did not seek to have the rape kit(s) tested. (ECF No. 116, at PageID 10644.) But counsel at times appeared to concede that the sexual act had occurred and even suggested that Tina Bailey subsequently rinsed her mouth (ECF No. 83-8, at PageID 6816-6817), and disputed only the timing of the rape vis-à-vis the murder of Daniel Bailey (ECF No. 83-8, at PageID 6820-6821; ECF No. 83-11, at PageID 7536-7537; ECF No. 83-12, at PageID 7736). When Petitioner, acting as his own counsel at the end of the trial phase, examined Tina Bailey, he did not dispute whether Ms. Bailey had performed oral sex on him, only whether she had done so under a threat of force or coercion by Petitioner. (ECF No. 83-11, at PageID 7613.) When Petitioner briefly delivered his own culpability-phase closing arguments, he admitted to having done everything the prosecution had alleged, which included forcing Tina Bailey to perform oral sex on him, and asked the jury to find him guilty. (ECF No. 83-12, at PageID 7728-7729.) When this Court denied Petitioner's initial request to have the rape kit tested, the Court did so on the basis that those results would not yield evidence relevant to the issue of whether Petitioner exerted force or coercion. Petitioner's suggestion some fourteen years later that no oral sex occurred, on the basis of some

17

DNA/serologic testing that Petitioner's own expert characterizes as of limited probative value due to chain of custody problems and the possibility of cross-contamination and that produced a result "not consistent with a claim of oral sex," is wholly insufficient to satisfy the good cause standard for conducting any further discovery.

Petitioner questions why, if as Tina Bailey testified at trial that Petitioner compelled her to perform oral sex on him, the STR testing of the oral swab from her rape kit showed no DNA profile foreign to her and the Y-STR testing showed a limited amount of DNA belonging to Petitioner but no sperm or semen. (ECF No. 116, at PageID 10644-10645.) Any assessment about the import of those test results must begin and end with Dr. Kessis's opinion that "the lack of an adequate and continuous chain of custody for this rape kit, including the evidentiary items contained within, casts serious doubt on any serologic or DNA results generated in connection with the kit." (ECF No. 107-1, at PageID 10542.) As to test results from Tina Bailey's oral swabs in particular, Dr. Kessis opined that "[g]iven the clear lack in the record of any chain of custody history for the rape kit and how it was handled, one cannot rule out the possibility of cross-contamination between samples as an explanation for the results BCI produced for this item." (ECF No. 107-1, at PageID 10543.) To the extent that Petitioner is suggesting that questionable handling of the rape kits might not have happened if defense counsel had asked at the time that they be tested, that is a strained insinuation and is not the basis of any claimed constitutional violation(s) before the Court.

Beyond the foregoing, Dr. Kessis offered at most that the test results from Tina Bailey's oral swab were "not consistent with a claim of oral sex"—he by no means excluded the possibility that oral sex had occurred. Petitioner's own defense counsel stated during opening

arguments, although it is not clear on what basis, that Tina Bailey rinsed her mouth after performing oral sex on Petitioner. That could explain the absence of any sperm or semen. And if it does not explain why a limited amount of Petitioner's DNA was detected, one must bear in mind again the caveats about the reliability of the rape kit results that Dr. Kessis himself raised.

Petitioner also stresses how DNA results demonstrating the possibility of non-disclosed consensual vaginal intercourse between Ms. Bailey and Petitioner, as well as the possibility of vaginal intercourse between Ms. Bailey and another unknown male, are inconsistent with Tina Bailey's trial testimony. (ECF No. 116, at PageID 10645.) That is not entirely true, as the presence of Petitioner's DNA, albeit not sperm fraction, in Ms. Bailey's vaginal or labia minora swabs could be consistent with Ms. Bailey's testimony that Petitioner inserted his fingers into her vagina during the oral sex. (ECF No. 83-10, at PageID 1934.) In any event, the presence of sperm and/or DNA belonging to Petitioner and/or another unknown male is wholly irrelevant to the issue at trial as to whether Petitioner compelled Tina Bailey to perform oral sex on him. Further, when Petitioner briefly acted as his own attorney to question Tina Bailey at the end of the trial phase, he never asked or suggested whether they had engaged in consensual sexual intercourse in the days preceding the aggravated murder of Daniel Bailey and the rape (coerced oral sex) of Tina Bailey. (ECF No. 83-11, at PageID 7585-7624.)

Petitioner disputes Respondent's characterizations of Dr. Kessis's findings as "contradictory" and "discordant," (ECF No. 116, at PageID 10646), but this Court has set forth in detail precisely what Dr. Kessis said, in his own words. And again, to the extent that questionable handling, storage, and maintenance of the rape kits played a role in undermining the reliability of any results generated from testing those kits and is the subject of several of

Petitioner's current discovery requests, it bears reminding that those matters are simply not relevant to the claim upon which Petitioner seeks discovery – namely a claim that defense counsel performed deficiently and to Petitioner's prejudice in failing to request that the rape kits be tested.

In view of the foregoing, the Court concludes that the recently completed DNA test results, as framed by Petitioner's own DNA expert, fail to provide good cause for conducting any further discovery. Petitioner's Second Motion for Discovery (ECF No. 108) is **DENIED**.

### IV. Motion to Amend

Petitioner seeks to amend his eleventh ground for relief to add language stemming from the recently completed DNA testing. (ECF No. 109, at PageID 10605-10607.)

A motion to amend a habeas corpus petition is, per 28 U.S.C. § 2242, subject to the same standards which apply generally to motions to amend under Fed. R. Civ. P. 15(a). The general standard for considering a motion to amend under Fed. R. Civ. P. 15(a) was enunciated by the United States Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of any allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be "freely given."

371 U.S. at 182. *See also Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011) ("[L]eave to amend 'should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile.'" (quoting *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995)).

A claim added by amendment "relates back" to the date of filing of the complaint in a civil case and thereby avoids any statute of limitations bar if it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading . . . ." Fed. R. Civ. P. 15(c)(1)(B). The Supreme Court has applied the relation back doctrine narrowly in habeas corpus cases, holding:

> An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.

*Mayle v. Felix*, 545 U.S. 644, 650 (2005).

Although Petitioner' proposed amendments do not fundamentally alter the claim of ineffective assistance set forth in ground eleven, they consist of facts and evidence this Court has concluded it cannot consider. As the Court noted earlier, Petitioner raised a claim in state postconviction proceedings that his attorneys provided ineffective assistance for failing to have the rape kits tested, and the Ohio courts rejected that claim on the merits. (ECF No. 82-19, at PageID 3605-3606.) The Court also noted that although it has not yet formally determined whether that adjudication contravened or unreasonably applied clearly established federal law within the meaning of § 2254(d), nothing the Court has seen yet in the pleadings and state-court materials gives cause to question the reasonableness of the state courts' adjudication. If the Court cannot determine that the state courts' decision on Petitioner's claim was unreasonable, this Court cannot grant relief on that claim. And *Pinholster* unmistakably precludes this Court from considering any new facts or evidence that the state courts did not have in determining whether the state courts' adjudication was reasonable. Thus, permitting amendment to add facts and evidence that may not be considered would be futile. *See Laurent v. Shaw*, No. 1:13CV30,

2014 WL 1153066, at * 1 (S.D. Mississippi Mar. 21, 2014) (denying motion to amend to add medical records on grounds that *Pinholster* limits consideration to record state courts had as to any claim state courts adjudicated on the merits); *see also Duran v. Stephens*, No. MO:14-CV-00073, 2014 WL 12638034, at * 1 (W.D. Texas Dec. 23, 2014).

Petitioner's Motion to Amend His Petition (ECF No. 109) is therefore **DENIED**.

### V. Motion for Stay and Abeyance

Petitioner asks the Court to stay the proceedings in this case and to hold them in abeyance to permit him to commence proceedings in the state courts to exhaust new evidence that was only uncovered during these habeas corpus proceedings. (ECF No. 110.)

District courts have the authority to grant stays in habeas corpus cases in order to permit exhaustion of state-court remedies in consideration of the AEDPA's preference that state courts have the first opportunity to resolve claims challenging the constitutionality of a state-court judgment. In recognizing district courts' authority in this regard, however, the Supreme Court cautioned:

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless. *Cf.* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State")....

> On the other hand, it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics.

*Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). "Staying a federal habeas petition frustrates [the] AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of federal proceedings." *Id*. at 277.

Because this Court has denied Petitioner's motion to amend his Petition, the Court does not have before it a mixed petition in need of stay and abeyance. Even if the Court had allowed amendment, recent Sixth Circuit precedent inhibits the use of a *Rhines* stay-and-abeyance "to 'exhaust evidence'—in other words, to return to state court to submit additional evidence to buttress claims already exhausted." *Carter v. Mitchell*, 829 F.3d 455, 466 (6th Cir. 2016).[6] That is what Petitioner seeks to do in this case. This is not a case where evidence learned of for the first time during habeas corpus discovery gives rise to a new constitutional claim never presented to or considered by the state courts. Rather, it is a case of uncovering additional evidence in support of a claim already considered and rejected by the state courts—a scenario that does not warrant stay and abeyance according to *Carter*.

Although Petitioner should not be deterred by today's decision from pursuing relief in the state courts, Petitioner likewise should not construe this decision as a guarantee that the Court will await completion of any state-court proceedings prior to adjudicating this case in due order. When this case becomes decisional, the Court expects to decide it in its then-current posture.

## VI. Conclusion

For the foregoing reasons, Petitioner's Motions for Discovery (ECF No. 108), to Amend (ECF No. 109), and for Stay and Abeyance (ECF No. 110) are **DENIED**. Petitioner shall have

sixty (60) days to file his Traverse.

**IT IS SO ORDERED.**

3 -19-2018
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

⁶ When this Court issued its Opinion and Order on February 27, 2012, allowing
Petitioner to expand the record with depositions and then staying the case and holding it in
abeyance to permit Petitioner to return to the state courts, *Pinholster* was in its infancy, and
*Carter* had not been decided.