## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**MARVIN G. JOHNSON,**

        **Petitioner,**        **:**

**v.**

**DAVID BOBBY,** Warden,        **:**

        **Respondent.**

**Case No. 2:08-cv-55**
**Judge Sarah D. Morrison**
**Magistrate Judge Chelsey M.**
**Vascura**

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action brought pursuant to 28 U.S.C. § 2254. This matter is before the Court for consideration of Petitioner's Amended Petition (ECF No. 86), Respondent's Return of Writ (ECF No. 91), and Petitioner's Traverse (ECF No. 131).

## I.   OVERVIEW

These proceedings began on January 17, 2008 when Petitioner filed a Notice of Intent to file a Habeas Corpus Petition. (ECF No. 2.) Petitioner filed his initial petition on September 28, 2008. (ECF No. 13.)

In a September 29, 2009 Opinion and Order, the Court dismissed as procedurally defaulted the following grounds for relief: fourteen, fifteen (subject to reconsideration), twenty-one, and twenty-two. (ECF No. 28.)

The Court then permitted some factual development in this case, including

granting Petitioner leave to depose his three trial attorneys as to several of his claims of ineffective assistance of trial counsel. (ECF No. 51). Those depositions were filed on April 19, 2011. The Court also granted Petitioner's request for funds for certain investigative and expert services. (ECF No. 40.) On February 27, 2012, the Court granted Petitioner's motion to expand the record, and directed that the Petition be stayed, and the proceedings held in abeyance pending Petitioner's return to state court to exhaust new claims. (ECF No. 65.)

Following the conclusion of those state court proceedings, the Court reinstated the instant case on July 6, 2015. After the state court record and trial transcripts were updated and re-filed, (ECF Nos. 82, 83, 85, and 88), Petitioner filed his Amended Petition on December 3, 2015 (ECF No. 86). Respondent filed the Return of Writ on February 29, 2016 (ECF No. 91), and, after briefing on DNA evidence that the Court ultimately did not admit (ECF No. 124), Petitioner filed his Traverse on September 17, 2018 (ECF No. 131).

This case is now ripe for review of the grounds for relief that are properly before the Court.

## II.    FACTUAL AND PROCEDURAL HISTORY

The details of this capital murder and aggravated robbery are set forth in numerous state court opinions, including the Ohio Supreme Court's published opinion in *State v. Johnson*, 112 Ohio St. 3d 210 (2006); ECF No. 82-13, PageID 2762:

Marvin G. Johnson appeals from his convictions entered pursuant to

2

jury verdicts finding him guilty of the aggravated murder of 13-year-old Daniel Bailey and the rape and aggravated robbery of Tina Bailey, Daniel's mother, and from the trial court's imposition of the death penalty.

. . .

The record reveals that Tina Bailey lived on Stewart Avenue in Cambridge, Ohio. Marvin Johnson first met her in 1998 or 1999, and he eventually began living with her on Stewart Avenue. Between 2000 and 2002, an Alabama court incarcerated him for violating parole in connection with a 1988 arson conviction in that state. Upon his release, however, Johnson returned to Ohio and resided with Tina until July 2003.

During the time Johnson lived with Tina, his use of crack cocaine became problematic. Frequently, Johnson did not come home on payday but would instead disappear for a night or two to spend his paycheck on crack. And, due to his drug habit, he only reluctantly contributed money to the household. He also had a strained relationship with Tina's two children, especially Daniel, because he resented Tina's generosity toward them.

Both Johnson and Tina were friends of Utelius "Eric" Barnes. Johnson occasionally became jealous of Barnes, and he suspected that Tina and Barnes had relations.

On July 3, 2003, after several weeks of anger and tension, Tina told Johnson to leave. Though she later allowed him back into her house two or three times, she made it clear to him that he did not have permission to enter the house in her absence.

Nevertheless, twice during the two or three weeks before August 15, 2003, Johnson entered her house while she was at work. On the second occasion, she returned to find him there, and she ordered him to leave. Johnson refused, and he dared her to call the police. As they argued, according to Tina's trial testimony, Johnson "pulled his arm back," as if to strike her, and he warned that she "shouldn't be surprised if [she] found [her] house in ashes." Eventually, he voluntarily left her home.

Tina worked as a nurse at the Southeastern Ohio Regional Medical Center, a hospital in Cambridge, Ohio, and during the summertime, she often worked the 11:00 p.m. to 7:00 a.m. shift. Her son, Daniel, who would stay at home alone while Tina worked, customarily stayed

3

up until 4:00 or 5:00 a.m. and would phone her at work to say goodnight before he went to bed. On the night of August 14, 2003, Tina worked the late shift while Daniel stayed at home alone, and, in keeping with his habit, he phoned his mother in the early morning hours of August 15 to say goodnight before he went to bed.

That same evening, Johnson stayed at the home of Lisa Wilson, an acquaintance of his and a drug dealer. David Jones, another Wilson acquaintance, also spent the night at Wilson's home. At midnight, Wilson went on what she described as a "crack run," and she testified that she saw Johnson asleep on her couch when she left. When she returned at 3:00 a.m., she remembered seeing him in the same position, and, at 3:30 a.m., when she left a second time, she also noticed him there.

Around 5:30 a.m., when Wilson returned, she did not see Johnson but learned from David Jones that he "had gotten up about 5:00." According to Wilson, Jones also told her that "ten minutes after I had left at 3:30," he heard Johnson "rummaging through a bag in the kitchen" before he left. The bag contained old shoes that Wilson had collected.

Sometime after Daniel's phone call to his mother saying goodnight, Johnson beat 13-year-old Daniel Bailey to death. The presence of blood spatters in the living room of the Bailey home established that the beating occurred there.

According to Dr. Charles Lee, the physician who performed the autopsy, Daniel suffered multiple skull fractures, bruising on his face, and two long lacerations on his head caused by five or six blows from a blunt instrument, possibly a two-by-four. The blows caused Daniel's brain to swell within the skull cavity until his breathing stopped. In such cases, according to Dr. Lee, death "typically takes anywhere from a couple to several minutes."

After beating Daniel, Johnson gagged and hogtied him with shoelaces taken from the bag in Lisa Wilson's home. According to Dr. Lee, Daniel's head injuries occurred before Johnson tied his hands and feet. Dr. Lee also concluded that Daniel was still alive when he was tied up: "Yes, there's no question he was alive. * * * [T]he skin reaction, the red hyperemia next to the bindings around the wrists shows that * * * the heart was still pumping while these tight bindings were around the wrists."

After beating Daniel and tying him up, Johnson carried him to the

4

basement of the Bailey home.

Tina returned from work around 8:00 a.m. and spoke briefly with Utelius Barnes, as he prepared to start his second day of work on the remodeling project at her home.  The two went inside and discussed the work for another 20 minutes.  Tina then went upstairs.

When she reached the top of the stairs, she saw Johnson coming out of the bathroom wearing an olive-colored T-shirt and carrying a knife in his hand.  As Johnson held the knife up in front of her, Tina asked him to put it down and said, "where's Daniel, what did you do to Daniel [?]"

Johnson walked Tina into her bedroom.  When Tina began to hyperventilate, Johnson told her to "calm down" and to "keep quiet" because Barnes and another home-remodeler were nearby.  According to Tina, Johnson warned that if she did not obey, "he couldn't guarantee that Daniel would be okay."  She testified that Johnson told her that Daniel "would be okay," provided that she complied with three demands:  first, Johnson wanted to watch Barnes and Tina have sex; second, he wanted to have sex with Tina "one last time" himself; and, third, he wanted $1,000.  Tina asked Johnson why he was doing this, and he replied, "this [is] the only way I know how to hurt you."

She disrobed and performed oral sex on him, and he placed his fingers in her vagina.  He continued to hold the knife during these acts.  Tina testified that she would not have done this had she not been afraid for Daniel or if Johnson had not held the knife.

Afterward, according to Tina, Johnson told her to "get up and get dressed, we ha[ve] to go to the bank."  She got dressed and walked out of the bedroom ahead of Johnson, who still held the knife.  She again asked him to put it down, and he returned to the bedroom and placed the knife under the mattress on the bed.  Police later recovered it there with Johnson's thumbprint on it.

Johnson persuaded Tina to drive him to her bank where, using the drive-through window, she withdrew $1,000 and handed it to him.  Bank records and the teller's testimony reveal that this transaction occurred between 8:48 and 8:50 a.m. on August 15.  Johnson then had Tina drive him to the parking lot of the local Elks Lodge, and he told her to go home and said he would call to tell her what he had done with Daniel.

Tina went home and found Daniel in the basement behind her washing machine, gagged, tied and lying face down in a blanket.  She tried to

5

remove the gag and tried to revive him before she ran upstairs and asked one of the home-remodelers to call the police.

Meanwhile, Johnson went to the home of his friend, Matthew Haskett, where he took off his bloodstained shirt, left it on the floor, and borrowed a clean one from Haskett. He then called a taxi and left for Zanesville.

While Johnson was on route to Zanesville, the Cambridge police learned of Johnson's departure and radioed the Zanesville police to look for the cab.

Patrolman Mike Choma of the Zanesville police spotted the cab and saw Johnson walking away from it. Choma and another officer approached Johnson and ordered him to the ground. However, Johnson fled to an abandoned park and hid the money that he had taken from Tina. The police recovered both the money and the bank envelope.

The police also recovered Johnson's bloody shirt from the Haskett residence and sent it to the Bureau of Criminal Identification and Investigation ("BCI") for analysis. BCI found the bloodstains on the shirt to be consistent with the DNA profile of Daniel Bailey. According to BCI, the chance of finding the same DNA profile in a random member of the population is one in more than 320 trillion.

The Guernsey County Grand Jury indicted Johnson on two counts of aggravated murder: Count 1, pursuant to the felony-murder provision in R.C. 2903.01(B), and Count 2, pursuant to the "prior calculation and design" provision in R.C. 2903.01(A). Each aggravated-murder count carried a death penalty specification charging Johnson as the principal offender in felony-murder, pursuant to R.C. 2929.04(A)(7). The indictment also contained counts for kidnapping, rape, and aggravated robbery. The jury convicted him of all counts and all specifications, and, following the jury's recommendation, the trial judge sentenced him to death.

*Johnson*, 112 Ohio St. 3d at 210–13; ECF No. 82-13, PageID 2768–70.

Represented by two new attorneys, Dennis L. Sipe and Kathleen McGary,

Petitioner pursued a direct appeal to the Ohio Supreme Court. On December 13,

2006, the Ohio Supreme Court rejected Petitioner's propositions of law and

6

concluded that Petitioner's death sentence was appropriate and proportionate. *Johnson*, 112 Ohio St. 3d 210; ECF No. 82-13, PageID 2762.  On February 7, 2007, the Ohio Supreme Court denied without opinion Petitioner's motion for reconsideration.

The United States Supreme Court denied *certiorari* on October 1, 2007.

Represented by Assistant Ohio Public Defenders Kimberly S. Rigby and Pamela Prude-Smithers, Petitioner on March 31, 2007 filed an application to reopen his direct appeal to the Ohio Supreme Court—Ohio's procedure for raising claims of ineffective assistance of appellate counsel. On June 25, 2007, the Ohio Supreme Court summarily denied Petitioner's application.

On July 20, 2005, Rigby and Prude-Smithers filed a postconviction action in the trial court.  Petitioner filed five amendments to that postconviction action from March 10, 1998 through March 19, 1999. On December 19, 2005, the trial court issued a two-page decision denying Petitioner's claims and dismissing his postconviction action. The Ohio Court of Appeals for the Fifth Appellate District affirmed the trial court's judgment on April 10, 2007, *State v. Johnson*, Case No. 2006-CA-04, 2007 WL 1098106 (Ohio App. 5 Dist. 2007), and the Ohio Supreme Court declined to accept jurisdiction.

As referenced above, Petitioner then commenced the instant proceedings by filing a Notice of Intent to file a Habeas Corpus Petition on January 17, 2008 (ECF No. 2), and his initial Petition on September 28, 2008 (ECF No. 13).

Petitioner completed additional state court proceedings while the instant

7

action was pending but stayed. On February 27, 2012, expanded the record with transcripts from depositions of his trial and appellate attorneys; affidavits by a medical expert averring that the victim was brain-dead before being transported and by a neuropsychological expert averring that Petitioner suffers from certain brain lobe impairment; and affidavits by six family members concerning mitigation testimony they could have provided during the penalty phase of Petitioner's trial. (ECF No. 65.)

On April 12, 2012, Petitioner filed an Application for Reopening in the Ohio Supreme Court pursuant to S. Ct. Prac. R. 11.6 (ECF No. 66-1), and a postconviction action in the state trial court. (ECF No. 66-2.)

In his postconviction action, Petitioner raised grounds he had previously presented to the state courts, only now supported with the new evidence that he discovered and developed during the habeas corpus proceedings. (ECF No. 85-1, PageID 8241–83.) On July 18, 2012, the state trial court issued a judgment entry dismissing Petitioner's subsequent/successive postconviction action due to Petitioner's failure to meet the jurisdictional requirements set forth in Ohio Rev. Code § 2953.23 for filing a successive and/or untimely postconviction action. (ECF No. 85-1, PageID 8886–87.)

Petitioner appealed and, on April 1, 2013, the Ohio Court of Appeals for the Fifth Appellate District affirmed the trial court's judgment. The appellate court upheld the constitutionality of § 2953.23's jurisdictional requirements (ECF No. 85-2, PageID 8995–97; *State v. Johnson*, No. 12-CA-19, 2013 WL 1400607, at *2–3

8

(Ohio App. 5 Dist. 2013)), and then proceeded to reject the substance of Petitioner's claims (ECF No. 85-2, PageID 8998–9004; *Johnson*, 2013 WL 1400607, at *3–7).

Petitioner sought discretionary review by the Ohio Supreme Court. But on June 3, 2015, the Ohio Supreme Court issued an Entry declining to accept jurisdiction. (ECF No. 85-3, PageID 9083.)

In his Application for Reopening, Petitioner urged the Ohio Supreme Court to reopen his direct appeal for consideration of claims that Petitioner's appellate attorneys had provided ineffective assistance for unreasonably failing to present certain meritorious claims for relief. (ECF No. 85-4, PageID 9086-93.) On June 5, 2013, the Ohio Supreme Court summarily denied Petitioner's application. (*Id.*, PageID 9227.)

## III.   STANDARDS FOR HABEAS REVIEW

This case is ripe for review of the merits of the grounds properly before the Court. Provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective prior to the filing of the instant petition, apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent" or "when the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases." *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001), *quoting Williams v. Taylor*, 529 U.S. 362, 406–07 (2000). A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case. *Coyle*, 260 F.3d at 699. A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Id*. Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

In *Woods v. Donald*, 575 U.S. 312 (2015) (*per curiam*), the Supreme Court further explained how high a bar § 2254(d)(1) was intended to set. As the Supreme Court expounded:

[A]EDPA's standard is intentionally " ' "difficult to meet." ' " *White v. Woodall*, 572 U.S. ---, ---, 134 S.Ct. 1697, 1702, 188 L.Ed.2d 698 (2014) (quoting *Metrish v. Lancaster*, 569 U.S. ---, ---, 133 S.Ct. 1781, 1786, 185 L.Ed.2d 988 (2013)). We have explained that " ' clearly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." *White*, 572 U.S., at ---, 134 S.Ct., at 1702 (some internal quotation marks omitted). "And an 'unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Id.*, at ---, 134 S.Ct., at 1702 (same). To satisfy this high bar, a habeas petitioner is required to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).

*Woods*, 575 U.S. at 316; *see also McKinney v. Hoffner*, 830 F.3d 363, 370 (6th Cir. 2016) ("Habeas review is thus intended to serve only as 'a guard against extreme malfunctions in the state criminal justice systems, not a substitution for ordinary error corrections through appeal.'") (*quoting Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

Finally, the Supreme Court has clarified that in making the § 2254(d)

11

determination, a federal court in habeas corpus must confine its review to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV.    PETITIONER'S CLAIMS

> **1.  First Ground for Relief: The trial court violated the Sixth and Fourteenth Amendments when it failed to conduct a reasonable inquiry when Petitioner, prior to trial, requested the appointment of different counsel.**

In his first ground for relief, Petitioner claims that the trial court denied his pre-trial request for the appointment of new counsel without first conducting the necessary inquiry. (ECF No. 86, PageID 9238–40.) He argues that the failure to hold a hearing or conduct a more searching good-cause inquiry after an allegation of "irreconcilable conflict" is raised is itself a constitutional violation, and that forcing him to go to trial with attorneys with whom he was "embroiled in an irreconcilable conflict" deprived him of the effective assistance of counsel in violation of his Sixth Amendment rights.

Respondent argues that a federal right to a hearing on an indigent defendant's request to substitute counsel has never been established by the United States Supreme Court, and thus the state court's failure to recognize such a right was not an unreasonable application of clearly established federal law under § 2254(d). (ECF No. 91, PageID 10415.) Respondent also points out that Petitioner has not alleged how his purported irreconcilable conflict rendered counsel ineffective, noting that the Sixth Amendment does not guarantee a "meaningful

relationship" with counsel so long as counsel is providing adequate representation.

(*Id.*, PageID 10416, *quoting Morris v. Slappy*, 461 U.S. 1, 14 (1983).)

Petitioner raised this claim as his first proposition of law on direct appeal,

and the Ohio Supreme Court held that the facts did not support Petitioner's state

law right to a broader inquiry:

> At a pretrial hearing on March 10, 2004, Johnson asked the trial court to replace his appointed counsel. In his first proposition of law, Johnson contends that the trial court denied him the right to effective assistance of counsel by failing to inquire sufficiently into the basis for his request.
>
> In *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, we held that a court has a duty to inquire into such a request: "Where, during the course of his trial for a serious crime, an indigent accused questions the effectiveness and adequacy of assigned counsel * * *, it is the duty of the trial judge to inquire into the complaint and make such inquiry a part of the record." *Id.*, syllabus. However, as one Ohio appellate court has rightly explained, the "limited judicial duty arises only if the allegations are sufficiently specific; vague or general objections do not trigger the duty to investigate further." *State v. Carter* (1998), 123 Ohio App.3d 419, 423, 715 N.E.2d 223, citing *Deal*, 17 Ohio St.2d at 19, 46 O.O.2d 154, 244 N.E.2d 742.
>
> The record before us reveals the following in regard to Johnson's request for new counsel:
>
> On February 11, 2004, Johnson's trial counsel referred during a pretrial hearing to an article in the Sunday, February 8, 2004, issue of the Daily Jeffersonian, which purported that Johnson, from jail, had asked Daniel's grandmother whether she would "like to know what the little boy's last words were." Based on this report, and other related articles appearing in both the Jeffersonian and the Zanesville Times Recorder, defense counsel moved for a change of venue, which the court denied. The court did delay the starting date of the trial for several weeks, however, and also imposed a limited gag order on the news

13

media.[1]

At a pretrial hearing on March 10, 2004, Johnson asked that his attorneys be removed from the case. He elaborated: "I feel as though I'm not being represented properly to the best of my [sic] ability. I can represent myself better than I'm being represented. I have questions to address to the Court but I'm not allowed to from my attorneys." The judge asked Johnson's counsel to respond. Johnson's lead counsel, Jack Blakeslee, stated that in his opinion, Johnson wanted new counsel because "basically he doesn't like to hear what we tell him."

The judge asked Johnson to speak, and Johnson responded, "I have questions I would like to address [to] the Court but I'm told I am—[.]" The trial judge interrupted Johnson to caution that anything he said could be used against him at trial, then allowed him to resume. Johnson said: "What I would like to say . . . is okay hopefully the newspaper is here today so they can actually print something I actually said in court—[.]" Blakeslee interrupted: "I'm going to object to this. I'm telling the defendant to keep your mouth shut."

The trial judge cautioned Johnson to "proceed with care" and stated: "If you wish to address the Court you may . . . write a letter to the Judge." Johnson said he had been "told not to do that," and the judge said, "Well, then you should follow the advice of your counsel."

Johnson said, "I still would like to address the Court pertaining to questions—[.]" The judge replied, "Your attorney has objected to that and I'm going to honor that objection at this time. . . ." Johnson continued to insist on asking his questions. Blakeslee said, "I'm objecting to it's being [sic] going in the newspaper. . . . It's going to be out there." The defendant said, "Exactly. . . . The newspaper printed something I didn't say." The judge noted that he had taken care to guard against "an atmosphere of what was perceived to be prejudicial pretrial publicity to [Johnson]."

Johnson said, "[Y]eah, but what I would like to know is how can the newspaper just print something I didn't say." The judge declined to answer that question, but said, "If you want to address these matters you may bring them to my attention in proper form."

---

[1]The judge subsequently granted the motion for change of venue at a pre-trial hearing on March 10, 2004. He also delayed the trial date an additional week at that time. (ECF No. 83-3, PageID 5712–15.)

At his next court appearance, on March 30, 2004, Johnson did not renew his request for new counsel. Instead, defense attorney Andrew Warhola stated: "Mr. Johnson has advised me that he will not be speaking during any of these proceedings, that he wants me to speak on his behalf."

The record does not support Johnson's claim that the court failed to inquire into his complaints. The court gave him an opportunity to present any complaints against counsel in open court, on the record, or in the form of a letter to the judge. The limited inquiry by the court afforded Johnson an opportunity to address his concern to the court regarding potential prejudice from pretrial publicity. When given the opportunity to speak, however, Johnson asked only, "[H]ow can the newspaper just print something I didn't say[?]"

The complaint did not entitle Johnson to a change of counsel or to broader inquiry by the court. Accordingly, we overrule this proposition.

*Johnson*, 112 Ohio St.3d at 220–21.

Petitioner acknowledges that the trial court conducted a limited inquiry but maintains that the Ohio Supreme Court's decision that he was not entitled to a broader inquiry into the nature of his conflict with appointed trial counsel is an unreasonable application of federal law. (ECF No. 131, PageID 10744–45.) Petitioner does not, however, identify the clearly established federal law that he believes the court unreasonably applied. And with good reason—there is no federal right to a good-cause inquiry when a defendant requests new appointed counsel.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. While defendants who are able to obtain the services of a private attorney have a right to their choice of counsel, with some limitations, indigent defendants relying on court-appointed attorneys enjoy no such right. *See*

15

*United States v. Gonzalez-Lopez*, 548 U.S. 140, 151–52 (2006), *citing Wheat v. United States*, 486 U.S. 153, 159 (1988) ("[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them.); *Caplin & Drysdale v. United States*, 491 U.S. 617, 624–25 (1989) ("[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."). Indigent defendants are merely guaranteed constitutionally adequate representation by a court-appointed attorney. *See Luis v. United States*, 136 S. Ct. 1083, 1089 (2016) ("[A]n indigent defendant, while entitled to adequate representation, has no right to have the Government pay for his preferred representational choice.").

For the purposes of § 2254(d)(1), the clearly established federal law does not impose a duty on a state trial court to conduct an inquiry when a defendant requests new counsel. *Brooks v. Lafler*, 454 Fed.Appx. 449, 452 (6th Cir. 2012). As the Supreme Court has explained, "the Sixth Amendment 'guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.'" *Id.* (*quoting Caplin & Drysdale*, 491 U.S. at 624). Petitioner therefore had no right to a good-cause inquiry under Federal law and the state supreme court was not unreasonable for failing to recognize such a Federal right.

The cases cited by Petitioner do not alter this conclusion. (*See* ECF No. 131,

16

PageID 10742–43.) They invariably either pre-date the AEDPA or concern a federal conviction not subject to review under § 2254(d). *See, e.g., United States v. Sullivan*, 431 F.3d 976 (6th Cir. 2005) (federal conviction); *United States v. Iles*, 906 F.2d 1122, 1131 (6th Cir. 1990) (federal conviction); *Linton v. Perini*, 656 F.2d 207, 209 (6th Cir. 1981) (predates the AEDPA). In other words, these cited cases from the federal courts of appeals are not clearly established federal law for the purposes of federal habeas review of a state court conviction under the AEDPA and do not control this case. *See Wilson v. Parker*, 515 F.3d 682, 696 (6th Cir. 2008), as amended on denial of reh'g and reh'g en banc (Feb. 25, 2009) ("[B]ecause *Iles* is not 'clearly established federal law, as determined by the Supreme Court of the United States,' it cannot provide a basis for granting habeas relief under AEDPA.") (*citing James v. Brigano*, 470 F.3d 636, 643 (6th Cir. 2006)); *Burton v. Renico*, 391 F.3d 764, 771 n.2 (6th Cir. 2004) (holding that *Linton* does not control federal habeas review of a state conviction under § 2254(d) because it was a lower court decision and pre-dated passage of the AEDPA). Because the United States Supreme Court has never held that a right to a good-cause inquiry exists within the Sixth Amendment, the Ohio Supreme Court's failure to recognize that right was entirely consistent with "clearly established Federal law" as the term is defined in § 2254(d).

Petitioner's reliance on *Schell v. Witek* to refute Respondent's contention that a claim based on a right to inquiry cannot sustain relief under the AEDPA is also misplaced. (*See* ECF No. 131, PageID 10742–43, *citing Schell*, 218 F.3d 1017, 1023 (9th Cir. 2000)). In *Schell*, the Ninth Circuit panel reiterated its position that "the

17

Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion, and that the matter be resolved on the merits before the case goes forward." *Schell*, 218 F.3d at 1025. But the court, characterizing it as a remedy issue, was equally clear that the trial court's inadequate inquiry cannot be the basis for relief in habeas. *Id.* at 1026. It instead identifies ineffective assistance as the only remediable constitutional claim:

> [T]he ultimate constitutional question the federal courts must answer here is not whether the state trial court "abused its discretion" in not deciding Schell's motion, but whether this error actually violated Schell's constitutional rights in that the conflict between Schell and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment.

*Id.* The court then found that the petitioner had alleged specific facts that, if true, were sufficient to establish constructive denial of counsel and entitle him to habeas relief so it remanded the matter to the district court for an evidentiary hearing. *Id.* Thus, *Schell* concluded that habeas relief is not available for a state trial court's failure to inquire unless the petitioner can establish ineffective assistance of counsel. *Id.*

To the extent that Petitioner claims ineffective assistance of counsel as a result of his alleged "irreconcilable conflict" with counsel (ECF No. 131, PageID 10745), the Court finds the claim is without merit. While an indigent defendant does not have the right to his choice of counsel, he does have an absolute right to effective representation under the Sixth Amendment. *Strickland v. Washington*, 466

18

U.S. 668, 686 (1984), *citing McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). But effective representation does not include the assurance of "a 'meaningful relationship' between an accused and his counsel." *Morris*, 461 U.S. at 14. To establish a constitutional violation, Petitioner must show that the irreconcilable conflict effectively prevented his attorneys from providing him with professionally competent representation, meeting the *Strickland* standard of deficient performance and prejudice. *Griffin v. Warden*, Nos. 2:14-cv-857 and 18-cv-839, 2019 WL 1989646, at *16 (S.D. Ohio May 6, 2019), *quoting James v. Lafler*, No. 2:09-cv-10929, 2010 WL 3702629, at *16 (E.D. Mich. Aug. 3, 2010). He has failed to do so.

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Petitioner has provided only an unsupported and vague allegation of "irreconcilable conflict." He has not explained how the claimed conflict affected his attorney's performance at trial or offered any evidence that it prejudiced the outcome. Without more, the Court has no basis for concluding that the trial court's failure to inquire more broadly into Petitioner's complaints condemned him to an ineffective or incompetent defense.

Petitioner argues that the state cannot simply deem counsel adequate in the absence of an inquiry into the nature of the conflict. (ECF No. 131, PageID 10745.) He misplaces the burden of proof. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment." *Strickland*, 466 U.S. at 690. "[A] defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, *citing Michel v. Louisiana*, 350 U.S. 91, 101 (1955). That is, the responsibility lay with Petitioner to present evidence and affirmatively demonstrate to the Court that counsel's performance was outside "the wide range of reasonable professional assistance." *Id.* "Irreconcilable conflict" is not a magic phrase, the uttering of which will automatically shift to Respondent the burden of disproving the allegation. In the absence of evidence of poor performance, the presumption that counsel's conduct was "adequate" stands.

The Ohio Supreme Court's rejection of Petitioner's first ground was not contrary to or an unreasonable application of clearly established federal law, nor based on an unreasonable determination of the facts. Accordingly, Petitioner's first ground for relief is **DENIED**.

> **2. Second Ground for Relief: The trial court failed to make a sufficient inquiry to determine whether Petitioner fully understood and intellectually relinquished his right to counsel.**

In his second ground for relief, Petitioner contends that the trial court failed to adequately inquire whether his waiver of his right to counsel was made knowingly and intelligently. Petitioner argues that the trial judge failed to satisfy the *Faretta v. California* standard of a "comprehensive and penetrating inquiry . . . regarding the dangers and disadvantages of self-representation," instead limiting his dialogue with Petitioner to brief questioning regarding competency, advice on testifying on his own behalf, and explaining why Tina Bailey could not be present if

20

Petitioner testified. (ECF No. 86, PageID 9241.) He cites the court's failure to obtain the state-required written waiver from Petitioner as further evidence of the trial court's neglect.

In response, Respondent first points out that Petitioner did not argue on direct appeal that the trial court's inquiry was insufficient under *Faretta*, but instead primarily relied on arguments that the inquiry failed under the state supreme court's precedents and applicable rule of criminal procedure. (ECF No. 91, PageID 10420.) The Court finds, based on its own independent review of the record, that this ground for relief echoes the federal claims made in Petitioner's eighteenth proposition of law on direct appeal. (ECF No. 82–11, PageID 2502–04.) Contrary to Respondent's assertion, Petitioner's merits brief on direct appeal indeed claimed the trial court's inquiry failed to satisfy the standards of both state and federal law, citing to relevant precedent of the United States Supreme Court. The Ohio Supreme Court also seems to have understood Petitioner as raising both state and federal claims because the court explicitly addressed both the state and federal standards. *See Johnson*, 112 Ohio St.3d at 222–26. Thus, the federal claims were properly presented and addressed in the state courts on direct appeal, preserving the claims for federal habeas review.

Respondent also argues that the Ohio Supreme Court's adjudication was neither contrary to nor an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts. (ECF No. 91, PageID 10419–20.) Respondent contends that the state court's focus on the

21

particular circumstances of this case in evaluating the trial court's actions under *Faretta* are consistent with the Supreme Court's guidance, citing *Iowa v. Tovar,* 541 U.S. 77 (2004). Respondent also points to the Sixth Circuit's analysis in *King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006), and *Glass v. Pineda*, 635 Fed.Appx. 207 (6th Cir. 2015), as evidence that the federal appellate court understood and applied *Faretta* in the same fact-specific, case-by-case manner. (ECF No. 91, PageID 10420.) Respondent further argues that "the reasonableness of the Ohio Supreme Court's application of *Faretta* is buttressed by the arguments presented by [Petitioner] on direct appeal." Specifically, Respondent points to the fact that Petitioner primarily focused his argument that the trial court's inquiry was inadequate on state, not federal, law, instead relying on *Faretta* only to argue that his waiver was not intelligent. Finally, Respondent asserts that the state court's factual determinations were reasonable, pointing out that Petitioner also has not alleged that the decision on direct appeal was based on unreasonable factual determinations. (*Id.*, PageID 10421.)

The Ohio Supreme Court summarized the relevant facts on direct appeal as follows:

> Two attorneys represented Johnson throughout the state's case-in-chief. When the state rested, Johnson's counsel also rested. At that point, however, contrary to counsel's advice, Johnson expressed a desire to testify on his own behalf, which caused defense counsel to ask the court to inquire into Johnson's competence to stand trial or make a statement. The court engaged in a colloquy with Johnson during which Johnson correctly recited the charges against him and affirmed his understanding that a death sentence could be imposed. Johnson then renewed his earlier request that his counsel be relieved.

22

Upon reflection, Johnson decided not to testify, but announced his intent to call Tina Bailey as a defense witness during the guilt phase of the trial. One of Johnson's lawyers told the court that Johnson was calling Tina to testify against the lawyer's advice. The following colloquy then occurred:

"Q. [trial judge] Mr. Johnson, will you be proceeding as your own—

"A. Yes, sir.

"Q. You're proceeding pro se then?

"A. Yes, sir.

"Q. And you understand you will be subject to the same rules of procedure and evidence that would apply to any other person?

"A. Yes, sir."

At that point in the proceedings, Johnson represented himself, but the trial judge, over Johnson's protests, designated his trial counsel as standby counsel. Johnson called Tina as a defense witness, questioned her, and then made a brief closing argument to the jury. However, defense counsel also continued to assist Johnson: they made motions for a mistrial and for a competency evaluation and discussed jury instructions with the trial judge and the prosecutor. The trial court also let defense counsel argue to the jury at the close of the guilt phase after Johnson did. Johnson's attorneys then resumed their full representation of him during the penalty phase of the trial.

*Johnson*, 112 Ohio St.3d at 222.

The state supreme court found that the trial court's inquiry was sufficient to conclude that Petitioner's waiver of counsel was knowing, intelligent, and voluntary, and thus the trial court's failure to obtain a written waiver as required by a state rule was harmless error. *Id.*, at 224. The court distinguished the case from previous state precedent in which it had found a trial court's inquiry insufficient because the trial judge had failed to "adequately explain the nature of the charges, the statutory offenses included within them, the range of allowable

23

punishments, possible defenses, mitigation, or other facts essential to a broad understanding of the whole matter." *Id.* at 223, *quoting State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227. Whereas the defendant in *Martin* conducted his entire defense himself and had expressed confusion about his right to act on his own behalf before waiving counsel, the court found it significant that Petitioner had been represented by counsel prior to and throughout his trial, only waiving counsel after the state rested its case, that "[he] showed no confusion about what he wanted or what self-representation meant," and that "the record establishe[d] that he knew the nature of the charges against him and that he was facing a potential death sentence." *Id.* at 223–24.

Likewise, the Ohio Supreme Court held that the trial court's warnings of the dangers of self-representation passed muster under *Faretta*. *Id.* at 225–26. Noting that the United States Supreme Court has not endorsed a script to warn all defendants but instead has emphasized the case-specific factors that determine what information a particular defendant needs to make a knowing choice, the Ohio Supreme Court found that the trial court's admonition that Petitioner would be subject to the same procedural and evidentiary rules as any lawyer was sufficient given that the court knew that Petitioner had already observed multiple pretrial hearings, voir dire, and four days of trial testimony. *Id.*

Because this claim was previously adjudicated on the merits by the Ohio Supreme Court on direct appeal, the question before the Court here is whether the state court's judgment was contrary to or unreasonably applied "clearly established

24

Federal law, as determined by the Supreme Court of the United States," or was based on an unreasonable determination of the facts. § 2254(d)(1)–(2).

The Sixth Amendment guarantees the assistance of counsel to defendants at all critical stages of the criminal process. *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013), *citing Iowa v. Tovar*, 541 U.S. at 80–81 (2004). The Sixth and Fourteenth Amendments also protect the defendant's right "to proceed without counsel when he voluntarily and intelligently elects to do so." *Faretta v. California*, 422 U.S. 806, 807 (1975). "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* at 835. But the Supreme Court has expressly declined to adopt any specific colloquy or script for courts to administer before a defendant may proceed without counsel because in any given case, "[t]he information a defendant must possess in order to make an intelligent election. . .will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding." *Tovar*, 541 U.S. at 88, *citing Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Rather, the Court has described "a pragmatic assessment of the usefulness of counsel to the accused at the particular proceeding, and the dangers to the accused of proceeding without counsel," in which a waiver is "'knowing' when [the accused] is made aware of these basic facts." *Patterson v. Illinois*, 487 U.S. 285, 298 (1988). Thus, a "more

searching inquiry" is needed to ensure a knowing waiver of counsel for trial than

for, e.g., post-indictment questioning because "the full 'dangers and disadvantages

of self-representation' during questioning are less substantial and more obvious to

an accused than they are at trial." *Id.* at 299 (internal citation omitted), *quoting*

*Faretta*, 422 U.S. at 835.

The Court finds that Ohio Supreme Court's reasoning was not contrary to,

nor an unreasonable application of, established Supreme Court precedent. A

reasonable jurist could conclude that the trial court's inquiry and warnings to

Petitioner were sufficient to determine, in light of the circumstances, whether his

waiver of counsel was made with a full understanding of the case against him, the

possibility of a death sentence, his right to representation, and the types of

procedural rules that he would be required to follow acting as his own counsel.

Petitioner had been continuously represented by counsel prior to and throughout

his trial, and his decision to waive counsel came only after the state had concluded

its case. At that point he had attended multiple pre-trial hearings, voir dire

proceedings, and four days of trial testimony. The record shows that Petitioner had

acknowledged just minutes earlier that he understood the charges against him and

that he could potentially receive a death sentence. Petitioner was explicitly warned

that he would be expected to comply with "the same rules of procedure and evidence

that would apply to any other person." (ECF No. 83–11, PageID 7581.) Moreover,

Petitioner did not express any confusion or hesitation about his choice to proceed

pro se or what it meant. "Given 'the particular facts and circumstances surrounding

26

[this] case,'" *see Tovar*, 541 U.S. at 93, *quoting Zerbst*, 304 U.S. at 464, it was not unreasonable for the Ohio Supreme Court to conclude that the trial court's dialogue with Petitioner had satisfied its constitutional duty to ensure that Petitioner "'kn[ew] what he [was] doing and his choice [was] made with eyes open.'" *Tovar*, at 88, *quoting Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942).

Moreover, Petitioner has not argued that his waiver of counsel was not knowing or intelligent. Nor has he suggested precisely what information he lacked that the trial court should have provided in its "required colloquy" with him. "In seeking habeas relief, [Petitioner] has the 'burden to prove that he did not competently and intelligently waive his right to the assistance of counsel.'" *Akins v. Easterling*, 648 F.3d 380, 398 (6th Cir. 2011), *quoting Tovar*, 541 U.S. at 92. While the extent of the trial court's inquiry and warning is relevant to the question of Petitioner's waiver, the "ultimate constitutional question" is whether his waiver was knowing, voluntary, and intelligent. *Id.*, 648 F.3d at 398. Petitioner's failure to identify what information he did not know that the trial judge should have told him dooms his claim; he has not met his burden of establishing that his waiver was not knowing. See *id.* at 399, *citing Tovar*, 541 U.S. at 92–93.

For the foregoing reasons, Petitioner's second ground for relief is **DENIED**.

3. **Third Ground for Relief: The trial court erred in not complying with its constitutional obligation to conduct a competency hearing when there was sufficient indicia in the record to call into doubt Petitioner's competency to stand trial.**

In his third ground for relief, Petitioner argues that the trial court ignored

signs of his incompetence and failed to conduct a hearing to evaluate his competency to stand trial in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments.[2] He asserts two separate but related claims, both centered on a single day of trial: May 13, 2004. First, Petitioner claims that his "erratic" behavior on May 13 was enough to raise a bona fide doubt as to his competence, triggering the need for a competency hearing. (ECF No. 86, PageID 9242.) Second, he argues that he was *actually* incompetent on May 13. (*Id.*, PageID 9244.) Petitioner cites as evidence for his incompetence his sudden decision to testify, his stated desire to receive the death penalty, firing his attorneys to proceed pro se, his refusal to seek the assistance of his attorneys as standby counsel, calling Tina Bailey as a witness only to ask her irrelevant and prejudicial questions, and his removal from the courtroom for "unruly" behavior. (*Id.,* PageID 9244.)

Respondent counters that the Ohio Supreme Court's decision was not contrary to or an unreasonable application of federal law, or an unreasonable determination of the facts. Respondent first asserts that, despite relying on state court precedent, the Ohio Supreme Court had applied the correct constitutional

---

[2]Contrary to Petitioner claim of Sixth Amendment violation, the Sixth Amendment does not guarantee a right to competence. The right to competence at trial and the related obligation of the trial court to hold an evidentiary hearing when a defendant's competence is in doubt are derived from the due process right to a fair trial protected by the Fifth and Fourteenth Amendments. Despite the reference to a defendant's ability to consult with his lawyer in the standard test for competence used by courts, the Sixth Amendment right to counsel has never included an implied right to competence. *See Ryan v. Gonzales*, 568 U.S. 57, 65–66 (2013).

standard because the state law it cited was based on the standards established in

*Drope v. Missouri*, 420 U.S. 162 (1975), and *Pate v. Robinson*, 383 U.S. 375 (1966).

(ECF No. 91, PageID 10425.) Respondent refers to the Sixth Circuit decision in

*Filiaggi v. Bagley*, 445 F.3d 851 (6th Cir. 2006), in which the court found that the

Ohio Supreme Court's adjudication of a competency claim under Ohio law was

consistent with *Drope* and *Pate* and thus not contrary to nor an unreasonable

application of clearly established federal law. Second, Respondent argues that the

state supreme court's treatment of the trial court's competency determination as a

finding of fact subject to deference on appeal was a reasonable application of the

governing law. (ECF No. 91, PageID 10426.) And finally, Respondent maintains

that the supreme court's factual findings are well supported by the record.

Specifically, Respondent points to the fact that Dr. Kohler evaluated Petitioner and

found him to be competent, while Dr. Jackson neither evaluated Petitioner's

competence nor rendered an opinion that Petitioner was incompetent at an earlier

date. (*Id.*) Respondent argues that Petitioner has not identified anything in the

record to refute the state court's findings, and that even if one viewed Dr. Kohler's

opinion as being inconsistent with Dr. Jackson's diagnosis of paranoid personality

disorder with reality contact problems, that inconsistency is not the clear and

convincing evidence necessary to overcome the factual findings of the state courts.

(*Id.*)

Petitioner originally raised his competency claim on direct appeal to the Ohio

Supreme Court. (ECF No. 82–10, PageID 2412–17.) In the course of determining

29

that the trial court did not abuse its discretion when it denied Petitioner's motion

for a competency hearing on May 13, 2004, the Ohio Supreme Court found:

> In his second proposition of law, Johnson contends that the trial court abused its discretion by failing to hold a timely hearing on his competence to stand trial.
>
> Johnson contends that the trial court should have granted defense counsel's May 13, 2004 oral request for a competency evaluation in light of Johnson's actions leading up to and during the trial. He cites the following instances in support of the need to conduct a hearing: his attempt to fire his attorneys; his statements to the court regarding his belief that the newspapers misquoted him; his expression to the court of his desire to receive the death penalty; and his May 13 demand to testify and proceed pro se after defense counsel rested.
>
> At that time, counsel moved for the competency hearing, and the court conducted its own examination of Johnson to determine his competence to stand trial. In response to the court's questions, Johnson accurately recited the charges against him and acknowledged the possibility of a death sentence, and he acknowledged that he understood the stage of the proceedings and that his testimony, argument, and questioning of witnesses would be governed by rules. Johnson also stated that he had spoken with his counsel and that he understood that his counsel had advised him against testifying or representing himself. Johnson nonetheless reaffirmed his desire to testify and to represent himself.
>
> Defense counsel moved again for a competency hearing, but the court concluded, "I have no reason to believe that you are not proceeding competently. You may not be proceeding wisely but there is no requirement of that in the law. * * * The Court finds the defendant competent. If he wishes to testify in this matter that is also his constitutional right." The court then granted a recess for Johnson to confer with his counsel before proceeding.
>
> In *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 56, we stated, "R.C. 2945.37(G) creates a rebuttable presumption that a defendant is competent to stand trial. 'This presumption remains valid under R.C. 2945.37(G) unless, "after a hearing, the court finds by a preponderance of the evidence" that the defendant is not competent.' *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 74, quoting R.C. 2945.37(G). The 'decision

as to whether to hold a competency hearing once trial has commenced is in the court's discretion.'" Id., quoting *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 492 N.E.2d 401.

"The right to a hearing 'rises to the level of a constitutional guarantee where the record contains "sufficient indicia of incompetence," such that an inquiry * * * is necessary to ensure the defendant's right to a fair trial.'" *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 156, quoting *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, and citing *Drope v. Missouri* (1975), 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103, and *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815. And "[i]ncompetency is defined in Ohio as the defendant's inability to understand ' * * * the nature and objective of the proceedings against him or of presently assisting in his defense.'" *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 502 N.E.2d 1016, quoting R.C. 2945.37(A).

The trial court did not abuse its discretion by denying counsel's May 13, 2004 motion for a competency evaluation, because the indicia of incompetence did not rise to a level that demanded a hearing or an evaluation. Johnson's anger regarding the newspaper articles, his refusal to heed his counsel's advice, and his abandoned request to fire his counsel did not indicate that he was unable to understand the nature of the charges and proceedings or the gravity of the situation or that he could not assist in his defense. Even Johnson's desire to receive the death penalty did not necessarily signal incompetency. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 29, 553 N.E. 2d 576 ("even if a capital defendant waives mitigation completely because he wants to be executed, that waiver does not by itself call his competence into question.")

We view these alleged indicators in light of Johnson's response to the court in which he expressed his understanding of the nature of the charges against him, the possibility of the death penalty for these charges, the ramifications of both testifying and representing himself, and the need to follow the rules. The court satisfied itself of Johnson's competence, and, in such matters, we defer to those "who see and hear what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

We acknowledge that on May 13, defense counsel informed the court of Dr. Jackson's expected diagnosis that Johnson suffered "paranoid personality disorder [and] reality contact problems." But the diagnosis said nothing of Johnson's competence. As we have previously held, "[a]

defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *Bock*, 28 Ohio St.3d at 110, 28 OBR 207, 502 N.E.2d 1016. Moreover, at the time it denied the defense's May 13 motion for a competency evaluation, the trial court had before it only defense counsel's assertions regarding Dr. Jackson's diagnosis, not evidence thereof.

As a result, the trial court did not abuse its discretion when it denied defense counsel's motion for a competency evaluation during trial on May 13, 2004.

Four days later, the court did grant the defense's subsequent motion for a mental evaluation and a competency hearing. Johnson contends that the court abused its discretion by waiting until that point to order the hearing.

On Monday, May 17, 2004, between the guilt and penalty phases of the trial, defense counsel informed the court that they had learned over the weekend that Dr. Jackson, the appointed defense psychologist, had "found symptoms consistent with severe mental illness." Counsel also related to the court that Johnson had called three times and had made statements that led counsel to question his competence. The defense renewed its motion for a mental evaluation of Johnson and a competency hearing, and the court granted it, ordering the Forensic Diagnostic Center to perform the evaluation.

At the competency hearing, held May 26, 2004, the parties stipulated to Dr. Denise Kohler's report, dated May 22, 2004, in which she found Johnson competent to stand trial, as he "is capable of understanding the nature and the objectives of the proceedings against him and of assisting in his defense." The defense submitted no evidence at the hearing. Based on this report, the trial court deemed Johnson competent and continued with the penalty phase of the trial.

Johnson argues that Dr. Kohler's evaluation occurred too late to detect his incompetency. He refers to Dr. Jackson's penalty-phase testimony that, under stress, his mental disorders could alter his perception of reality. Because such stress may not have existed at the time Dr. Kohler evaluated him, he argues, Dr. Kohler's evaluation inaccurately determined him competent.

The record before us does not substantiate Johnson's claim. In his report, Dr. Jackson opined that in "moderate to high stress situations, anger, suspiciousness and distress/depression *can contribute* to

extreme agitation and *possible* atypical perception." (Emphasis added.) However, not only does this evidence fail to address Johnson's *competency*, the evidence fails to suggest what Johnson's competency *would have been* four days earlier, when Johnson believes he should have been evaluated.

This situation is analogous to that in *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 55, in which we rejected a defendant's claim that the court erred by failing to order additional testing because "[i]t is purely speculative whether additional testing would have made any difference in the outcome of [the defendant's] competency evaluation."

Similarly, we reject Johnson's claim that an earlier evaluation would have revealed his incompetency, as it rests upon speculation and has no basis in the record before us.

The second proposition of law is overruled.

*Johnson*, 112 Ohio St.3d at 232–35.

A trial court's failure to hold a competency hearing when there is substantial evidence of a defendant's incompetence violates his due process right to a fair trial. *Pate*, 383 U.S. at 385–86. A defendant is competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). A trial court is obligated to hold a competency hearing when the facts before it are sufficient to create a reasonable doubt as to the defendant's competence. *Pate v. Smith*, 637 F.2d 1068, 1071 (6th Cir. 1981), *citing Drope*, 420 U.S. at 180. In *Drope v. Missouri*, the Supreme Court described the nature of the necessary inquiry:

[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but []

33

> even one of these factors, standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

420 U.S. at 180.

The same standard for competency to stand trial or plead guilty also applies to competency to waive the right to counsel. *Godinez v. Moran*, 509 U.S. 389, 399 (1993). In other words, a defendant who is competent to stand trial is also competent to waive his right to counsel. The competency inquiry is distinct from the determination of whether a decision to waive the right to counsel was made voluntarily, knowingly, and intelligently.[3] While a competency inquiry is concerned with a defendant's mental capacity or present ability to understand the nature of the proceedings, a waiver inquiry asks whether a defendant actually understands his rights and the consequences of waiving those rights. *Godinez*, 509 U.S. at 401 n.12. Of course, a defendant seeking to waive his right to counsel must have *both* the capacity to understand the significance of the decision as well as an actual understanding of the nature and consequences of the decision.[4]

---

[3]The *Faretta* inquiry used to determine whether a waiver of rights is voluntary, knowing, and intelligent is the subject of Petitioner's second ground for relief, *supra*.

[4]While a defendant must *be* competent to waive counsel, the trial court is not obligated to conduct a competency determination absent sufficient reasons to doubt defendant's competence. *Godinez*, 509 U.S. at 401 n.13, *citing Drope*, 420 U.S. at

"A state court's 'determination of competence is a factual finding, to which deference must be paid.'" *Richardson v. Palmer*, 941 F.3d 838, 848 (6th Cir. 2019), *quoting Filiaggi*, 445 F.3d at 858, *citing Thompson v. Keohane*, 516 U.S. 99, 110–11 (1995). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

a.    **Denial of Competency Hearing**

The Ohio Supreme Court's conclusion that the evidence of incompetence cited by Petitioner "did not rise to a level that demanded a hearing or evaluation," *Johnson*, 112 Ohio St.3d at 233, was not an unreasonable determination of the facts based on the evidence presented. Petitioner argues again before this Court that the series of "irrational" decisions he made on May 13, 2004—starting with his announcement that he wished to testify against the advice of counsel, then firing his attorneys and calling Tina Bailey as a witness, and culminating with his declaration that he wished to receive the death penalty and his removal from the courtroom—was substantial evidence of his incompetence. But wisdom is not the same thing as competence. *See Cowans v. Bagley*, 624 F.Supp.2d 709, 763 (S.D. Ohio 2008) ("[T]he test is whether the petitioner possessed the *capacity* to reason

_____

180, and *Robinson*, 383 U.S. at 385.

logically by choosing means that related logically to his ends, not whether the petitioner *actually* employed means that related logically to his ends."). As the Court noted in *Cowans*,

> [W]hile petitioner's actions and remarks have been characterized by him as irrational, that word is appropriate only to the extent it describes actions by petitioner which were not in his best interest. However, rationality from a standpoint of competence is not determined by foolishness or wisdom, and, for this additional reason, the events on which petitioner relies to establish his incompetency at the time of trial and the duties on counsel are not probative on the point.

*Id.* at 763–64, *quoting Sweezy v. Garrison*, 554 F.Supp. 481, 485 (D.C.N.C. 1982).

Unwise or foolish decisions such as forgoing counsel's advice, or expressing a desire to receive a death sentence, are not necessarily indicative of incompetence. *See, e.g.*, *United States v. Heard*, 762 F.3d 538, 542 (6th Cir. 2014) (holding that petitioner's refusal to cooperate with his attorney does not render him incompetent, *citing United States v. Miller*, 531 F.3d 340, 349 (6th Cir. 2008)). In *Cowans*, the Court ultimately concluded that the petitioner's outbursts and inappropriate behavior were not the result of his incompetence:

> [D]isruptive behavior alone, especially when prompted by anger at certain aspects of the proceedings against him as opposed to mental disease or defect, is insufficient to establish a defendant's incompetency or even necessarily raise questions as to his competency. . . . [T]his Court concludes that [the petitioner's] occasional outbursts of disruptive behavior are "more explainable in terms of an angry, hostile personality rather than in terms of incompetence."

*Id.* at 754, *citing Sweezy*, 554 F.Supp. at 485, 491.

And so it is here. A closer examination of the record reveals that Petitioner's

behavior on May 13, 2004, is in no way evidence of an inability to understand the proceedings or think rationally. Rather, his conduct, although often inappropriate and detrimental to his defense, demonstrated that he was fully engaged in the proceedings and capable of reasoning logically, comporting himself appropriately, and work within the rules of the court to achieve his desired outcome.

After Petitioner announced that he wished to testify against the advice of counsel, the trial court asked him a series of questions to establish that he was competent:

> By the Court:
>
> Q. Mr. Johnson, under Ohio law and the law of the United States of America you have the absolute right to testify in your own behalf at trial. You have that right after you have conferred with counsel. You may testify even, if you are testifying against the advice of counsel. However, the duty of the Court is to determine if you are proceeding and are competent. I'm going to ask you a few questions at this time, as the jurors are not present. I'll need you to answer them so I can determine if you are competent and I will then further review with you, if you're found to be competent at this time, the rules as it relates to testifying.
>
> The court first, Mr. Johnson, wishes to advise you under Ohio law a person is presumed to be competent unless it's shown otherwise on the record of the Court. I have observed you throughout the trial, I've addressed you, not under oath, but during the trial I have seen nothing from you that leads me to believe that you are not competent at this time but I have a duty to determine that. Do you understand that?
>
> A. Yes.
>
> Q. I need to ask you the questions that I would ask a person to determine competency under any other setting. Some of these are almost straight forward to the point of seeming as if the questioner is insulting your intelligence. That's not my purpose. Can you please tell me what you are on trial for at this time?

A. Aggravated murder, rape, aggravated robbery and kidnapping.

Q. And do you understand that the two aggravated murder charges do have aggravated circumstance specifications which could make the case a possible death penalty case?

A. I understand that.

Q. And do you understand in a death penalty case if, and only if, we get to the second phase, the mitigation phase, under Ohio law the defendant has the right to make a statement to the jury that is unsworn and not subject to cross-examination?

A. Yes, I am.

Q. And you understand we are in the trial phase of this case at this time?

A. Yes.

Q. And you understand if you testify at this time, and you would be testifying against the advice of your counsel, that it would be under oath and you would be subject to cross-examination by the State of Ohio?

A. Yes, sir.

Q. Do you understand that under Ohio law to test the credibility of a witness or to impeach the credibility of a witness the State of Ohio would be permitted to use prior criminal record?

A. Yes, sir.

Q. Do you further understand that the State of Ohio could ask you questions as it would relate to any prior inconsistent statements?

A. Yes, sir.

Q. Now, Mr. Johnson, I need you to tell me where we are today, that is, what courtroom we're in and what the date is please.

A. Well, we're in Belmont County but we are in the Guernsey County court and the date is May — I'm not sure, the 13th? I'm not sure.

Q. That is correct. It is May 13. And do you understand by testifying at this time that it is the duty of the Court to advise the jurors that your testimony is to be tested for credibility in the same manner that they

38

test any other witness's credibility?

A. Yes, sir.

Q. And you do wish to testify in this matter, is that correct?

A. That's correct.

Q. And you have conferred with your attorneys and they have advised you that that's against their advice, is that correct?

A. The way I look at it, Your Honor, it's not their life that they are looking at. This is my life.

Q. That also is correct but you have conferred with your attorneys?

A. Yes, I have.

Q. And you understand if you are permitted to testify you'd be testifying against their advice?

A. Well, if that's the case, Your Honor, I'd like for them to be relieved of their duties just like I did March 10, if you recall, they're fired.

Q. Well, under Ohio law you have the right to ask your attorneys to be relieved of their dutites [sic] but they would be assigned as stand-by counsel by the Court, if you have questions of them, for they are familiar with your case and there would be no other counsel available at this time that would be familiar with your case.

A. Well, sir, March 10, Your Honor, you didn't advise me of that that they could be stand-by when I said I wanted them removed. You didn't advise me of that so there's no need to advise me today that they can be stand-bys. I don't want nobody standing by.

Q. All right. Have you cooperated and participated in the competency or psychological evaluation that they've advised me of? Nothing has been filed with the Court at this time.

A. Yes, I have. Obviously it's not important enough. That should have been here at court the first day.

Q. Ordinarily such matters are presented in the mitigation phase, Mr. Johnson, but that's not an issue before us at this time. And you are advising me that you wish to waive your privilege against being required to testify and testify in this case?

39

A. Yes, sir.

Q. And do you believe that you do understand the full ramifications of that?

A. Yes, sir.

(ECF No. 83-11, PageID 7566–71.)

As the trial court continued to question Petitioner regarding his wish to testify, Petitioner explained that he only wanted to testify if Tina Bailey was present:

Q. Mr. Johnson, do you understand that on the current state of the record if you testify your attorneys have advised, and you have advised that you wish to discharge them, but have advised that they will call you to the witness stand or you may be called to the witness stand if that is your request, be placed under oath and they will not be asking you questions but you would be permitted the opportunity to testify in your own behalf?

A. Yes.

Q. Is that how you wish to proceed?

A. I just want to be questioned by the Prosecutor. There are so many things they need to know.

Q. That would occur if you testify.

A. That's what I want, Your Honor. There are so many things that they don't have.

Q. Well, it is not your duty to assist the Prosecuting Attorney in making their case.

A. But I want to. I would like to in the court in front of the jury, in front of Ms. Bailey. There are some things she needs to know also.

Q. Well, she has been a witness in this case and has been separated from the courtroom, so she would not be present.

A. Well, these are some things she needs to know.

Q. Do you understand that you are testifying in your own case and the

40

jurors will then be asked to make a determination if the State of Ohio has proved its case beyond a reasonable doubt?

A. Yes, sir.

Q. And the jurors can use your testimony and they can weigh it, they can either use for you or use it against you and it could lead to your convictions?

A. I'm aware of that, sir.

Q. And you understand the convictions of this matter, if there is a second phase of this trial, could lead to the death penalty?

A. I understand.

Q. And knowing that you do wish to testify?

A. Yes, sir, I do.

Q. I have no reason to believe that you are not proceeding competently. You may not be proceeding wisely but there is no requirement of that in the law. It is competent.

The Court finds the defendant competent. If he wishes to testify in this matter that is also his constitutional right. The Court has conducted a dialog with the defendant in accord with Ohio law.

Is there anything further that you request of record, Mr. Johnson?

A. I request that Tina Bailey be present as I testify.

Q. There has been a motion to separate witnesses that previously had been granted by the Court so I cannot honor that request. Is there anything in addition to that matter?

A. Just that, Your Honor.

Q. You understand I can't honor that request or will not honor the request for there's a [sic] been a separation of witnesses. She may be recalled after you testify by the State of Ohio in rebuttal.

A. There won't be any rebuttal because I want her to know what went on, Your Honor.

Q. Well, she will not be in the courtroom to hear your testimony but —

A. If she is not present I'm not testifying.

41

Q. Well, there is a separation of witnesses. Tina Bailey has been a witness in this case. She would not be present while you testify. Now, do you —

A. It's not that I'm going to testify against what she said. I want her to know what happened. I want her to know firsthand. I don't want her reading, I don't want her hearing it from anyone else but someone that was there, Your Honor. That's what I want.

Q. Mr. Johnson, I understand that and this is a court of law. I am here to apply the law. I cannot accommodate that request as there's a separation of witnesses. She's been separated from the courtroom. That separation of witnesses remains in effect and until and unless that is lifted she will not be present in the courtroom. Do you or do you not wish to testify?

THE DEFENDANT: Mr. Plummer, could you lift that so Ms. Bailey could be in court?

MR. PLUMMER: Your Honor, I am not going to respond to the defendant, but Ms. Bailey will not be in court.

THE COURT: As there is a motion to separate witnesses she would not be present, Mr. Johnson.

THE DEFENDANT: What about the other witnesses that's testified against me? Would they be present in court? Why is it just that she is being separated?

MR. PLUMMER: Your Honor, I don't believe there's any witnesses in court. There was one witness who we had no intention to recall who has left the courtroom, Mr. Utelius Barnes, but at this time there are no other witnesses in the courtroom.

By the Court:

Q. There are no other witnesses in the courtroom, Mr. Johnson. Utelius Barnes has stepped out of the courtroom, if that's who you were referring to.

A. No, I was just asking a question why. That's all. I just asked the question why was other witnesses allowed in the court if she wasn't.

Q. The only witness I know that was in the courtroom right now was Utelius Barnes and he had been relieved of subpoena by both sides. Tina Bailey had not been relieved of subpoena and is subject to recall if

42

there is rebuttal.

Now, we are having a dialog that is going beyond the parameters of the issue. I have advised you there's a separation of witnesses, Tina Bailey is a witness subject to recall, she will not be in the courtroom.

A. But I wasn't separated when she took the stand.

Q. No, you are a defendant in the case and you have an absolute right to be present. That's as far as I wish to proceed with that dialog, Mr. Johnson.

I need to ask you do you wish to testify in this matter or not?

A. Unless she's in the courtroom.

Q. Well, I made that perfectly clear. There is a separation of witnesses. Tina Bailey is not in the courtroom unless the separation of witness motion is lifted she would not be in the courtroom. Do you wish to testify?

A. I'll testify when her subpoena is lifted.

Q. Well, you have the right to testify. You do not have the right to prescribe the rules of court. Do you wish to testify, Mr. Johnson?

A. When her subpoena is lifted.

Q. All right. When her subpoena is lifted?

A. That's when she'll be able to be in the courtroom.

THE COURT: I'll declare a recess so the counsel can confer and advise the Court when I return if they do or do not wish to lift the motion to separate witnesses and —

MR. PLUMMER: I can advise the Court that will not occur.

THE COURT: Then that will not occur.

By the Court:

Q. Mr. Johnson, Tina Bailey will not be in the courtroom. Do you wish to testify and this dialog has gone as far as I believe is reasonably proper.

A. Only if she's in the courtroom.

43

Q. She's not going to be in the courtroom. So you don't wish to testify, is that correct?

A. Only if she's in the courtroom.

Q. Mr. Johnson, you have the right to testify, if you want to. You don't have the right to prescribe the rules and it's clear to this time that you are competent and you are attempting to cause your own mistrial. So you decide.

A. Only if she's in the courtroom.

THE COURT: I'm going to take a recess, five minutes. You can talk to your attorneys if you want to.

MR. BLAKESLEE: Your Honor, I don't even know if we're still on the case.

THE COURT: Okay. I'll take a five minute recess and Mr. Johnson when I return you will advise me if you want to testify or not. Recess, please.

. . .

By the Court:

Q. Mr. Johnson, I advised that there would be a five minute recess. I need you to advise the Court if you do or do not wish to testify.

A. Not at this time, Your Honor.

Q. The defendant advises he does not wish to testify at this time?

A. But the defense would like to call a witness to the stand.

Q. Who do you wish to call to the stand?

A. Tina Bailey.

Q. You are calling Tina Bailey as a witness?

A. Yes, sir.

. . .

THE COURT: The defendant would have the right to call witnesses in his case-in-chief. . . . Now, I need to determine, Mr. Blakeslee, Mr. Warhola, this is with or without your advice?

44

MR. BLAKESLEE: It's without our advice.

By the Court:

Q. Mr. Johnson, will you be proceeding as your own —

A. Yes, sir.

Q. You're proceeding pro se then?

A. Yes, sir.

(ECF No. 83–11, PageID 7573–81.)

Petitioner plainly expressed that he wished to testify only if Tina could be in the courtroom because he wanted her to hear what he had to say. When told that this was impossible and she could only be present in the courtroom if called as a witness, Petitioner, proceeding on his own behalf, called her as a witness. His actions, however unwise and detrimental to his defense, clearly "demonstrate[] an ability to engage in means-end reasoning to achieve a stated goal." *Carter v. Bogan*, 900 F.3d 754, 772 (6th Cir. 2018) (concluding that lunging at the judge was a calculated act to be removed from the courtroom). That the immediate aims he pursued were not helpful to his defense or his long-term interest in avoiding a death sentence is not proof that he lacked the capacity to make such decisions.

Petitioner's questioning of Tina Bailey further demonstrates that he understood cause and effect, was able to form logical questions, and could respond appropriately to the court's instructions. While his questioning was undoubtedly irrelevant to the issues contested at trial—as Petitioner now argues before the Court—it was not irrational when understood as a means to rehash his grievances against Tina.

45

By the Defendant:

Q. State your name for the record.

A. Constantina M. Bailey.

Q. Ms. Bailey, yesterday you testified to the fact that Marvin hardly or didn't help you with support during the time — during the course of the period you two were together financially?

A. Yes.

Q. Okay. Do you recall Christmas of 2001 Marvin went to jail on a probation violation, correct?

A. Yes.

Q. During the time he was locked up and you came to visit him, correct?

A. Yes.

Q. Isn't it true that you were having calls from your mortgage company stating to you that they was going to —

MR. PLUMMER: Objection, relevancy, Your Honor.

THE COURT: The response, please?

A. Yes, I did get calls.

. . .

By the Defendant:

Q. Who helped you pay that mortgage?

A. Marvin.

Q. How much was that mortgage?

A. $800.00.

Q. And what was your Christmas gift suppose to be that year?

MR. PLUMMER: Objection, Your Honor. Relevancy.

THE COURT: Response, please? Do you have a response to the objection?

THE DEFENDANT: No, Your Honor.

THE COURT: The Court will grant some latitude at this time as I understand the testimony is that to show inconsistencies with prior testimony. The objection is overruled at this time but you need to tie it up to something pretty quickly. Continue, please.

THE DEFENDANT: I'm tying it up to where I did help out, Your Honor.

THE COURT: All right. You have that permission at this time. You may continue.

By the Defendant:

Q. Do you recall how much that mortgage was?

A. Yes.

Q. Could you tell the Court how much that was?

A. It was $800.00.

Q. Who paid that for you?

A. Marvin.

Q. And you don't consider that help saving your home, a roof over your kids' head, you don't consider that help?

MR. PLUMMER: I'm going to object. There was testimony yesterday that she indicated Mr. Johnson provided her from time to time with financial assistance. I think this is a matter has already been reviewed and there's already been testimony and she's already indicated. So I don't see any inconsistency to what she previously said.

THE COURT: The Court will permit reasonable latitude. You may answer the question, please.

A. Can he repeat that question, please?

By the Defendant:

Q. You don't consider that an enormous amount of help keeping a roof over your children's head?

A. Yes, it was a help.

47

Q. Did you ever tell your mother about that?

MR. PLUMMER: Objection, Your Honor. What discussions she had with her mother are not relevant.

THE COURT: Response, please?

THE DEFENDANT: Tying into where her mother use to come in and ask me, Your Honor, why are you here.

THE COURT: I don't see any relevance to the issues.

THE DEFENDANT: I withdraw.

THE COURT: Thank you. You may continue your next question.

. . .

By the Defendant:

Q. You also stated in your testimony that you supported Marvin with his drug and alcohol habit. Correct?

A. Yes.

Q. Did you ever attempt — when he asked you to lets [sic] go to meetings did you ever go attend any meetings with him?

A. No.

Q. Even when there are meetings gathered at your job did you ever attend meetings with him?

A. No.

Q. Could you tell the Court why? I mean, if you intended to support Marvin isn't that supporting him by going along with him?

A. Marvin never went to the meetings.

Q. Yes, Marvin did.

A. He went to one.

Q. Did you accompany him with that meeting?

A. No, but Daniel did.

Q. Daniel did. Why didn't Tina accompany Marvin in that meeting?

48

A. I didn't want to go.

Q. Is it true that you were too good to be seen in places like that?

MR. PLUMMER: Objection, Your Honor.

THE DEFENDANT: Withdraw, Your Honor.

THE COURT: No ruling is necessary by the Court. You may continue.

By the Defendant:

Q. Do you recall coming to Utelius Barne's [sic] house on 9th Street one day and throwing money that Marvin had given you at him?

A. Yes.

Q. Why did you do that?

A. Because Marvin only gave me $60.00 and he kept much more for himself to spend partying.

Q. But that 60 wasn't enough?

A. Marvin doesn't understand how much it cost to run a household. If he did, $60.00 he knows would not have been enough.

Q. Did you ever go to Mr. Johnson and say to him can you give me more?

MR. PLUMMER: Your Honor, I'm going to object. This is not relevant. This is not a divorce. This is an aggravated murder case. This is not relevant testimony and I object to it.

THE COURT: Response, Mr. Johnson?

THE DEFENDANT: Withdraw, Your Honor.

THE COURT: You may continue.

By the Defendant:

Q. Do you recall coming to ShieldAlloy one day supposedly to pick up Marvin's check?

A. Yes.

Q. Explain to the Court what happened that day in the parking lot.

49

MR. PLUMMER: Your Honor, again, it's not relevant. Objection.

THE DEFENDANT: Withdraw, Your Honor.

. . .

Q. In the parking lot at ShieldAlloy that day isn't it true that when Marvin didn't give you his check you slammed his car door so hard that you broke the window?

MR. PLUMMER: Your Honor, again, this is just not relevant testimony.

THE COURT: What time frame are we talking about?

THE DEFENDANT: I'm establishing her violence.

THE COURT: What time frame, please? When is this alleged to have occurred?

THE DEFENDANT: This occurred in 1999.

THE COURT: All right. The objection has to be sustained. I see no relevance to the events of August of 2003. You may continue, please.

By the Defendant:

Q. Isn't it true that before August 15, 2003, that there was an incident of you and Marvin arguing in the house and you was following Marvin through the house saying hit me, hit me but don't hit me in the face so I'll be able to still go to work. Isn't that true, Ms. Bailey?

A. No.

Q. Isn't it true before Marvin hit you, because he didn't hit you, he spat in your face, do you recall that?

A. Yes, you spat in my face.

Q. But didn't you say hit me, hit me prior to that?

A. No.

Q. Yes you did.

MR. PLUMMER: Your Honor, this is argument.

. . .

50

By the Defendant:

Q. Why did he spit in your face then?

MR. PLUMMER: Objection.

THE COURT: Mr. Johnson, what time frame are we referring to, please?

THE DEFENDANT: This would be June.

THE COURT: Of what year?

The Defendant: 2004.

THE COURT: Well, that hasn't occurred yet.

THE DEFENDANT: I mean 2003, Your Honor. I'm sorry.

THE COURT: What issue do you believe this is relevant to?

THE DEFENDANT: Her credibility, Your Honor. I mean, okay she answered the question that I spat in her face. What led up to that?

THE COURT: Unless you can tie it to some issue that is relevant before the Court as to the charges against you, your defense of those charges or her credibility as to an issue that relates to the charges, the Court is not going to extend unlimited examination of a witness unless it is relevant. I see no relevance to June of 2003 as it relates to the August 15th time frame. You may ask specific questions that relate to the August time frame, Mr. Johnson, and continue, please.

THE DEFENDANT: Well, Your Honor, the Prosecutor was able to ask questions leading up to the start of the relationship leading up to August 15. Why can't I ask questions leading up to August 15?

THE COURT: You may, if it is challenging the credibility of the witness. I don't see that before the Court in your question but continue, please, Mr. Johnson.

By the Defendant:

Q. Ms. Bailey, you claim Marvin wanted your kids to do chores around the house, correct?

A. Yes.

Q. Can you specify what chores Marvin wanted your children to do?

A. Yes.

Q. Could you tell the Court, please?

A. Washing dishes, taking out the trash, doing laundry, vacuuming, dusting, lawn care.

Q. Isn't it true that Marvin did the lawn care and the laundry? Isn't it true that Marvin only asked Daniel to pick the trash up from the upstairs, his room, and take it downstairs, gather the trash downstairs and take it out? Isn't it true that Marvin did laundry, folded clothes, took them to the children's room and just had the kids put them away? Is that true?

MR. PLUMMER: Your Honor, I hate to keep objecting but these questions are absurd.

THE COURT: The objection is sustained in part and overruled in part. She did testify as to the dispute as to parenting therefore that may have some relevance to the acts of August 15, 2003. . . . You may continue and answer the question limited to parenting skills which was part of the prior testimony. Was there argument regarding parenting skills? You may answer that question.

A. Daniel's chores included taking the laundry to the basement, taking the laundry back upstairs after it was completed.

By the Defendant:

Q. Did Marvin do any of those things?

A. Since Marvin didn't work all the time he was expected to do things around the house.

. . .

(ECF No. 83-11, PageID 7586–98.)

In light of Petitioner's outward competence and without solid evidence of past or current mental illness, other than the anticipated diagnosis of "paranoid personality disorder [with] reality contact problems" from Dr. Jackson, it was eminently reasonable for the trial judge to find insufficient justification for a

competency hearing on May 13. Petitioner challenges this conclusion, arguing that the trial court overlooked the prong of the competency standard that requires "sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding," *Dusky*, 362 U.S. at 402, and thus disregarded the "ample evidence from trial counsel that Petitioner could not assist in his defense." (ECF No. 131, PageID 10754.) "While the Supreme Court has said that defense counsel's expressed doubts about his client's competence '[are] unquestionably a factor which should be considered,'" the concerns of counsel must rise to the level of clear and convincing evidence in order to rebut the state court's finding of competence. *Woodley v. Bradshaw*, 451 Fed.Appx. 529, 538 (6th Cir. 2011), *quoting Drope*, 420 U.S. at 178 n.13 (internal citations omitted); *see also Godinez*, 509 U.S. at 403–04 (Kennedy, J., concurring in part and concurring in the judgment) ("Although the *Dusky* standard refers to 'ability to consult with [a] lawyer,' the crucial component of the inquiry is the defendant's possession of 'a reasonable degree of rational understanding.' In other words, the focus of the *Dusky* formulation is on a particular level of mental functioning, which the ability to consult counsel helps identify.") Here, it was not unreasonable for the trial court to conclude that the opinions of defense counsel did not outweigh its own observations, both on May 13 and throughout the lengthy pre-trial and trial proceedings, of Petitioner's mental state.

The events that transpired after May 13 also do not provide reason to call into question the trial court's earlier finding that Petitioner was competent. Defense

counsel renewed their motion for a competency evaluation and hearing on May 17, informing the court that Petitioner had called counsel three times and made statements that led counsel to again question his competence and that Dr. Jackson, the defense psychologist, had reportedly "found symptoms consistent with severe mental illness." The trial court granted the motion and ordered the Forensic Diagnostic Center to perform the evaluation. Dr. Denise Kohler found Petitioner competent to stand trial. Both parties stipulated to Dr. Kohler's report at the May 26 competency hearing, and the defense did not present other evidence. The trial court held that Petitioner was competent.

Petitioner argues that Dr. Kohler's conclusion that he was competent days later does not establish that he was also competent on May 13 because the nature of Petitioner's mental illness was that his conditions changed over time.[5] (ECF No. 131, PageID 10754–55.) He maintains that the competency evaluation came too late to detect his incompetence on May 13. But the question is not whether Dr. Kohler proved Petitioner's competence on May 13, but whether the evidence instead

_____

[5]Petitioner also argues in his traverse that trial counsel were ineffective for stipulating to Dr. Kohler's report at the May 26 competency hearing when the contradictory testimony of Dr. Jackson was available. (ECF No. 131, PageID 10755.) While the Court is not convinced that Dr. Jackson's report and testimony contradicted Dr. Kohler's competence determination, Petitioner may not add a new claim, not found in his petition, through his traverse. Regardless, even if Petitioner had properly raised the ineffective assistance claim in his petition, federal habeas review would still be unavailable because he failed to present the claim to the state courts. *See Franklin v. Bradshaw*, 695 F.3d 439, 449 (6th Cir. 2012) (holding that unexhausted claims for which state review is no longer available are procedurally defaulted, *citing Murray*, 477 U.S. at 485).

*requires* a finding of incompetency. *See Carter*, 900 F.3d at 771 (holding that, even if the petitioner's evidence was enough to establish his incompetence, "the question before [a federal habeas court] is whether such evidence *compels* a determination of incompetence," *citing Rice v. Collins*, 546 U.S. 333, 341 (2006)). Speculation that Petitioner could have been incompetent on May 13 because Dr. Kohler's examination several days later could not prove he was also competent on May 13 falls well short of the evidence needed to "compel[] a determination of incompetence," *id.*

Nor does the later report and testimony of Dr. Jackson, presented during the penalty phase of trial, provide sufficient reason to doubt Petitioner's competence on May 13 in light of the evidence of his behavior and functioning on that date. Dr. Jackson reported that stressful situations, anger, suspiciousness, and distress "can contribute to extreme agitation and possible atypical perception." As the Ohio Supreme Court emphasized when it disregarded the relevance of Dr. Jackson's report to the issue of Petitioner's competency, the report neither addressed the issue of competency nor spoke to whether Petitioner had been competent four days earlier. *See Johnson*, 112 Ohio St.3d at 235. That is, the relevance of Dr. Jackson's findings to Petitioner's condition on May 13 is entirely speculative. He does not establish that Petitioner *was* experiencing the stress, anger, suspiciousness, or distress that *could* "contribute to . . . *possible* atypical perception," *id.*, let alone show that Petitioner actually *had* atypical perception ***and*** that his atypical perception was such as to render him incompetent.

55

Because this Court can find nothing in the record of Petitioner's actions on May 13, nor in the events that followed, to suggest that either the trial court or the Ohio Supreme Court were unreasonable in determining that Petitioner was competent, Petitioner's claim that the trial court erred by not holding a competency hearing on May 13, 2004 is **DENIED**.

### b. Actual Competency

Petitioner also argues that he actually was incompetent on May 13, 2004. (ECF No. 86, PageID 9244.) It is unclear if Petitioner intended to raise actual incompetence as a separate claim, but the Court will respond to it as such because actual incompetence is conceptually distinct from his first claim that the trial court erred in failing to hold a competency hearing. A claim of actual incompetence instead argues that the *fact* of Petitioner's incompetence on May 13, 2004 rendered the proceedings unconstitutional. *See Franklin v. Bradshaw*, 695 F.3d 439, 451 (6th Cir. 2012) (distinguishing claim of actual incompetence from that of trial court error for failure to hold competency hearing).

Petitioner did not argue actual incompetence in his direct appeal to the Ohio Supreme Court, where he first raised his claim that the trial court erred for not holding a competency hearing. (*See* ECF No. 82-10, PageID 2412–17.) The first time he raised the issue of actual incompetence was in his federal habeas petition to this Court. Respondent appears to have been unaware that this claim existed and did not respond to it in the Return of Writ. (*See* ECF No. 91, PageID 10421–26.) While Respondent's failure to argue procedural default waives the defense, procedural

56

default may also be raised sua sponte by the federal courts. *See Lovins v. Parker*, 712 F.3d 283 (6th Cir. 2013), *citing Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005); *see also Strong v. Nagy*, 825 Fed.Appx. 3d 239, 241 (6th Cir. 2020) ("[W]here a straightforward analysis of settled state procedural default law is possible, federal courts cannot justify bypassing the procedural default issue.") (*quoting Sheffield v. Burt*, 731 Fed.Appx. 438, 441 (6th Cir. 2018)).

Because Petitioner never presented this claim to the state courts, the claim is procedurally defaulted. "Claims that could have been, but were not, presented to the state courts and that are now barred by state procedural rule are deemed procedurally defaulted." *Franklin*, 695 F.3d at 449, *citing Murray v. Carrier*, 477 U.S. 478, 485 (1986). Procedural default may be overcome if the petitioner can demonstrate cause for the default and prejudice from the underlying constitutional violation, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Petitioner argues neither. As a result, his claim of actual incompetence is procedurally defaulted.

Regardless, Petitioner's actual incompetence claim also fails on the merits. Petitioner has not shown that the trial court's finding that he was competent on May 13 was clearly wrong. His subsequent diagnoses of mental illness do not speak to whether he was capable of understanding the proceedings and thinking rationally. The only psychiatrist or psychologist to ever conduct a competency evaluation found that Petitioner was competent. While it is undoubtedly true that,

as Petitioner argues, a finding of competence on May 22 does not *prove* that Petitioner was also competent a week earlier on May 13, a finding of competence on May 22 also does not establish—or even suggest—that he was *incompetent* on May 13. Moreover, the considerable evidence in the trial record of Petitioner's actual behavior and functioning on May 13, discussed above, does not support a finding of actual incompetence.

Because Petitioner has not shown with clear and convincing evidence that the trial court erred in denying a competency hearing on May 13 or that he actually was incompetent at any point during his trial, Petitioner's third ground for relief is **DENIED**.

> **4. Fourth Ground for Relief: Trial counsel were ineffective when they failed to object to constitutionally improper and inadmissible victim impact evidence [during] the trial phase of Petitioner's trial.**

In his fourth ground for relief, Petitioner argues that his trial attorneys performed unreasonably and to his prejudice in failing to object to improper and inadmissible victim-impact evidence. (ECF No. 86, PageID 9245–48.) Petitioner explains that despite having filed motions in limine to prohibit victim-impact evidence, trial counsel failed to object when the prosecutor included details about victim Daniel Bailey in his opening statement and when, during direct examination, the victim's mother Tina Bailey testified about activities Daniel used to enjoy while holding a photograph of Daniel in his football uniform. Pointing to excerpts from trial counsel's habeas corpus depositions, Petitioner contends that attorney Warhola

conceded counsel had no strategic reason for not objecting to that evidence, and that attorney Blakeslee unreasonably failed to construe the evidence as objectionable victim-impact evidence. Petitioner argues that because the evidence cited was irrelevant to the facts of the crime and was introduced solely to elicit sympathy from the jury and to prejudice Petitioner, it was inadmissible under controlling federal law and should have been objected to. Petitioner thus concludes that he received ineffective assistance of counsel because Petitioner was prejudiced by counsel's unreasonable failure to object.

Respondent argues that Petitioner's claim mirrors allegations that he presented to the Ohio Supreme Court on direct appeal, and more recently to the state courts during successor postconviction proceedings, and that those decisions rejecting Petitioner's claim did not contravene or unreasonably apply clearly established federal law. (ECF No. 91, PageID 10439–41.) Before addressing the merits-based arguments raised by the parties, it is necessary for the Court to resolve a companion procedural argument raised by Respondent.

In arguing that ground four does not warrant habeas relief, Respondent asserts that this Court's consideration of the deposition testimony of Petitioner's trial attorneys is precluded by *Cullen v. Pinholster* because that testimony was not before the Ohio Supreme Court when it considered and rejected Petitioner's ineffective assistance claim. (ECF No. 91, PageID 10441, *citing Pinholster*, 563 U.S. at 181, and *Moore v. Mitchell*, 708 F.3d 760, 779, 789 (6th Cir. 2013)). As is well established, pursuant to 28 U.S.C. § 2254(d), a federal court *shall not* issue a writ of

habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). In *Pinholster*, the Supreme Court held that in making the § 2254(d) threshold "reasonableness" determination, a federal court in habeas corpus must confine its review to the record that was before the state court that adjudicated the claim on the merits.

Petitioner responds that he included the deposition testimony at issue when he recently re-presented this ineffective assistance claim during his successor postconviction proceedings, and that the evidence thus *was* before the state courts when they rejected the claim. (ECF No. 131, PageID 10762–64.) However, for the reasons that follow, the Court concludes that Petitioner's recent re-presentation of previously exhausted claims with the addition of new evidence developed during these habeas proceedings was insufficient to remove the bar that *Pinholster* erects to this Court's consideration of that new evidence.

As previously noted, earlier in these proceedings, this Court granted Petitioner's requests to conduct limited discovery and for funds to retain certain investigative and expert services. (ECF Nos. 39, 40, 51.) The Court allowed Petitioner to expand the record with the depositions of his trial and appellate attorneys, the affidavits of forensic pathologist Dr. LeRoy Riddick and

60

neuropsychologist Dr. Nicholas Doniger, and the declarations of several family members. (ECF Nos. 65 and 57.)

The Court also ordered that this case be stayed, and the proceedings be held in abeyance, so that Petitioner could return to the state courts to re-present certain claims as bolstered by new evidence that Petitioner had discovered and developed during these proceedings. The Court took that action in response to Respondent's argument that *Pinholster* precluded the Court from expanding the record with any new evidence that the state courts had not considered, explaining:

> The Court is of the view that the best course of action is to stay this case and hold the proceedings in abeyance to allow Petitioner to exhaust his new claims in the state courts. They are properly characterized as new claims because they are not the same claims that the state courts already considered. The Court finds that the new evidence that Petitioner seeks to add to the record so fundamentally alters the claims at issue that the principles of comity and federalism underlying the exhaustion doctrine dictate that Petitioner give the state courts an opportunity to address the claims first. *See Mills v. Mitchell*, No. 1:96-CV-423, 2007 WL 1412982, at *4 (S.D. Ohio May 10, 2007) ("the very reason Mills must return to the state courts to litigate his *Brady* claim is because this Court has found that the newly discovered evidence 'fundamentally alter[ed] the legal claim already considered by the state courts.' ") (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986))); *see also Bragan v. Morgan*, 791 F. Supp. 704, 720 (M.D. Tenn. 1992) ("A claim has not been exhausted when newly discovered evidence presented in the federal petition, which has not been presented to the state courts, 'places [the] claim in a significantly different posture.'") (quoting *Sampson v. Love*, 782 F.2d 53, 55 (6th Cir. 1986))).

(ECF No. 65, PageID 1103.) The Court additionally concluded that Petitioner had good cause for his failure to present the claims affected by the new evidence to the

state courts earlier, and that these claims were not plainly meritless.[6] (*Id.*, PageID 1104–05.)

After Petitioner completed his successor postconviction proceedings, he filed an Amended Petition in which he incorporated the new evidence developed during habeas corpus discovery, understandably believing that his presentation of that evidence during his successor postconviction proceedings was sufficient to lift any hurdle *Pinholster* might have posed to this Court's ability to consider the new evidence. Petitioner emphasizes this Court's determinations that Petitioner had good cause for his failure to present his new evidence to the state courts sooner, and that the claims affected by the evidence were properly characterized as "new." (ECF No. 131, PageID 10762.) Petitioner also stresses that he returned to the state courts at this Court's directive, and that it would be "nonsensical … for this Court to now not have the ability to consider the depositions in determining the merits of various grounds for relief." (*Id.*, PageID 10763.) In so arguing, Petitioner questions Respondent's reliance on *Moore v. Mitchell*, 708 F.3d at 780, in which the Sixth Circuit held that *Pinholster* precluded the federal courts from considering new evidence that the state courts had not considered, even though the parties had jointly moved to expand the record with that new evidence. "The crucial distinction

_____

[6]In *Rhines v. Weber*, 544 U.S. 269, 275-76 (2005), the Supreme Court held that district courts had the authority to order stay-and-abeyance when faced with a mixed petition containing both exhausted and unexhausted claims, so long as the court found that there was good cause for the petitioner's failure to present the unexhausted claims to the state courts earlier and that the unexhausted claims

between *Moore* and the instant case," Petitioner reasons, "is that the additional evidence from the depositions **was presented** to the state courts." (ECF No. 131, PageID 10763 (emphasis in original).) Petitioner concludes by noting that "once this Court concludes that the state court unreasonably applied *Strickland*, then the constrictions of § 2254(d)(1) and (d)(2) fall away and the claim must be reviewed de novo." (*Id.*, PageID 10764.) Due to the evolving state of the law in the Sixth Circuit concerning application of *Pinholster*, the Court cannot conclude that Petitioner's return to the state court was sufficient to remove *Pinholster*'s restrictions.

In *Dunlap v. Paskett*, Case No. 1:99-cv-559, 2019 WL1274862 (S.D. Ohio Mar. 20, 2019), the Court recently rejected a similar request by a petitioner to consider evidence following the petitioner's return from an unsuccessful pursuit of successor postconviction proceedings in an effort to overcome *Pinholster*'s restriction. The Court explained in part:

> [I]n *Carter v. Mitchell*, 829 F.3d [455], 464-67 [(6th Cir. 2016)], the Sixth Circuit held that the trial court had not abused its discretion in denying Carter's request to stay his habeas proceedings and hold them in abeyance so he could return to the state court to present evidence in support of claims that had already been presented to and rejected by the state courts—albeit without the evidence that Carter had developed in habeas corpus. The Sixth Circuit noted that "*Pinholster* indeed limited the 'record under review' in federal habeas proceedings to 'the record before the state court,' precluding review of evidence developed in federal habeas proceedings." *Id.* at 464. "[I]n an effort to evade *Pinholster*," the Sixth Circuit continued, "Carter seeks to return to state court so that he can change the record before it and, hopefully, recommence federal habeas proceedings with a more favorable state court record." *Id.* The crux of Carter's argument was that "*Rhines*

were not plainly meritless.

permits stays for a petitioner to 'exhaust evidence'—in other words, to return to state court to submit additional evidence to buttress claims already exhausted…." *Id.* at 466. The Sixth Circuit rejected that argument, and made clear that *Rhines* stays may not be extended to encompass "unexhausted evidence." *Id.* at 467.

*Dunlap*, 2019 WL 1274862, at *7.

In response to Petitioner's assertion that his return to state court could not have been in vain (ECF No. 131, PageID 10763), it now appears that it was in vain. Although *Carter* does not operate to somehow invalidate Petitioner's return to the state court or the justifications this Court found for directing him to return to state court, the fact remains that had *Carter* been in effect at the time, this Court would not have issued a *Rhines*-based stay-and-abeyance so that Petitioner could return to state court to present "unexhausted evidence." That being so, even if *Carter* does not apply as to the already-decided issue of whether stay-and-abeyance was warranted, it unmistakably speaks to how the Court should proceed going forward as to evidence that was presented to, *but ultimately not considered by*, the state courts. *See Dunlap*, 2019 WL 1274862, at *8.

In arguing that Respondent's reliance on *Moore v. Mitchell* was misplaced, Petitioner asserts that his new evidence, unlike Moore's, "**was presented** to the state courts." (ECF No. 131, PageID 10783 (emphasis in original).) But that argument misses the critical distinction between state courts *being presented* with evidence and state courts *having evidence before them* within the meaning of *Pinholster*.

[T]he evidence Petitioner seeks to add to ground fourteen is evidence

that the state courts have not considered, despite Petitioner's attempt to persuade them to consider it. As to each of the claims that Petitioner presented in his successive postconviction petition, both the trial court and the court of appeals held that the trial court did not have jurisdiction to consider the claim because Petitioner had failed to meet the jurisdictional prerequisites for filing a successive postconviction petition set forth in Ohio Rev. Code § 2953.23(A). (record citations omitted.) The Ohio Supreme Court declined jurisdiction to review the case, thereby leaving in effect the trial court's judgment as affirmed by the court of appeals. (record citation omitted.) It is immaterial that the trial court and appellate court offered pronouncements on the merits of some of Petitioner's claims, for any judgment of the merits by a court that lacks jurisdiction is *void ab initio. See, e.g., Gumm v. Mitchell*, 775 F.3d 345, 362 (6th Cir. 2014). And the Sixth Circuit has ruled that R.C. § 2953.23(A)'s jurisdictional prerequisites constitute an adequate basis for denying federal habeas review. *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013); *see also Stojetz v. Ishee*, 892 F.3d 175, 204–06 (6th Cir. 2018); *Davie v. Mitchell*, 547 F.3d 297, 311 (6th Cir. 2008).

[T]he unmistakable conclusion from the foregoing is that the state courts were presented with, but did not consider and therefore *did not have before them*, the new evidence that Petitioner seeks to add to his fourteenth ground for relief. That being so, *Pinholster* precludes this Court from considering that evidence in determining whether the state courts' decision denying the version of Petitioner's mitigation-phase ineffective assistance claim as originally pleaded was unreasonable within the meaning of 28 U.S.C. § 2254(d).

*Dunlap*, 2019 WL 1274862, at *9. This reasoning applies here. A court without jurisdiction to rule on a successive postconviction action cannot be said to have had before it any of the evidence underlying that action.[7]

---

[7]*But see Hughbanks v. Hudson*, 2 F.4th 527, 535–36 (6th Cir. 2021) (considering new evidence obtained during federal habeas that was not before the state court when it adjudicated the claim on the merits). *Hughbanks* can also be read as limited to procedurally defaulted *Brady* claims that were never subjected to any merits review in state court. Hughbanks limited his *Brady* claim on appeal to the 6th Circuit to only those grounds presented for the first time to the state courts in his successive post-conviction petition. Because the *Brady* claim at issue on

Petitioner laments that he could not have been required to return to the state courts with his new evidence, only to not be able to present that evidence to this Court upon his return. The Court is not unsympathetic to Petitioner's argument. But it is important to note what the Court's stay-and-abeyance order was and what it was not. The Court addressed this quandary in *Dunlap*, explaining that:

> [P]etitioner is essentially gleaning from this Court's stay-and-abeyance order an implicit guarantee that Petitioner would be able to amend his petition with anything that he presented to the state courts during his successive postconviction proceedings. That is an understandable assumption, but one that now runs counter to the current state of the law. Petitioner developed a wealth of new evidence during these proceedings. In the wake of *Pinholster*, allowing Petitioner to return to state court to attempt to present those new issues offered the best chance—but by no means a guarantee—for this Court to be able to consider those new issues. However diligent Petitioner was in that endeavor, he was unsuccessful in having the state courts consider this new issues.

*Dunlap*, 2019 WL 1274862, at *9.

In short, *Pinholster* does not contain a due diligence exception. *Id*. at *10, quoting *Lynch v. Hudson*, 182 F. Supp. 2d 787, 791 (S.D. Ohio 2016). That being so, as to any claim that the Ohio courts adjudicated on the merits, *Pinholster* precludes this Court from considering any evidence that the state courts did not have before them in determining whether the state courts' adjudication was unreasonable under § 2254(d).

Petitioner's fourth ground for relief is that his trial attorneys performed

---

appeal had never been adjudicated on the merits by state courts, the court reviewed the claim and all of its evidence *de novo* to determine whether the procedural

unreasonably and to his prejudice when they failed to object to several instances of the prosecution introducing improper victim-impact evidence. He argues that, despite having filed motions in limine to preclude the admission of victim-impact evidence at any phase of Petitioner's trial (demonstrating that counsel were aware of the devastating effect of such evidence), counsel failed in several instances to object when victim-impact evidence was introduced. Petitioner points to references by the prosecution during opening statements to victim Daniel Bailey's age, grade level, academic honors, paper route, and favorite activities and pastimes. (ECF No. 86, PageID 9245.) Petitioner also asserts that during Tina Bailey's testimony, the prosecution elicited some of the same details about her son Daniel, all while Tina held a photograph of Daniel wearing his football uniform. (*Id*., PageID 9245–46.)[8]

Petitioner asserts that even though the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 824–25 (1991), determined that individual states could determine what evidence may be considered as to the sentence to be imposed, the victim-impact evidence that Petitioner's trial counsel failed to object to came in during the guilt-innocence phase of his trial. Petitioner further argues that in Ohio, victim-impact evidence should be excluded from the trial phase if it does not relate to the facts attendant to the offense and serves only to inflame the passion of the jury.

---

default was excused.

[8]The next several paragraphs in Petitioner's Amended Petition relate details from trial counsel's habeas corpus depositions, which, as set forth above, this Court has held it may not consider in determining whether the state court decision rejecting Petitioner's claim was unreasonable under § 2254(d).

(ECF No. 86, PageID 9247, *citing and discussing State v. White*, 15 Ohio St. 2d 146 (1968); *State v. Fautenberry*, 72 Ohio St. 3d 435 (1995); *State v. Allard*, 75 Ohio St. 3d 482 (1996).) He claims that because the biographical and anecdotal evidence about Daniel referenced during the prosecution's opening statement and Tina Bailey's direct testimony was irrelevant to the facts of the offense, trial counsel's failure to object was unreasonable and could not have been calculated trial strategy. (ECF No. 86, PageID 9247.) Petitioner continues that this impermissible victim-impact evidence prejudiced the jury in its determination of his guilt or innocence. (*Id.*, PageID 9248.)

Respondent asserts, Petitioner does not dispute, and independent review of the record confirms that Petitioner presented this claim of ineffective assistance of counsel on direct appeal to the Ohio Supreme Court as part of his nineteenth proposition of law. (ECF No. 82-11, PageID 2507.) Petitioner also presented on direct appeal a substantive claim that improper victim-impact evidence was introduced during the trial phase. (ECF No. 82-10, PageID 2445–46.)[9] The Ohio Supreme Court rejected Petitioner's ineffective assistance claim as follows:

> Third, Johnson complains that his counsel failed to object to Tina's testimony about Daniel's honor-student status and his hobbies, failed

---

[9]Petitioner also presented this claim of ineffective assistance in his successor postconviction proceedings. (ECF No. 85-1, PageID 8241.) But, as set forth above, because Petitioner failed to satisfy Ohio Rev. Code § 2353's jurisdictional requirements for filing a successor postconviction petition, the state courts were without jurisdiction to entertain Petitioner's claim, thereby precluding this Court from considering that claim.

68

on three occasions to object to hearsay, and failed to object to testimony about Johnson's prior convictions. However, "failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel. To prevail on such a claim, a defendant must first show that there was a substantial violation of any of defense counsel's essential duties to his client, and, second that he was materially prejudiced." *State v. Holloway* (1988), 38 Ohio St. 3d 239, 244, 527 N.E.2d 831. Johnson does not explain how these alleged failures constituted a violation of counsel's duties or caused prejudice in light of the evidence against him.

As the United States Court of Appeals for the Sixth Circuit has recently explained, "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been a part of a trial strategy or tactical choice." *Lundgren v. Mitchell* (C.A. 6, 2006), 440 F.3d 754, 774. Accord *State v. Campbell* (1994), 69 Ohio St.3d 38, 52-53, 1994 Ohio 492, 630 N.E.2d 339.

Our review of the trial transcript reveals no such failure by Johnson's trial counsel, and we overrule his claim of ineffective assistance based on these incidents.

*Johnson*, 112 Ohio St. 3d at 229–30.

The preliminary issue is whether the Ohio Supreme Court's decision was an unreasonable application of clearly established federal law or involved an unreasonable determination of the facts. Only if the Court answers that query in the positive can it consider whether habeas corpus relief is warranted. "Clearly established Federal law" within the meaning of § 2254(d)(1) means a Supreme Court decision, as opposed to one from a lower federal court. *See Renico v. Lett*, 559 U.S. 766, 779 (2010). Additionally, Petitioner must identify a Supreme Court

69

holding, as opposed to dicta. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). And

Petitioner must demonstrate that the state courts unreasonably applied an on-point

Supreme Court decision, not merely failed to extend that decision to the facts of

Petitioner's case. *Richter*, 562 U.S. at 101; *Knowles v. Mirzayance*, 556 U.S. 111, 122

(2009) ("But this Court has held on numerous occasions that it is not 'an

unreasonable application of' 'clearly established Federal law' for a state court to

decline to apply a specific legal rule that has not been squarely established by this

Court.") (*citing Wright v. Van Patten*, 552 U.S. 120, 123 (2008) (*per curiam*));

*Schriro v. Landrigan*, 550 U.S. 465, 478 (2007); *Carey v. Musladin*, 549 U.S. 70, 76–

77 (2006)). With respect to a claim that the state courts unreasonably rejected an

allegation of ineffective assistance of counsel, "the relevant clearly established law

derives from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d

674 (1984)." *Premo v. Moore*, 562 U.S. 115, 118 (2011).

   The standard for demonstrating a claim of ineffective assistance of counsel is

composed of two parts:

> First, the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so serious
> that counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant must show
> that deficient performance prejudiced the defense. This requires
> showing that counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.  Scrutiny of defense counsel's performance must be

"highly deferential." *Id*. at 689.

   With respect to the first prong of the *Strickland* test, "[b]ecause of the

70

difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* To establish the second prong, prejudice, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that Petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

Of course, the issue before the Court is not whether Petitioner's trial counsel rendered ineffective assistance in failing to object to victim-impact evidence, but whether the Ohio Supreme Court's decision answering that inquiry in the negative was an unreasonable application of *Strickland*. This requires an exercise of double deference. As the Supreme Court has explained, while "[s]urmounting *Strickland*'s high bar is never an easy task[,]:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' * * * and when the two apply in tandem, review is 'doubly' so * * *. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. * * * Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Premo*, 562 U.S. at 122–23 (internal quotation marks and citations omitted); *see*

*also Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (*per curiam*) ("Judicial review of a defense attorney's [performance] is therefore highly deferential—and doubly deferential when it is conducted through the lens of federal habeas."); *Robins v. Fortner*, 698 F.3d 317, 329 (6th Cir. 2012) ("The 'pivotal question' for us on appeal, however, is 'whether the state court's application of the *Strickland* standard was unreasonable, which is different from asking 'whether defense counsel's performance fell below *Strickland*'s standard.'") (*quoting Richter*, 562 U.S. at 101).

In his Traverse, Petitioner contends that it was both. But he does not explain how, beyond merely reiterating arguments he advanced in his amended petition for why counsel's failure to object was unreasonable and prejudicial. (ECF No. 131, PageID 10758–64.)

Respondent asserts that the Ohio Supreme Court's decision did not contravene or unreasonably apply clearly established federal law. (ECF No. 91, PageID 10440–41.) Specifically, Respondent argues that the Ohio Supreme Court exactingly applied *Strickland* and concluded that counsel could have deliberately declined to object where the complained of evidence or testimony was not prejudicial and where repeated objection could harm the defendant's case. Respondent continues that it is not likely that Tina Bailey's holding a photograph of Daniel Bailey while testifying or that brief biographical references so inflamed the jury that it could not render an unbiased verdict. To that point, Respondent reasons that sympathy for a child-victim requires no prompting. Respondent also asserts that repeated objections can emphasize testimony and be viewed negatively by a jury.

72

Finally, in arguing that the Ohio Supreme Court's decision was not unreasonable, Respondent contends that a defense attorney complaining about the mother of a murdered child holding a photograph of her child is not likely to curry favor with jurors.

The Court is not persuaded that the Ohio Supreme Court's decision rejecting Petitioner's ineffective assistance claim unreasonably applied *Strickland*. The Ohio Supreme Court followed *Strickland*'s two-part test in evaluating whether trial counsel's performance was objectively deficient and prejudicial to Petitioner. That Court correctly recognized that an attorney's failure to object should be found unreasonably deficient only if it cannot be deemed as part of a reasonable trial strategy. And courts have consistently held that an attorney may decide as a matter of trial strategy that repeated or forceful objections could have a negative effect on their case by distracting the jury or unduly emphasizing unfavorable evidence. The Court does not disagree with the Ohio Supreme Court's assessment of counsel's performance, much less find the assessment unreasonable.

Nor does the Court find unreasonable the Ohio Supreme Court's decision that Petitioner was not materially prejudiced by counsel's performance. Petitioner asserts that because of trial counsel's unreasonable failure to object, the complained-of victim-impact evidence prejudiced the jury's guilt/innocence determination by tipping the scales in favor of guilt. But that claimed impact seems exaggerated in view of the overwhelming evidence against Petitioner, including his own admission(s) while attempting to represent himself at trial. Combine that with

73

this Court's assessment that the complained-of references to victim-impact evidence were neither egregious nor pervasive, and the Ohio Supreme Court's conclusion that counsel did not render objectively deficient and prejudicial performance in not objecting to those references cannot be deemed "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. That is, the Ohio Supreme Court's decision was not unreasonable within the meaning of § 2254(d). Petitioner's fourth ground for relief is DENIED.

> **5. Fifth Ground for Relief: There was insufficient evidence that a kidnapping occurred – because the victim died prior to the restraint or Petitioner inflicted serious physical harm prior to the imposition of restraints.**

In his fifth ground for relief, Petitioner claims there was insufficient evidence to convict him of kidnapping because the prosecution failed to prove that Daniel was still alive when bound and moved from the living room to the basement or that serious physical harm was inflicted after the restraints were applied.[10] (ECF No. 86, PageID 9248–50.) Petitioner contends that statements made by the prosecutor during voir dire, the trial testimony of the lead detectives, and the allegedly conflicting testimony from the medical examiner undermine or discredit the assertion that Daniel was still alive when he was restrained and moved. Petitioner

_____

[10]To convict Petitioner of kidnapping, the state had to prove that he (1) moved or restrained Daniel's liberty, (2) by force, threat, or deception, and (3) for the purpose of terrorizing or inflicting serious physical harm. O.R.C. § 2905.01(A)(3).

maintains that the only evidence that Daniel was alive when he was tied up was Dr. C. Jeff Lee's[11] stated opinion that he was alive, but Petitioner argues that Dr. Lee then contradicted that opinion in other parts of his testimony. (*Id.*, PageID 9249–50.) Specifically, he points to Dr. Lee's determination that Daniel died from "blunt force injury to the head" and that the fatal injuries were inflicted prior to the ligatures being applied to his hands and feet as contradicting his time-of-death opinion. *Id.* Petitioner also cites the testimony of Detectives Greg Clark and Brian Harbin, who both stated that the blood spatter and large amount of blood in the living room led them to conclude that Daniel was killed there rather than in the basement where his body was found. (*Id.*, PageID 9249, *citing* ECP 83-9, PageID 7053–55, 7092, 7097.)

Respondent argues that the Ohio Supreme Court's rejection of Petitioner's claim on direct appeal was a reasonable application of Supreme Court precedent. (ECF No. 91, PageID 10469–70.) He points out that Petitioner does not challenge the state court's factual findings as to the existence of the relevant testimony in the record, but instead merely asserts the weakness of the state's evidence in light of the conflicting testimony as to the issue of whether Daniel was still alive. Respondent maintains that the Ohio Supreme Court was obligated to presume that the jury resolved conflicting evidence in favor of the prosecution under the *Jackson v. Virginia* standard for insufficient evidence claims.

---

[11]Dr. Lee was the forensic pathologist who performed Daniel's autopsy.

75

The Ohio Supreme Court, reviewing Petitioner's claim on direct appeal, rejected the contention that Daniel could not have been alive when he was restrained:

> First, he argues that he could not have kidnapped Daniel, because Daniel died before Johnson hogtied him. . . . [T]he evidence does not support Johnson's contention that Daniel had died before being restrained. Dr. Lee testified that Daniel was still alive when Johnson tied his hands and feet, and this testimony supports the jury's finding that Johnson restrained Daniel of his liberty.
>
> Johnson also contends that during voir dire, the state conceded that Daniel had died before Johnson hogtied him. A review of the transcript reveals that the prosecutor stated, "The charges accuse Mr. Johnson of going into the home of Constantina Bailey when Daniel was there alone, beating him to death, tying him up and dragging him into the basement * * *." This statement is not a concession that Johnson killed Daniel before restraining and taking him to the basement.
>
> Accordingly, we reject Johnson's assertions that Daniel died before Johnson hogtied and carried him to the basement. . . .
>
> We overrule Johnson's 13th proposition of law.

*Johnson*, 112 Ohio St.3d at 215–17.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *Thompson v. City of Louisville*, 362 U.S. 199, 206 (1960). On a claim of insufficient evidence, the reviewing court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The essential elements of the crime

76

are those "substantive elements of the criminal offense as defined by state law." *Id.* at 324. "[The reviewing court] do[es] not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Smith v. Nagy*, 962 F.3d 192, 205 (6th Cir. 2020), *quoting Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

In addition to the deference given to the trier-of-fact under *Jackson*, a federal habeas court reviewing a state court conviction under the strictures of the AEDPA, as here, also must defer to the state appellate court's sufficiency determination. *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc), *citing Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). "This means that 'even though [the Court] might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution.'" *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018), *quoting Brown*, 567 F.3d at 205. And "even were [the Court] to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt . . . we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.*, *quoting Brown*, 567 F.3d at 205 (internal quotation marks omitted).

Because the Ohio Supreme Court rejected Petitioner's claim on the merits, the question before the Court is whether the state court unreasonably applied the *Jackson* standard to the facts. *See* § 2254(d)(1). The Court finds that it did not. Sufficient evidence existed in the record to allow a rational trier of fact to

77

reasonably conclude that the victim was still alive when he was tied up, most notably Dr. Lee's testimony as to the physical signs he observed that the ligatures were applied when Daniel was alive: "[T]here's no question he was alive [prior to being tied up and restrained]. . . . Because of the skin reaction, the red hyperemia next to the bindings around his wrists shows that the bindings were put on and the heart was still pumping while these tight bindings were around the wrists." (ECP 83-11, PageID 7505.)

Petitioner counters that it was unreasonable for the Ohio court to "cherry pick[] one small piece of Dr. Lee's testimony and cite[] it out of context" in light of Dr. Lee's conflicting statements and the two detectives' testimony regarding their conclusion about where the crime took place. (ECF No. 131, PageID 10767–68.) But an appellate court, when faced with a record of conflicting evidence open to different inferences, reviews the evidence in the light most favorable to the prosecution to preserve the jury's role as factfinder. *Smith v. Cook*, 956 F.3d 377, 396 (6th Cir. 2020), *quoting Jackson*, 443 U.S. at 326. It looks at "whether there is sufficient evidence which, *if credited*, could support the conviction." *Schlup v. Delo*, 514 U.S. 298, 330 (1995) (emphasis added). Convictions may be sustained solely on the basis of circumstantial evidence, and the evidence need not eliminate every reasonable hypothesis but guilt. *United States v. Burris*, 999 F.3d 973, 976 (6th Cir. 2021), *quoting United States v. Lowe*, 795 F.3d 519, 522–23 (6th Cir. 2015); *United States v. Rosales*, 990 F.3d 989, 994 (6th Cir. 2021), *citing United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020). Thus, to the extent the "conflicting" testimony cited

78

by Petitioner was truly irreconcilable with Dr. Lee's conclusion regarding time of death, it was for the jury, in its "factfinder's role as weigher of the evidence," *Jackson*, 443 U.S. at 319, to resolve any conflicts in the testimony or issues of witness credibility, *see United States v. Williams*, 998 F.3d 716, 727–28 (6th Cir. 2021), *quoting Jackson*, 443 U.S. at 319. Because the jury convicted Petitioner of the aggravated kidnapping charge, a reviewing court must assume it resolved any conflicts for the prosecution and review the sufficiency of the "cherry-picked" evidence that supports the conviction.

Petitioner makes much of Dr. Lee's, the detectives', and the prosecutor's statements that Daniel was killed in the living room. He claims that all of these opinions are admissions that the kidnapping did not occur because Daniel was already dead, refusing to distinguish between the infliction of the fatal injuries and the actual time of death. But a rational jury could have understood comments alluding to the place where Daniel was killed as referring to the place where the fatal injuries were inflicted, not to the location of his precise moment of expiration, and then concluded based on Dr. Lee's testimony of red hyperemia around the wrist bindings that death was not instantaneous. *See Coleman v. Johnson*, 566 U.S. 650, 655 (2012) ("*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'") (*quoting Jackson*, 443 U.S. at 319).  Nor was it unreasonable for the Ohio Supreme Court to rely on this interpretation of the witness statements when reviewing Petitioner's claim on direct

79

appeal. It was a straightforward application of *Jackson*'s admonition that evidence

be viewed in the light most favorable to the prosecution to preserve the jury's role as

factfinder.

Petitioner also argues that the state failed to prove that he moved or

restrained Daniel for the purpose of terrorizing or inflicting serious physical harm[12]

because the assault occurred before the ligatures were applied. (ECF No. 86,

PageID 9250.) He also challenges the notion that serious harm could be inflicted on

a person who is nearly deceased, citing Dr. Lee's trial testimony that Daniel likely

would have died from his injuries even if he had been in a hospital at the time. (*Id.*,

*citing* ECF No. 83-11, PageID 7511.)

There is no requirement in Ohio law that serious physical harm must be

inflicted after the restraint of liberty in order to show the perpetrator's intent to

inflict harm. In *State v. Haines*, an Ohio appellate court held that locking the victim

in a crawlspace for 30–45 minutes after hitting her several times in the head with a

---

[12]Section 2901.01(A)(5) of the Ohio Revised Code "defines serious physical harm to persons," as used in the § 2905.01(A)(3) kidnapping statute, as:

   (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
   (b) Any physical harm that carries a substantial risk of death;
   (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
   (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
   (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

§ 2901.01(A)(5)(a)–(e) (2002 ed.).

board was sufficient evidence for a jury to find that the act was intended to terrorize *and* to inflict serious physical harm, satisfying either or both prongs of § 2905.01(A)(3). No. 2005-Ohio-1692, 2005 WL 820539, at *13 (Ohio App. 11 Dist. 2005), *rev'd in part on other grounds*, 112 Ohio St.3d 393 (Ohio 2006); *see also, e.g., State v. Simko*, 71 Ohio St.3d 483, 489 (Ohio 1994) (brandishing a gun before locking the victim in the bathroom was sufficient to prove intent to terrorize); *State v. McDougler*, No. 2006-Ohio-100, 2006 WL 62572, at *2–3 (Ohio App. 8 Dist. 2006) (defining "terrorize" as "to fill with terror or anxiety," such that threats to victim that defendant was going to "fuck him up," "beat his ass," and "mess him up," were sufficient evidence of a purpose to terrorize in § 2905.01(A)(3)).

Petitioner cites *Tanner v. Yukins*, 867 F.3d 661 (6th Cir. 2017), for the proposition that a conviction cannot be sustained, even under the AEDPA, when there is merely reasonable speculation as to an element of the crime. (ECF No. 131, PageID 10767.) But the facts in *Tanner* bear no resemblance to those here. In *Tanner*, the inculpatory evidence for felony murder and armed robbery consisted of (1) a detective's testimony that the defendant said the knife found at the crime scene was hers which she had last handled several weeks earlier, (2) the same detective's testimony that the defendant said she had waited in the car in the parking lot around the time of the murder while her friend ran inside the bar where the victim was later found murdered, and (3) blood found on the upstairs sink

matched the defendant's blood type and PGM subtype. *Tanner*, 867 F.3d at 672.[13] The Sixth Circuit set aside the numerous problems with the detective's testimony, such as the fact that the transcript of the conversation directly contradicted his testimony that the defendant told him the knife was hers, and—as required by *Jackson*—fully credited as true his statements about the knife and the defendant's location that night. *Id.* at 673. The problem in *Tanner* was that the inculpatory evidence, viewed in the best light for the prosecution and without consideration of the exculpatory evidence, could not prove the elements of the crime.

In contrast, Petitioner's argument that there is merely reasonable suspicion as to whether Daniel was alive when the ligatures were applied depends on reweighing all of the evidence. Unlike in *Tanner* where the fully credited inculpatory evidence still fell short, Dr. Lee's testimony here, if credited for the prosecution as required by *Jackson*, was alone sufficient evidence to conclude that Daniel was alive when he was tied up.

At base, Petitioner's argument is that the Court should reweigh the evidence, placing greater weight on the prosecutor's and detectives' references to the living room as the place where Daniel was killed and discounting Dr. Lee's testimony that Daniel was likely alive when the ligatures were applied. This is directly contrary to the clearly established federal law in *Jackson v. Virginia*. In contrast, the Ohio

---

[13]The prosecution also presented evidence that the victim had died from multiple stab wounds after a struggle and that the blood stains on the victim's shirt came from an unidentified woman. The blood stains did not match the defendant or

Supreme Court's rejection of Petitioner's claim was *not* an unreasonable application of *Jackson*. Accordingly, Petitioner's fifth ground is **DENIED**.

> **6. Sixth Ground for Relief: Petitioner was deprived of the right to the effective assistance of trial counsel contrary to the Fifth, Sixth, Eighth and Fourteenth Amendments when counsel failed to present any testimony or evidence of Petitioner's family, character, upbringing, and background**.

In his sixth ground for relief, Petitioner claims ineffective assistance of counsel during the penalty phase of his trial due to trial counsel's failure to present mitigation evidence or testimony from his relatives regarding his family, character, upbringing, and background. Specifically, Petitioner argues that his trial counsel and mitigation specialist conducted an inadequate investigation, failing to collect background records and only interviewing a handful of his family members, and that Attorney Warhola actively discouraged his family members in Alabama from attending or testifying in the mitigation phase of his trial. (ECF No. 86, PageID 9250–53, 9255.) Because of these failures, Petitioner claims, jurors were deprived of learning about the abuse he suffered as a child, the racist environment he grew up in, and the prevalence of drugs and alcohol in his life beginning in childhood. In support of his claims, he presented the habeas depositions of his trial counsel and affidavits from family members attesting to what they would have told the jury had they been contacted by defense counsel to testify.

Respondent responds that the state court's rejection of Petitioner's claims

---

any of her hypothesized associates. *Id.* at 674.

was objectively reasonable, its application of the *Strickland* test did not contravene or unreasonably apply federal law, and its factual findings that Petitioner's trial counsel conducted an effective investigation and the new evidence presented in post-conviction was not sufficiently different or compelling to justify a finding of prejudice were fully supported by the record. (ECF No. 91, PageID 10442–44.) Respondent contends that this case is similar to *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005), in which the Sixth Circuit held that affidavits presenting additional information about family background and positive character traits were not sufficient to show prejudice. (ECF No. 91, PageID 10442–43.)

Petitioner raised these claims in his initial state post-conviction petition.[14] (ECF No. 82-14, PageID 2974–82.) He relied on affidavits from several family members: half-sister Iveryl Johnson Robinson, niece Grenea Bridges, sister-in-law Estoria Johnson, and an affidavit from post-conviction mitigation specialist Pam Swanson recounting her conversation with paternal half-sister Lulu Williams. (*See* ECF No. 82-15, PageID 3027–36.) The Ohio Court of Appeals affirmed the state trial court's rejection of the claims, finding that counsel performed competently and Petitioner was not prejudiced:

─────────────────

[14]Petitioner's fifth ground for relief in his initial state post-conviction petition claimed ineffective assistance for discouraging Ivryl Robinson and Marion Robinson from traveling to Ohio to testify during the mitigation phase. (ECF No. 82-14, PageID 2974–76.) The sixth ground claimed counsel failed to properly investigate, prepare, and present evidence regarding Petitioner's background. (*Id.*, PageID 2977–79.) The seventh ground claimed counsel failed to investigate and present available mitigation evidence because of the inadequate investigation conducted by

In his fifth, sixth, and seventh claims for relief appellant contends that counsel was ineffective in failing to conduct and [sic] adequate and reasonable investigation of appellant's background, failing to collect medical records and failing to call family members to testify, thereby failing to provide additional mitigating evidence.

In his direct appeal the Ohio Supreme Court noted "Johnson introduced evidence of a mitigating factor under R.C. 2929.04(B)(3) that 'because of a mental disease or defect,' he 'lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to requirements of the law' when he killed Daniel. He also introduced evidence that he suffers from alcoholism and drug addiction and that he had consumed drugs and alcohol shortly before the murder." *State v. Johnson*, supra, 112 Ohio St.3d at 250, 2006-Ohio-6404 at ¶ 291, 858 N.E.2d at 1184.

Generally, counsel's decision as to what mitigating evidence to present during the penalty phase of a capital trial is a matter of trial strategy. *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47, certiorari denied (1998), 523 U.S. 1063, 118 S.Ct. 1393, 140 L.Ed.2d 652. Defense counsel has a duty to investigate mitigating circumstances in order to make informed tactical decisions about what information would be most helpful to his or her client. *State v. Jackson*, Franklin App. No. 01AP808, 2002-Ohio-3330 ("*Jackson II*"), citing *State v. Johnson* (1986), 24 Ohio St.3d 87, 90, 494 N.E.2d 1061. The decision to forego the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel. *State v. Johnson* (1986), 24 Ohio St.3d 87, 91, 494 N.E.2d 106.

Further, decisions regarding what witnesses to call fall within trial strategy and, absent prejudice, generally will not constitute ineffective assistance of counsel. *State v. Hessler*, Franklin App. No. 01AP-1011, 2002-Ohio-3321. To demonstrate prejudice, a petitioner must show not only that there was mitigating evidence counsel failed to present, but, also, "there is a reasonable probability that the evidence would have swayed the jury to impose a life sentence." *Keith* at 536, 684 N.E.2d 47. We find no such evidence here.

"Moreover, the record demonstrates that Johnson wished to hurt Tina, as demonstrated by his statement during trial: 'Do you recall times after sex with me * * * that you would, after finished, you would get up

---

the mitigation specialist, Marsha Heiden. (*Id.*, PageID 2980–82.)

and go to the window? * * * You remember that feeling? That's what it felt like to beat your son in the f***ing head.'

"Johnson's employment record, his history as an abused and neglected child, and his redeeming traits of spirituality, politeness, and helpfulness have little weight." *State v. Johnson*, supra, 112 Ohio St.3d at 253, 2006-Ohio-6404 at ¶ 307, 858 N.E.2d at 1186.

"This is not, however, a case where counsel simply abdicated their responsibility to their client, thus necessitating an evidentiary hearing to determine the effectiveness of their representation. Cf. *State v. Scott* (1989), 63 Ohio App.3d 304, 578 N.E.2d 841 (remanding to the trial court for a hearing on counsel's effectiveness); *Johnson* (finding counsel ineffective and reversing death sentence). Rather, the record firmly establishes counsel's diligent preparation and good-faith efforts at representation, and appellant's post-conviction presentation of additional or different theories of mitigation does not present facts sufficient to show that his counsel were ineffective". *State v. Conway*, 10th Dist. No. 05AP-76, 2005-Ohio-6377 at ¶ 44.

As the Supreme Court further explained in *Jackson*, supra, "[b]road assertions without a further demonstration of prejudice do not warrant a hearing for all post-conviction relief petitions." *Id.* at 111. Rather, a petitioner must submit evidentiary documents containing sufficient operative facts to support his claim before an evidentiary hearing will be granted. Accordingly, "a trial court properly denies a defendant's petition for post conviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

The petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that appellant set forth sufficient operative facts to establish substantive grounds for relief. *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C). We find there is no reasonable probability that the medical evidence, testimony by family members or other mitigating evidence set forth in appellant's fifth, sixth and seventh claims for relief would have swayed the jury to impose a life sentence.

We reject appellant's fifth, sixth, and seventh claims for relief.

*Johnson*, 2007 WL 1098106, at *12–14.

86

Petitioner reprised his claims in his second state post-conviction petition, this time bolstered by new evidence developed during federal habeas proceedings, including additional affidavits from members of his family: niece Marian Johnson, niece Kizzy Edwards, brother Cornelius Johnson, sister Coretta Johnson, and new affidavits from niece Grenea Bridges and sister-in-law Estoria Johnson. The Ohio Court of Appeals affirmed the trial court's dismissal of the petition for failing to satisfy the jurisdictional requirements governing the filing of successive post-conviction petitions in § 2953.23(A)(1). *Johnson*, 2013 WL 1400607, at *5.

The Court reviews the decision of the Ohio Court of Appeals in Petitioner's initial state post-conviction proceedings as it was "the last state court decision to reach the merits of the particular claims being considered." *Moreland v. Bradshaw*, 699 F.3d 908, 931–32 (6th Cir. 2012), *quoting Davis*, 658 F.3d at 531. For the reasons explained in response to Petitioner's fourth ground for relief, *supra*, the Court's review is also limited to the record that was before the Ohio Court of Appeals when it adjudicated the claims in Petitioner's initial state post-conviction proceedings. *See Pinholster*, 563 U.S. at 185. The new evidence developed during federal habeas and presented for the first time in Petitioner's second state post-conviction petition will not be considered because it was not before the state appellate court when it reviewed these claims on the merits.[15]

---

[15]Specifically, the Court may not consider the habeas depositions of trial counsel or the affidavits of family members Marion Johnson, Kizzy Edwards, Cornelius Johnson, Coretta Johnson, or the second affidavits from Grenea Bridges

The *Strickland* standard for ineffective assistance of counsel applies to the penalty phase of trial as well as the guilt phase. Petitioner must demonstrate that counsel's performance was deficient and that he was prejudiced as a result. *Strickland*, 466 U.S. at 687. While decisions regarding mitigation strategy and witness presentation are generally subject to considerable deference as aspects of trial strategy, both the failure to present mitigating evidence, *Williams*, 529 U.S. at 395–96, or discover all reasonably available mitigating evidence, *Wiggins v. Smith*, 539 U.S. 510, 521–24 (2003), can constitute deficient performance. But to satisfy the prejudice prong, Petitioner must offer additional new evidence that "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Caudill v. Conover*, 881 F.3d 454, 463–64 (6th Cir. 2018), *quoting Hill*, 400 F.3d at 319. "[A]dditional mitigating evidence that is 'merely cumulative' of that already presented does not rise to the level of a constitutional violation." *Pike v. Gross*, 936 F.3d 372, 379 (6th Cir. 2019), *quoting Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006). Ultimately, prejudice requires showing "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Hill*, 400 F.3d at 314, *quoting Strickland*, 466 U.S. at 695.

Because Ohio's courts adjudicated Petitioner's claims on the merits, the Court may grant relief only if the state court's adjudication "was contrary to, or

and Estoria Johnson.

involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Thus, Petitioner must not only establish that his counsel were constitutionally ineffective under the *Strickland* standard, but he also "must satisfy AEDPA—by showing that any rulings by the state courts on the merits of [his] claim were unreasonable." *Caudill*, 881 F.3d at 460. "The combined effect of *Strickland* and § 2254(d) is 'doubly deferential' review." *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011), *quoting Pinholster*, 563 U.S. at 190. In other words, "only if there is no reasonable argument that counsel met *Strickland*'s deferential standard" may the Court grant relief. *Caudill*, 881 F.3d at 462, *citing Richter*, 562 U.S. at 105.

### a.    Discouragement of Family Testimony

First, Petitioner claims that counsel acted unreasonably when Attorney Warhola informed Iveryl Robinson and Marion Johnson[16] of the outburst that occurred during the trial while Petitioner was acting as his own attorney and questioning Tina Bailey. According to Iveryl Robinson's affidavit, she and Marion Johnson were en route to Ohio for the mitigation hearing when Attorney Warhola

---

[16]Iveryl Robinson's name is variously spelled "Iveryl" and "Ivryl" in the record. The Court uses "Iveryl" here, except in direct quotes from the trial transcript, because that is the spelling used in her 2005 signed affidavit. (*See* ECF No. 82-15, PageID 3027–28.) Marion Johnson's name is variously spelled "Marion" and "Marian" in the record. The Court uses "Marion" here, except in direct quotes, because that is the spelling used in Iveryl Robinson's 2005 signed affidavit. (*See id.*, PageID 3028.)

informed them of the outburst:

> Attorney Warhola said Marvin's was a very high profile case and he could not guarantee that we would not get hurt though we would have security around the clock. When I asked about whether any African-Americans would be in the courtroom, Attorney Warhola said that the judge, jury, attorneys and audience would be white and that my niece and I would be the only Afro-Americans there.
>
> I asked Attorney Warhola whether I could be provided with a bullet proof vest. Attorney Warhola told me that we would be escorted to and from the courtroom, to the car, and the hotel, but he could not get bullet proof vests for us. When I inquired about whether it would be safe to come to Ohio to testify, Attorney Warhola told me, "I can't actually promise you that." It was then and there that I decided not to come to Ohio. I feared for my life.
>
> Had I not feared for my safety, I would have testified on Marvin's behalf at his mitigation hearing.

(ECF No. 82-15, PageID 3028.)

Petitioner has presented no evidence that counsel actively attempted to discourage his family from attending the mitigation hearing. By Iveryl Robinson's own account, after informing her of the outburst in court, Attorney Warhola tried to reassure her by promising security around the clock and escorts to and from the courtroom, car, and hotel.

Rather, the record suggests that counsel had acted diligently to ensure the presence of Petitioner's family. Counsel contacted Petitioner's family members in Alabama and Mississippi long before trial and arranged to have them travel to Ohio to testify at the mitigation hearing. At the February 6, 2004 pretrial hearing, defense counsel presented argument in support of the defense's motion for travel funds for Petitioner's family, explaining that five members of Petitioner's family

90

had agreed to testify in mitigation without a subpoena if their travel and lodging expenses were covered. (ECF 83-2, PageID 5629–34.) As of the end of the guilt phase of trial, counsel indicated to the court that they still anticipated that Iveryl Robinson and Marion Johnson would be attending and testifying at the mitigation hearing. (*See* ECF No. 83-11, PageID 7666; ECF No. 83-12, PageID 7793.) Perhaps in hindsight counsel erred in choosing to avoid the lengthier and more expensive process of hiring local attorneys in Alabama and Mississippi to petition the courts there to issue subpoenas that would compel appearance, but such error is not outside the wide range of reasonable professional assistance given that it is only in hindsight that it can be judged a mistake.

By arguing that Attorney Warhola wrongfully caused their absence, Petitioner seems to imply that simply informing his family of the outburst in court was deficient performance. But it would be strange indeed if effective assistance required counsel to lie, or at least actively conceal, information they believed to be true and accurate as to the safety of witnesses and the nature of the case. Petitioner has not shown that counsel performed outside the wide range of reasonable professional assistance in their attempts to bring his family to Ohio for the mitigation hearing.

While the lack of family testimony at Petitioner's mitigation hearing certainly left a hole in the defense's mitigation case, the state court's conclusion that he was not prejudiced by their absence was a reasonable one. According to her affidavit, Iveryl Robinson would have told the jury that their mother ran a "liquor

house" and "was a very strict disciplinarian and would whip the children if they did something wrong." (ECF No. 82-15, PageID 3027.) She could have testified that the family was on public assistance and the racial situation in their hometown was very bad and explained that Petitioner would become angry if a white person used the n-word. (*Id.*, PageID 3027–28.) She would have related that the white kids burned down the high school after a fight between a white student and a black student, after which they were all bussed to Annemarie, but that school was burned down too. (*Id.*) She had also provided information for Marsha Heiden's report, some of which was discussed by Dr. Jackson during his testimony, including as to the change that occurred in Petitioner's personality in his 20s when he began using crack cocaine.

Much of the content of Iveryl Robinson's testimony, as reflected in her affidavit and in Marsha Heiden's report, was introduced through either Dr. Jackson's testimony or written report. (*See* ECF No. 83-13, PageID 7919–22; ECF No. 82-15, PageID 3095–96.) "[A]dditional mitigating evidence that is 'merely cumulative' of that already presented does not rise to the level of a constitutional violation." *Pike*, 936 F.3d at 379, *quoting Broom*, 441 F.3d at 410. The only part of her testimony that was not raised as part of other mitigation evidence was the racial oppression and violence Petitioner experienced and witnessed growing up in Alabama, with the exception of an oblique reference in Dr. Jackson's written report that Petitioner "grew up fearful . . . in the community or school." (ECF No. 82-15, PageID 3099.)

At the same time, Iveryl Robinson's testimony could have been detrimental to Petitioner because she had specifically denied when speaking to the mitigation specialist that Petitioner experienced any physical or emotional abuse growing up or that their mother was an alcoholic. (*Id.*, PageID 3044–45.) *See also Sowell v. Anderson*, 663 F.3d 783, 800 (6th Cir. 2011) (concluding that defense counsel's failure to call witness could not have affected the outcome of the trial where the witness's statement partially contradicts the petitioner's story). In fact, the contradiction between Petitioner's claims of abuse and Iveryl Robinson's claim that there was no abuse was also raised by the prosecution during the cross-examination of Dr. Jackson:

> Q. Something you found significant was Mr. Johnson's claim he was abused as a child. You have indicated that in your view is a significant incident or would have been significant if it occurred in Mr. Johnson's life?
>
> A. He actually tried to minimize it a bit. He told me stories about the kind of abuse he got but generally said it wasn't that bad or something to that effect.
>
> Q. And he indicated to you he was beaten with an electrical cord, his mother was an alcoholic and those sorts of things?
>
> A. Right. He mentioned the beating. The mother alcoholic came from the mitigation specialist report.
>
> Q. And Ivryl Johnson [sic] in an interview which occurred on January 13, 2004, between Mrs. Heiden when she was talking to Ivryl Robinson, who I believe is a half sister of Mr. Johnson, denied that Mr. Johnson experience any kind of a physical, emotional or sexual abuse. Were you aware of that?
>
> A. I read the entire report so, yes.
>
> Q. So if Mr. Johnson suggested to you that he was physically or emotional or sexually abused—did he indicate to you that he was

sexually abused?

A. No.

Q. So let's take that out. That if he told you he was emotionally or physically abused that would at least be contrary to the information provided to Ms. Heiden by Ivryl Robinson, is that correct?

A. Yes.

(ECF No. 83-13, PageID 7920–21.)

In light of the potential for additional damaging testimony undermining Petitioner's claims of childhood abuse and the limited value of the non-cumulative testimony, the Court cannot say that Petitioner was necessarily prejudiced by the absence of Iveryl Robinson's testimony in mitigation. Petitioner has not shown that the state court's conclusion that counsel were not ineffective and he was not prejudiced was unreasonable.

### b. Background Investigation

Petitioner also claims that counsel failed to thoroughly investigate his background. (ECF No. 86, PageID 9255.) He asserts that mitigation specialist Marsha Heiden collected no records and spoke exclusively with Petitioner, his half-sister Iveryl Robinson, and his friend Bonnie George. (*Id*.)

While it certainly appears that only a limited number of Petitioner's family members were interviewed as part of the mitigation investigation, the Court cannot say that the state court improperly applied *Strickland* when it concluded that counsel's investigation into Petitioner's background and family was adequate. "*Strickland* does not require counsel to investigate every conceivable line of

94

mitigation evidence no matter how unlikely the effort would be to assist the defendant at sentencing," but the "decision not to investigate [] 'must be directly assessed for reasonableness in all the circumstances.'" *Wiggins*, 539 U.S. at 533, *quoting Strickland*, 466 U.S. at 691. "'Strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id.*, *quoting Strickland*, 466 U.S. at 690–91.

Petitioner argues that counsel's failure to talk to more than a handful of his family members was itself deficient performance. But mitigation specialist Marsha Heiden was able to prepare a comprehensive report on Petitioner's family history, as well as his educational, employment, interpersonal, legal, and medical history as an adult. As Petitioner asserts, she relied heavily on information gathered directly from Petitioner, Iveryl Robinson, and Bonnie George, noting in her report her difficulties reaching other members of Petitioner's family, who were all located in Alabama and Mississippi. (See ECF 82-15, PageID 3043.) The difficulty of reaching Petitioner's family members would seem to be further demonstrated by the fact that post-conviction counsel were only able to reach three additional family members when preparing this claim for state postconviction.[17] As described in more detail

---

[17]While more family members were finally reached during Petitioner's federal habeas proceedings, evidence which the Court may not consider here, the fact that it took nearly a decade, and four sets of attorneys and investigators, to finally reach the majority of Petitioner's family members does not support the argument that it was trial counsel's lack of diligence that resulted in them only speaking to a few

below, none of these three—Petitioner's niece, sister-in-law, and paternal half-sister—had firsthand knowledge of Petitioner's childhood outside of general descriptions of the racial atmosphere in the county at the time.

  Petitioner argues that counsel's failure to talk to more than a handful of his family members was itself deficient performance, but counsel had no indication from the information already gathered that further interviews with additional members of Petitioner's family was likely to uncover new or different information regarding Petitioner's background—a fact later confirmed by the affidavits of his family Petitioner gathered and presented in his state postconviction proceedings. *See Dovala*, 2021 WL 3732338, at *8 ("[C]onsidering what was already known about the case, there was little to put [defense counsel] on notice that a further investigation and formal consultation with an expert witness might be fruitful.") (*citing Strickland*, 466 U.S. at 691). Indeed, the cases in which counsel have been found ineffective based on an insufficiently thorough investigation have generally been situations in which counsel terminated further investigation despite clear signs that a particular matter should be explored further. *See, e.g.*, *Wiggins*, 539 U.S. at 525 (counsel's decision not to expand their investigation beyond the state social service records was unreasonable in light of the leads uncovered in those records because "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible

_____

members of Petitioner's family.

defenses); *Harries v. Bell*, 417 F.3d 631, 638–39 (6th Cir. 2005) (finding constitutionally inadequate a mitigation investigation that included phone conversations with the petitioner's mother and brother, written requests for information from several institutions in which the petitioner had been confined, and interviews with the petitioner, his co-defendant, and two state witnesses, because counsel failed to investigate further the leads actually developed regarding the petitioner's mental health problems and troubled childhood). In *Mason v. Mitchell*, 543 F.3d 766, 776 (6th Cir. 2008), the Sixth Circuit found inadequate an investigation that included a psychiatric evaluation, review of state records, and brief conversations with several family members, because counsel had ignored documented evidence in the state records he reviewed of frequent violence and drug use in the petitioner's childhood home, failing to conduct any further independent investigation into the matter after the petitioner's father and brother denied any abuse. It was therefore premature, the court found, for counsel to rule out presenting any evidence regarding childhood or background before speaking to any other family members who might be able to explain the discrepancy between the denials of abuse and the evidence in the state records. *Id*. at 779.

In light of the circumstances here, it would not be unreasonable for counsel to conclude that their resources were better spent on building out a mitigation case based on Petitioner's mental health and drug use rather than tracking down and interviewing additional members of Petitioner's family. Given the documented difficulties of reaching Petitioner's relatives and the absence of any clues that

97

further investigation and family interviews would uncover new information, the Court cannot say that the Ohio Court of Appeals unreasonably applied *Strickland* when it found counsel's investigation within the broad range of reasonable performance.

Moreover, whatever the limitations of trial counsel's investigation or collection of records, the "new" evidence presented by Petitioner show that his family members would primarily have testified regarding the poor economic conditions within which Petitioner grew up, the extreme racism in his hometown at the time, and his drug and alcohol abuse.

Grenea Bridges, Petitioner's niece, would have told the jury that she was close to Petitioner and that white students burned down his high school because they did not want black students there. (ECF No. 82-15, PageID 3029.) She said she was aware that Iveryl and Marion had planned to attend the mitigation hearing but stayed home because of the commotion that occurred in the courtroom. (*Id.*) She said that she was not contacted by the mitigation specialist, but if she had been she would have been willing to talk about Petitioner. (*Id.*)

Estoria Johnson, Petitioner's sister-in-law, could have testified that Petitioner's mother was an uneducated teenage mother, who was not raised by her own mother because her mother did not want her due to her darker skin. (*Id.*, PageID 3033.) She would have shared that Selma and Pine Hill, where Petitioner grew up, were the worst places for blacks. Pine Hill High School had been predominately white, but after desegregation when all the kids had to attend the

same school, the school was burned down to keep the black students from going there. (*Id.*) She could have explained that there were no black doctors in Pine Hill at the time, and black people went to white doctors for treatment. There were different sections for whites and blacks, and the white patients were called first. (*Id.*, PageID 3034.) Most black families used home remedies because even if they trusted the doctor, they could not always afford treatment. If you couldn't pay your bill and had property, the doctor would take your property. (*Id.*) She said that Petitioner called her twice from jail but otherwise she kept up with the trial through the internet, and she could not believe what Petitioner said in court. "The racism Marvin grew up with may have been a factor. Any little thing someone said would have set him off." (*Id.*) She said that she had not been contacted by the defense team but would have been willing to talk to them and testify if she had been contacted. (*Id.*)

According to post-conviction mitigation specialist Pam Swanson's affidavit, Petitioner's paternal half-sister Lulu Williams reported that Petitioner lived with her at times when he was an adult, and she had heard that his mother ran a bootleg joint. (*Id.*, PageID 3035.) She also heard, but was not sure, that Wilcox County was a particularly bad place for blacks. Blacks were not allowed in restaurants or other establishments and had to conduct their business at the back door. (*Id.*) She said that Petitioner had always been good to her, and she was shocked to find out that he had murdered a young boy. (*Id.*) She said that she had not been contacted by his defense team but would have been willing to testify if she had been asked and had been able to travel to Ohio. (*Id.*)

99

The new evidence submitted by Petitioner in the affidavits from his family is largely cumulative of the mitigating evidence introduced during the penalty phase of his trial. The most salient—and only non-cumulative—topic to which his family members could testify was the racism and oppression prevalent in their rural Alabama county at the time. Otherwise much of the information provided by Petitioner's family members is focused on the prevalence of alcohol in Petitioner's childhood home and his drug and alcohol use as an adult, subjects already well-covered in greater detail by Dr. Jackson's testimony and report. Petitioner's drug and alcohol use in particular was discussed by all four mitigation witnesses, with two of these witnesses (Marianna Williamson and Dr. Mark Fettman) called solely to discuss Petitioner's drug and alcohol use.

Most of the details about Petitioner's past that he cites in his Amended Petition and Traverse as the new background evidence his counsel failed to uncover during trial comes not from his family members or records, but instead from his own affidavit. In his 2005 affidavit prepared for his initial state post-conviction proceedings, Petitioner reports that he started drinking at age seven, stealing alcohol from his mother, who ran a bootlegging business out of the home. (ECF No. 82-15, PageID 3030.) He witnessed considerable violence as a young child as a result of his mother's bootlegging, including numerous stabbings and fights, and would often have to clean up blood the next day. He says that his older brother would often beat him up when he tried to tag along with him, and once his brother Cornelius hit him in the head with a hoe. His mother applied alcohol to the wound

and used a towel to stop the bleeding, and then Cornelius received a lengthy beating as punishment. (*Id*.) Most of the children were treated with home remedies at that time, and he only remembers one trip to the doctor as a child. (*Id*., PageID 3031.)

Petitioner recounts that his older brother Bobby, who was an adult when he was born and had served in Vietnam, often came by the house and was verbally and physically abusive. Bobby once beat him with a fan belt and an extension cord after he and Cornelius had gone swimming at a local swimming hole. (*Id*.) His mother was also abusive, usually when she was drinking. The family's only source of income was his mother's job at a small general store and her bootlegging. His stepfather supplemented their food by hunting. (*Id*.) He says that he felt like an outcast in his own family. His sisters told him they were mean to him because his father was mean to them, but he doesn't know what his father did. (*Id*.)

Petitioner says that he had attended treatment programs for his drug and alcohol problems, including one sponsored by Good Samaritan Hospital in Zanesville, a Guernsey County program during the 1990s with his ex-wife, and one in Orange County, California that was covered by his insurance at the time. (*Id*.)

Petitioner also reports that he was unhappy with his counsel at trial because they said he was guilty during opening statements. He would write down questions for them to ask witnesses, but they would not ask them. (*Id*.) He also didn't like the mitigation specialist, Marsha Heiden. He says she only talked to him for two hours and then he didn't see her again, and he never signed any releases for her to access documents, so he doesn't know what she collected. He also disliked the investigator,

Mike Durkin, because he "didn't do anything either." (*Id.*, PageID 3032.)

Petitioner argues that if trial counsel properly investigated his background, they would have presented witness testimony during mitigation regarding the abuse he suffered and its adverse effects on him. (ECF No. 86, PageID 9254.) But Dr. Jackson testified to precisely that fact, albeit briefly, linking Petitioner's present mental health diagnoses to his abusive background. (ECF No. 83-13, PageID 7920–21.) Dr. Jackson's report, provided in evidence to the jury, provided greater detail on the nature of Petitioner's childhood abuse and explored the ways in which that history contributed to his current maladies. (ECF No. 82-15, PageID 3094–99.) In fact, the incident when he was beaten with a fan belt by his older brother was specifically mentioned in the report. (*Id.*, PageID 3096.) Counsel has no obligation to present cumulative evidence, *Lang v. Bobby*, 889 F.3d 803, 815 (6th Cir. 2018), *citing Caudill*, 881 F.3d at 462.

Nor has Petitioner actually identified any other witnesses to testify to the abuse he suffered. The family members Petitioner says trial counsel should have presented during mitigation would not have testified to this abuse. The only "new" evidence cited regarding the incidents of abuse described in the Amended Petition is Petitioner's own affidavit. (*See* ECF 82-15, PageID 3030–32.) The sole corroboration, if that, of anything resembling abuse by any member of his family is Iveryl Robinson's statement that their mother was a strict disciplinarian who would whip them if they did something wrong. (See ECF No. 82-15, PageID 3027.) But as discussed above, she flatly denied any abuse in the home. (*Id.*, PageID 3044–45.)

102

Petitioner argues that Dr. Jackson's testimony regarding the abuse was weak because it was based entirely on his self-reports. (ECF No. 131, PageID 10783–84.) Yet after conducting the more thorough investigation and collection of records Petitioner faults trial counsel for not performing, the evidence of his abusive childhood is still nearly entirely based on his self-reports. He has failed to uncover any other evidence of this abuse.

Petitioner cites a number of cases to argue that the presentation of a mitigation case does not mean that counsel was per se effective. (ECF No. 131, PageID 10781–82.) This is certainly true. Even the presentation of a "superficially reasonable mitigation theory" can be found upon closer examination to be both deficient and prejudicial. *See Sears v. Upton*, 561 U.S. 945, 954–55 (2010) (*per curiam*). But the Supreme Court has explained "that there is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker," even in cases where little to no mitigation evidence was presented. *See id.* at 954, *quoting Strickland*, 466 U.S. at 700. In other words, prejudice turns not on the quantity of evidence presented or left out but on its substance. Here, the state court's finding of no prejudice is reasonable, not because counsel presented "some" mitigation evidence at trial, but because the new evidence Petitioner claims counsel should have presented does not alter the sentencing profile presented to the jury. That is, the new evidence is largely cumulative.

Petitioner also argues that the Ohio appeals court erroneously held him to a

standard that required his new evidence to sway the full jury. (ECF No. 131, PageID 10780.) The Ohio Court of Appeals did not say any such thing. Courts, as well as attorneys appearing before them, commonly cite the standard for prejudice in a *Strickland* analysis as "a reasonable probability that the evidence would have swayed *the jury* to impose a life sentence," as the Ohio Court of Appeals did here, *see Johnson*, 2007 WL 1098106, at *14 (emphasis added). Because a unanimous jury is needed to impose a death sentence, swaying one juror against a sentence of death is the equivalent of swaying *the jury* to impose a life sentence. Thus, whether the standard is phrased as a reasonable probability of swaying the jury, swaying at least one juror, or obtaining a different outcome is irrelevant. They all mean the same thing.

Petitioner argues that the standard for new evidence presented in support of an ineffective assistance claim found in *Hill v. Mitchell* and cited favorably in the Return of Writ, (ECF No. 91, PageID 10442–43), has never been adopted by the Supreme Court. (ECF No. 131, PageID 10781.) Petitioner misunderstands the requirements of § 2254(d). A federal habeas court may not *grant relief* if the state court's decision was not an unreasonable application of "clearly established Federal law as determined by the United States Supreme Court." § 2254(d)(1) (emphasis added). But so long as the rule or reasoning in question is within the range of discretion allowed by the clearly established federal law, it may be legitimately applied by the state courts in the first instance or by this Court *affirming* the state court's judgment. *Cf. Renico*, 559 U.S. at 767 (2010) ("Because AEDPA permits

granting the writ only when the state court acts unreasonably, the more general the

rule at issue—and thus the greater the potential for reasoned disagreement among

fair-minded judges—the more leeway state courts have in reaching outcomes in

case-by-case determinations.") (*quoting Yarborough v. Alvarado*, 541 U.S. 652, 664

(2004)).

Ultimately, a reasonable jurist, reweighing the aggravating and mitigating

factors in light of the additional mitigation evidence Petitioner presented in his

initial state post-conviction proceedings, could conclude that there was no realistic

chance of a different outcome. The vast majority of the new evidence, particularly

that concerning his childhood abuse and drug and alcohol use, was cumulative of

evidence presented at trial. Given the little weight accorded to Petitioner's drug use

and history of abuse, further testimony on the same could not have changed the

outcome. The evidence regarding the racism prevalent in the community in which

he grew up was not brought up during the mitigation hearing, but the Court cannot

say that it had a realistic probability of affecting the sentence. The nature of that

evidence was primarily about the general societal conditions at that time; there is

no mention of what Petitioner personally experienced. In fact, the single mention of

the effect it had on Petitioner was that it was why he became angry if a white

person used the n-word.

Accordingly, the Court finds that the Ohio Court of Appeals' conclusion that

counsel acted reasonably and Petitioner was not prejudiced was neither contrary to

nor an unreasonable application of *Strickland*. Petitioner's sixth ground for relief is

DENIED.

> **7. Seventh Ground for Relief: Petitioner was deprived of the right to the effective assistance of trial counsel contrary to the Fifth, Sixth, Eighth and Fourteenth Amendments when counsel failed to investigate and provide its psychologist with the necessary records, failed to have the psychologist spend sufficient time to evaluate Petitioner, failed to properly prepare the psychologist for testimony and allowed the psychologist to present evidence that provided the jury additional reasons to impose the death penalty.**

In his seventh ground for relief, Petitioner claims that he received ineffective assistance of counsel as a result of trial counsel's inadequate preparation and presentation of psychological expert testimony during mitigation. Specifically, Petitioner argues that Dr. Richard Jackson, the psychologist retained by the defense, conducted an inadequate evaluation, produced a deficient report, and provided "weak and ineffectual and at points harmful" testimony during trial. (ECF 86, PageID 9259–61.) Petitioner points to the limited amount of time Dr. Jackson spent with him, the lack of records trial counsel provided to Dr. Jackson for use in his report, the imprecise wording Dr. Jackson used to offer a diagnosis in his written report followed by the altered diagnosis he provided during his trial testimony, and the damaging statements regarding Petitioner's threatening and destructive behavior in jail while awaiting trial. (*Id.*, PageID 9260–63.) Petitioner relies on the report of post-conviction psychologist Dr. Robert Smith to demonstrate the psychological evidence the jury could have heard had counsel properly investigated and provided Dr. Jackson with the necessary records.

In response, Respondent argues that the state appellate court's approach of

106

reweighing the evidence in aggravation against the totality of the available mitigating evidence to determine whether there was prejudice is identical to the method used by the Sixth Circuit in *Fautenberry v. Mitchell*, 515 F.3d 614 (6th Cir. 2008), and therefore did not contravene or unreasonably apply *Strickland*. (ECF No. 91 PageID 10446.) Respondent also argues that Petitioner cannot meet the first prong of *Strickland*—that counsel were deficient—because even if Dr. Jackson misdiagnosed Petitioner, counsel were entitled to assume Dr. Jackson was competent unless they had good reason to believe otherwise. (*Id.*, citing *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006).)  Finally, Respondent contends that Dr. Jackson's assessment of Petitioner aligns with Petitioner's post-conviction mental-health expert, Dr. Smith. (*Id.*, PageID 10447.)

Petitioner raised these claims in his initial state post-conviction petition. (ECF No. 82-14, PageID 2983–88.) The Ohio Court of Appeals denied the claims, finding that Petitioner could not show he was prejudiced:

> In his eighth and ninth claims for relief appellant argues, in essence, that appellant's trial counsel was ineffective because the psychological testimony by Dr. Richard Jackson was "generic, unbelievable, and at times harmful to the jury." Appellant contends that their post-conviction expert Dr. Robert Smith, a clinical and forensic psychologist, would testify that appellant was suffering from Schizotypal Personality Disorder which was magnified by the effects of his alcohol and drug abuse. Thus, appellant was under the influence of an extreme mental or emotional disturbance at the time of the offense.
>
> The Ohio Supreme Court in the direct appeal concluded, upon its independent review of appellant's death sentences, that the aggravating circumstances outweighed the mitigating circumstances. The Court found that "Johnson introduced evidence of a mitigating factor under R.C. 2929.04(B)(3) that 'because of a mental disease or

107

defect,' he 'lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law' when he killed Daniel. He also introduced evidence that he suffers from alcoholism and drug addiction and that he had consumed drugs and alcohol shortly before the murder." *State v. Johnson*, *supra*, 112 Ohio St.3d at 250, 2006-Ohio-6404 at ¶ 291, 858 N.E.2d at 1184. Accordingly, the defense did establish a mitigating factor under R.C. 2929.04(B)(3): "because of a mental disease of defect," appellant "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law" at the time he committed the crimes. However, the Ohio Supreme Court concluded this factor carried little weight: "Voluntary intoxication generally deserves little weight as a mitigating factor. *See, e.g., State v. Dennis* (1997), 79 Ohio St.3d 421, 436, 683 N.E.2d 1096; *State v. Campbell* (2002), 95 Ohio St.3d 48, 51, 765 N.E.2d 334. In addition, while Johnson may have had mood swings due to intoxication on August 15, 2003, there is no evidence in the record that he suffered a manic phase at the time of the murder.

"Although stress may affect Johnson's ability to perceive reality, the record does not show that Johnson faced stressors at the time of the murder. Though we acknowledge Williamson's and Fettman's testimony regarding the severity of drug-withdrawal symptoms, no evidence shows that Johnson experienced withdrawal at the time of the murder. The lack of evidence regarding stressors has significance because, as Dr. Jackson testified, 'It's only when stressors hit [that] you're likely to see outbursts.' (Emphasis added.)

"Further, the record does not suggest that Johnson killed Daniel during either an 'outburst,' a stress-caused 'alteration of reality contact,' or any other delusional moment. Rather, the record reveals that Johnson acted deliberately, with premeditation and advance planning. Moreover, the record demonstrates that Johnson wished to hurt Tina, as demonstrated by his statement during trial: 'Do you recall times after sex with me * * * that you would, after finished, you would get up and go to the window? * * * You remember that feeling? That's what it felt like to beat your son in the f* * *ing head.'"

In the case at bar, appellant failed to demonstrate a reasonable probability that, but for his counsel's failure to employ a different mitigation specialist [sic], the R.C. 2929.04(B)(3) mitigating factor would have been assigned such weight as to compel the conclusion that the aggravating factors did not outweigh the mitigating factors. "A disorder both caused and exacerbated by the voluntary ingestion of

drugs deserves minimal weight in mitigation." *State v. Fitzpatrick* (2004), 102 Ohio St.3d 321, 339, 2004-Ohio-3167 at ¶ 111, 810 N.E.2d 927, 944.

The petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that appellant set forth sufficient operative facts to establish substantive grounds for relief. *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

Accordingly, we overrule appellant's eight [sic] and ninth claims for relief.

*Johnson*, 2007 WL 1098106, at *14–15 (corrected punctuation).

Petitioner reprised his claim as the ninth ground for relief in his second state post-conviction petition, which was dismissed for a failure to comply with the jurisdictional requirements of §2953.23(A)(1). *Johnson*, 2013 WL 1400607, at *5. Because the decision of the Ohio Court of Appeals in Petitioner's initial post-conviction proceeding was the last state court adjudication on the merits of Petitioner's claim, the Court reviews that decision here. When a state court relies on only one prong of *Strickland* to decide an ineffective assistance claim, as the Ohio Court of Appeals did here, the unadjudicated prong is reviewed *de novo*. *Raynor v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012). Accordingly, the Court will examine the deficient performance prong *de novo* and the prejudice prong will be subject to AEDPA deference. As explained more fully in connection with Petitioner's fourth ground for relief, *supra*, this means that the Court's review of prejudice is limited to the record before the Ohio Court of Appeals in Petitioner's initial state post-conviction proceedings. *See Pinholster*, 563 U.S. at 185. The Court may grant relief on Petitioner's claim only if the state court's finding in the initial post-conviction

109

proceeding that Petitioner was not prejudiced "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

To succeed on his ineffective assistance claim, Petitioner must show that counsel's preparation and use of Dr. Jackson as an expert witness was so deficient as to fall below an objective standard of reasonableness, or "outside the wide range of professionally competent assistance," and that Petitioner was prejudiced as a result. *See Strickland*, 466 U.S. at 687. Prejudice requires additional new evidence that "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Caudill*, 881 F.3d at 463–64, *quoting Hill*, 400 F.3d at 319. "[A]dditional mitigating evidence that is 'merely cumulative' of that already presented does not rise to the level of a constitutional violation." *Pike*, 936 F.3d at 379, *quoting Broom*, 441 F.3d at 410. Ultimately, prejudice requires showing "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Hill*, 400 F.3d at 314, *quoting Strickland*, 466 U.S. at 695. "Because Ohio law requires that the death penalty be imposed by unanimous vote, [Petitioner] may show prejudice by establishing 'a reasonable probability that one juror would have voted against death had defense counsel presented [adequate] mitigation evidence.'" *Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007), *quoting Williams*, 460 F.3d at 804.

110

First, the Court finds that counsel's performance was well within the "range of professionally competent assistance," *Strickland*, 466 U.S. at 687, even under a *de novo* standard of review. Dr. Jackson testified on direct examination as to the information he had access to for his assessment of Petitioner:

> Q. Now, let's talk about the information that you used in arriving at your conclusions here. Can you identify the information that you received that you've relied upon and the examinations and testing that you did in arrive [sic] at your conclusions in this case?

> A. I generally try to see an individual knowing as little as possible about them. Now, obviously I couldn't form all of my impressions completely blind in this case because I knew what Marvin had been charged with and some information had been forwarded to me. But my typical approach is I want my first impressions formed by the individual as opposed to by what someone else thinks. So what I typically do is I will show up to meet the individual with some background information that has been provided for me. I'll do as much of the interview as possible without really looking at the background information because I want to get their version of what has happened and then while they complete some of the other testing, for example, Marvin when he was doing the MMPI . . . While he was doing that I looked at some of the background data because I didn't want to miss anything that was important but it's really important to me in my diagnostic approach that I interview blind. I do not know a lot of background information when I start my interview.

> Q. Just so the jury knows, Attorney Blakeslee and I contacted you early on in this case several months ago, is that correct?

> A. Right.

> Q. And so you started your work — when would have been your first contact with Mr. Johnson?

> A. I met with him right before Thanksgiving, the 20th of November of last year.

> Q. And Attorney Blakeslee and I have provided information to you concerning this case, is that correct?

> A. Yes.

111

Q. And in addition have we continued to keep you updated as to behaviors displayed by Marvin both prior to trial and during this trial?

A. Yes.

Q. In addition, doctor, did you have any occasion to be with Attorney Blakeslee and myself when we met with Dr. Lee, the coroner [sic], who did the autopsy in this case?

A. Yes.

Q. You were actually present when we discussed the case with Dr. Lee?

A. Yes, I was.

Q. And you had occasion to see the photographs of the autopsy and the injuries and to actually ask him questions as to the nature of this crime, is that correct?

A. Correct.

Q. Have you also, as part of your investigation and evaluation in this case, reviewed a written mitigation report by Marcia [sic] Heiden?

A. Yes, I did.

Q. Marcia Heiden – have you worked with her professionally on other cases, doctor?

A. Yes, I have.

Q. And did she provide to you what's called a written mitigation report as to Marvin's social history, that sort of thing?

A. Yes, she did.

Q. Is it your understanding that she's a social worker that does these types of mitigation reports as part of her regular business?

A. Yes, and does about the best ones I've ever seen.

Q. And you also had occasion prior to trial to sit down with Attorney Blakeslee and myself and Mrs. Heiden to review that information that she had provided, is that correct?

A. Yes.

Q. And the relevant portions of Marvin's social history, upbringing and

that sort of thing. Did you include that in your own written psychological evaluation report prepared in this case?

A. Yes, I did.

Q. Is there — and then in addition to that information then you would have interviewed Mr. Johnson and provided psychological testing to him that you thought was relevant?

A. Correct.

(ECF No. 83-13, PageID 7882–86.) In other words, Dr. Jackson met with Petitioner for the first-time months before trial began, was kept appraised of key information and developments throughout the pre-trial and trial periods and was provided with a comprehensive mitigation report covering Petitioner's family background, childhood, education, and work history. Counsel appears to have adequately provided Dr. Jackson with all of the relevant information and access he might need to conduct his psychological assessment of Petitioner.

To the extent that Petitioner argues that counsel performed unreasonably by retaining Dr. Jackson rather than another psychologist, this assertion fails as well. "A licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary." *Lundgren*, 440 F.3d at 772, *citing Skaggs v. Parker*, 235 F.3d 261, 268 (6th Cir. 2000). Counsel were entitled to rely on Dr. Jackson's expertise in the absence of any indication that he was not competent. Petitioner's complaints that "Dr. Jackson's testimony was weak and ineffectual and at points harmful" and that he did not state his diagnosis in the proper terms, (ECF No. 131, PageID 10795–96), do not implicate Dr. Jackson's expertise or competence such that counsel could be said to have performed deficiently for retaining him.

113

Petitioner has failed to show that counsel's preparation and use of Dr. Jackson in mitigation was in any way inadequate.

The Ohio appellate court's holding that Petitioner was not prejudiced by the alleged errors was also reasonable. The new evidence Petitioner provides is cumulative of that presented at trial. Specifically, the report of Dr. Smith, which Petitioner presented as the psychological evidence that the jury did not have the opportunity to hear due to counsel's deficient performance, is not obviously more thorough or more favorable to Petitioner than the findings of Dr. Jackson. Nor is it clear that a jury would place more weight on a diagnosis of Schizotypal Personality Disorder and Substance Abuse Disorder than a diagnosis of Bipolar Disorder with psychotic symptoms or Paranoid Personality Disorder.

Petitioner highlights several aspects of Dr. Smith's report that he contends demonstrates the poor preparation and inadequacy of Dr. Jackson's evaluation. First, he argues that several factors in his background that were noted by Dr. Smith could have been relevant to the jury's consideration of whether to sentence Petitioner to death, such as the fact Petitioner did not have a close relationship with his parents; his mother was preoccupied with bootlegging, drinking, and pursuing male relationships; he lacked parental guidance or rules growing up; his family did not show affection to one another; and that Petitioner learned from his early life not to trust anyone. (ECF No. 86, PageID 9264, *citing* ECF No. 82-15, Page ID 3117–18.)

Petitioner further highlights the mental deficiencies Dr. Smith reported he

114

observed during his examination of Petitioner: Petitioner was illogical and irrational and reluctant to change his perspective; he recounted hearing voices that were mumbling, sometimes stating his name, and seeing images in shadows that he perceived as being deceased relatives and others from his past; he was unemotional; he had a fair attention span and was easily distracted by external stimuli; he had impaired insight and minimal understanding of his motivations and actions; he appeared highly impulsive and limited in his ability to exercise self-control; and his judgment was fair, compromised by his suspicions of others and illogical reasoning. (*Id.*, *citing* ECF 82-15, PageID 3119–3120.)

Dr. Smith diagnosed Petitioner with Schizotypal Personality Disorder and Substance Dependence, citing potential causal factors as "abandonment by his biological father, neglect by his mother, witnessing violence and bloodshed within their home," being attacked and stabbed by a group of male peers, and his alcohol and drug abuse during adolescence and adulthood. (ECF 82-15, PageID 3120–21.) Dr. Smith described the symptoms of Schizotypal Personality Disorder as "a pervasive pattern of social and interpersonal deficits marked by acute discomfort with and reduced capacity for close relationships as well as by cognitive and/or perceptual distortions." (*Id.*, PageID 3121.) Petitioner further points to the examples Dr. Smith cited of how Petitioner's profile was consistent with his diagnosis: Petitioner's history of discomfort with any form of interpersonal closeness; his consistent suspicion and paranoia regarding those around him; his illogical and irrational rationale for his beliefs; his display of ideas of reference; his

115

perceptions that other were talking about him, plotting against him, and attempting to hurt him in some manner; his seeing images and shadows and hearing voices; and his or constricted affect when describing painful and traumatic events in his past. (ECF No. 86, PageID 9265, *citing* ECF No. 82-15, PageID 3120– 21.)

Compare then the findings in Dr. Jackson's report to the factors that Petitioner found significant in Dr. Smith's report. Dr. Jackson described Petitioner's long history of drug and alcohol dependency, including that he began drinking at age eight, smoking marijuana at ten, and smoking crack cocaine at twenty-one. (ECF No. 82-15, PageID 3095.) He reported that Petitioner's mother drank heavily, he had little supervision as a child and neglect was a concern, and that he was abused by his mother and oldest brother, often using belts, sticks, or electrical cords. (*Id.*, PageID 3096.) Petitioner's older brother would sometimes beat him for no reason, once with a fan belt. (*Id.*) He was also bullied in high school, and at times would have to go home with only his notebook to cover him because the bullies took his clothes. (*Id.*, PageID 3097.) Dr. Jackson reported that Petitioner said he was seeing and hearing things at the time of Daniel's murder, and that he had previously had similar experiences of seeing his dead family members in his dreams. (*Id.*)

As to mental deficiencies, Dr. Jackson states that Petitioner's "anger, suspiciousness, and distress/depression can contribute to extreme agitation and possible atypical perception" in moderate to high stress situations. (*Id.*, PageID

116

3098.) He related other factors of Petitioner's profile: difficulties with impulse control; viewed as angry, irritable, and potentially reactive by those around him; deep feelings of insecurity and fragile self-concept; distrustful of others and sees the world as threatening and rejecting; impaired empathy; may vacillate between periods of withdrawal and depression and periods in which he strikes out in anger as a defense against being hurt; "suspiciousness and distrust [which can] at times reach extreme proportions of paranoid misperception or delusions"; autistic, fragmented, tangential, or circumstantial thinking; poor concentration and attention contributes to impulsivity and poor judgment; and difficulty differentiating between fantasy and reality. (*Id.*)

Dr. Jackson concluded that Bipolar Disorder with psychotic symptoms, Paranoid Personality Disorder, or Paranoid Schizophrenia were the typical diagnoses for Petitioner's profile. (*Id.*) Dr. Jackson found that Petitioner's abusive and neglectful childhood, in which he grew up fearful at home, in the community, and at school, is a frequent etiology for the symptoms Petitioner has experienced as an adult, such as his "extreme tendencies for distrust, suspiciousness, and potential for paranoid misperception." (*Id.*, PageID 3099.) He also stated that background records showed that Petitioner had a history of performing well in an environment with structure and control. (*Id.*)

Petitioner complains that counsel did not adequately prepare Dr. Jackson or provide him relevant records to use in preparation of his evaluation and report, comparing Dr. Jackson's "scant record support" for his conclusions to the "plethora

117

of records" that Dr. Smith reviewed when he examined Petitioner during his initial state post-conviction proceedings. (ECF No. 131, PageID 10793–95.) Yet given the thoroughness of Dr. Jackson's report, it is unclear how precisely counsel's failure to uncover these records prevented them or Dr. Jackson from assessing Petitioner's background, or how the records would have further assisted the jury in understanding his background. *See Moreland*, 699 F.3d at 935 (counsel's alleged failure to obtain medical and educational records was not prejudicial when petitioner was unable to explain how his records would have assisted the sentencing panel in understanding his background). There is certainly no indication from Dr. Smith's report that the additional record collection provided additional insight or relevant, non-cumulative biographical information beyond what could be found in Dr. Jackson's report.

Petitioner also attacks the amount of time Dr. Jackson spent with him. Specifically, he asserts that Dr. Jackson met with him only twice, the first meeting lasting 15-20 minutes and the second meeting lasting 2.5–3 hours, with the first two hours used to complete psychological tests. (*Id.*, PageID 9260.) Dr. Jackson explained in his trial testimony that Petitioner did not want to meet with him when he arrived for their first meeting:

> Q. Now, you first saw him in November of 2003. Can you describe to the jury what happened during that encounter?
>
> A. Briefly, I had been warned ahead of time he was having a bad day, so to speak, by the guards and when he came in he was not abusive but he made it very clear right he didn't want to talk to me, he didn't want to take any tests and he was extremely animated. I think he was

118

probably in what I will be describing later as a manic phase of a bipolar —

MR. PLUMMER: Your Honor, I'm going to object to "probably".

MR. WARHOLA: Based upon your —

THE COURT: The objection is sustained. You may continue.

MR. WARHOLA:

Q. Based upon your scientific conclusions you have made since that time and contained in your report would you state today to a reasonable degree of scientific probability in your profession he was suffering from a manic phase at that point?

A. Yes, I would.

Q. Go ahead. So how did he appear and what happened.

A. He was very animated. He was showing the typical signs of what we refer to as sympathetic nervous system activation or in common terms a stress response. He was breathing very hard, he showed flared nostrils, he had trouble speaking without skipping words and stumbling over words and that kind of thing. Although, again, I want to stress he was not abusive in any way. So given the situation I said will you mind if I tell you a few things and he said no, that's fine. And so I sort of explained to him why I was there and what it was that we would be doing if he wanted to do it or agreed to do it and he listened carefully but continued to be quite animated and then told me again that he was not going to talk to me and was not going to complete any tests. I told him a little bit more about what it is that I do and gave him a third opportunity to see if he would comply and again he said he wouldn't and so we terminated the interview.

(ECF No. 83-13, PageID 7886–87.) Dr. Jackson reported that Petitioner was cooperative and compliant during their second meeting. (ECF No. 82-15, PageID 3096.)

It is not even clear that Dr. Smith spent significantly more time with Petitioner relative to Dr. Jackson. As Dr. Smith relates in his report, he too met with Petitioner once for several hours, interviewing him and administering several

psychological tests during that time. (*Id., PageID 3119.*) But Petitioner refused to meet with him or leave his cell when Dr. Smith returned for their second meeting, and Dr. Smith left after thirty minutes. (*Id.*) Regardless, Petitioner's complaint is baseless. He has not shown that the amount of time Dr. Jackson spent with him compromised Dr. Jackson's ability to assess him.

Petitioner also complains that Dr. Jackson's testimony was harmful to the defense because he failed to use the words "with a reasonable degree of psychological certainty" when stating his diagnosis, altered one of his diagnoses from his report during his testimony, and implied that Petitioner could not be expected to do well in prison if given a life sentence. (ECF No. 86, PageID 9263.) Petitioner cites as evidence the comments several jurors made to his post-conviction counsel, Kimberly Rigby. Specifically, Juror Russell Landers said he was not sure he bought into the psychologist's testimony that Petitioner was bipolar and had paranoid personality disorder, but that the evidence was so strong the other way it didn't matter. (ECF No. 82-15, PageID 3020.) Juror Sara Danadic said that defense counsel did not prove to them that Petitioner suffered from any mental disease or was under the influence of drugs at the time of the murder, and she thought Petitioner made up the bipolar diagnosis when he attended rehab by copying someone who had it. (*Id.*, PageID 3018–19.) Juror Judith Conaway said that she felt the testimony regarding Petitioner's mental health was questionable, that he could have searched the internet for those symptoms and faked them because he was manipulative and able to work the system. (*Id.*, PageID 3019.)

120

There is no indication from the jurors' comments that it was the fact that Dr. Jackson limited his diagnosis to Bipolar Disorder or Paranoid Personality during his testimony or that he failed to state "with a reasonable degree of psychological certainty" that led them to place little weight on the "mental defect or deficiency" mitigating factor. Moreover, Dr. Jackson did clearly state his diagnosis of Petitioner during his trial testimony:

> Q. What is your diagnosis of Marvin Johnson based to a reasonable degree of scientific probability in your profession?
>
> A. I would go with the bipolar disorder and the paranoid personality disorder. Those are Axis I and Axis II diagnosis [sic].

(ECF No. 83-13, PageID 7891.)

It is also not uncommon for substance abuse and some psychological diagnoses to be double-edged swords when presented as evidence for mitigation. First, presenting such evidence can also open the door to other damaging evidence. In *Brinkley v. Houk*, the Sixth Circuit found that trial counsel did not act unreasonably by choosing not to present evidence of his personality disorder diagnosis or substance abuse at trial. 831 F.3d 356, 364–65 (6th Cir. 2016). The court found that "any testifying psychologist would have reviewed Brinkley's history, as [the defense psychologist] in fact did. That history would have been fair game during cross-examination of any psychologist testifying for the defense. . . ." *Id.*, *citing State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253, 266–67 (1995). Second, presenting such evidence does not always elicit a sympathetic reaction from the jury. "[C]ourts have 'repeatedly' held in capital cases that evidence of

121

defendant's substance abuse 'often can have a distinctly double-edged nature to it: whatever mitigating effect such evidence might have had if presented, it is just as likely the jury would have reacted negatively to it.'" *Id*. at 365, *quoting Wackerly v. Workman*, 580 F.3d 1171, 1178 (10th Cir. 2009). Trial counsel made the tactical decision to present expert psychological evidence in spite of those risks.

In sum, Petitioner has not shown that counsel performed unreasonably in their preparation and presentation of Dr. Jackson, or that more records, better preparation of Dr. Jackson, or the use of a different psychological expert had any realistic possibility of producing a different outcome at trial. Accordingly, Petitioner's seventh ground for relief is **DENIED**.

> **8. Eighth Ground for Relief: Petitioner was deprived of the right to the effective assistance of trial counsel contrary to the Fifth, Sixth, Eighth and Fourteenth Amendments when counsel failed to investigate and failed to present expert testimony regarding Petitioner's neurological deficits, behavioral issues due to diabetes, and cultural differences due to his race and where he was raised.**

In his eighth ground for relief, Petitioner raises three claims of ineffective assistance based on a failure to investigate and present expert testimony in mitigation. First, he argues that his counsel failed to obtain the services of a neurologist or neuropsychologist to investigate possible neurological deficits as a result of his long-term drug use. Second, he argues that counsel were unreasonable for not retaining an endocrinologist to look into the possible behavioral effects of his drug use on his Type II diabetes. And finally, he asserts that counsel were ineffective for failing to hire a cultural expert to explain the effects on his

122

personality of growing up amongst the pervasive racism of 1960s and 70s rural Alabama.

Petitioner originally raised these claims as the tenth, eleventh, twelfth, and twentieth, claims in his initial state post-conviction petition. (ECF No. 82-14, PageID 2989–97; ECF No. 82-16, PageID 3222–24.) On review of the trial court's rejection of the claims, the Ohio Court of Appeals held that Petitioner was not prejudiced by the failure to present expert testimony on diabetes and culture because there was no reasonable possibility such testimony would have resulted in a life sentence given the little weight such factors carried and in light of the aggravating circumstances. *Johnson*, 2007 WL 1098106, at *15–16, 18. The court also held that counsel were not deficient in failing to obtain the services of a neurologist given the presumption of reasonableness afforded to decisions regarding evidence presentation, and that the alleged error did not prejudice Petitioner regardless. *Id.* at *16–18, 20–21.

Petitioner returned to state court to raise these claims a second time as the fourth, seventh, and eighth grounds in his second state post-conviction petition— this time supported by new evidence developed during his federal habeas proceedings. (ECF No. 85-1, PageID 8227–84.) Specifically, he presented for the first time in his second post-conviction petition the expert opinion of a neurologist, Dr. Nicholas Doninger, in support of his first and second subclaims here; an article written by Martin Luther King, Jr., "Let Justice Roll," in support of his third subclaim; as well as the habeas depositions of his trial counsel in support of all

123

three subclaims. The Ohio Court of Appeals affirmed the trial court's dismissal of Petitioner's second petition on the ground that he had failed to meet the jurisdictional prerequisites of § 2953.23(A)(1). *Johnson*, 2013 WL 1400607, at *5.

The Court's review in habeas corpus is limited to the record that was before the state court when it decided Petitioner's claims on the merits. *See Pinholster*, 563 U.S. at 181. Here, the last state court to adjudicate these claims on the merits, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 n.3 (1991), was the Ohio Court of Appeals in Petitioner's initial state habeas proceedings. As previously explained, *supra*, the new evidence presented to the state courts for the first time in Petitioner's second post-conviction petition may not be considered because it was not before the Ohio Court of Appeals when it adjudicated his claims on the merits in his initial state post-conviction proceedings. Therefore, when reviewing the claims in Petitioner's eighth ground in accordance with § 2254(d), the Court may not consider Dr. Doninger's opinion, trial counsel's habeas depositions, or the article supporting the third subclaim.

To succeed on his ineffective assistance of counsel claims, Petitioner must first show that counsel's alleged errors in investigating and presenting evidence for mitigation were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

124

Counsel's decisions as to mitigation strategy are generally subject to deference, but a failure to discover and present mitigation evidence cannot be justified as merely a tactical decision if counsel did not first conduct a thorough investigation. *See Wiggins*, 539 U.S. at 522.

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Strickland*, 466 U.S. at 690–691.

To show prejudice, Petitioner must offer additional new evidence that "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Caudill*, 881 F.3d at 463–64, *quoting Hill*, 400 F.3d at 319. "[A]dditional mitigating evidence that is 'merely cumulative' of that already presented does not rise to the level of a constitutional violation." *Pike*, 936 F.3d 379, *quoting Broom*, 441 F.3d at 410. Ultimately, prejudice requires showing "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Hill*, 400 F.3d at 314, *quoting Strickland*, 466 U.S. at 695.

Because the claims in Petitioner's eighth ground for relief were adjudicated on the merits by the Ohio courts, the Court may only grant habeas relief if the state

125

court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Thus, Petitioner must not only establish that his counsel were constitutionally ineffective under the *Strickland* standard, but he also "must satisfy AEDPA—by showing that any rulings by the state courts on the merits of [his] claim[s] were unreasonable." *Caudill*, 881 F.3d at 460. "[E]ven a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision. *Id.* at 101, *quoting Yarborough*, 541 U.S. at 664.

### a. Neurological Deficits

Petitioner claims that a reasonable attorney would have employed a neurologist to examine him for potential deficits after learning of his long-term substance abuse, childhood head injury, and uncontrolled diabetes, and that the decision not to present evidence of potential neurological deficits cannot be considered strategic when counsel failed to investigate the existence of possible neurological deficits. Petitioner argues that trial counsel ignored multiple signs that would have led a reasonable attorney to obtain an expert neurologist, specifically pointing to his long history of drug abuse—known to counsel—as well as the suggestion of his trial mitigation specialist, Marsha Heiden, that counsel may want

126

to have a neurological exam performed, depending on the psychologist's findings. (ECF No. 131, PageID 10805, *quoting* ECF No. 82-15, PageID 3041.)

Respondent argues that the Ohio Court of Appeals did not contravene or unreasonably apply *Strickland* when it concluded that counsel's decision not to consult a neurologist or neuropsychologist for mitigation fell within the range of reasonable strategy. (ECF No. 91, PageID 10450.) Respondent asserts that the record fully supports the Ohio appellate court's finding that counsel's mitigation investigation was effective, pointing out that the defense had obtained two mental health experts to evaluate Petitioner and testify at the mitigation hearing. He contends that the evidence offered by Petitioner to support his claim—specifically the affidavit of a post-conviction investigator reporting that trial mitigation specialist Marsha Heiden had suggested a neurological assessment of Petitioner— did not establish that counsel were deficient. He argues that mitigation specialist Heiden could not render an expert opinion on the issue, while counsel's two mental health experts apparently did not suggest neurological testing. (*Id.*) He also points out that trial counsel presented sufficient expert testimony and evidence to garner "an instruction to the jury consistent with O.R.C. 2929.04(B)(3), e.g., 'whether . . . the defendant, because of mental disease or defect, lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law.'" (*Id.,* PageID 10450–51, *citing* ECF No. 83-14, PageID 8118.)

Respondent also repeats his earlier argument that evidence collected during

127

federal habeas and presented to the state courts for the first time in Petitioner's second post-conviction petition, cannot be considered in the Court's review of the Ohio Court of Appeals' decision. In other words, Dr. Doninger's report must be excluded from the evidence considered by the Court. (*Id.,* PageID 10451.) But, Respondent notes, even if the report could be considered, it is not evidence of either deficient performance or prejudice. Counsel could not have performed deficiently for failing to consult a report which did not exist at the time of trial and of which counsel had no knowledge. (*Id.*) As to prejudice, Respondent argues that it is reasonable to assume that the jury considered Petitioner's substance abuse and gave it little weight and that Dr. Doninger's opinion would not change that determination in light of the mental health testimony jurors did hear—enough to earn a jury instruction on mental disease or defect—and the common knowledge that heavy drug use can damage the brain and body. (*Id.*)

Petitioner initially raised this claim in the eleventh and twentieth grounds of his first state post-conviction petition. Specifically, he argued in his eleventh ground for relief that counsel failed to reasonably investigate, prepare, and present mitigating evidence that he may have suffered from neurological deficits due to his history of substance abuse, and that if counsel had conducted a reasonable investigation they would have obtained a neurologist to examine Petitioner. (ECF No. 82-14, PageID 2992–94.) He supported his claim with an affidavit from the post-conviction mitigation specialist, Pam Swanson, reporting the recollection of trial mitigation specialist, Marsha Heiden, that she recommended a neurological

128

screening; defense psychologist Dr. Richard Jackson's report based on his evaluation of Petitioner prior to trial; psychologist Dr. Denise Kohler's report based on her competency evaluation of Petitioner during trial; and psychologist and addition specialist Dr. Robert Smith's report based on his post-trial evaluation of Petitioner.

Petitioner repeated a nearly identical claim in his twentieth ground, added as part of his third amendment to his post-conviction petition. Rather than arguing that a competent investigation would have led trial counsel to obtain a *neurologist* as he did in his eleventh ground, Petitioner faulted trial counsel for not retaining a *neuropsychologist* in his twentieth ground. (ECF No. 82-16, PageID 3222–24.) He cited the same four pieces of evidence in support of his twentieth ground as he did for his eleventh ground.

The Ohio Court of Appeals affirmed the trial court's rejection of both claims:

> In support of his eleventh claim for relief, appellant submitted the affidavit of Pam Swanson, the mitigation specialist currently working on appellant's post-conviction case. [Exhibit K]. This affidavit is a summary of Ms. Swanson's telephone conversation with Marsha Heiden, the mitigation specialist employed for appellant's trial. Ms. Swanson states, in pertinent part: "Ms. Heiden stated that she thought that our client had some neurological deficits due to his long-term drug use. Ms. Heiden believed that crack usage over a long period of time, would have produced a change in [appellant's] personality. She had suggested to the defense attorneys that they get a neurologist on board, but she does not know what happened to that suggestion." [Exhibit K at ¶ 13].

> Nothing in the record provides a foundation qualifying Ms. Heiden to give an opinion that long-term drug usage requires a neurological assessment. Nor do the records, affidavits, documentary evidence, or files provide a basis for Ms. Heiden's conclusion.

As this affidavit contains or relies upon hearsay, the trial court could give it little or no weight. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 281, 714 N.E.2d 905; *State v. Elmore*, 5th Dist. No.2005-CA-32, 2005-Ohio-5740 at ¶ 109.

As the Supreme Court further explained in *Jackson*, supra, "[b]road assertions without a further demonstration of prejudice do not warrant a hearing for all post-conviction relief petitions." Id. at 111. Rather, a petitioner must submit evidentiary documents containing sufficient operative facts to support his claim before an evidentiary hearing will be granted. Accordingly, "a trial court properly denies a defendant's petition for post conviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

The Ohio Supreme Court in the direct appeal concluded, upon its independent review of appellant's death sentences, that the aggravating circumstances outweighed the mitigating circumstances. The Court found that "Johnson introduced evidence of a mitigating factor under R.C. 2929.04(B)(3) that "because of a mental disease or defect," he "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law" when he killed Daniel. He also introduced evidence that he suffers alcoholism and drug addiction and that he had consumed drugs and alcohol shortly before the murder." *State v. Johnson*, supra, 112 Ohio St.3d at 250, 2006-Ohio-6404 at ¶ 291, 858 N.E.2d at 1184. Accordingly, the defense did establish a mitigating factor under R.C. 2929.04(B)(3): 'because of a mental disease or defect,' appellant 'lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law' at the time he committed the crimes.

In *State v. Phillips*, supra, the court noted "Significantly, evidence outside the record alone will not guarantee the right to an evidentiary hearing. *State v. Combs* (1994), 100 Ohio App.3d 90, 97, 652 N.E.2d 205. Such evidence '"must meet some threshold standard of cogency; otherwise it would be too easy to defeat the holding of [*State v. Perry* (1967), 10 Ohio St.2d 175] by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery."' (Citation omitted.) *State v. Lawson* (1995), 103 Ohio

130

App.3d 307, 315, 659 N.E. 2d 362. Thus, the evidence must not be merely cumulative of or alternative to evidence presented at trial. *Combs*, 100 Ohio App.3d at 98, 652 N.E.2d 205".

We conclude that the evidence outside the record is only cumulative of the evidence that was presented to the jury. *State v. Madrigal* (Nov. 17, 2000), 6th Dist. No. L-00-1006 at 7. The petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that appellant set forth sufficient operative facts to establish substantive grounds for relief. *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

Accordingly, we reject appellant's eleventh claim for relief.

. . .

In his twentieth claim for relief appellant contends defense counsel failed to investigate and/or provide mitigation evidence. Specifically, appellant contends that his trial counsel was ineffective in failing to retain a neuropsychologist to examine appellant for possible brain impairment complicated by appellant's lengthy history of drug abuse. We disagree.

"Johnson introduced evidence of a mitigating factor under R.C. 2929.04(B)(3) that "because of a mental disease or defect," he "lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law" when he killed Daniel. He also introduced evidence that he suffers from alcoholism and drug addiction and that he had consumed drugs and alcohol shortly before the murder." *State v. Johnson*, supra, 112 Ohio St.3d at 250, 2006-Ohio-6404 at ¶ 291, 858 N.E.2d at 1184.

Generally, counsel's decision as to what mitigating evidence to present during the penalty phase of a capital trial is a matter of trial strategy. *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47, certiorari denied (1998), 523 U.S. 1063, 118 S.Ct. 1393, 140 L.Ed.2d 652. Defense counsel has a duty to investigate mitigating circumstances in order to make informed tactical decisions about what information would be most helpful to his or her client. *State v. Jackson*, Franklin App. No. 01AP808, 2002-Ohio-3330 ("*Jackson II*"), citing *State v. Johnson* (1986), 24 Ohio St.3d 87, 90, 494 N.E.2d 1061. The decision to forego the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel. *State v. Johnson* (1986), 24 Ohio St.3d 87, 91, 494 N.E.2d 106.

131

Further, decisions regarding what witnesses to call fall within trial strategy and, absent prejudice, generally will not constitute ineffective assistance of counsel. *State v. Hessler*, Franklin App. No. 01AP-1011, 2002-Ohio-3321. To demonstrate prejudice, a petitioner must show not only that there was mitigating evidence counsel failed to present, but, also, "there is a reasonable probability that the evidence would have swayed the jury to impose a life sentence." *Keith* at 536, 684 N.E.2d 47. We find no such evidence here.

The only evidence in support of this argument is the affidavit of the current mitigation specialist who summarizes her conversation with the former mitigation specialist. [Exhibit K]. As this affidavit contains or relies upon hearsay, the trial court could give it little or no weight. *State v. Calhoun* (1999), 86 Ohio St.3d 279, 281, 714 N.E.2d 905; *State v. Elmore*, 5th Dist. No. 2005-CA-32, 2005-Ohio-5740 at ¶ 109.

As the Supreme Court further explained in *Jackson*, supra, "[b]road assertions without a further demonstration of prejudice do not warrant a hearing for all post-conviction relief petitions." *Id.* at 111. Rather, a petitioner must submit evidentiary documents containing sufficient operative facts to support his claim before an evidentiary hearing will be granted. Accordingly, "a trial court properly denies a defendant's petition for post conviction relief without holding an evidentiary hearing where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

Appellant has failed in his burden to demonstrate that there is a reasonable probability that, absent the errors, the sentence—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

The petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that appellant set forth sufficient operative facts to establish substantive grounds for relief. *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C)

We reject appellant's twentieth claim for relief.

*Johnson*, 2007 WL 1098106, at *16–18, 20–21.

132

Petitioner raised this claim again in his second state post-conviction petition, this time amended to argue that not only his history of substance abuse, but also a childhood head injury and his Type II diabetes, should have alerted trial counsel to the need for a neuropsychologist. (ECF 85-1, PageID 8250–52.) In addition to the evidence presented in support of his initial state post-conviction petition, he also presented the habeas depositions of his trial counsel, as well as a report from neuropsychologist Dr. Nicholas Doninger based on the evaluation of Petitioner he conducted during federal habeas proceedings. The state courts dismissed the petition without a merits decision due to Petitioner's failure to satisfy the jurisdictional requirements of § 2953.23(A)(1). *Johnson*, 2013 WL 1400607, at *5. As explained above, the Court reviews the merits decision of the Ohio Court of Appeals on Petitioner's initial state post-conviction petition based on the record before the state court at the time. *See Pinholster*, 563 U.S. at 181.

The Court concludes that the state court's assessment that trial counsel's performance was not deficient was a reasonable one. Counsel are obligated to conduct a reasonably thorough investigation, but counsel are not obligated to chase down every stray lead or follow every suggestion of a mitigation specialist. *Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.") Here, trial counsel retained two mental

133

health experts to evaluate Petitioner and testify during the penalty phase of trial, one of whom, Dr. Fettman, was an addiction expert hired to focus on the nature and effect of Petitioner's long-term drug use. It was not unreasonable for the Ohio Court of Appeals to conclude that counsel acted reasonably when they chose to rely on the opinions of their two mental health experts (neither of whom apparently recommended a neurological screening) over that of the mitigation specialist who recommended a neurological assessment due to Petitioner's long-term drug use. Absent signs that Dr. Fettman and Dr. Jackson were incompetent, counsel were entitled to rely on their expertise as to whether a neurological exam was needed. *See Morris v. Carpenter*, 802 F.3d 825, 841 (6th Cir. 2015) ("Attorneys are entitled to rely on the opinions and conclusions of [medical] experts.")

But even if counsel's performance was deficient, the claim still fails for lack of prejudice. The state appellate court's opinion that any neurological evidence would be cumulative was not an unreasonable one. Counsel had presented two mental health experts in mitigation who testified to Petitioner's cognitive deficits and the possible effects of his substance abuse. Petitioner has not shown that a neurologist or neuropsychologist would have added anything new to the sentencing profile already presented to the jury. *See Esparza v. Sheldon*, 765 F.3d 615, 620 (6th Cir. 2014) (no prejudice from facially deficient investigation when a thorough investigation would barely have altered the sentencing profile); *Hill*, 400 F.3d at 319 (prejudice requires new evidence that substantially differs from that presented at trial).

134

In fact, the Court's conclusion would not change even if Dr. Doninger's opinion were considered. Dr. Doninger reported that he observed some cognitive deficits in Petitioner consistent with frontal lobe dysfunction but would need to conduct an MRI or PET scan to validate his findings. (ECF No. 85-1, PageID 8539.) But the mental deficiencies Dr. Doninger cataloged are not altogether new or different than those identified by Dr. Jackson at trial. Specifically, Dr. Doninger found:

> Mr. Johnson scored in the impaired range on several measures of executive functioning. This is a broad class of cognitive abilities, which facilitate appropriate, socially responsible, and goal directed conduct as well as modification of behavior in response to environmental changes. He suffers from mild to moderate deficiencies with respect to the capacity to learn from experience. He also suffers from deficiencies in abstract reasoning/problem solving, conceptual flexibility, identifying rules, planning and organization.

> It is my opinion, to a reasonable degree of neuropsychological certainty that Mr. Johnson suffers from frontal lobe dysfunction. Several events in his background reveal poor judgment and impulse control suggestive of executive dysfunction. The etiology of his current executive impairments is multi-factorial in nature reflecting the residual effects of traumatic brain injuries (TBIs) and poly-substance abuse.

(*Id.*) Compare that with the findings of Dr. Jackson. (ECF 82-15, PageID 3094–99). The neuropsychological evidence does not provide new information relative to the psychological evidence presented at trial that it could have had any probable effect on the outcome.

Petitioner argues that "[n]eurological issues must be considered in every case." (ECF No. 131, PageID 10810.) He relies on *Frazier v. Huffman* for the proposition that a reasonable mitigation strategy can never forgo the investigation

135

and presentation of evidence of brain impairment. (*Id.*, *citing Frazier*, 343 F.3d 780, 794 (6th Cir. 2003).) Petitioner's reliance is misplaced. In *Frazier*, the Sixth Circuit concluded that not presenting evidence of a known brain impairment could not be considered a reasonable strategy when counsel's actual mitigation strategy depended entirely on the jury finding residual doubt based on a one-sentence statement from the defendant. *Frazier*, 343 F.3d at 793–94. "[T]he sum total of the evidence presented on Frazier's behalf during the penalty phase of the trial was the following unsworn statement: 'Ladies and gentlemen, I know you found me guilty, and in the past I have done things that were wrong, but I am not guilty of this crime and I am asking you to spare my life.'" *Id.* In other words, *Frazier* was a situation in which counsel failed to find or present *any* background evidence, a mitigation strategy which could not be saved by the defense that counsel chose it while being fully aware of the defendant's existing brain damage. *Id.* at 794–95; *see also Carter v. Mitchell*, 443 F.3d 517, 532–33 (6th Cir. 2006) (noting that *Frazier* and two other cases all "involve situations in which counsel failed *entirely* to seek or present mitigating family-background evidence") (*citing Moore v. Parker*, 425 F.3d 250, 255 (6th Cir. 2005) (emphasis in original)). *Frazier* nowhere said that a mitigation strategy in which mental health and cognitive deficits were presented through the testimony of expert psychologists rather than framed as neurological issues and presented by a neurologist or neuropsychologist would be considered deficient. Accordingly, Petitioner has failed to show that decision of the Ohio Court of Appeals was an unreasonable application of federal law.

136

### b. Diabetes

Petitioner claims that his trial counsel were deficient in not obtaining an endocrinologist to testify in mitigation that high blood sugar from Type II diabetes can lead to "mental confusion, drowsiness, and seizures" as a result of dehydration. (ECF No. 86, PageID 9272.) He argues that an endocrinologist could have explained to the jury how these symptoms might have affected Petitioner's behavior and informed them that outside stressors, including drug use, can elevate blood sugar levels. Petitioner contends that a reasonable attorney would have retained an endocrinologist based on the fact that he was diagnosed with Type II diabetes in 1992 and had high measured glucose levels—information contained in his medical records. In support of his claim, Petitioner presents the habeas depositions of his trial counsel, the opinion of neuropsychologist Dr. Doninger, as well as general information about the risks and potential symptoms of diabetes and high blood sugar.

Respondent argues that the Ohio Court of Appeals' conclusion that the absence in mitigation of any evidence regarding the potential effects of Petitioner's drug use on his diabetes was not prejudicial was reasonable given the minimal weight typically assigned to the voluntary ingestion of drugs. (ECF No. 91, PageID 10449.)

Petitioner initially raised this claim in his initial state post-conviction petition:

In support of his twelfth claim for relief appellant submits non-

137

certified medical records and articles concerning the effects of diabetes. Appellant claims counsel was ineffective in not presenting evidence of his Type 2 diabetes and how this long history of drug abuse would impact this condition during the mitigation phase of his trial.

We have previously rejected this type of evidence as being inadmissible to prove the truth of the matter asserted. *State v. Elmore*, 5th Dist. No.2005-CA-32, 2005-Ohio-5740[18] [sic] at ¶ 80–87.

Even if we accepted this evidence we find the records and articles are of marginal significance. "Evidence presented outside the record must meet some threshold standard of cogency' to advance the petitioner's claim beyond mere hypothesis." *State v. Brown* (Jan. 14, 2000), Lucas App. No.L-99-1251, quoting *State v. Lawson* (1995), 103 Ohio App.3d 307, 315, 659 N.E.2d 362 (citation omitted). "A disorder both caused and exacerbated by the voluntary ingestion of drugs deserves minimal weight in mitigation". *State v. Fitzpatrick* (2004), 102 Ohio St.3d 321, 339, 2004-Ohio-3167 at ¶ 111, 810 N.E.2d 927, 944.

To demonstrate prejudice, a petitioner must show not only that there was mitigating evidence counsel failed to present, but also "there is a reasonable probability that the evidence would have swayed the jury to impose a life sentence." *Keith*, at 536, 684 N.E.2d 47. See, also, *Strickland* at 2069 (stating "[w]hen a defendant challenges a death sentence * * * the question is whether there is a reasonable probability that, absent the errors, the sentence—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death"). "A post-conviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial." *Combs*, at 103, 652 N.E.2d 205.

Appellant has failed in his burden to demonstrate that there is a reasonable probability that, absent the errors, the sentence—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

---

[18]This is the citation as written in the opinion of the Ohio Court of Appeals. The correct case number for *State v. Elmore* is 2005-Ohio-5940.

138

> The petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that appellant set forth sufficient operative facts to establish substantive grounds for relief. *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).
>
> Accordingly, we reject appellant's twelfth claim for relief.

*Johnson*, 2007 WL 1098106, at *18.

Petitioner reprised this claim in his successive state post-conviction petition, but it was dismissed without a decision on the merits. *Johnson*, 2013 WL 1400607, at *5. Thus, the Court reviews the merits decision of the Ohio Court of Appeals in Petitioner's initial post-conviction proceedings, *see Ylst*, 501 U.S. at 803–04 n.3, based on the record before the state court at that time, *see Pinholster*, 563 U.S. at 181. Because they were not before the state court at that time, the Court may not consider the opinion of Dr. Doninger or the habeas depositions of trial counsel. *See id*.

Effective assistance does not require counsel to investigate every possible lead, no matter how likely it is to prove relevant and useful. *Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). In light of the fact that counsel already had a psychologist and a substance abuse expert to provide evidence regarding Petitioner's existing mental deficiencies and the effects of drug abuse, it would not be unreasonable for counsel to conclude that a

potential behavioral effect resulting from the interaction of Petitioner's diabetes and drug use, even if proven, would not appreciably alter the sentencing profile. In other words, counsel could make a reasonable and informed tactical decision that time and resources were better spent elsewhere than on hiring an endocrinologist to chase a speculative and unprovable theory that Petitioner was (1) suffering from high blood sugar at the time of the murder, and (2) his low blood sugar affected his behavior.

Nor has Petitioner shown that the absence of this evidence was prejudicial. General information about possible risks and consequences of diabetes, without any basis for establishing that Petitioner actually suffered from the identified symptoms at the time of the murder, is unlikely to have any effect on the jury's sentence.

Moreover, the potential side effects on which Petitioner relies to make out his claim appear to depend on the use of drugs or alcohol. The state court reasonably noted that a condition exacerbated by substance abuse is not weighted heavily. It is unclear how much the effects Petitioner points to are the result of diabetes and how much are simply the effects of drugs and alcohol. Petitioner presented evidence at trial regarding his use of drugs and alcohol shortly before the murder, so the jury could already consider his potential diminished mental capacity.

Accordingly, the Court concludes that Petitioner's claim of ineffective assistance for failing to investigate and present evidence regarding the effects of diabetes does not warrant habeas relief.

### c. Cultural and Racial Differences

Finally, Petitioner claims that counsel were deficient in failing to obtain a cultural expert to explain the effect that Petitioner's upbringing and experience with racism in 1960s and 70s rural Alabama had on his personality and behavior. (ECF No. 86, PageID 9274–77.) He argues that the testimony of a cultural expert would have contextualized for the jury his hostility to the victim and his rants about race and explained the significance of racism to his development.

During his initial state post-conviction proceedings, Petitioner retained a cultural expert, Dr. Kwame'-Osagyefo Kalimara, to investigate Petitioner's history and background, and presented Dr. Kalimara's report as evidence in support of his petition. (ECF No. 82-15, PageID 3124.) Based on Dr. Kalimara's report, Petitioner argues here as he did in post-conviction that a cultural expert would have explained to the jury the community and societal roots of maladjustment, particularly the risk of maladjustment that results from living in a segregated community and being exposed to racial discrimination; the sense of power he derived from his many relationships with white women; the symbolic reason that Petitioner referred to Daniel as a man rather than a child; and the reasons he was hostile to Daniel and often referenced race and racism in his outbursts. (ECF No. 86, PageID 9275–76.) He asserts that counsel's failure to present a complete picture of him to the jury allowed the jury to believe that his ranting about racism was unfounded, prejudicing the outcome. (*Id.*, PageID 9276.) As evidence of counsel's failure to investigate cultural issues, he also cites the habeas depositions given by his trial

141

counsel.

Respondent argues that the state court's determination that the evidence offered no reasonable possibility of a different verdict was reasonable, especially in light of the little weight the Supreme Court of Ohio had assigned to Petitioner's employment record, childhood of abuse and neglect, and redeeming traits of spirituality, courtesy, and helpfulness on direct appeal. (ECF No. 91, PageID 10449–50.) He maintains that counsel's performance was not deficient given the presumption of reasonableness afforded decisions regarding what evidence to present in mitigation.

The Ohio Court of Appeals adjudicated this claim on the merits in response to Petitioner's initial state post-conviction petition:

> In his tenth claim for relief appellant argues that counsel was ineffective in failing to present testimony of an expert in African-American cultural mitigation. . . .
>
> In support of his claim that counsel was ineffective in failing to call a cultural mitigation expert during the mitigation phase of appellant's trial appellant's counsel submitted the affidavit of Dr. Kwame'-Osagyefo Kalimara who opined "[the murder victim] symbolized to [appellant] the years of fear, alienation, rage and oppression. Ultimately, [appellant] was too weak and felt powerless to confront his rage over perceived mistreatment. It is my professional opinion that the pathology of [appellant], which was shaped through his family and cultural environment, as well as his crake [sic] cocaine addiction, created a vehicle for him to empower himself and contribute to the brutal murder of Daniel Bailey." [Exhibit P at ¶ 22].
>
> To demonstrate prejudice, a petitioner must show not only that there was mitigating evidence counsel failed to present, but also "there is a reasonable probability that the evidence would have swayed the jury to impose a life sentence." *Keith*, at 536, 684 N.E.2d 47. See, also, *Strickland* at 2069 (stating "[w]hen a defendant challenges a death

142

sentence * * * the question is whether there is a reasonable probability that, absent the errors, the sentence—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death"). "A post-conviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial." *Combs*, at 103, 652 N.E.2d 205.

"A disorder both caused and exacerbated by the voluntary ingestion of drugs deserves minimal weight in mitigation." *State v. Fitzpatrick* (2004), 102 Ohio St.3d 321, 339, 2004-Ohio-3167 at ¶ 111, 810 N.E.2d 927, 944. The Ohio Supreme Court in the direct appeal concluded, upon its independent review of appellant's death sentences, that the aggravating circumstances outweighed the mitigating circumstances. The Court found that "Johnson's employment record, his history as an abused and neglected child, and his redeeming traits of spirituality, politeness, and helpfulness have little weight."

The petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that appellant set forth sufficient operative facts to establish substantive grounds for relief. Calhoun, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

Accordingly we reject appellant's tenth claim for relief.

*Johnson*, 2007 WL 1098106, at *15–16.

Petitioner repeated his claim in his second state post-conviction petition, but that petition was dismissed without a decision on the merits. *Johnson*, 2013 WL 1400607, at *5. The Court therefore reviews the merits decision of the Ohio Court of Appeals in Petitioner's initial state post-conviction proceedings, *see Ylst*, 501 U.S. at 803–04 n.3, based on the record before the state court at that time, *see Pinholster*, 563 U.S. at 181.The Court may not consider the depositions of Petitioner's trial counsel in habeas because they were not before the Ohio Court of Appeals when it adjudicated this claim in Petitioner's initial post-conviction proceedings. *See id*.

143

The state court's determination that Petitioner was not prejudiced was a reasonable one. "The probability of a different sentence had this evidence been presented is a function of the strength of the aggravating circumstances and the net mitigating value of [Petitioner's troubled background]." *Sutton v. Bell*, 645 F.3d 752, 762 (6th Cir. 2011), *citing Wiggins*, 539 US at 516–18. The state appellate court relied on the conclusion of the Ohio Supreme Court when it reweighed the aggravating and mitigating factors on direct appeal that Petitioner's background as "an abused and neglected child" deserved little weight, as did disorders caused by voluntary drug use. *See Johnson*, 2007 WL 1098106, at *16. It was reasonable to find that further testimony regarding Petitioner's background and childhood, especially testimony focused on the effect of larger societal forces, was unlikely to affect the outcome when evidence as to the abuse and neglect personally experienced by Petitioner had little weight.

Moreover, counsel's failure to obtain a cultural expert was not deficient in light of the investigation they did conduct. Until Petitioner's family members suddenly changed their mind, counsel believed that they would be testifying as to Petitioner's background and childhood, including the conditions of the community in which they grew up. It was not unreasonable for counsel to choose to present such evidence through lay witnesses, or to forgo consulting an expert when they already had witnesses ready to speak to the same topic.

Petitioner argues that the state appellate court erred in holding that there was no reasonable probability the additional cultural evidence could have changed

144

the outcome because Ohio courts have previously recognized the value of cultural experts in mitigation. (ECF No. 131, PageID 10817, *citing State v. Mapes*, 2006 Ohio App. LEXIS 251, at *11 (8th App. Dist. Jan. 26, 2006), and *State v. Dixon*, 1997 Ohio App. LEXIS 915, at *96–98 (8th App. Dist. Mar. 13, 1997).) He also points to *Morales v. Mitchell*, 507 F.3d 916 (6th Cir. 2007), in which the Sixth Circuit affirmed the district court's grant of habeas relief in an Ohio capital case for failure to present cultural evidence. (ECF No. 131, PageID 10817.)

First, the fact that cultural expertise was beneficial or even necessary in some cases does not mean that it is necessary in every case. For instance, courts have frequently held that a failure to investigate past abuse is ineffective assistance, *see, e.g.*, *Wiggins*, 539 U.S. at 525; yet courts have **not** held that failing to investigate or present abuse is *always* prejudicial, *see e.g.*, *Bobby v. Van Hook*, 558 U.S. 4, 10–11 (2009); *West v. Bell*, 550 F.3d 542, 555 (6th Cir. 2008). The same principle applies here.

Second, Petitioner misrepresents the holding in *Morales*. The court did not simply grant relief on the basis of missing cultural evidence; it held that Morales's counsel was ineffective because he had not conducted *any* investigation, had not hired an investigator or mitigation specialist to investigate for him, had not presented *any* evidence at the mitigation hearing other than Morales's own unsworn statement, and had not even made an opening statement—despite the existence of a range of mitigation evidence and witnesses willing to testify. *Morales*, 507 F.3d at 931–33. As the Sixth Circuit recounted in its opinion, the district court

145

found that Morales's trial counsel had failed to "interview any member of Morales's family, any of his friends, or 'anyone else who knew him'; to 'search any records pertaining to [Morales's] education, health, mental problems, or juvenile offenses'; to retain any mitigation expert; 'to adequately prepare [Morales] to make an unsworn statement in the penalty phase of the trial'; 'to adequately investigate [Morales's] cultural background and the effect it had on [his] life'; and 'to investigate the possibility of a neurological cause of [Morales's] mental and emotional deficiencies due to his lifelong alcohol consumption.'" *Id.* at 931, *quoting Morales v. Coyle*, 98 F.Supp.2d 849, 898–99 (N.D. Ohio 2000). In determining that Morales was prejudiced by the deficient investigation, the Sixth Circuit specifically cited as significant the volume of undiscovered evidence: "Because the net effect of the undiscovered and unpresented evidence, viewed cumulatively and in light of the totality of the circumstances, demonstrates the existence of significant mitigating evidence that favored Morales, it is reasonably probable that at least one juror hearing that evidence would have been persuaded to impose a life, rather than a death, sentence." *Id.* at 936.

The alleged errors here bear no resemblance to the facts in *Morales*. This is not a case where counsel failed to prepare or present any case in mitigation. The majority of the evidence Petitioner claims his trial counsel failed to present is merely cumulative of the evidence that his counsel *did* present regarding his difficult childhood, mental health diagnoses, and history of substance abuse. While counsel did not offer the testimony of a cultural expert at the mitigation hearing to

146

explain the effect of racism on Petitioner's psyche, the Court cannot say the absence of such evidence is enough to raise doubt in the verdict in light of the range and amount of mitigation evidence that was presented.

For the above reasons, Petitioner's claims of ineffective assistance for the failure to investigate and present mitigation evidence on neurological deficits, effects of diabetes, and cultural differences are **DENIED**.

> **9. Ninth Ground for Relief: Petitioner was deprived of the effective assistance of trial counsel contrary to the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments when counsel failed to present competent expert evidence regarding Petitioner's substance abuse during the mitigation phase of his capital trial.**

In his ninth ground for relief, Petitioner claims that he was deprived of constitutionally effective assistance of counsel as a result of his trial counsel's deficient investigation and presentation of mitigation evidence regarding his history of drug use. (ECF No. 86, PageID 9277–83.) This ground contains two separate sub-claims. First, he argues that trial counsel performed a deficient investigation, failing to obtain medical and other records regarding his history of drug use, which resulted in "incomplete and ineffective" testimony from Dr. Mark Fettman (the addiction and substance abuse expert who testified in mitigation). Second, he argues that counsel failed to obtain and present a competent expert witness to discuss his substance abuse. Specifically, Petitioner claims that Attorney Warhola knew that Dr. Fettman would not be beneficial to his case but presented him anyway. Petitioner originally raised the first sub-claim in his initial state post-

147

conviction proceedings, and the second sub-claim in his second state post-conviction proceedings.

In support of his claims, Petitioner points to trial counsel's habeas corpus depositions during which Attorney Warhola said that they had not received any records regarding Petitioner's drug use and confessed his dissatisfaction with Dr. Fettman's performance at trial. (ECF No. 86, PageID 9278–79, *citing* ECF No. 85-1, PageID 8433–34, 8442–44.) Petitioner also relies on the report of Dr. Robert Smith, a clinical and forensic psychologist retained during his initial state post-conviction proceedings to conduct a psychological examination. (ECF No. 86, PageID 9279–82, *citing* ECF No. 82-15, PageID 3100–23.) Petitioner argues that Dr. Smith's report demonstrates what evidence the jury could have heard had trial counsel properly investigated and prepared a competent substance-abuse expert.

Respondent argues that trial counsel's post-hoc assessments of their own performance are not compelling evidence and that Petitioner failed to challenge Dr. Fettman's competence in his initial state post-conviction proceedings. (ECF No. 91, PageID 10452.)

### a. Collection of records

Petitioner raised the first sub-claim that trial counsel failed to investigate and obtain records of his drug use in his initial state post-conviction petition. (ECF No. 82-16, PageID 3206–08.) The Ohio Court of Appeals found that the new evidence presented by Petitioner was cumulative of evidence presented at trial, and thus he could not show prejudice:

148

Appellant argues that trial counsel was ineffective in failing to present mitigating evidence concerning the extent that substance abuse affected all facets of his life. [Petitioner's First Amendment to Petition to Vacate or Set Aside Judgment and/or Sentence Pursuant to Ohio Revised Code Ann. Section 2953.21 filed July 29, 2005]. We disagree.

The Ohio Supreme Court found that appellant suffers from alcoholism and drug addiction and that he had consumed drugs and alcohol shortly before the murder. *State v. Johnson*, supra, 112 Ohio St.3d at 250, 2006-Ohio-6404 at 291, 858 N.E.2d at 1184.

We conclude that the evidence outside the record is only cumulative of the evidence that was presented to the jury. *State v. Madrigal* (Nov. 17, 2000), 6th Dist. No. L-00-1006 at 7. Appellant has failed in his burden to demonstrate that there is a reasonable probability that, absent the errors, the sentence—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

The petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that appellant set forth sufficient operative facts to establish substantive grounds for relief. *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

Accordingly, we reject appellant's nineteenth claim for relief.

*Johnson*, 2007 WL 1098106, at *20.

Because Petitioner's claim was adjudicated on the merits in state court, the Court is limited to the record before the Ohio Court of Appeals when it decided the claim. *Pinholster*, 563 U.S. at 185. As explained more thoroughly in connection with Petitioner's fourth ground for relief, *supra*, *Pinholster* bars the Court from considering the evidence developed during federal habeas proceedings—in this case,

149

the depositions of Attorneys Warhola and Blakeslee.[19] *Id.*

To establish a claim of ineffective assistance, Petitioner "must show that '(1) his counsel's performance was deficient, that is, objectively unreasonable under prevailing professional norms, and (2) it prejudiced his defense.'" *Miller v. Mays*, 879 F.3d 691, 703 (6th Cir. 2018), *quoting Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009). Prejudice means "'a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Id.* at 705, *quoting Strickland*, 466 U.S. at 695. In the context of a claim of a deficient mitigation investigation, prejudice "requires 'new evidence' that 'differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing.'" *Id.*, *quoting Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005). The Court reweighs the aggravating evidence against the sum total of mitigating evidence, including the evidence presented at trial and the new evidence that emerged in post-conviction proceedings, to determine whether the addition of the new evidence had a reasonable probability of affecting the outcome. *Id.*, *quoting Goodwin v. Johnson*, 632 F.3d 301, 327 (6th Cir. 2011). The question for the Court is whether the

_____

[19]Unlike Petitioner's fourth ground for relief, where he re-presented the previously adjudicated claim bolstered with new evidence to the state courts in his second post-conviction petition, he did not re-present this claim to the state courts in his second post-conviction petition. In other words, this subclaim has never been presented to the state courts with the evidence obtained from the habeas depositions of his trial counsel.

150

judgment of the Ohio Court of Appeals that Petitioner was not prejudiced by counsel's alleged deficiencies was based on an unreasonable application of clearly established federal law. The Court concludes that it was not.

Petitioner's case for mitigation during the penalty phase focused primarily on his mental illnesses and long history of drug and alcohol use. All four witnesses who testified for the defense in the mitigation phase of trial spoke at least briefly of Petitioner's history of substance abuse from their individual expertise or personal experience. Dr. Mark Fettman, a forensic and addiction psychiatrist, explained to the jury the nature of addiction and expressed his opinion that Petitioner suffered from alcohol dependence and addictions to crack cocaine and marijuana. (ECF No. 83-13, PageID 8014–15.) He testified as to the alcohol and drugs Petitioner consumed in the hours immediately preceding the crime and described the adverse effect such consumption would have had on Petitioner's perception of reality and judgment in light of his existing mental illness diagnoses. (*Id.*, PageID 8011, 8013, 8015–16.) Dr. Richard Jackson, a clinical psychologist, also testified regarding Petitioner's history of drug abuse. Dr. Jackson's written report—also provided to the jury as evidence in mitigation—covered Petitioner's history with drugs and alcohol in more detail, stating:

> Marvin. . . has a lengthy history of drug and alcohol/dependency [sic]. Reportedly, he began drinking at about age eight and first smoked marijuana at about age ten. . . . He began smoking crack cocaine at about age twenty-one. . . . In 2003 Marvin's drug addiction reached the point of frequent and at times daily crack cocaine use. . . . Marvin has a lengthy history of drug abuse, remission, and relapse. He acknowledged living in a crack house after moving from the home of

151

Tina Bailey. . . .

(ECF No. 82-15, PageID 3095–96.) Later, Dr. Jackson related what Petitioner told

him about his drug use during the time period leading up to Daniel's murder:

> . . . Marvin asked if his drug use would be relevant [to his trial],
> adding, "I was arrested for child support the last Friday of July. . .
> prior to that I'd been using ever since the beginning of June and those
> three days Friday, Saturday, and Sunday are the only days I didn't."
> Asked what he had been using in the weeks prior to the offense,
> Marvin responded, "Crack cocaine every day. . . I did go to a drug and
> alcohol place here in July, and they were helping get me in a program,
> but it was taking too long, and I told them outpatient wouldn't help, I
> needed inpatient cause I sold the car for drugs. It was Guernsey Drug
> and Alcohol Counseling. I talked to two ladies."

(*Id.*, PageID 3097.) In the final Summary and Recommendations section of his

report, Dr. Jackson stated:

> As detailed above, these data depict Marvin as functioning in the
> average to low average range and as one with a lengthy history of drug
> and alcohol abuse. He also has a lengthy history of legal offenses
> mostly related to alcohol use (including domestic violence, resisting
> arrest, driving under the influence and open container). His childhood
> was abusive and neglectful (particularly at the hands of his mother
> and older brother). His mother was described as drinking heavily at
> times. . . . Marvin has a lengthy history of remission from drug or
> alcohol abuse then relapse.

(*Id.*, PageID 3099.)

Marianna Williamson, a certified chemical dependency counselor and

prevention specialist at Alcohol and Drug Services of Guernsey County, testified

regarding Petitioner's history with the clinic and his most recent visit to the clinic

two months before the crime. (ECF No. 83-13, PageID 7938.) Finally, the jury heard

from Bonnie George, a friend of Petitioner's who spoke about what she personally

witnessed of Petitioner's drug use. As a result of the defense evidence regarding

Petitioner's substance abuse, the jury was instructed to consider the mitigating effect of Petitioner's impairment due to mental disease, mental defect, or intoxication.

None of the new evidence that Petitioner presents "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *See Hill*, 400 F.3d at 319. The records that Petitioner asserts counsel were deficient for not collecting are cumulative. Petitioner presents Dr. Robert Smith's report, based on his evaluation of Petitioner, as an example of the evidence regarding his substance abuse the jury would have heard but did not because trial counsel failed to collect the records necessary for any expert witness to produce a thorough and beneficial assessment. (ECF No. 131, PageID 10820.) Among the evidence that Petitioner claims the jury would have heard but for trial counsel's failure to collect records is that his mother was a bootlegger and his childhood home was a makeshift after-hours joint, exposing him to alcohol and violence at an early age; he was an experienced drinker by his late teens and introduced to crack by the age of 25, eventually escalating to near daily use of crack; and his pattern of drug and alcohol abuse continued until his arrest in August 2003 for Daniel's murder. (*Id.*, PageID 10821–22.) He says that unlike Dr. Fettman, Dr. Smith diagnosed him with two psychiatric disorders: Schizotypal Personality Disorder and Substance Dependence. (*Id.*, PageID 10823.) Dr. Smith also described in his report how drugs and alcohol affect the functioning of the central nervous system, impairing cognition and causing mood swings and increased aggression. (*Id.*)

153

Because a court reviewing whether the absence of evidence was prejudicial reweighs the aggravating circumstances against the *sum total* of mitigation evidence, *Mays*, 879 F.3d at 705, whether Petitioner's "new" substance abuse evidence was cumulative depends not on the testimony of Dr. Fettman in isolation but on all of the evidence regarding substance abuse introduced at trial. As discussed in Petitioner's seventh ground for relief, *supra*, Dr. Jackson's report thoroughly covered Petitioner's long history of substance abuse. Even if Dr. Smith provides additional details and recounts specific events, there is nothing in Dr. Smith's report that is substantively different or new from the evidence regarding Petitioner's substance abuse presented at trial, in both expert and lay testimony. The fact that at age fourteen, "Petitioner and his peers grew marijuana in the fields near their home," or that he discontinued his marijuana use as his cocaine and alcohol use increased, (ECF No. 131, PageID 10822), does not change the overall substance or weight of the substance abuse evidence. "The necessary reweighing of evidence, however, is not evaluated simply in terms of volume. As this court has previously stated, '[o]ur cases reject a requirement that any later-identified cumulative mitigating evidence must have been introduced in order for counsel to be effective.'" *Hartman v. Bagley*, 492 F.3d 347, 361 (6th Cir. 2007), *quoting Clark*, 425 F.3d at 286.

The state appellate court's conclusion that Petitioner's new evidence was cumulative of that presented at trial and he was not prejudiced by counsel's allegedly inadequate investigation was reasonable. The expert opinion of Dr. Smith

154

presented to the Ohio state courts in post-conviction and based on the full panoply of records that Petitioner claims trial counsel failed to collect for trial is nonetheless not markedly different from the evidence actually presented at trial. Dr. Smith had access to a broader array of records than did Dr. Jackson or Dr. Fettman, but those records did not provide substantively new information or lead to different conclusions than those offered by Drs. Jackson and Fettman. Even if trial counsel did fail to conduct an effective investigation—an issue which the Court does not reach—it does not constitute ineffective assistance when the evidence that counsel failed to discover does not change the sentencing profile and could not have affected the outcome.

### b. Competent Addiction Expert

Petitioner's claim that counsel failed to present a competent expert witness to discuss his substance abuse was raised for the first time as the sixth ground for relief in his second or successive state post-conviction petition. (ECF No. 85-1, PageID 8256.) As evidence to support his new petition, he presented the depositions of trial counsel taken during federal habeas proceedings as well as Dr. Smith's report based on his psychological examination of Petitioner prepared for Petitioner's initial state post-conviction petition.

The trial court dismissed the petition for failing to satisfy the jurisdictional requirements governing the filing of second or successive post-conviction petitions found in Ohio Rev. Code § 2953.23. (ECF No. 88-1, PageID 10019.) The Ohio Court of Appeals affirmed, also noting that ineffective assistance requires more than

155

merely presenting a different expert opinion from the one presented at trial. *Johnson*, 2013 WL 1400607, at *5. Respondent argues that the decision of the Ohio Court of Appeals was objectively reasonable and that trial counsel's "post hoc assessments of their own performance are not compelling evidence." (ECF No. 91, PageID 10452.)

The Court concludes that federal habeas review of this claim is barred by procedural default. While it is unclear whether Respondent's argument was intended to invoke a procedural default defense, procedural default may nevertheless be raised sua sponte by the federal courts. *See Lovins v. Parker*, 712 F.3d 283 (6th Cir. 2013), *citing Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005); *see also Strong v. Nagy*, 825 Fed.Appx. 3d 239, 241 (6th Cir. 2020) ("[W]here a straightforward analysis of settled state procedural default law is possible, federal courts cannot justify bypassing the procedural default issue.") (*quoting Sheffield v. Burt*, 731 Fed.Appx. 438, 441 (6th Cir. 2018)).

Procedural default precludes federal habeas review where a state court's dismissal of a federal claim rests on an independent and adequate state procedural ground. *Lundgren*, 440 F.3d at 763, *citing Coleman*, 501 U.S. at 749. In the Sixth Circuit, courts apply the *Maupin* test to determine whether a claim has been procedurally defaulted, asking whether (1) the petitioner failed to comply with a state procedural rule applicable to his claim; (2) the state courts actually enforced the state rule against the petitioner; and (3) the rule is an independent and adequate state ground for barring review of a federal constitutional claim. *See*

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). Finally, if the answer to these questions is yes, the federal habeas court asks whether the petitioner can excuse the default by showing cause for his failure to follow the state rule and prejudice from the alleged constitutional error. *Id.*

First, Petitioner failed to comply with an applicable state procedural rule. State statute permits Ohio courts to entertain second or successive post-conviction petitions only if (a) the petitioner shows that he was "unavoidably prevented from discovery of the facts" necessary to present his claim or the claim is based on a new right recognized by the Supreme Court that applies retroactively, and (b) "the petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found [him] guilty . . . or, [in the case of a death sentence] . . . eligible for the death sentence."[20] O.R.C. § 2953.23(A)(1). Petitioner satisfied neither of the § 2953.21(A)(1) conditions in his second state post-conviction petition. He failed to address whether he was unavoidably prevented from uncovering the facts (or instead was claiming a newly recognized right). (*See* ECF No. 85-1, PageID 8224–84.) And he readily conceded his inability to meet the second condition, declaring up front, "Petitioner's evidentiary document presented in support of his pending petition will not establish by clear and convincing evidence that, but for constitutional error at trial, no reasonable fact-finder would

---

[20]Section 2953.23(A)(1) applies only to second or successive post-conviction petitions that are not claiming actual innocence based on DNA testing.

have found the petitioner guilty of the capital murder or sentenced him to death."[21] (ECF No. 85-1, PageID 8240.)

The record also confirms that the state courts enforced the procedural rule against Petitioner. (*See* ECF No. 88-1, PageID 10129). And the Sixth Circuit has held that § 2953.23(A) is an independent and adequate state ground for denying review of a federal constitutional claim. *Stojetz v. Ishee*, 892 F.3d 175, 205–06 (6th Cir. 2018), *citing Davie v. Mitchell*, 547 F.3d 297, 311 (6th Cir. 2008), and *Matthews v. Ishee*, 486 F.3d 883, 889–90 (6th Cir. 2007). Finally, Petitioner also failed to demonstrate, or even address, cause to excuse the default of his claim in either his Amended Petition or Traverse.[22] As a result, Petitioner's claim is procedurally defaulted, barring federal habeas review of the merits.

Accordingly, Petitioner's ninth ground for relief is **DENIED**: the first sub-claim because the state court's judgment that Petitioner was not prejudiced by counsel's investigation was reasonable, and the second sub-claim for procedural default.

> **10. Tenth Ground for Relief: Petitioner was deprived of the effective assistance of trial counsel contrary to the Sixth and Fourteenth Amendments when counsel permitted the jury to hear repeated testimony about Petitioner's criminal history.**

---

[21] Petitioner instead argued before the state trial and appellate courts that § 2953.23(A)(1) was unconstitutional, both facially and applied to him. (ECF No. 85-1, PageID 8233–40; ECF No. 88-1, PageID 10041–45.)

[22] Because Petitioner's failure to show cause is enough, standing alone, to meet the *Maupin* standard for procedural default, the Court declines to address the issue of prejudice from the claimed ineffective assistance of counsel.

In his tenth ground for relief, Petitioner claims ineffective assistance based on counsel's concession of guilt to the aggravated murder charge, disclosure of Petitioner's past criminal acts in opening statements (despite the evidence being ruled inadmissible during the guilt phase), and failure to object to witness testimony regarding Petitioner's criminal history. (ECF No. 86, PageID 9283–85.) Petitioner argues that the information regarding his prior convictions for escape and assault on a corrections officer in particular were highly prejudicial in the mitigation phase of his trial. He relies on affidavits from his post-conviction counsel and mitigation specialist attesting to conversations they had with several jurors who said they were afraid for their safety if he were to escape from prison. He contends that jurors used his previous escape charge as a non-statutory aggravating circumstance showing future dangerousness. He also points to comments from his trial counsel, made during their habeas depositions, in which they were unable to recall why they had decided to introduce Petitioner's criminal history in opening statements.

Respondent argues that the Ohio Supreme Court's merits adjudication of the claim on direct review is subject to deferential review under § 2254(d) as it was the last state court adjudication of the claim on the merits. (ECF No. 91, PageID 10454, *citing Durr v. Mitchell*, 487 F.3d 423, 434–35 (6th Cir. 2007).) As a result, Respondent asserts that the new evidence Petitioner presented in his initial state post-conviction petition and later developed during federal habeas proceedings

cannot show that the Ohio Supreme Court's decision on direct appeal was unreasonable. (*Id.*, PageID 10453, *citing Pinholster*, 563 U.S. at 181, and *Moore*, 708 F.3d at 779, 789.) Finally, Respondent argues that the Ohio Supreme Court's decision on direct appeal was neither contrary to nor an unreasonable application of clearly established federal law. (*Id.*)

Petitioner responds that *Pinholster* does not bar his new evidence because the state courts did not adjudicate his claim on the merits. Section 2254(d) only applies to decisions on the merits, and *Pinholster* only applies to habeas review under § 2254(d). (ECF No. 131, PageID 10828.) He also argues that the Ohio Supreme Court's conclusion that counsel's performance was not deficient is not reasonable under § 2254(d)(1). (*Id.*) He contends that the state court's reasoning overlooked the fact that the trial court had excluded his prior convictions when it based its conclusion on the possibility of his criminal history being raised later in the trial. (*Id.*, PageID 10828–29.) Petitioner also maintains that he was prejudiced, particularly as to the carryover effect on the jury's penalty determination.

Petitioner initially raised his claims of ineffective assistance based on concession of guilt, disclosure of his criminal history, and failure to object to testimony regarding his prior convictions as his nineteenth proposition of law on direct appeal, and the Ohio Supreme Court held that counsel's actions were not objectively unreasonable nor prejudicial. *Johnson*, 112 Ohio St.3d at 229. Petitioner reprised his ineffectiveness claims regarding counsel's disclosure of and failure to object to testimony on his criminal history as the third ground for relief in his initial

160

petition for state post-conviction relief, presenting new evidence outside the trial record of the prejudicial effect the information had on sentencing based on interviews with several jurors conducted by his post-conviction counsel. (ECF 82-14, PageID 2968–70.) The Ohio Court of Appeals affirmed the trial court's dismissal of the claim as *res judicata* on the ground that the issue had been raised and fully litigated on direct appeal. *Johnson*, 2007 WL 1098106, at *10.

In again presenting his claim related to disclosure of his criminal history as the second ground for relief in his second state post-conviction petition in 2013, Petitioner added the habeas depositions of his trial counsel to the evidence he had presented in his initial post-conviction proceedings. (ECF 85-1, PageID 8244–46.) The Ohio Court of Appeals affirmed the trial court's dismissal of the petition for failing to satisfy the jurisdictional prerequisites of § 2953.23(A)(1). *Johnson*, 2013 WL 1400607, at *4–5. The court also noted that the claim was *res judicata* because it had been raised and fully litigated on direct appeal. (*Id.*)

Early in the proceedings before this Court, Respondent moved to dismiss Petitioner's federal habeas claim as procedurally defaulted on the basis that Petitioner had raised the claim improperly in state post-conviction rather than direct appeal. (ECF No. 15, PageID 157–162.) The Court held that Petitioner had preserved the claim by presenting it as his nineteenth proposition of law on direct appeal, at least as to the specific arguments made in his tenth ground for relief that also appeared in his nineteenth proposition of law on direct appeal:

Respondent's argument that Petitioner defaulted his tenth ground for

161

relief by raising it improperly in postconviction instead of on direct appeal must fail, *but only as to the specific arguments* from Petitioner's tenth ground for relief that also appeared in Petitioner's nineteenth proposition of law on direct appeal—namely that trial counsel performed unreasonably and to Petitioner's prejudice by conceding Petitioner's guilt and detailing Petitioner's criminal history during opening statements as well as by failing to object to testimony concerning Petitioner's prior legal problems. Were Petitioner arguing that his tenth ground for relief is preserved only to the extent and in the form that he raised it in his nineteenth proposition of law, then the Court's inquiry would end here. Petitioner appears to argue, however, that to the extent that his tenth ground for relief sets forth additional facts beyond those that he had made in his nineteenth proposition of law—specifically that counsel's mention of Petitioner's escape from prison put Petitioner's future dangerousness at issue and that several jurors did in fact consider that matter, improperly, during their sentencing deliberations—those additional facts relied on evidence *dehors* the record and thus were properly raised in postconviction and supported with affidavits detailing postconviction counsel's interviews with several jurors about the jury's sentencing deliberations.

(ECF No. 28, PageID 380–81.) The Court went on to find that the subsequent dismissal of the reasserted claims in post-conviction did not, for the purposes of federal habeas review, defeat preservation of the claim for which Petitioner had already obtained a merits decision on direct appeal. (*Id.,* PageID 381–82, citations omitted).

As to the new claim contained in Petitioner's tenth ground for relief that had not been presented on direct appeal to the Ohio Supreme Court, the Court articulated: "[T]he issue before the Court with respect to the allegations set forth in Petitioner's tenth ground for relief that Petitioner did not present on direct appeal and presented only in postconviction is whether those allegations were present[ed] to the state courts properly or are barred by procedural default." (*Id.* at PageID

162

382.) The Court went on to apply the *Maupin* test to determine whether the new allegations presented for the first time in Petitioner's initial post-conviction petition were procedurally defaulted:

> Ohio's *res judicata* rule prevents a criminal defendant from litigating in postconviction any claim that was or could have been litigated on direct appeal. Claims appearing on the face of the trial record must be raised on direct appeal or they will be barred by res judicata. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104. Claims that involve matters outside the record must be raised and supported by evidence dehors the record in state postconviction proceedings. In determining whether *res judicata* applies to a constitutional claim, the inquiry is properly focused on whether the claim genuinely relies on and is supported by evidence that was not a matter of record. *State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169. Thus, non-record evidence submitted during postconviction proceedings to support a constitutional claim cannot be superfluous or cumulative to the evidence of record; rather, that evidence must genuinely support the claim in a manner that no record evidence could. *See State v. Powell*, 90 Ohio App.3d 260, 268, 629 N.E.2d 13 (Ohio App. 1 Dist. 1993) (holding that additional evidence offered in postconviction to support claim of trial counsel ineffectiveness during mitigation was merely cumulative to evidence presented at trial).
>
> In the instant case, the precise claim at issue is that defense counsel, by referencing a previous escape charge that Petitioner had faced, put Petitioner's future dangerousness at issue when it came time for the jury to decide whether to recommend the death penalty or one of the life sentence options. According to Petitioner, several jurors did in fact consider improperly the non-statutory aggravating circumstance that Petitioner's future dangerousness made it necessary for them to recommend a death sentence rather than one of the life sentence options. That component of Petitioner's tenth ground for relief was not litigated on direct appeal and therefore Petitioner did not violate the aspect of *res judicata* that prevents defendants from re-litigating in postconviction claims they had litigated on direct appeal already. To determine whether this component of Petitioner's tenth ground for relief could and should have been litigated on direct appeal as required by Ohio's *res judicata* rule, the Court must determine whether the facts supporting that component of Petitioner's tenth ground for relief appeared on the face of the trial record. It does not appear they did so.

When Petitioner presented the allegation to the state courts in postconviction that counsel's reference to Petitioner's escape charge had injected the issue of his future dangerousness into the jury's sentencing deliberations, Petitioner supported the allegation with affidavits detailing postconviction counsel's interviews with various jurors who admitted that, based on information that Petitioner had been charged with escape, they feared the possibility that he might attempt to escape again and decided accordingly that death was the only appropriate sentence. In an affidavit by attorney Kimberly Rigby recounting her interview of juror Judith Conaway, Ms. Rigby stated:

She [juror Conaway] does not think there was anything the defense attorneys could have done during mitigation to persuade her to give Marvin anything other than death. He had a prior escape conviction from when he escaped in Alabama. That escape conviction impacted her decision. If Marvin ever got out and did something to Tina or another juror or even someone that she did not know, she could not live with that. She would have been the person who let him out. She could not live with it if he got out or if she gave him life and he killed again.

Another juror, Jennifer Hicks was frightened that Marvin would come after her or her family if he was ever released or if he ever escaped from prison.

(App. Vol. 7, at 140.) In the same affidavit, Ms. Rigby recounted the following statement from juror Sara Danadic:

She [juror Danadic] thinks Marvin's escape conviction affected Jennifer Hicks because she has small children. Anyone with kids was affected by it. They all feared for their safety, especially the women on the jury. It became a factor at that time of the outburst.

(*Id.* at 141, 629 N.E.2d 13.) An affidavit by mitigation specialist Pam Swanson regarding her interviews of juror Jennifer Hicks included the following excerpts:

She [juror Hicks] was afraid of him. He had the same papers his attorneys had during voir dire. Mrs. Hicks was afraid that he had their addresses.

She admitted that she is afraid that the client will get out of prison.

She was worried that the client would get out of prison someday.

(*Id.* at 143–44, 629 N.E.2d 13.) Nowhere does the information set forth above exist on the face of the trial record. And without the information

164

set forth above, this component of Petitioner's tenth ground for relief
could not have been fully and fairly decided on direct appeal because
any assertion by Petitioner that he was prejudiced by defense counsel's
mention of Petitioner's escape conviction insofar as jurors considered
his future dangerousness as a non-statutory aggravating circumstance
would have been purely speculative. Because this component of
Petitioner's tenth ground for relief relied on and was supported by
evidence outside the trial record, this Court is of the view that
Petitioner did not violate Ohio's *res judicata* rule when he presented
the claim in postconviction instead of on direct appeal.

. . .

For the foregoing reasons, the Court concludes that Petitioner's tenth
ground for relief is properly before the Court for review on the merits—
most of the ground because it was raised and addressed on direct
appeal, and the allegation concerning the effect on the jury of defense
counsel's mention of Petitioner's prior escape conviction because it was
raised properly in postconviction. Respondent's motion to dismiss
Petitioner's tenth ground for relief as procedurally defaulted is
DENIED.

(ECF No. 28, PageID 382–87.)

While Ohio R. Evid. 606(b), also known as Ohio's aliunde rule, arguably

excludes as incompetent evidence the affidavits of his post-conviction counsel and

mitigation specialist recounting their interviews with jurors that Petitioner

presented in his initial state post-conviction proceedings, the state courts never

expressed an opinion on the competency of that evidence. Nor has Respondent

argued the applicability of Rule 606(b) here. Had the state courts enforced Rule

606(b) to find the evidence presented in Petitioner's initial state post-conviction

petition incompetent, the subsequent dismissal of the claim as *res judicata* would

have been proper because the only remaining evidence was that found on the face of

the trial record. (*See, e.g.*, *id.*, PageID 409–21.) But as previously explained in

response to Respondent's motion to dismiss, the Court declines "to *sua sponte* invoke Ohio aliunde rule to conclude that Petitioner, by failing to support his claims with *competent* evidence outside the record, violated Ohio's *res judicata* rule." (*See id.* at PageID 386–87 n.1 (emphasis in original).)

In accordance with the Court's earlier ruling on procedural default, the Court reviews, subject to AEDPA deference, the merits decision of the Ohio Supreme Court on direct appeal as to that portion of Petitioner's tenth ground that was properly presented on direct appeal (i.e., concession of guilt, disclosure of criminal history, and failure to object to testimony about criminal history claims). The new allegations specifically pertaining to the effect on the penalty phase of counsel's disclosure of the escape charge, supported by evidence *de hors* the record and properly presented to the state courts for the first time in post-conviction, are reviewed *de novo. See Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008), *citing Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007).

### a. Concession of Guilt

Petitioner claims ineffective assistance of counsel based on counsel's concession of guilt to the aggravated murder charge in opening statements to the guilt phase of trial. (ECF No. 86, PageID 9284 n.11.) Respondent argues the state supreme court's decision was objectively reasonable because it accurately applied established federal law recognizing that concession of guilt in a capital case can be a reasonable trial strategy. (ECF No. 91, PageID 10453.) Respondent also points out that Petitioner does not challenge the state court's description of the evidence

against him as overwhelming. (*Id.*)

Petitioner contends that Respondent overlooked *McCoy v. Louisiana*, which Petitioner claims held that "concessions of guilt cannot be admitted without a defendant's approval." (ECF No. 131, PageID 10826–27.) He also disputes the state supreme court's finding that he was not prejudiced due to the overwhelming evidence of his guilt, arguing that there were contested issues regarding "Petitioner's intent, whether a rape occurred, whether the victim was dead before the kidnapping, and whether any of the felonies occurred during the course of the murder." (*Id.*, PageID 10827–28.)

Petitioner first raised this claim on direct appeal. The Supreme Court of Ohio rejected it on the merits:

> First, Johnson contends that his counsel rendered ineffective assistance by conceding in opening statement that Johnson killed Daniel Bailey. Counsel stated the following to the jury:
>
> "There is an aggravated murder here. There was purposely, prior calculation and design. Marvin Johnson did kill Daniel Bailey. The issue is whether or not this was during the commission of a kidnapping or was there a kidnapping committed in this case. * * * There is an aggravated murder in this case but we contend there were no death penalty specifications that were involved here. Indeed, we contend there was not a rape. We contend there was not an aggravated robbery. But if you find that there was a rape, that there was an aggravated robbery we contend that that still does not make this a death penalty eligible case."
>
> Conceding guilt in a capital case does not necessarily constitute deficient performance. *Florida v. Nixon* (2004), 543 U.S. 175, 190–191, 125 S.Ct. 551, 160 L.Ed.2d 565; *State v. Goodwin* (1999), 84 Ohio St.3d 331, 338, 703 N.E.2d 1251. "Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. * * * In such cases,

167

'avoiding execution [may be] the best and only realistic result possible.'" *Florida v. Nixon*, 543 U.S. at 191, 125 S.Ct. 551, 160 L.Ed.2d 565, quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Section 10.9.1, Commentary (Rev.Ed.2003), reprinted in 31 Hofstra L.Rev. (2003) 913, 1040.

In this case, the record contains overwhelming evidence of Johnson's culpability for Daniel's murder, and Johnson at no point claimed innocence. We decline to second-guess trial counsel's decision to concede guilt on the murder charge but to dispute each of the other felonies that formed the basis for the death-penalty specifications. Moreover, in light of the evidence against him, Johnson cannot demonstrate how the concession caused him prejudice or might have altered the trial's outcome. See *Goodwin*, 84 Ohio St.3d at 338, 703 N.E.2d 1251. Therefore, counsel's concession in opening does not constitute ineffective assistance of counsel in this case.

*Johnson*, 112 Ohio St.3d at 228–29.

Petitioner's claim was decided on the merits by the state court on direct appeal, so it is subject to AEDPA deference. This means that the Court may not grant relief unless the Ohio Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or resulted in an unreasonable determination of the facts. § 2254(d).

A strategic decision by counsel to concede guilt in a capital trial undertaken without the defendant's express consent is not *per se* ineffective assistance. *Florida v. Nixon*, 543 U.S. 175, 190–92 (2004). But counsel may not override a defendant's *explicit* choice to maintain his innocence, even if that choice is not in the defendant's best interest. *McCoy v. Louisiana*, 584 U.S. ___, 138 S.Ct. 1500, 1509 (2018) (emphasis added). An error under *McCoy*, in which counsel refuses to defer to his

client's express assertion that he wishes to argue his innocence, is a structural error not subject to harmless error analysis.[23] *See Pennebaker v. Rewerts*, No. 17-12196, 2020 WL 4284060, at *4 (E.D. Mich. July 27, 2020). Contrary to Petitioner's characterization of *McCoy* (ECF No. 131, PageID 10826–27), the case does not mandate affirmative consent for concessions of guilt.

Petitioner nowhere claims that he expressly voiced disagreement with his trial counsel's strategy of conceding guilt to the charge of aggravated murder, merely stating that "[t]here is no evidence Petitioner approved of this concession" and then arguing that his subsequent desire to represent himself is evidence of his disagreement with counsel's strategy. (ECF No. 131, PageID 10827.) But "'waiver of certain fundamental rights can be presumed from defendant's conduct alone, absent circumstances giving rise to a contrary inference.'" *Hodge v. Haeberlin*, 579 F.3d 627, 639–40 (6th Cir. 2009) (holding that waiver of defendant's right to testify could be presumed when there were no statements or actions from the defendant indicating his disagreement, *quoting United States v. Stover*, 474 F.3d 904, 908 (6th Cir. 2007)); *see also United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000) (holding that, in the absence of contrary evidence, courts will presume counsel followed the requirements of professional conduct, and "is 'strongly presumed to have rendered adequate assistance' in carrying out the general duty 'to advocate the

---

[23]It is not clear that *McCoy* is retroactively applicable in federal habeas, but the Court declines to reach the issue because there is no evidence Petitioner ever expressed a desire to maintain his innocence at trial.

defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important development in the course of the prosecution.'") (*citing Strickland*, 466 U.S. at 688–90).

Here, there is no indication that Petitioner's decision to proceed as his own attorney was at all related to trial counsel's strategy of conceding guilt to aggravated murder. Counsel conceded guilt during opening statements at the beginning of the trial, yet Petitioner did not express a desire to fire his attorneys until the conclusion of the prosecution's case when he announced that he wished to testify against the advice of counsel. He subsequently chose to act as his own attorney, called Tina Bailey as a defense witness, and openly admitted his guilt to the murder in the course of questioning her. (ECF No. 83-11, PageID 7623–24.) Petitioner then admitted his guilt to all charges while delivering a short closing argument. (ECF No. 83-12, PageID 7728.) Given the time elapsed between counsel's concession of guilt in opening statements and Petitioner's decision to remove defense counsel after the prosecution rested its case, and the absence of any sign in the record that Petitioner ever expressed reservations about counsel's decision to concede guilt—not to mention Petitioner's own admissions of guilt when he was representing himself—the Court presumes that Petitioner assented to counsel's strategy.

Because the record suggests that Petitioner only objected to counsel's strategy after conviction, "this is not a case of structural error, as in *McCoy*, but rather, invokes *Nixon*'s analysis of ineffective assistance of counsel." *Pennebaker*,

170

2020 WL 4284060, at *4. Outside of the boundaries of *McCoy*, "[c]ounsel's decision to concede guilt should be assessed under *Strickland* by considering the evidence of defendant's guilt and the chance to avoid execution." *Goodwin*, 632 F.3d at 310, *citing Nixon*, 543 U.S. at 191–92. "[U]nless the petitioner can establish that his attorney 'entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing,' he must show a reasonable probability that the outcome of the proceeding would have been different to prevail on a claim that counsel was ineffective for conceding that he was guilty." *Simmons v. Huss*, No. 19-1613, 2020 WL 3032923, at *2 (6th Cir. May 4, 2020), *quoting Nixon*, 543 U.S. at 190. "[T]hat question depends on the strength of the evidence of the petitioner's guilt." *Id.*, *citing Poindexter v. Mitchell*, 454 F.3d 564, 582 (6th Cir. 2006).

In light of the strength of the state's case, defense counsel crafted a reasonable strategy to attempt to avoid a death sentence. There is no reasonable probability of a different outcome had they instead chosen to argue innocence. The evidence of Petitioner's guilt as to the murder charge was overwhelming, but there was arguably some room to contest the felony charges that served as death penalty specifications. Therefore, counsel concentrated on challenging, during the guilt stage, the kidnapping charge based on Daniel's time of death and the use of force in the rape and robbery, and then focusing on mitigation due to mental impairment and substance abuse during the penalty phase. Counsel also attempted to counteract some of the most potentially damaging testimony by introducing, during their cross-examination of Detectives Harbin and Clark, evidence to impeach

171

jailhouse informant Mickey Alexander before he took the stand. Had the prosecution not ultimately decided against calling Alexander as a witness at trial, counsel likely anticipated that he would repeat his testimony from the pre-trial suppression hearing that Petitioner planned to accuse Tina Bailey of orchestrating the murder of her son in an insurance fraud because "he was going to get her too," (*see* ECF No. 83-2, PageID 5533–34).

Given the overwhelming evidence of his guilt as to the murder charge, Petitioner cannot show that counsel's concession was unreasonable or had any effect on the outcome. *See Nixon*, 543 U.S. at 191 (in death penalty cases, "'avoiding execution [may be] the best and only realistic result possible" in response to often overwhelming evidence of guilt and a heinous crime, *quoting* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 10.9.1. The Ohio Supreme Court's rejection of Petitioner's claim was therefore neither contrary to nor an unreasonable application of federal law, nor an unreasonable determination of the facts.

**b. Disclosure of Criminal History**

Petitioner argues that counsel's decision to bring up his criminal history cannot be attributed to trial strategy, pointing to the depositions of Attorneys Warhola and Blakeslee taken during federal habeas proceedings in which neither was able to provide a reason for the decision to introduce Petitioner's prior convictions. (ECF No. 86, PageID 9285.) Petitioner argues that the mention of his past convictions for assault on a corrections officer and escape were particularly

prejudicial to the penalty phase of his trial when jurors were tasked to determine whether to impose the death penalty or a life sentence. (*Id.*, PageID 9284–85.) As evidence of the information's prejudicial nature, Petitioner cites post-trial statements from several jurors to the effect that they considered his previous prison escape as evidence of future dangerousness during penalty phase deliberations, despite the fact that future dangerousness is not an aggravating factor in Ohio. (ECF No. 86, PageID 9286.)

Respondent maintains that *Pinholster* bars review of counsel's habeas depositions because they were not before the Ohio Supreme Court when it adjudicated the claim on direct appeal, but that counsel's "post-hoc subjective assessments" are nevertheless not compelling evidence that counsel performed deficiently at trial. (ECF No. 91, PageID 10453.) Respondent also argues that Petitioner cannot show prejudice due to the overwhelming evidence of his guilt. (*Id.*, PageID 10453–54.)

To recap, Petitioner initially raised this claim on direct appeal, and the Ohio Supreme Court held that counsel's actions were not objectively unreasonable nor prejudicial:

> During opening, Johnson's counsel stated the following: "[Tina] knew that Marvin had a criminal past. She knew that in 1989 in Alabama he had been convicted of arson. She also knew that he used illegal drugs such as crack cocaine but with all those short comings [sic] she still permitted him to become a part of her family." He then listed Johnson's convictions and stated that while he served various prison sentences for these convictions, "Tina continues to maintain contact with him by telephone or letter, they continue their relationship during those hard times."

173

> Counsel connected Johnson's prior convictions with Tina's willingness
> to support him, to maintain a relationship and to take him back upon
> his release from prison. This does not objectively fall below a
> reasonable standard of representation, particularly if defense counsel
> expected the state to raise his prior convictions later in trial. See *State
> v. Bey* (1999), 85 Ohio St.3d 487, 493, 709 N.E.2d 484. Moreover, in
> light of the overwhelming evidence of Johnson's guilt, he cannot show
> that these statements prejudiced him. Thus, he did not receive
> ineffective assistance in this instance.

*Johnson*, 112 Ohio St.3d at 229.

Petitioner reprised his ineffectiveness claims regarding counsel's disclosure of

and failure to object to testimony on his criminal history in his initial petition for

state post-conviction relief, presenting new evidence outside the trial record of the

prejudicial effect the information had on sentencing based on interviews with

several jurors conducted by his post-conviction counsel. (ECF No. 82-14, PageID

2968–70.) The Ohio Court of Appeals affirmed the trial court's dismissal of the

claim as *res judicata* on the ground that the issue had been raised and fully

litigated on direct appeal:

> Appellant next contends that the trial counsel was ineffective by
> summarizing appellant's criminal record during opening statements
> and by failing to object when the murder victim's mother testified about
> his criminal history.
>
> As appellant raised and fully litigated this issue on direct appeal, this
> court concludes that the trial court did not err in finding that the issue
> was barred by *res judicata. State v. Johnson*, supra, 112 Ohio St.3d at
> 229, 2006-Ohio-6404 at ¶ 136–138, 858 N.E.2d at 1167–78.
>
> Accordingly, we reject the appellant's third claim for relief.

*Johnson*, 2007 WL 1098106, at *10.

In again presenting his claim as part of his second state post-conviction

174

petition in 2013, Petitioner added the habeas depositions of his trial counsel to the new evidence he had presented in his initial post-conviction proceedings. The Ohio Court of Appeals affirmed the trial court's dismissal of the petition for failing to satisfy the jurisdictional prerequisites of § 2953.23(A)(1). *Johnson*, 2013 WL 1400607, at *4–5. The court also noted that the claim was *res judicata* because it had been raised and fully litigated on direct appeal. *Id.*

In accordance with this Court's earlier decision that the Ohio Court of Appeals had improperly asserted res judicata to the new allegations in Petitioner's first post-conviction petition on the basis that they had been previously litigated on direct appeal (*see* ECF No. 28, PageID 378–87), the Court reviews separately that portion of Petitioner's claim regarding disclosure of criminal history that was preserved on direct appeal and his specific claim related to disclosure of his previous escape charge that was preserved in his initial state post-conviction petition.

### i. General Criminal History

As explained above, Petitioner presented this portion of his tenth ground on direct appeal to the Ohio Supreme Court. Because Petitioner's claim was decided on the merits by the state court on direct appeal, it is subject to AEDPA deference; the Court may not grant relief unless the Ohio Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or resulted in an unreasonable determination of the facts. § 2254(d). Review is limited to the record that was before the state court on direct appeal when it adjudicated the claim on

175

the merits. *See Pinholster*, 563 U.S. at 181. That means that trial counsel's statements made in their habeas depositions may not be considered by the Court.

First, the state court did not contravene clearly established federal law. Petitioner argues that the Supreme Court did not cite or discuss the United States Constitution or *Strickland* in its decision. (ECF No. 131, PageID 10827.) "The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them. Instead, it is sufficient that the result and reasoning are consistent with Supreme Court precedent." *Slagle v. Bagley*, 457 F.3d 501, 513–14 (6th Cir. 2006), *citing Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (internal citations omitted); *Richter*, 562 U.S. at 98.

The state court's decision was also not unreasonable in light of the deference owed to trial counsel's strategic decisions under *Strickland*. Petitioner had to show that counsel's performance was deficient and that he was prejudiced as a result. Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, *quoting Michel*, 350 U.S. at 101.

Petitioner argues that the Ohio Supreme Court erred by citing counsel's potential motivation to introduce his criminal history based on an expectation that the state would raise his prior convictions later in the trial. (ECF No. 131, PageID 10828–29.) He points out that counsel had moved to exclude evidence of his prior

convictions (ECF No. 85-1, PageID 8378–85), which the trial court granted (ECF No. 83-2, PageID 5488). As a result, Petitioner argues, trial counsel had no reason to worry that the prosecution would raise his prior convictions at trial.

Petitioner overlooks one exception to the exclusion of evidence regarding his prior convictions: the state could still use evidence of prior bad acts in rebuttal if the defense raised his history, character, or background.[24] *See State v. Clark*, 38 Ohio St.3d 252, 254–55 (Ohio 1988) ("[I]f the appellant in facts carries his burden of going forward with evidence of mitigating factors, he opens the door for the state to introduce rebuttal evidence. . . . [T]he rebuttal evidence of appellant's prior criminal record was relevant in this context because it completed an otherwise incomplete account of appellant's history and background. Since appellant essentially raised the issue of his history, character, and background, he 'opened the door' to all evidence relevant thereto.") (*citing* Evid. R. 405(B)). By the time the guilt phase of trial began, it is probable that counsel knew that their mitigation strategy would include evidence on Petitioner's history, character, and background.[25] Rather than

---

[24]*But see Mason v. Mitchell*, 543 F.3d 766, 780–82 (6th Cir. 2008) (holding that Ohio evidence law limits the state's right to introduce rebuttal evidence regarding criminal history to instances in which a mitigation witness "offers a specific assertion . . . that misrepresents the defendant's prior criminal history," *quoting State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542, 555 (Ohio 1988)). Even under the stricter standard found in *DePew*, Dr. Jackson's report that Petitioner historically did well in prison and that his prior offenses were mostly alcohol-related would have allowed the state to use Petitioner's criminal history in rebuttal.

[25]Evidence that counsel already understood this to be their planned mitigation strategy is the fact that Dr. Jackson met with Petitioner for the first

waiting for the state to inevitably raise prior bad acts in rebuttal during mitigation, counsel could have reasoned that it was preferable to bring it in prior to mitigation so that it was old information and not fresh in the jurors' minds by the time they considered sentence. Counsel could have reasonably concluded that Petitioner's criminal history was less potentially damaging to their case during the guilt phase of trial, where their strategy was based on conceding guilt to the aggravated murder and challenging only the death penalty specifications, than it could be to their case for a life sentence during the penalty phase. Introducing Petitioner's past convictions during opening statements also allowed defense counsel to frame the information as part of the story of Petitioner's relationship with Tina Bailey. It was not unreasonable for the Ohio Supreme Court to conclude that counsel might have employed a strategy in which certain facts were conceded or introduced during the guilt phase in order to gain favor during the mitigation phase, and to decide that such tactical decisions were owed deference under *Strickland*. *See Campbell v. Bradshaw*, 674 F.3d 578, 588 (6th Cir. 2012) (finding that counsel's decision to introduce incarceration records during the guilt phase of trial was not deficient performance because it was "part of a strategic effort to be candid with the jury about Campbell's past in an effort to gain credibility, and, ultimately, obtain a life

---

time to evaluate him six months before trial (ECF No. 83-13, PageID 7884), and they requested travel funding for Petitioner's family in Alabama to travel to Ohio to testify at the mitigation hearing during a pre-trial hearing (ECF 83-2, PageID 5629–30).

sentence for Campbell").

Likewise, the conclusion of the Ohio Supreme Court that Petitioner could not show that he was prejudiced in light of the overwhelming evidence against him was reasonable. In addition to the numerous witnesses placing Petitioner at the Bailey house and other physical evidence linking Petitioner to the crime, counsel conceded guilt to the aggravated murder charge, and Petitioner, while briefly representing himself, admitted guilt to all charges in his closing statement.

### ii. Previous Escape Conviction

Petitioner presented this portion of his tenth ground to the state courts for the first time in his initial state post-conviction proceedings, arguing that disclosure of his prior convictions for escape and assault of a corrections officer during the guilt phase produced a carry-over effect on the penalty phase. The state courts improperly applied Ohio's *res judicata* rule barring subsequent relitigation of previously litigated claims to his claim that disclosure of his previous escape conviction had led the jury to consider it during sentencing as a non-statutory aggravating factor.[26] Because the claim was properly presented to the state courts, preserving it for federal habeas, but was not adjudicated on the merits by any state court due to the Ohio Court of Appeals' erroneous application of *res judicata*, it is

---

[26]Respondent failed to specifically address the escape charge allegation in the Return of Writ, inexplicably repeating his prior argument that the state courts properly dismissed the claim in Petitioner's initial and second post-conviction petitions as *res judicata* based on the Ohio Supreme Court's prior adjudication of the original claim on direct appeal. (*See* ECF No. 91, PageID 10452–54.)

not subject to AEDPA deference under § 2254(d). *See Pinholster*, 563 U.S. at 213 n.5 (Sotomayor, J., dissenting) ("Of course, § 2254(d)(1) only applies when a state court has adjudicated a claim on the merits."). The Court reviews the claim *de novo*. As a consequence, the record is not restricted to the record properly presented to the state courts in Petitioner's initial state post-conviction proceedings. *See McClellan v. Rapelje*, 703 F.3d 344, 351 (6th Cir. 2013) ("*Pinholster* only applies to limit consideration of additional evidence when the state court has previously decided the same merits issue later presented to the federal court."). The Court may review all of the evidence presented by Petitioner in support of this claim, including that developed during his federal habeas proceedings.

Even on *de novo* review, Petitioner cannot show that counsel's performance was deficient. As explained above, the prosecution would be able to use the evidence of Petitioner's prior convictions to rebut defense arguments based on Petitioner's history, character, and background during the penalty phase, notwithstanding the trial court's order excluding from the trial (or guilt) phase evidence of prior bad acts. *See Clark*, 38 Ohio St.3d at 254–55. Counsel's strategy for mitigation was focused on Petitioner's background of abuse and neglect, his mental health, and his history of substance abuse. As a result, defense counsel could reasonably anticipate that the state would raise the issue of Petitioner's criminal history in rebuttal during mitigation. *See Campbell*, 674 F.3d at 589 n.2 (noting that the damaging information in the petitioner's incarceration records would have been introduced in rebuttal during the penalty phase if, rather than introducing the full records at the

180

beginning of the guilt phase of trial, defense counsel had instead presented

witnesses during mitigation to explain only the positive examples in the records).

In particular, Dr. Jackson's finding, included in his written report presented as

evidence in the penalty phase, that Petitioner historically functioned well in the

structured environment of prison and that he had "a lengthy history of legal

offenses mostly related to alcohol use (including domestic violence, resisting arrest,

driving under the influence and open container)." (*See* ECF No. 82-15, PageID

3099.) Dr. Jackson was also questioned during cross examination on his finding that

Petitioner historically did well in prison and was likely able to adapt to prison if he

received a life sentence. (ECF No. 83-13, PageID 7923–25.) That evidence would

have opened the door to rebuttal with Petitioner's prior convictions for escape and

assault of a corrections officer during cross-examination.[27] Ohio R. Evid. 405(B). It

was thus a reasonable tactical decision for counsel to preempt the state and disclose

Petitioner's past convictions to the jury during opening statements in the guilt

phase so that it would not be fresh in jurors' minds when later considering sentence

during the penalty phase.

Petitioner argues that counsel's decision should not get deference as trial

strategy, pointing to statements made during trial counsel's habeas depositions in

which counsel were unable to articulate the reason for disclosing Petitioner's

---

[27]As explained in the previous subsection, *supra*, Dr. Jackson's report would
have invited the use of criminal history in rebuttal even under the stricter standard
for admission of other bad acts articulated in *DePew*.

criminal history. Specifically, the following exchange occurred during Attorney

Blakeslee's deposition:

> Q. Okay. Do you recall making the opening statement in Mr. Johnson's case?
>
> A. Yes.
>
> Q. Okay. How was it decided that you would — you would make the argument?
>
> A. I don't know.
>
> Q. Okay. Do you know when that decision was made?
>
> A. No.
>
> Q. Do you recall how long you spent preparing for your opening?
>
> A. No.
>
> . . .
>
> Q. Okay. Do you recall specifically what you argued in the opening statement —
>
> A. No.
>
> Q. — in this case? All right.
>
> . . .
>
> Q. Do you recall why you — after getting that pretrial success on keeping out the criminal history your opening statement [sic] —
>
> A. Well, apparently there was a decision made that we should mention it.
>
> Q. Okay. Do you recall the basis of that decision?
>
> A. No. No.
>
> Q. Okay. Would you agree that you mentioned the assault of a correction's guard, that cuts against — when you're talking about, you know, mitigate — giving him a life sentence that cuts against your mitigation?

A. That's right.

Q. Okay. Do you have any recollection of — of, again — and — and you've answered this. But any recollection at all why the criminal history was brought out in the opening statement at the guilt phase?

A. No.

Q. Okay.

A. There is a reason, but I don't know what it was now. I couldn't recall it.

. . .

Q. Okay. But the criminal history —

A. There's a reason for it. I can't tell you what it is. It's something you generally don't do, but in this case it was done. There would be reason for it.

(ECF No. 85-1, PageID 8317–23.) Attorney Warhola made similar statements in his

deposition:

Q. All right. Do you recall then, in the opening statement given by your co-counsel, that he detailed Mr. Johnson's criminal history for the jury?

A. I don't recall.

Q. All right. Do you have any reason to doubt if he mentioned to the jury his previous charges for things such as arson, drugs, domestic violence, assault of a correction's officer and escape?

A. I don't recall.

Q. All right. And particularly with an escape charge, you agree that could cut against a jury giving him a life sentence, perceiving him to be a future danger even while in prison?

A. Perhaps.

Q. And just so the record's clear, we're in Ohio. Future dangerousness is not an aggravating circumstance, is it, in Ohio?

A. I don't believe it is.

(ECF No. 85-1, PageID 8416–17.)

It is not up to counsel to prove their decision was either reasonable or strategic ten years after trial when memories have faded. Petitioner bears the burden of overcoming the deference courts show to counsel's decisions. That counsel may not have remembered the reasons for every decision is hardly surprising and hardly enough, standing alone, to justify a conclusion that counsel's actions were constitutionally ineffective.

Regardless, Petitioner was not prejudiced in light of the fact that the jury would likely learn of his escape charge at some point even if defense counsel had not proactively disclosed it. Where the alleged prejudicial effect is on sentencing, revealing the past escape conviction in opening statements of the guilt phase merely changed the timing, not the fact, of disclosure. In other words, counsel's decision could not have affected the outcome of the penalty phase when the jury was always likely to learn about the escape charge before deliberating sentence. This is so because defense counsel's mitigation strategy relied on evidence of Petitioner's history, character, and background, which would have allowed the prosecution to raise Petitioner's prior convictions in rebuttal. *See Clark*, 38 Ohio St.3d at 254–55; *Campbell*, 674 F.3d at 589 n.2. Dr. Jackson's report, entered into evidence in the penalty phase, asserted that Petitioner's prior legal offenses primarily involved alcohol and that he historically did well in the structured environment of prison:

> Background records indicate that Marvin has a history of performing well given structure and external controls. That is, he was released from prison after twenty-two months of a six year sentence for good behavior. . . . People with [his] pattern of severe mental illness function best if given clear structure and predictability in the environment,

aided by appropriate medication interventions and psychotherapy (consistent with Marvin's background of doing well when he was in prison in the 1990s).

(ECF No. 82-15, PageID 3099.) That mitigation evidence would have opened the door to cross-examination on Petitioner's prior convictions for escape and assault on a corrections officer.

Petitioner argues that the state bears the burden of proving that the introduction of prior convictions was not prejudicial based on *Bonner v. Holt*, 26 F.3d 1081 (11th Cir. 1994). (ECF No. 131, PageID 10830.) While non-binding decisions such as this one by the Eleventh Circuit can often be persuasive authority, that is not the case here because Petitioner misrepresents the holding in *Bonner*. The Eleventh Circuit held that the burden remains with the government to prove a constitutional error was harmless in habeas corpus cases under the *Brecht* harmless error standard. *Bonner*, 26 F.3d at 1082. The court nowhere said that the issue of prior convictions was the basis of—or even relevant to—its determination of where to place the burden of production in a *Brecht* harmless error analysis.[28] As Petitioner's ineffective assistance of counsel claim is governed by *Strickland* not

---

[28]The Supreme Court subsequently weighed in on the issue, holding that in a *Brecht* harmless error analysis, "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). The Court also noted that "we deliberately phrase the issue in this case in terms of a judge's grave doubt, instead of in terms of 'burden of proof.' The case before us does not involve a judge who shifts a 'burden' to help control the presentation of evidence at a trial, but rather involves a judge who applies a legal standard (harmlessness) to a

*Brecht*, *Bonner* would not be relevant case law even if it was otherwise binding on this Court.

Because counsel's disclosure of Petitioner's prior escape conviction was a reasonable strategic decision and Petitioner was not prejudiced, Petitioner is not entitled to habeas relief on this claim.

### c. Objections to Testimony Regarding Prior Convictions

Finally, Petitioner argues that counsel were ineffective for failing to object to trial testimony in which witnesses referred to his criminal history. (ECF No. 86, PageID 9284 n.11.) Respondent maintains that Petitioner cannot show prejudice due to the overwhelming evidence against him. (ECF No. 91, PageID 10453–54.)

The testimony at issue occurred during the state's direct examination of Tina Bailey:

Q. Were you aware that Mr. Johnson had legal problems in his past?

A. Yes.

Q. How did you become aware of that?

A. He told them to me.

Q. And what did he tell you about that?

A. He told me while he lived in Alabama he had an arson — a record of arson, I believe burglary, he had a domestic violence case in Guernsey County, I believe, and that's about the extent of his record that I know of.

Q. Did you know when that domestic violence case was in Guernsey County?

---

record that the presentation of evidence is no longer likely to affect." *Id.* at 436–37.

A. It was before I met him. It was with his ex-wife.

Q. Did you know who that was?

A. I know her name.

Q. Mr. Johnson had went back down to Alabama at some point around 2000 and was gone for a period of time, is that correct?

A. Yes.

Q. Do you know where he was in Alabama?

A. He was in jail.

Q. A prison?

A. At first he was in a jail for months until he went to court and then was sent to prison.

Q. How long was he gone?

A. He was gone about two years.

Q. Did you write to him during that period of time?

A. Yes, I did.

Q. And did he write to you?

A. Yes, he did.

Q. Even after that did you allow him to come back to your home?

A. Yes, I did.

Q. And why did you do that?

A. The things that we wrote in letters led me to believe that he was ready to change his life, that he attended Bible study classes and he mailed me his certificates where he completed those classes and I had hope in Marvin, I had hope in him that he would become a decent man, that he would stop doing drugs and stop drinking alcohol and I believed that would have had a happy life.

Q. Did Mr. Johnson tell you about his efforts to rehabilitate himself in Alabama prison?

A. The things that he told me about was the Bible study classes that he

187

went through. I believe he went through an anger management program as well and that's all I know of.

Q. Did he tell you that he completed that anger management program?

A. I don't believe he completed it.

Q. Did he tell you whether or not he had engaged in any drug or alcohol counseling while in prison?

A. No.

Q. Did you ever ask him about that?

A. I did but he had excuses for not attending.

Q. Did he indicate to you that he was offered that type of training or rehabilitation?

A. There was some kind of class that he didn't agree with the instructor on some reason and didn't complete the course.

Q. He didn't successfully complete that.

A. No.

Q. Now, I believe the court records indicate that Mr. Johnson had some legal problems in Guernsey County as well. Is that correct?

A. Yes.

Q. And you mentioned the domestic violence. I believe there was another change that occurred in Guernsey County, is that correct?

A. Yes.

Q. And that was in the Common Pleas Court?

A. Yes.

Q. And did you support — do you know what that charge was?

A. He had — while he was in the jail in Guernsey County for a D.U.I. and a domestic violence he had an altercation with one of the correction officers and that's why we were in court, I believe.

Q. And he was charged with felony assault of a peace officer, is that correct?

A. Yes.

Q. And you supported him through that?

A. Yes.

Q. In fact, you and you brought your family to court with him?

A. Yes.

(ECF No. 83-10, PageID 7388–92.)

The Ohio Supreme Court denied the claim on direct appeal, holding that

Petitioner had failed to establish either that his counsel violated their duties or that

he was prejudiced:

> Third, Johnson complains that his counsel . . . failed to object to testimony about Johnson's prior convictions. However, "failure to object to error, alone is not enough to sustain a claim of ineffective assistance of counsel. To prevail on such a claim, a defendant must first show that there was a substantial violation of any of defense counsel's essential duties to his client and, second, that he was materially prejudiced by counsel's ineffectiveness." *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831. Johnson does not explain how these alleged failures constituted a violation of his counsel's duties or caused prejudice in light of the evidence against him.
>
> As the United States Court of Appeals for the Sixth Circuit has recently explained, "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." *Lundgren v. Mitchell* (C.A. 6, 2006), 440 F.3d 754, 774. Accord *State v. Campbell* (1994), 69 Ohio St.3d 38, 52–53, 630 N.E.2d 339.
>
> Our review of the trial transcript reveals no such failure by Johnson's trial counsel, and we overrule his claim of ineffective assistance based

189

on these incidents.

*Johnson*, 112 Ohio St.3d at 229–30.The Court's review of the state supreme court's decision is subject to AEDPA deference. § 2254(d). As a result, the Court may not consider evidence outside of the trial record because review under § 2254(d) is limited to the record that was before the Ohio Supreme Court on direct review. *See Pinholster*, 563 U.S. at 181.

Here, the trial record shows no pervasive failure on the part of defense counsel to object to errors, or any evidence of defense counsel's general inattention to the proceedings. Counsel raised objections throughout the trial, and on multiple occasions just during the direct examination of Tina Bailey. (*See, e.g.*, ECF 83-10, PageID 7394, 7403–04, 7422–23.) Nor was the testimony so prejudicial to Petitioner that the single failure to object "essentially default[ed] the case to the state," *Lundgren*, 440 F.3d at 774. Petitioner argues that testimony regarding his prior convictions was inherently prejudicial given the nature of the crimes of which he had been convicted: arson, domestic violence, escape, assault of a corrections officer. (ECF No. 131, PageID 10829.) He notes that these are not *de minimus* or minor offenses. (*Id.*) But the defense had already opened the door to evidence of Petitioner's criminal history by raising it in opening statements. Moreover, counsel also knew they would be bringing in Petitioner's criminal history during the penalty phase through the introduction of Dr. Jackson's testimony and report. Counsel could have reasoned that an objection was not worth the risk of putting off the jury when the jury was already aware of Petitioner's criminal record. *See Lundgren*, 440

190

F.3d at 774. Or counsel may have sought to avoid undermining the image they had tried to cultivate of being open and candid with the jury by then objecting to testimony about information the jury already had. Counsel also could have simply wished to avoid drawing further attention to the criminal history because they knew it was going to come up again.

Petitioner also cannot satisfy the prejudice prong of *Strickland* for the same reason. His prior convictions had already been revealed to the jury. Allowing Tina Bailey to mention them in her testimony could not have changed that fact. Moreover, in light of the evidence against Petitioner—including his own admissions of guilt while representing himself—there is no reasonable probability that his criminal history played any role in the verdict.

For the above reasons, the claims in Petitioner's tenth ground do not warrant habeas relief.

### d. Certificate of Appealability

Notwithstanding the foregoing, the Court finds that Petitioner's claims that counsel were ineffective for introducing his criminal history during the guilt phase of trial and failing to object to witness testimony about his past crimes, and that the disclosure of his escape charge in particular prejudiced the jury's deliberations during the sentencing phase, warrant further consideration on appeal. A petitioner challenging a state conviction in federal habeas may not appeal a district court's denial of relief without a certificate of appealability (COA). 28 U.S.C. § 2253(c)(1). To receive a COA, the petitioner must make "a substantial showing of the denial of

a constitutional right." § 2253(c)(2). A substantial showing "means 'showing that reasonable jurists could debate whether' relief should have been granted." *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020), *quoting Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Buck v. Davis*, 137 S. Ct. 759, 773 ("At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'")(*quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). The Sixth Circuit has stressed that "a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect," in light of "*not only* the merits of the underlying constitutional claim *but also* any procedural barriers to relief." *Id.*, *citing Buck v. Davis*, 137 S. Ct. 759, 777 (2017), and *Slack*, 529 U.S. at 484–85 (emphasis in original). In other words, "a certificate is improper if any outcome-determinative issue is not reasonably debatable." *Id.*

The Court believes that reasonable jurists could debate whether Petitioner has stated a valid claim of ineffective assistance given the scant evidence of counsel's strategic basis for introducing Petitioner's criminal history at the guilt phase, the inherently damaging nature of his past crimes to consideration of both guilt and sentence, the strong evidence that members of the jury were actually influenced by their knowledge of his previous escape charge in their sentencing deliberations, and the reliance on the relative weight of the state's evidence of guilt and the strength of the aggravating circumstances in the finding of no prejudice.

**11. Eleventh Ground for Relief: Petitioner was deprived of the effective assistance of trial counsel contrary to the Sixth and Fourteenth Amendments when counsel failed to have the alleged victim's rape kit tested.**

In his eleventh ground for relief, Petitioner claims that his trial counsel were constitutionally ineffective in failing to request that the rape kit performed on Tina Bailey be tested. Petitioner argues that because the rape kit could prove the accuracy or inaccuracy of Tina Bailey's testimony regarding the rape and the defense contested the rape charge at trial, it was unreasonable for counsel not to ensure the collected material was tested for DNA. (ECF No. 86, PageID 9287–89.) He maintains that if he had ejaculated in Tina Bailey's mouth, as she testified, his DNA should be found in the oral swabs taken as part of her rape kit. (*Id*.) Likewise he argues that his DNA should be present in the vaginal swabs if her testimony that he put his fingers in her vagina is accurate. (ECF No. 131, PageID 10833.)

Respondent contends that the Ohio Court of Appeals' adjudication of this claim was not an unreasonable application of *Strickland* nor based on an unreasonable determination of the facts. (ECF No. 91, PageID 10454–55.) Respondent argues that defense counsel's decision not to request DNA testing at trial was firmly within the range of presumptively valid strategic decisions because (1) counsel had no reason to believe that DNA testing would not corroborate Tina Bailey's testimony, (2) not testing the evidence allowed counsel to raise the lack of testing as an issue at trial, and (3) a negative DNA test would not prove that Tina Bailey's testimony was false. (*Id*.)

Petitioner raised this claim in his first state postconviction petition. The Ohio Court of Appeals held that Petitioner had not demonstrated that his attorneys erred or that he was prejudiced by the failure to test the rape kit:

> Appellant contends counsel was ineffective because he failed to request DNA testing of the victim's rape kit. We disagree.
>
> In his direct appeal, appellant contended "that insufficient evidence exists to prove his rape conviction beyond a reasonable doubt because the state adduced no physical evidence, such as rape-kit evidence, to corroborate Tina's testimony". *State v. Johnson*, supra, 112 Ohio St.3d at 217, 2006-Ohio-6404 at ¶ 53, 858 N.E.2d at 1158. The Court held: "However, Tina's testimony satisfies the test established in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 ("the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Corroboration of victim testimony in rape cases is not required. See *State v. Sklenar* (1991), 71 Ohio App.3d 444, 447, 594 N.E.2d 88; *State v. Banks* (1991), 71 Ohio App.3d 214, 220, 593 N.E.2d 346; *State v. Lewis* (1990), 70 Ohio App.3d 624, 638, 591 N.E.2d 854; *State v. Gingell* (1982), 7 Ohio App.3d 364, 365, 7 OBR 464, 455 N.E.2d 1066. Johnson's 14th proposition is not well taken."
>
> Accordingly, appellant has failed to submit evidentiary material containing sufficient operative facts that demonstrate a substantial violation of any of defense counsel's essential duties to his client and prejudice arising from counsel's ineffectiveness. *Calhoun*, 86 Ohio St.3d at 289, 714 N.E.2d 905; *State v. Jackson* (1980), 64 Ohio St.2d 107, 413 N.E.2d 819, syllabus; see, also *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674, 693; *State v. Phillips*, supra. There is no showing that the result of the appellant's trial would have been different had the DNA test been requested. *State v. Johnson*, supra, 112 Ohio St.3d at 229, 2006-Ohio-6404 at ¶ 135, 858 N.E.2d at 1167. ["Moreover, in light of the evidence against him, Johnson cannot demonstrate how the concession caused him prejudice or might have altered the trial's outcome. See *Goodwin*, 84 Ohio St.3d at 338, 703 N.E.2d 1251."].
>
> Accordingly, we reject the appellant's fourth claim for relief.

194

*Johnson*, 2007 WL 1098106, slip op. at *10–11.[29]

Because the Ohio Court of Appeals adjudicated Petitioner's eleventh ground

on the merits, AEDPA deference applies to the Court's review. That being so,

*Pinholster* precludes the Court from considering any evidence that the state courts

did not have before them in its review of the state court decision under § 2254(d).[30]

*See Pinholster*, 563 U.S. at 181.

To establish ineffective assistance, Petitioner must show that his counsel's

performance was deficient and that he was prejudiced as a result. *Strickland*, 466

U.S. at 687. Counsel is "'strongly presumed to have rendered adequate assistance

and made all significant decisions in the exercise of reasonable professional

judgment,' with the burden to show otherwise resting squarely on the defendant."

*Burt v. Titlow*, 571 U.S. 12, 13 (2013), *quoting Strickland*, 466 U.S. at 690 (internal

---

[29]Petitioner sought testing of the rape kit in his first motion for discovery in federal habeas proceedings, but the Court denied the request on the basis that the only fact in dispute at trial was whether the oral sex was the result of force or coercion and DNA testing would not be probative as to that question. (ECF No. 39, PageID 548.) On April 18, 2016, Petitioner sought funds to obtain a DNA consultant (ECF No. 93)—which this Court granted (ECF No. 98)—after receiving a new DNA Report from Respondent regarding the recent testing of previously untested rape kits. Petitioner filed notice of the final report from the DNA consultant, Dr. Theodore D. Kessis, on January 24, 2017 (ECF No. 107), and also moved to amend his petition, (ECF No. 109), to conduct further discovery (ECF No. 108), and for stay and abeyance (ECF No. 110). The Court denied all three motions. (ECF No. 124.)

[30]While this means the new DNA evidence from the previously untested rape kits tested for the first time in 2016 cannot be considered here for the purpose of reviewing the state court disposition under § 2254(d), the inclusion of the 2016 DNA evidence likely would not have changed the outcome. (*See* ECF No. 124, PageID 10696–700.)

citation omitted). Petitioner "bears the burden of rebutting the presumption that trial counsel 'acted for tactical reasons rather than through sheer neglect.'" *Berry v. Palmer*, 518 Fed.Appx. 336, 339–40 (6th Cir. 2013), *quoting Yarborough*, 540 U.S. at 8.

It was not unreasonable for the Ohio Court of Appeals to conclude that Petitioner had not overcome the presumption that counsel performed adequately. Counsel likely reasoned that there was limited, if any, benefit gained from a negative test result because the absence of Petitioner's DNA could not establish that the rape had not occurred, while the presence of Petitioner's DNA would only further corroborate Tina's account. By not testing the rape kit for DNA, counsel could point to the lack of solid forensic evidence supporting Tina's version of events. Sometimes the soundest trial strategy can be to use the lack of definitive evidence to raise doubt. *See Richter*, 562 U.S. at 111 ("When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict.").

Petitioner argues that counsel's decision to forgo testing the rape kit was especially inexplicable given counsel's strategy of contesting the rape death penalty specification at trial. (ECF No. 86, PageID 9289.) But defense counsel never argued that there was no sexual contact between Petitioner and Tina Bailey, the only issue to which a DNA test could possibly be relevant. Rather, counsel challenged whether the admitted sexual contact was non-consensual, an issue about which DNA could

196

provide no insight.[31]

Nor was the state court unreasonable in concluding that Petitioner could not

show prejudice. A negative DNA test could not prove that the rape did not occur. In

fact, negative results could not even prove that sexual contact did not occur. *Cf.*

*District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 62 (2009)

("Where there is enough other incriminating evidence and an explanation for the

DNA result, science alone cannot prove a prisoner innocent."). If the testing had

been performed and Petitioner's DNA was not found, the results would, at most, fail

to provide forensic corroboration of Tina's testimony that sexual contact occurred.

Yet Petitioner had conceded that sexual contact occurred. The presence or absence

of Petitioner's DNA was entirely irrelevant to the only contested issue, which was

whether the sexual contact had been the result of force.

Moreover, mere speculation about what testing would uncover does not

establish prejudice under *Strickland*. *See Wiles v. Bagley*, 561 F.3d 636, 641 (6th

Cir. 2006) (speculation as to what a neurologist would have discovered regarding

defendant's head injury does not establish prejudice); *Hodge*, 579 F.3d at 651 ("Mere

speculation that additional investigation would have uncovered wrongfully withheld

exculpatory evidence does not establish either that counsel acted unreasonably or

that Hodge was prejudiced."). In other words, Petitioner needs to demonstrate that

---

[31]Counsel also argued that the timing of the rape, as well as the fact that it
involved a second victim, precluded it from serving as a death penalty specification
to aggravated felony murder because the rape and Daniel's murder were separate

the results of the DNA testing results would actually benefit him in order to establish that the failure to test had any reasonably probable effect on the outcome. This is a showing he has not made and cannot make. In light of Tina's testimony, Petitioner's own admissions regarding the rape at trial, and the fact that DNA testing was immaterial to the only contested element of the rape charge, there is no realistic possibility that counsel's failure to have the rape kit tested could have affected the outcome. Accordingly, Petitioner's eleventh ground for relief is **DENIED**.

> 12. **Twelfth Ground for Relief: Law enforcement agents may not employ an undercover agent to solicit inculpatory statements from an incarcerated defendant after formal proceedings have been instituted.**

In his twelfth ground for relief, Petitioner asserts three claims centered around the state's use of information obtained from a jailhouse informant, Mickey Alexander. First, he claims that his Sixth Amendment right to counsel was violated by the prosecution's use of evidence at trial that was discovered as a result of incriminating information deliberately elicited from Petitioner by Alexander without a *Miranda* warning while Petitioner and Alexander were housed in the Guernsey County Jail together. (ECF No. 86, PageID 9292.) Second, he accuses the prosecution of withholding *Brady* material regarding the incentives police provided to Mickey Alexander to secure his cooperation and allowing Alexander to testify falsely that he was not provided compensation or leniency for his information.

---

crimes and not part of a continuous course of conduct.

Finally, he claims his right to confront the witnesses against him was violated when the prosecutor used the testimony of other witnesses to introduce evidence originally obtained from Alexander, depriving Petitioner of the opportunity to cross-examine Alexander at trial.

Alexander was housed at the Guernsey County Jail when Petitioner was brought there following his arrest and they eventually shared a cell. Alexander provided detectives information that he said Petitioner had related to him regarding the crime, particularly the location in Zanesville where Petitioner had hidden the stolen money and the key to the Bailey house in Petitioner's wallet. Detectives were able to retrieve the money and the key as evidence as a result of Alexander's information. Alexander testified during a pre-trial suppression hearing and was questioned by defense counsel (*see* ECF No. 83-2, PageID 5509–41), but did not testify at trial. Instead, detectives disclosed Alexander's role as informant during their trial testimony to explain how they had been able to find the money and key. (ECF No. 83-9, PageID 7069–71.)

In 2012, Alexander told Mark Rooks (a post-conviction investigator working on Petitioner's federal habeas case) that before he testified at the suppression hearing police had promised him a sentence reduction if he cooperated. (ECF No. 85-1, PageID 8579–81.) According to the affidavit from Mark Rooks recounting the interview, Alexander said that detectives had at some point in 2003 asked him to obtain information from Petitioner and that he was promised leniency in exchange for his cooperation.

199

a. *Massiah* Claim

Petitioner claims that his Sixth Amendment right to counsel was violated because the state presented evidence against him at trial that had been uncovered as a result of incriminating statements deliberately elicited from Petitioner by jailhouse informant Alexander after Petitioner's right to counsel had attached. He argues that Alexander's post-trial statements to investigator Rooks refute his pre-trial testimony that he was not acting at the behest of the police when he obtained incriminating information from Petitioner.

Respondent maintains that the Ohio Supreme Court reasonably applied Supreme Court precedent when it found on direct appeal that Petitioner's Sixth Amendment right to counsel was not infringed by use at trial of the evidence found as a result of his statements to Alexander. (ECF No. 91, PageID 10476.) Respondent points to *Kuhlman v. Wilson*, 477 U.S. 436, 459 (1986) (superseded by statute on other grounds), which held that a Sixth Amendment violation requires that police took some action beyond merely listening that was designed to deliberately elicit incriminating remarks, to argue that the standard in *Kuhlman* was satisfied by Alexander's testimony that the police did not instruct him to obtain information from Petitioner and that Petitioner requested Alexander be placed in his cell.

The Ohio Supreme Court rejected Petitioner's claim on direct appeal, finding the following:

> In his ninth proposition of law, Johnson contends that the state violated his Sixth Amendment right to counsel by assigning informant Mickey Alexander as his cellmate in the Guernsey County Jail in order

to obtain statements from him after his right to counsel attached. Although the state did not introduce Johnson's statements at trial, Johnson claims that the statements he made to Alexander led to the discovery of the following three exhibits for the state: the $1,000 that Johnson hid in the park, the key to Tina's house in Johnson's wallet, and the shoes from Lisa Wilson. He argues that these items should be suppressed as "fruit of the poisonous tree."

However, the record demonstrates that Johnson volunteered the information to the informant. In such cases, "a defendant does not make out a violation of [the Sixth Amendment] right [to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson* (1986), 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d 364; cf. *United States v. Henry* (1980), 447 U.S. 264, 271, 100 S.Ct. 2183, 65 L.Ed.2d 115 (right to counsel violated where informant "was not a passive listener" but took "affirmative steps to secure incriminating information").

The record does not support Johnson's claim. At a pretrial suppression hearing, Alexander testified that the police never asked him to question Johnson or initiate any conversations and that he never asked Johnson any questions about his case, but only listened to what Johnson volunteered. Alexander also testified that he came to be assigned to Johnson's cell because he and Johnson had known each other for several years, and Johnson requested that Alexander be assigned to his cell. Only Alexander testified at the suppression hearing, and nothing in the record contradicts his testimony.

Because the record does not reveal that Alexander did anything but listen to what Johnson volunteered to him, the trial court did not err in denying Johnson's suppression motion. Hence, we overrule Johnson's ninth proposition.

*Johnson*, 112 Ohio St.3d at 242.

Petitioner reprised his claim in his successor state post-conviction petition, presenting to the state courts for the first time the Rooks affidavit containing Alexander's post-trial statements that he was provided incentives in exchange for

201

his testimony. (ECF No. 88-1, PageID 10064.) The state trial court dismissed the claim for failing to meet the statutory requirements for filing a successive post-conviction petition. (*Id.*, PageID 10019.) The Ohio Court of Appeals affirmed, also noting that the court could have dismissed the claim as *res judicata.*[32] *Johnson*, 2013 WL 1400607, at *5.

Because the Ohio Supreme Court adjudicated this claim on the merits on direct appeal, the Court reviews that decision under the heightened deference of § 2254(d). *See Cone v. Bell*, 556 U.S. 449, 466–67 (2009) ("When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review.") As the Court's § 2254(d) review is limited to the record before the Ohio Supreme Court when it issued its decision, new evidence obtained during federal habeas proceedings (i.e., the Rooks affidavit) cannot be considered. *See Pinholster*, 563 U.S. at 181.[33]

――――――――――

[32]In this instance, *res judicata* would bar state collateral review of the claim because it was already brought and fully litigated on direct appeal. This use of *res judicata* does not provide a basis for procedural default of the claim on federal habeas review. *See Durr*, 487 F.3d at 434, *citing Lundgren*, 440 F.3d at 765 n. 2.

[33]*But see Hughbanks v. Hudson*, 2 F.4th 527, 535–36 (6th Cir. 2021) (considering new evidence obtained during federal habeas that was not before the state court when it adjudicated the claim on the merits). *Hughbanks* can also be read as limited to procedurally defaulted *Brady* claims that were never subjected to any merits review in state court. Hughbanks limited his *Brady* claim on appeal to the 6th Circuit to only those grounds presented for the first time to the state courts in his successive post-conviction petition. Because the *Brady* claim at issue on appeal had never been adjudicated on the merits by state courts, the court reviewed the claim and all of its evidence *de novo* to determine whether the procedural default was excused.

202

The Sixth Amendment entitles a defendant to the assistance of counsel at all critical stages of the criminal proceedings after indictment. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). This right is violated by the use as evidence at trial of a defendant's "own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States*, 377 U.S. 201, 206 (1964). The Sixth Amendment right to counsel applies not only to direct interrogation by police officers, but also to "indirect and surreptitious interrogations" carried out by informants serving as undercover government agents. *Id.* at 206; *see also Maine v. Moulton*, 474 U.S. 159 (1985); *United States v. Henry*, 447 U.S. 264 (1980).

"[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann*, 477 U.S. at 459. An informant's prior arrangement with police alone is insufficient to make out a *Massiah* violation. *Id*. "Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id*. "[A] Sixth Amendment violation occurs whenever the State 'intentionally creat[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel,' *Henry*, 447 U.S. at 274, or 'knowing[ly] exploit[s]' a situation in order to obtain incriminating information from a defendant 'without counsel being present[.]'" *Ayers v. Hudson*, 623 F.3d 301, 309 (6th Cir. 2010), *quoting Moulton*, 474 U.S. at 176.

203

The Court cannot say that the Ohio Supreme Court acted unreasonably based on the record before it when it concluded that there was no indication that Alexander acted to elicit information from Petitioner. There was nothing in the record before the state court to contradict Alexander's testimony at the pre-trial suppression hearing that he was assigned to Petitioner's cell at Petitioner's request, that he never asked Petitioner questions or initiated any conversations, and that he was never instructed by the detectives to do so. It was thus reasonable to rely on Alexander's testimony, given under oath and subject to cross examination, in the absence of any contrary evidence. Detectives Harbin and Clark corroborated Alexander's testimony in their own testimony at trial.

Petitioner argues in his Traverse that placing Alexander in his cell was the "deliberate action intended to elicit incriminating information" required by *Kuhlman*. (ECF No. 131, PageID 10840–41.) He also points to the testimony of Detectives Clark and Harbin, who both stated at trial that they met with Alexander more than once, arranged a furlough for Alexander to recover the evidence that Alexander learned about from Petitioner, paid Alexander cash for his help, and provided him Newport cigarettes to give to Petitioner. (ECF No. 83-9, PageID 7069–70, 7119.) Petitioner maintains that the Ohio Supreme Court unreasonably determined the facts when it failed to mention this testimony in its decision. Petitioner overlooks the burden of proof, which remains with him to demonstrate with clear and convincing evidence that the state court's factual determination was wrong. The state courts have no obligation to explain their opinions. *See Richter*,

204

562 U.S. at 98.

There is no evidence in the record that police were involved in pairing Alexander and Petitioner together. Both Detective Clark and Detective Harbin testified at trial that they never asked the jail to put Alexander in with Petitioner or asked Alexander if he would room with Petitioner. (ECF No. 83-9, PageID 7067–69, 7115.) Alexander testified that Petitioner requested that Alexander be moved to his cell. (ECF No. 83-2, PageID 5523–28.) The independent actions of the jail cannot be attributed to police without some evidence of police involvement.

Nor was it unreasonable for the Ohio Supreme Court to disregard the actions taken by detectives *after* Alexander had obtained incriminating information from Petitioner when deciding whether detectives had acted to deliberately induce Petitioner to talk. The furlough, cash, and cigarettes were part of investigators' response to the information Petitioner had already shared with Alexander about the location of the hidden money and cannot be proof that detectives directed Alexander to obtain information absent some proof of prior promise that Alexander would receive particular perks if he induced Petitioner to confess to him.[34] The meetings with Alexander, standing alone, are not evidence that police took any "deliberate action intended to elicit incriminating information" from Petitioner.

_____

[34]To be sure, the benefits Alexander received from police *after* sharing information with them is valid impeachment evidence of Alexander to show potential bias. But it doesn't prove prior direction from police in the context of a *Massiah* claim without evidence that police acted in some way prior to Alexander obtaining the information from Petitioner.

205

Petitioner's contention that Alexander was a paid informant acting under the instructions of the government is merely speculative. Alexander's past cooperation with the police and his history as an informant is evidence that Alexander had a pre-existing relationship with the police, but the existence of a previous relationship alone is insufficient to establish that he was acting as a government agent here. *See Kuhlman*, 477 U.S. at 459. Petitioner has not offered any evidence that Alexander lied about never receiving consideration in exchange for his prior cooperation with police. There is simply no evidence in the record that detectives instructed Alexander to get information from Petitioner.

Because there is no evidence that police either directed Alexander to obtain incriminating information from Petitioner or that police or Alexander ever acted deliberately to elicit Petitioner to talk, the Ohio Supreme Court's conclusion that Petitioner's Sixth Amendment right to counsel was not violated by the use at trial of evidence obtained as a result of his statements to Alexander was a reasonable application of established federal law.

### b. *Brady* Claim

Petitioner also claims that the state withheld favorable impeachment evidence and allowed Alexander to provide false testimony during a pre-trial suppression hearing in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (ECF No. 86, PageID 9294–96.) Specifically, he argues that the state failed to inform the defense that Alexander had been promised leniency and received other compensation for his cooperation. In support of his claim, Petitioner relies on the

affidavit from post-conviction investigator Mark Rooks regarding Alexander's post-trial statements that he was promised early release before he testified at the suppression hearing. (*See* ECF No. 85-1, PageID 8579–81.) Alexander also told Rooks that after he led detectives to the hidden money in Zanesville, he received cigarettes and furloughs. (*Id.*, PageID 8580.) Petitioner also cites Detective Clark's trial testimony[35] that Alexander had been given fifty dollars and cigarettes after he helped them locate the money because Petitioner had requested both. (*See* ECF No. 86, PageID 9296, *citing* ECF No. 83-9, PageID 7070.) Petitioner contends that this evidence demonstrates that Alexander lied when he testified at the pre-trial hearing that he did not receive money or any other benefit from the state in exchange for his cooperation. (ECF No. 86, PageID 9294–96, *citing* ECF No. 83-2, PageID 5520.)

Respondent maintains that Petitioner's *Brady* claim is procedurally defaulted because the Ohio Court of Appeals held that the claim, raised for the first time in Petitioner's second post-conviction petition, could have been adjudicated on the basis of the trial record and thus *res judicata* warranted dismissal. (ECF No. 91, PageID 10475.) Respondent also argues that the claim is meritless because Alexander did not reveal anything in his post-trial statements to Mark Rooks that could have affected the outcome of either the trial or the suppression hearing given

---

[35]Petitioner refers to the cited trial testimony as Detective Harbin's testimony, *see* ECF No. 86 PageID 9296, but it is in fact the testimony of Detective Clark.

that Alexander did not testify at trial and the money, cigarettes, and furlough were revealed during the pretrial suppression hearing.[36] Finally, Respondent disputes Petitioner's assertion that Alexander told Mark Rooks that police asked him to get information from Petitioner, pointing out that the affidavit says that Alexander told Rooks that "at some point police asked him for information on the crime." (ECF No. 91, PageID 10476, *citing* ECF No. 85-1, PageID 8580.)

Petitioner originally raised this claim in state court as the thirteenth ground in his second post-conviction petition. (ECF No. 85-1, PageID 8277–79.) The state trial court dismissed the petition, without findings of law or fact, because Petitioner failed to satisfy the jurisdictional prerequisites for successive post-conviction petitions in § 2953.23(A)(1). (ECF No. 88-1, PageID 10019–20.) The Ohio Court of Appeals affirmed the trial court's decision[37]:

> In his twelfth claim, appellant raises *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. In order to establish a *Brady* violation, a defendant must prove that the prosecution failed to disclose evidence upon request, the evidence was favorable to the defense, and the evidence was material. *State v. Garn* (Feb. 21, 2003), Richland App.No. 02CA45, ¶ 23, citing *Moore v. Illinois* (1972), 408

---

[36]Contrary to Respondent's assertion, the existence of these benefits was not disclosed during the pretrial suppression hearing. They were revealed at trial during Detective Clark's testimony though. *See* ECF No. 83-9, PageID 7070.

[37]In his second state post-conviction petition, Petitioner's *Brady* claim was the thirteenth ground for relief and his Confrontation Clause claim was the twelfth ground for relief. (*See* ECF No. 85-1, PageID 8274–79.). But in his appeal from the trial court's dismissal of that petition, Petitioner labeled his *Brady* claim as his twelfth claim and his Confrontation Clause claim as his thirteenth claim. (*See* ECF No. 88-1, PageID 10130–31.)

U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706. However, a common pleas court may apply the doctrine of *res judicata* to dismiss a post-conviction claim when the claim presents a matter that could fairly have been determined without resort to evidence dehors the record. *See, e.g., State v. Dixon*, Richland App.No. 2004-CA-90, 2005-Ohio-2846, ¶ 27. While it appears that appellant's *Brady* allegation is partially based on a post-trial 2012 investigative interview with Mickey Alexander, a former cellmate who had given police information about appellant, we are unpersuaded that appellant was unavoidably prevented from obtaining the subsequent information from Alexander.

Upon review, we find no error of law in the trial court's rejection of claim 12.

*Johnson*, 2013 WL 1400607, at *5–6; ECF No. 88-1, PageID 10130.

As the last state court to issue a reasoned decision on his *Brady* claim, *see Ylst*, 501 U.S. at 805, the Ohio Court of Appeals held that Petitioner failed to satisfy the § 2953.23(A)(1) requirements for second or successive post-conviction petitions, *see Johnson*, 2013 WL 1400607, at *2–3.

### i. Standard of Review

Petitioner argues that because the Ohio Court of Appeals' dismissal of his claim was based on a procedural ground and not "on the merits" within the meaning of § 2254(d), AEDPA deference does not apply. (ECF No. 131, 10842–44.) When a claim was adjudicated "on the merits" by the state courts, a federal habeas court reviews the state court's decision under the heightened deference prescribed by AEDPA. *Cone*, 556 U.S. at 472. But § 2254(d) does not apply when the state court has not reached the merits, and the claim is instead reviewed *de novo. See Clark v. Warden*, 934 F.3d 483, 491 (6th Cir. 2019), *citing Cone*, 556 U.S. at 472.

Where, as here, the last reasoned decision of a state court explicitly enforced

209

a procedural rule to foreclose review in the state courts, federal habeas review is also barred if "the state court's decision rest[ed] upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone*, 556 U.S. at 465, *quoting Coleman*, 501 U.S. at 729. Only if the federal habeas court determines that the state court's denial of the claim satisfies the standard for procedural default—and that the petitioner cannot overcome the default—does the state court judgment preclude federal habeas review. *See id.*, at 465–66 ("'The adequacy of state procedural bars to the assertion of federal questions' . . . is not within the State's prerogative finally to decide; rather, adequacy 'is itself a federal question.'") (*quoting Lee v. Kemna*, 534 U.S. 362, 375 (2002)). Where either the state procedural bar was deemed inadequate to support default or the procedural default was excused, the claim is reviewed *de novo. Id.*, at 472.

As previously explained in connection with Petitioner's ninth ground for relief, the state appellate court's dismissal of Petitioner's second post-conviction petition for failure to comply with the jurisdictional prerequisites of § 2953.23(A) easily satisfies the first three criteria in the *Maupin* test for procedural default. Petitioner was subject to the filing requirements for successive post-conviction petitions in § 2953.23(A); the state courts enforced the statute against Petitioner by dismissing his petition for failing to comply with § 2953.23(A),[38] *see* ECF No. 88-1,

---

[38]Because the state appellate court held the trial court lacked jurisdiction to hear the claim, any comments regarding the merits of Petitioner's claim are *void ab initio. See Gumm v. Mitchell*, 775 F.3d 345, 362 (6th Cir. 2014); *cf. Coe v. Bell*, 161

210

PageID 10130; and § 2953.23 has repeatedly been found to be an independent and adequate state ground barring federal habeas review, *see, e.g., Stojetz*, 892 F.3d at 205–06, *citing Davie*, 547 F.3d at 311, and *Matthews*, 486 F.3d at 889–90.

The only question remaining is if Petitioner can show cause for the default and prejudice from the underlying constitutional violation. *See Coleman*, 501 U.S. at 749; *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014). In the case of a procedurally defaulted *Brady* claim, two of the elements of the claimed *Brady* violation—the state withheld favorable evidence and the suppressed evidence was material—also constitute cause and prejudice to excuse procedural default. *Strickler v. Green*, 527 U.S. 263, 282 (1999). In other words, if Petitioner can prove the merits of his *Brady* claim he will simultaneously overcome the procedural default of the claim.

The Court's review of Petitioner's *Brady* claim for cause and prejudice to excuse procedural default is *de novo*. The Sixth Circuit applies a *de novo* standard on the basis, alternately, that AEDPA deference never applies to cause-and-prejudice review or that AEDPA deference does not apply when the state court did not adjudicate the claim's merits.[39] *See, e.g., Williams v. Burt*, 949 F.3d 966, 974

---

F.3d 320, 330 (6th Cir. 1998) (holding that a claim can still be procedurally defaulted when a state court discusses the merits in the alternative but rules on the procedural ground).

[39]The federal courts of appeals are split as to whether AEDPA deference applies when reviewing the cause and prejudice aspect of procedural default. *See Richardson v. Lemke*, 745 F.3d 258, 273 (7th Cir. 2014) (applying AEDPA deference

(6th Cir.), cert denied, 141 S. Ct. 276 (2020) ("[W]e have sometimes said that AEDPA deference does not cabin our review of the cause and prejudice aspect of procedural default. We need not decide whether this position is correct today." (internal citations omitted), *citing Hall v. Vasbinder*, 563 F.3d 222, 236–37 (6th Cir. 2009)); *Hughbanks v. Hudson*, 2 F.4th 527, 535 (6th Cir. 2021) (AEDPA deference does not apply when the state courts did not reach the merits); *Woods v. Smith*, 660 Fed.Appx. 414, 430–31 (6th Cir. 2016) (procedurally-defaulted *Brady* claim reviewed *de novo* to excuse default and under AEDPA to grant relief); *Ege v. Yukins*, 485 F.3d 364, 379 n.7 (6th Cir. 2007) (ineffective assistance claim reviewed *de novo* as cause to overcome procedural default but subject to AEDPA when reviewed as independent claim). Regardless, Petitioner's *Brady* claim is reviewed *de novo* as to cause and prejudice, whether because the state courts never reached the merits of the claim or because all claims reviewed in the cause-and-prejudice context are reviewed *de novo*.[40]

### ii. Merits

Prosecutors have an obligation, grounded in the due process protections of the Fifth and Fourteenth Amendments and the right to a fair trial, to turn over to

---

to cause-and-prejudice review but noting the split among the circuits).

[40]Because the Court reviews this claim *de novo* rather than under the standards of § 2254(d), *Pinholster*'s restrictions on the consideration of new evidence developed during federal habeas proceedings do not apply. *See Hughbanks v. Hudson*, 2 F.4th 527, 535 (6th Cir. 2021) (considering new evidence developed during federal habeas on *de novo* review of procedurally defaulted *Brady* claim).

the defense material exculpatory evidence in the government's possession. *Brady*, 373 U.S. at 87. A *Brady* violation occurs when (1) evidence favorable to the defendant, whether exculpatory or impeaching, (2) is withheld by the government, and (3) the defendant is prejudiced as a result. *Strickler*, 527 U.S. at 281-82. Evidence is material for the purposes of *Brady*—and thus its suppression prejudicial—if there is a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 556 U.S. at 469–70. A reasonable probability of a different result means that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Evidence is considered cumulatively, *Kyles*, 514 U.S. at 436-37, in light of the entire record, *United States v. Agurs*, 427 U.S. 97, 112 (1976).

The cash and cigarettes Alexander received from detectives after he accompanied them to Zanesville is not *Brady* material. Detectives Clark and Harbin both disclosed at trial, in response to cross-examination, that detectives gave Alexander money and cigarettes because they had been requested by Petitioner. (s*ee* ECF No. 83-9, PageID 7069–71, 7146). *Brady* is generally limited to a complete failure to disclose information; delayed disclosure "only violates *Brady* when the delay itself causes prejudice." *United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006), *quoting United States v. Bencs*, 28 F.3d 555, 560–61 (6th Cir. 1994). Petitioner has not offered any evidence that the alleged delay had any effect on the outcome of his trial. *See United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991)

213

("[T]he issue of materiality for *Brady* purposes pertains only to the question of a defendant's guilt or innocence, not to the issue of a defendant's ability or inability to prepare for trial."). But even if Petitioner could meet the standard of showing prejudice from the fact of the delay itself, the delayed release of evidence that was ultimately learned midway through his May 2004 trial (at the latest[41]) cannot serve as the cause for his subsequent failure to raise this claim in either his direct appeal or initial state post-conviction petition. *See Brooks v. Tennessee*, 626 F.3d 878, 890 (6th Cir. 2010) (holding that cause means "some objective factor external to the defense [that] impeded [the defense's] efforts to comply with the State's procedural rule," such as the claim's factual or legal basis previously being unavailable or interference by officials, *quoting Murray v. Carrier*, 477 U.S. at 488[42]).

As to the promise of leniency, Petitioner has not shown that an agreement actually existed between Alexander and the state for early release in exchange for cooperation. The only evidence cited by Petitioner is the Rooks affidavit containing Alexander's unsworn hearsay statements that he was promised early release. To be sure, even a "less formal, unwritten, or tacit agreement" between investigators and Alexander is subject to *Brady*'s disclosure requirements. *Bell v. Bell*, 512 F.3d 223,

---

[41]Attorney Warhola specifically raised the furlough, money, and cigarettes given to Alexander in his questions to Detective Clark, *see* ECF 83-9, PageID 7069–70, demonstrating at least some prior knowledge of the evidence.

[42]The full case name is provided to distinguish the shortened citation of *Murray v. Carrier* from that of *Smith v. Murray*, 477 U.S. 527 (1986), also cited within this opinion.

233 (6th Cir. 2008) (en banc). But there needs to be proof that such an unwritten agreement existed. *Kennedy v. Mackie*, 639 Fed.Appx. 285, 292 (6th Cir. 2016), *citing Bell*, 512 F.3d at 233. In light of the evidence that no promise of early release was made—including the trial court's pre-trial order directing the state to disclose any threats or promises made to witnesses, Alexander's sworn testimony at the suppression hearing, the trial testimony of Detectives Clark and Harbin, and the fact that Alexander did not subsequently receive any sentence reduction or other consideration—the Rooks affidavit is no more than minimally persuasive that Alexander was ever promised any benefit in exchange for his cooperation. *See id.* (recantations of trial testimony are treated cautiously, *citing Welsh v. Lafler*, 444 Fed.Appx. 844, 850 (6th Cir. 2011)); *Knickerbocker v. Wolfenbarger*, 212 Fed.Appx. 426, 433 (6th Cir. 2007) (hearsay is presumptively less reliable than direct testimony); *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991) (recanting affidavits and witnesses are viewed with extreme suspicion).

Even if Petitioner could establish that Alexander had in fact been promised early release though, he would still need to show prejudice. Prejudice, or materiality, depends largely on the value of the undisclosed evidence in light of the strength and nature of the government's evidence. *See Smith v. Cain*, 565 U.S. 73, 132 (2012), *citing Agurs*, 427 U.S. at 112–13. For example, evidence that impeaches a sole eyewitness's testimony is more likely to be material in the absence of independent corroborating evidence. *See id.* While "[t]he bias of a witness is 'always relevant' in discrediting the witness and affecting the weight of testimony," *Eakes v.*

215

*Sexton*, 592 Fed.Appx. 422, 428 (6th Cir. 2014), *quoting Davis v. Alaska*, 415 U.S. 308, 316 (1974), the undisclosed impeachment evidence generally must go to the credibility of a witness whose testimony was critical to the prosecution's case to be material to the outcome. *See, e.g., Thomas v. Westbrooks*, 849 F.3d 659, 665 (6th Cir. 2017) ($750 payment from FBI to witness was material when the witness provided the only credible testimony placing the defendant at the scene, the only testimony linking the defendant to his co-defendant the day of the crime, and the only testimony tying the defendant to circumstantial evidence of his involvement in the crime); *Peoples v. Lafler*, 734 F.3d 503, 515–17 (6th Cir. 2013) (finding false testimony that witnesses received nothing for their cooperation material when the two witnesses were the only witnesses tying the defendant to the crime, their credibility was open to attack, and the jury temporarily deadlocked before reaching a verdict); *Robinson v. Mills*, 592 F.3d 730, 737 (6th Cir. 2010) (evidence that witness was a paid police informant was material when the witness's testimony was the only evidence negating the defendant's claim of self-defense).

Not only was Alexander not a critical witness at trial whose "reliability . . . may well be determinative of guilt or innocence," *Giglio v. United States*, 405 U.S. 150, 154 (1972), but he did not even testify at trial. His credibility was irrelevant to the evidence the state actually presented to the jury. Alexander's testimony that Petitioner had repeatedly confessed to him in jail is the type of evidence that would depend on Alexander's perceived credibility, but the jury never heard that testimony because it was only given at the pretrial suppression hearing and

216

Alexander did not testify at trial.

While Detectives Clark and Harbin did testify at trial as to Alexander's role in leading them to the location of the stolen money and Bailey house key, the relevant testimony was limited to explaining how the police were able to find these pieces of evidence.[43] The evidence that the stolen money was hidden in the area to which Petitioner fled after leaving the bank with Tina Bailey and that a key to the Bailey home was in Petitioner's wallet did not hinge on whether the jury believed that Alexander was telling the truth about the location of the key and money. Detectives Clark and Harbin each testified to finding the money in Zanesville and the key in Petitioner's wallet. Telling the jury that Alexander was promised an early release in exchange for his cooperation with police would not undermine the evidence that investigators found the stolen money and house key. Nor has Petitioner explained how disclosure of the alleged promise would have instead led directly to the discovery of other admissible evidence that could have changed the outcome. *See Phillip*, 948 F.2d at 249.

Finally, Petitioner claims that the prosecution allowed Alexander to provide false testimony at the pre-trial suppression hearing when he stated that he had not received anything in exchange for his cooperation from the police. Specifically, Petitioner contends that Alexander lied when he did not reveal that he received fifty

---

[43]See the discussion regarding Petitioner's related *Crawford* claim for a more thorough explanation of the course-of-investigation exception to hearsay evidence.

dollars and cigarettes after helping detectives locate the stolen money and that he was promised early release if he testified. (ECF No. 86, PageID 9296.) The knowing presentation of false evidence by the state, if there is any reasonable likelihood it could have affected the jury's judgment, is a variant of a *Brady* violation. *Brooks*, 626 F.3d at 894, *citing Agurs*, 427 U.S. at 103–04.

> In order to establish prosecutorial misconduct or denial of due process, the defendants must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. The burden is on the defendants to show that the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony.

*Id.* at 894–95, *quoting Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).

Petitioner has not shown that Alexander's statement was actually false. It is not clear from the transcript whether Alexander's response to the question about benefits received in exchange for snitching was even referring to his role in Petitioner's case or if his response was limited to benefits received for past snitching on drug dealers. The relevant question came toward the end of a series of inquiries specifically focused on Alexander's history as an informant prior to Petitioner's case. Given the context, it is not improbable that the question was both understood *and* intended as asking only about any consideration he had received for his past help in drug cases. The relevant portion of attorney Blakeslee's direct examination of Alexander is as follows:

> Q. Have you ever provided law enforcement information concerning criminal activities?
>
> A. Yes.

218

Q. And when did you first start doing that? How old were you when you first started providing law enforcement information about criminal activities?

A. Over the age of 21.

Q. Around 21. So that would be about seven years ago you started doing that?

A. I don't know exact date or what age it was.

Q. Approximately seven years ago? Now, have you — did you do this on more than one occasion?

A. Give them any kind of information?

Q. About criminal activity, yeah.

A. Yes.

Q. Can you give us an estimate about how many times you have provided information to law enforcement officers about criminal matters or activity over the seven year span here?

A. I don't know how many times.

Q. More than a hundred?

A. No.

Q. More than 50?

A. No.

Q. More than 25?

A. I'm not sure.

Q. Could it be more than 25 times?

A. Could be and it could not be. I don't know.

Q. Are you an informant?

A. No.

Q. A snitch?

A. No.

219

Q. Could you please give me an idea of what kind of criminal information — what kind of information you provide to law enforcement about criminal activity?

A. Just what do you mean on that?

Q. Well, I don't know. Could you tell me, give me an example of some of the information you have provided to law enforcement about criminal activity?

A. About drugs in Guernsey County.

Q. About what?

A. Drugs in Guernsey County.

Q. Drugs in Guernsey County. Now, do you provide law enforcement officers the name of folks that deal in drugs?

A. Yeah.

Q. You inform on them, right?

A. Yeah.

Q. And what other criminal activity do you relate to law enforcement officers or inform to law enforcement officers besides drug activity?

A. That's it.

Q. Why do you do it?

A. Because I think it's wrong.

Q. Well, do you do it to try to get a break?

A. No.

Q. So you do this simply because you think it's wrong for folks to deal in drugs?

A. That's right.

Q. And then so you provide law enforcement officers with the names of those folks?

A. Yes.

Q. And that's the only information that you provide law enforcement

220

officers is drug related information?

A. Yes, I think, yes.

Q. You say you think?

A. Yes.

Q. Do you know of anything else?

A. No.

Q. Who do you provide — can you tell me the name of the officer or the detective that you provide this information to?

A. Either Mike Shepard at the time or Larry Able.

Q. Who else?

A. That's it.

Q. How long have you been providing information — informing to Mike Shepard and Larry Able, how long have you been doing it?

A. How long? I don't know. I don't know how long it's been.

Q. Now, you say you have two felony convictions and how many misdemeanor convictions would you say you have as an adult?

A. Not a lot.

Q. **And you did not expect to receive anything of value to you from law enforcement as a result of presenting this information to law enforcement?**

A. No.

Q. **No money?**

A. No.

Q. **No leniency of recommendations to sentencing?**

A. No.

Q. **Have you ever been released from jail early as a result of providing information to law enforcement?**

A. No.

(ECF No. 83-2, PageID 5516–20 (emphasis added).)

Regardless of whether Alexander's denial that he received inducements to cooperate was truthful, the alleged false testimony is not material. Alexander's testimony was given at a pretrial suppression hearing. The jury did not hear it. Nor did the jury hear any testimony from Alexander at trial. It is unclear how possession of impeachment evidence against a witness who did not testify at trial could have plausibly affected the trial outcome (or led directly to evidence that would have). Nor has Petitioner attempted to explain how the testimony, even if untruthful, could have changed the outcome.

Because Petitioner has failed to show either cause or prejudice, his *Brady* claim is denied as procedurally defaulted.

### c. *Crawford* Claim

Finally, Petitioner claims that the prosecution's introduction of Alexander's statements at trial through the testimonies of Detectives Harbin and Clark deprived him of the opportunity to cross-examine Alexander in violation of his right to confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004). (ECF No. 86, PageID 9292–94.) Specifically, Petitioner points to trial testimony in which the detectives reported that Alexander told them Petitioner had shared with him the location of the bank envelope of money and the key Petitioner used to enter the Bailey house, and then led them to the spot in which Petitioner had hidden the money. Petitioner argues that because Alexander was available to testify at trial, his previous testimonial statements to police could not be introduced through the

testimony of other witnesses despite the fact that Petitioner had been able to cross-examine him when he testified at the pre-trial suppression hearing.

Respondent argues that the claim indisputably could have been raised on direct appeal, and thus is procedurally defaulted unless cause and prejudice is shown. (ECF No. 91, PageID 10473.) Respondent also maintains that Petitioner cannot establish cause and prejudice for the default based on the claims in his thirteenth ground because it is unlikely the Confrontation Clause was even implicated given that the testimony regarding Alexander's statements was not offered for the truth of the matter asserted. (*Id.*)

Petitioner initially raised this claim in his successive state post-conviction petition. (ECF No. 85-1, PageID 8274–76.) The Ohio Court of Appeals affirmed the trial court's denial of the petition for failing to satisfy the jurisdictional requirements of § 2953.23(A), but also held that the claim was nonetheless barred by *res judicata*:[44]

> Appellant next raises a claim of a confrontation violation pursuant to *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. In *Crawford*, the United States Supreme Court held that under the Confrontation Clause, "testimonial" statements of a witness who does not appear at trial may not be admitted or used against a criminal defendant unless the declarant is unavailable to testify and the defendant has had a prior opportunity for cross-examination. The

---

[44]In his second state post-conviction petition, Petitioner's *Brady* claim was his thirteenth ground for relief and his Confrontation Clause claim was his twelfth ground for relief. (*See* ECF No. 85-1, PageID 8274–79.). But in his appeal from the trial court's dismissal of that petition, Petitioner labeled his *Brady* claim as his twelfth claim and his Confrontation Clause claim as his thirteenth claim. (*See* ECF No. 88-1, PageID 10130–31.)

> *Crawford* decision was issued just shortly before appellant's trial in the case sub judice. Appellant filed his first post-conviction petition in July 2005, but his appeal thereof did not include any claims under *Crawford*. As such, we hold claim 13 is barred by the doctrine of *res judicata*.

*Johnson*, 2013 WL 1400607, at *6; ECF No. 88-1, PageID 10130–31.

As previously explained in response to Petitioner's ninth ground for relief, claims raised for the first time in Petitioner's second, untimely state post-conviction petition are procedurally defaulted. Because Petitioner's Confrontation Clause claim was raised for the first time in his second post-conviction petition, it is procedurally defaulted. Petitioner also failed to preserve the claim for appeal by not objecting to the alleged Confrontation Clause violations at trial. As a result, had he properly brought the claim in his direct appeal, the Supreme Court of Ohio would have restricted its review to clear error. Ohio's contemporaneous objection rule is also an adequate and independent state ground foreclosing federal habeas review. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012), *citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).

The claims of ineffective assistance of appellate counsel in Petitioner's thirteenth ground for relief, if proven, could potentially provide cause to overcome procedural default of his Confrontation Clause claim. *See Maupin*, 785 F.2d at 138. In his thirteenth ground, Petitioner contended that appellate counsel were ineffective for failing to raise on direct appeal claims that the trial court erred by admitting Alexander's hearsay statements through the testimony of Detectives Harbin and Clark and trial counsel were ineffective for failing to object to the

hearsay statements as a Confrontation Clause violation. Petitioner failed to actually argue that the claims in his thirteenth ground provided cause to excuse the default here, but as the claims in his thirteenth ground fail on the merits, the point is moot. For the reasons articulated in response to his thirteenth ground for relief, *infra*, Petitioner is unable to show that his appellate counsel were ineffective and thus has not established the cause necessary to overcome procedural default of this claim. Moreover, as more fully explained in connection with Petitioner's thirteenth ground, Petitioner also cannot establish that he was prejudiced by the alleged Confrontation Clause violation, also a necessary element for overcoming procedural default.

For these reasons , Petitioner's twelfth ground for relief is **DENIED**. The first (*Massiah*) sub-claim on the merits, and the second (*Brady*) and third (*Crawford*) sub-claims as procedurally defaulted.

### 13. Thirteenth Ground for Relief: Petitioner's appellate counsel were ineffective in failing to properly present and argue a meritorious constitutional claim related to a *Crawford* error.

The statements of jailhouse informant Mickey Alexander are also at the center of Petitioner's thirteenth ground for relief. Petitioner claims that his appellate counsel were unconstitutionally ineffective for failing to raise two issues on direct appeal: First, that the trial court improperly allowed hearsay evidence in violation of the Confrontation Clause, and second, that trial counsel was ineffective for failing to continuously object to the improper hearsay evidence. (ECF No. 86, PageID 9297–307.) Specifically, he argues that the trial court and his defense counsel both erred by, respectively, allowing and failing to continually object to the

225

introduction of Alexander's hearsay statements through the testimony of Detectives Harbin and Clark in violation of Petitioner's confrontation rights under *Crawford v. Washington*, 541 U.S. 36 (2004).

Respondent argues that the Ohio Supreme Court's denials are not contrary to or an unreasonable application of *Strickland*, nor based on an unreasonable determination of the facts. Respondent contends that it was reasonable to find that the Confrontation Clause claims appellate counsel failed to raise were not as strong as the issues actually presented, if not wholly meritless. (ECF No. 91, PageID 10456.) He disputes that the Confrontation Clause was even implicated because Alexander's statements were offered not for the truth of the matter asserted but to explain why detectives searched a particular location for the stolen money. *Id.*, *citing Crawford*, 541 U.S. at 53–54 n.9. Even if the testimony was problematic, Respondent maintains that Petitioner was not prejudiced, and the admission was harmless beyond a reasonable doubt because without Alexander's statements detectives still could have testified that they found the money in the bank envelope hidden in the area to which Johnson fled and was arrested. *Id.*, PageID 10456–57.

### a. Procedural Posture

Petitioner raised his ineffective appellate counsel claims twice in applications to the Ohio Supreme Court to reopen his direct appeal. "In Ohio, claims of ineffective assistance of appellate counsel are not cognizable in the normal course of post-conviction proceedings, and must be raised through an application to reopen the direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B)." *Carter v.*

226

*Mitchell,* 693 F.3d 555, 564 (6th Cir. 2012). In a death penalty case, the application to reopen is instead filed directly with the Ohio Supreme Court pursuant to S.Ct. Prac. R. 11.6.[45] Other than directing the application to the state supreme court in the first instance rather than the state appellate courts, R. 11.6 largely mirrors the corresponding provisions for non-capital cases in App. R. 26(B).[46]

Petitioner's first application to reopen his appeal was timely filed in 2007.[47] (ECF No. 82-13, PageID 2837–44.) The Ohio Supreme Court summarily denied the application. (*Id.*, PageID 2850.) After deposing his appellate counsel, Kathleen McGarry and Dennis Sipe, during his federal habeas proceedings, Petitioner returned to state court to exhaust his claims—newly bolstered with evidence collected during federal habeas—in a second, untimely application to reopen in 2012.[48] (ECF No. 85-4, PageID 9084–94.) It too was summarily denied by the Ohio

---

[45]At the time of Petitioner's first application to reopen in 2007, the relevant rule was S.Ct. Prac. R. XI, § 5. The Court refers to it by its current designation, R. 11.6, throughout for consistency.

[46]The primary exception is that App. R. 26(B) directs the appellate courts to state the reasons for a denial in the entry of judgment, while S.Ct. Prac. R. 11.6 does not contain a corresponding requirement that the Ohio Supreme Court state its reasoning in the case of denial.

[47]Petitioner's timely application to reopen exhausted the state process for his ineffective assistance of appellate counsel claims and preserved the claims for federal review. *See Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (holding that federal habeas review is barred unless the petitioner has first exhausted the claim before the state courts by fairly presenting the legal and factual basis of the alleged constitutional violation "at every stage of the state appellate process").

[48]Petitioner also presented appellate counsel's case notes and time records

Supreme Court. (*Id.*, PageID 9227.) He also raised his appellate counsel claims as the eleventh ground in his successor state post-conviction petition. (ECF No. 85-1, PageID 8271–73.) The state appellate court affirmed the trial court's dismissal of the petition on jurisdictional grounds as explained above in connection with the ninth ground for relief, but that court also noted that ineffective assistance of appellate counsel claims are not cognizable in post-conviction. (ECF No. 88-1, PageID 10131.)

The Court presumes that the Supreme Court of Ohio's summary denial of Petitioner's first timely R. 11.6 application was a decision on the merits for the purposes of AEDPA. When a federal claim was fairly presented to a state court and the state court denied relief without addressing the claim, a federal court must "presume[] that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Brown v. Bobby*, 656 F.3d 325, 329 (6th Cir. 2011), *citing Richter*, 562 U.S. at 99–100. This is also consistent with how federal courts in Ohio have previously treated summary denials of timely-filed R. 11.6 applications. *See, e.g., McKnight v. Bobby*, No. 2:09-CV-059, 2012 WL 5269157, at *13–14 (S.D.Ohio Oct. 23, 2012) (treating the summary denial of a timely R. 11.6 application as a decision on the merits and applying AEDPA deference); *Wesson v. Jenkins*, No. 5:14-CV-2688, 2020 WL 1066531, at *64 (N.D. Ohio March 5, 2020) (same); *see also Goff v. Bagley*, 601 F.3d 445, 464, n.8 (6th Cir.

---

from his direct appeal. (ECF No. 85-4, PageID 9095–219.)

2010) (holding that an Ohio appellate court's denial of a timely R. 26(B) application for failing to raise a genuine issue of whether defendant was deprived of effective assistance of appellate counsel is a decision on the merits, *citing Haliym v. Mitchell*, 492 F.3d 680, 688–93 (6th Cir. 2007)).

In contrast, the Court concludes that the denial of Petitioner's second R. 11.6 application to reopen was not a decision on the merits. In *Smith v. Warden*, the Sixth Circuit held that an Ohio appellate court's summary dismissal of a petitioner's second R. 26(B) application to reopen could "be assumed to rest on state procedural law" because state law provided "no right to file successive applications for reopening under [Rule] 26(B)" and the prosecution's primary arguments for denying the application were procedural. *Smith v. Warden*, *Toledo Corr. Inst.*, 780 Fed.Appx. 208, 223 (6th Cir. 2019) (internal citations omitted). While the decision was made in the context of procedural default analysis, the court reasoned that the same factors that were relevant to finding procedural default under *Coleman* were also the "indication[s] or state-law procedural principles" that *Richter* counseled could overcome the presumption of a merits adjudication for purposes of § 2254(d). *Id.*, at 223–24, *quoting Richter*, 562 U.S. at 99.

Given the nearly identical text of App. R. 26(B) and S.Ct. Prac. R. 11.6, the application of R. 26(B) can provide a guide for understanding R. 11.6. *See Ahmed v. Houk*, 2:07-CV-658, 2014 U.S. Dist. LEXIS 81971, at *18–20 (S.D. Ohio 2014) (holding the presumption of a merits decision was overcome in the case of a summary denial of a motion for reconsideration by interpreting the relevant state

supreme court practice rule as barring new claims of error based on how the corresponding state appellate rule had been applied). Just as the 6th Circuit in *Smith* found "no right to file successive applications for reopening under [Rule] 26(B)," the Court can identify no provision or history of allowing successive applications under R. 11.6. Likewise, the state's first and primary argument in opposition to Petitioner's second application to reopen was procedural.[49] (*See* ECF 85-4, PageID 9222–23.) These facts are sufficient to overcome any presumption of merits adjudication in the case of Petitioner's second R. 11.6 application. Because the Court holds that only Petitioner's first 11.6 application was considered on the merits by the state courts, the Court's review is restricted to the Ohio Supreme Court's denial of that application.[50]

### b. Merits

Petitioner argues his appellate counsel were ineffective for failing to raise claims of trial court error and ineffective assistance of trial counsel. The *Strickland* standard for ineffective assistance of counsel also applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000), *citing Smith v. Murray*, 477 U.S. 527, 535–36 (1986), and *Strickland*, 466 U.S. at 687–91.

---

[49]In contrast, the state opposed Petitioner's first application to reopen his direct appeal solely on the merits. (*See* ECF No. 82-13, PageID 2866–71.)

[50]Because Petitioner has presented the claims in his thirteenth ground as free-standing ineffective assistance claims, they are reviewed under the heightened deference of AEDPA. *See Ege*, 485 F.3d at 379 n.7 (holding that AEDPA deference applies to review of free-standing ineffective assistance claim, but the claim is

Thus, to succeed on his ineffective assistance of appellate counsel claims, Petitioner must demonstrate that appellate counsel's performance fell below an objective standard of reasonableness and that he was prejudiced as a result. *Id.* Appellate counsel are not obligated to raise all nonfrivolous claims, *id.* at 288, *citing Jones v. Barnes*, 463 U.S. 745 (1983). In the absence of contrary evidence, counsel's failure to raise a claim is presumed to be sound appellate strategy: "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it," does not constitute objectively deficient performance under *Strickland*. *Murray v. Carrier*, 477 U.S. at 486–87. Only if the claims are clearly stronger than those actually presented on appeal will the presumption of effective assistance be overcome. *Davila v. Davis*, 137 S.Ct. 2058, 2067 (2017). If Petitioner succeeds on the first prong, he then must also demonstrate "a reasonable probability that, but for his counsel's unreasonable failure . . . he would have prevailed on his appeal." *Robbins*, 528 U.S. at 285–86, *citing Strickland*, 466 U.S. at 694. Thus, both prongs of the *Strickland* analysis ultimately turn on the strength of Petitioner's underlying Confrontation Clause claims.

Petitioner's Confrontation Clause complaints are based on the following testimony of Detectives Clark and Harbin at trial. First, Detective Clark testified on

---

reviewed *de novo* when presented as cause for a procedural default).

direct examination as to the trip he took with Detective Harbin and Alexander to Zanesville to find the money hidden by Petitioner before he was arrested:

Q. Who was all present when you went to Zanesville, Ohio to recover this money?

A. Myself, Detective Harbin and Mickey Alexander.

. . .

Q. How did you know where to go in Zanesville?

A. Mickey directed us there. I'm not familiar with Zanesville.

. . .

A. There is 1178 is the house I believe it's a vacant house next to a parking lot right here which is what Mickey instructed us to go to this parking lot. At the back of the parking lot there was suppose [sic] to be concrete steps. There's a park there, that's the steps at the back of the parking lot. Then as you went down the steps at the bottom of the steps if you turned left he instructed to go to the bottom of the steps turn left there was a bunch of weeds.

By Mr. Padden:

Q: This is where you actually went?

A. Yes.

Q. And you took these photographs as you're going along?

A. Yes. There was a bridge. Mr. Alexander was familiar with this bridge because just familiar with Zanesville, I guess, but the park goes this way. He said turn left go through these weeds look for a culvert. He said it's a big concrete culvert. Well, we located that probably 75 feet into the weeds along the edge there.

Q. And that's shown in exhibit "DD-2"?

A. Yes. Then he said immediately after the culvert look for a news stand. I'm not sure what the news stand was but right here Times Recorder newspaper stand. If you look right back in here there's the culvert and the news stand is right after it, immediately after that.

Q. "DD" number "2"?

A. Yes. Once you find the news stand look for tires. Well, if you see in the background there's old tires.

. . .

A. "DD-1" here is the top portion of that same news stand. If you look there's a couple tires immediately past there. On examining the tires, looked in the farthest tire and there was an envelope tucked inside the tire. Pulled that out and it's a US Bank envelope that a cashier would put money in.

. . .

Q. Again, the information to head to Zanesville, Ohio and this particular location this tire past the news stand was provided by Mr. Alexander?

A. Correct.

Q. Do you know Mr. Alexander's location when he obtained this information?

A. Yes.

Q. What is that?

A. Guernsey County Jail.

Q. And do you know where in particular in the Guernsey County Jail he was?

A. He was roomed with Mr. Johnson.

(ECF No. 83-9, PageID 7062–65, 7067.) Later, during Detective Harbin's testimony about the same trip to locate the hidden money in Zanesville, defense counsel intervened several times to object:

Q. After you took that statement from him did you believe that Mickey Alexander was getting information from this defendant, Marvin Johnson?

A. Yes, I did.

Q. Why was it that you thought that?

233

. . .

A. He gave me information that I believe only Marvin Johnson would know.

Q. Based upon that describe the conversation, without going into the content of it, describe the conversation you had with Mr. Alexander.

A. He indicated to me —

MR. BLAKESLEE: Objection. Hearsay.

MR. PLUMMER: I don't believe he's going to restate the comments, Your Honor. I think he's going to give general areas of the subject matter that was discussed.

THE COURT: The objection is sustained in part and overruled in part. He may not testify as to what Mickey Alexander may have said. However, he may testify as to what information was gained for his investigation. You may continue in that manner.

A. He advised me of certain comments that Marvin had made to him and also the possible location of pertinent evidence.

By Mr. Plummer:

. . .

Q. Two days later you then had another meeting with Mr. Alexander on August 21, 2003, is that correct?

A. Yes, sir.

Q. And can you tell us the nature of that meeting?

A. Yes. Again, I was contacted by the Guernsey County Jail that Mickey requested to speak with me once again. This was the third and subsequently the final meeting I had with Mickey.

Q. At the conclusion of that meeting with Mr. Alexander did you believe that Mr. Alexander may be of assistance in locating evidence that you thought to be important in this investigation?

A. Yes, I did.

Q. And what evidence did you believe you may be able to locate?

A. The missing money that was taken withdrawn from USA Bank —

234

US Bank.

Q. We're talking about the money that is alleged Mr. Johnson went to the bank with Ms. Bailey on the 15th after Daniel had been murdered and the money was withdrawn from US Bank?

A. Yes, sir.

Q. The thousand dollars?

A. Yes.

Q. So based upon your conversation with Mr. Alexander you felt that he may be of assistance in locating that money?

A. Yes, sir.

Q. Can you tell us what you advised Mr. Alexander — at that point prior to going to Zanesville to look for the money can you tell us what you advised Mr. Alexander at that point and what arrangements you made with him to have him assist you in locating the money?

A. Yes. He advised that he had detailed —

MR. BLAKESLEE: Objection. It's hearsay.

THE COURT: Response?

MR. PLUMMER: It is hearsay, Your Honor. We'll rephrase.

THE COURT: Sustained. Objection sustained.

By Mr. Plummer:

Q: Had Mr. Alexander relayed to you where he thought the money was?

A. Yes, he did.

Q. Again, had he been in jail ever since — when you talked to him and he gave you those directions on August 21, 2003, had he been in jail the Guernsey County Jail [sic] ever since August 9, 2003?

A. Yes.

Q. Did you have a discussion with Mr. Alexander relating — let me back up and ask this question. Did you at that point want Mr. Alexander to go with you to see if you could find the money that had

been hidden over in the Zanesville area?

A. Yes, I did.

Q. And what arrangements did you make to accomplish that?

A. Myself, Detective Clark and Mr. Alexander got into the vehicle and we had Mr. Alexander tell us exactly where to go, what turns to make, what exits to get off of.

. . .

Q. Tell us what you did.

A. We got in our vehicle and headed towards Zanesville.

Q. Who is "we"?

A. Myself, Detective Clark and Mr. Alexander.

Q. And tell us where you went.

A. We traveled 70 west to Zanesville. Again, this is at the direction of Mickey Alexander.

Q. Was he telling you where to go?

A. Yes.

Q. He was giving you directions?

A. That is correct. He had us get off of State Street exit. From there we made left [sic] onto State Street, another left onto west Muskingum, I believe, and then a right onto Ridge Avenue. Again, he takes us down Ridge Avenue to an abandoned house. Adjacent the abandoned house is a parking lot and beyond that parking lot down over an embankment is a park grown up. You can tell it hasn't been used in quite awhile.

. . .

Q. So you were relying solely on the information that Mr. Alexander was giving to you?

A. Yes, sir.

. . .

Q. On the 15th Mickey Alexander was in jail?

236

A. Yes, he was.

Q. But yet he was giving you this information of where this money was?

A. Correct.

. . .

Q. Showing you what's been marked for purposes of identification as State's Exhibit "DD-1".

A. Yes. This is inside the wooded area extremely thick. This is a news stand. It was one of the objects that Mr. Alexander had told me that Mr. Johnson had told him to look for in his way to the money.

Q. "DD-2".

A. Yes, there's a concrete cement culvert extremely large that is another item that before leaving Cambridge Mr. Alexander told him to look for — Mr. Johnson told Mr. Alexander to look for in his route to the money.

. . .

Q. "DD-9".

A. That is a picture of the money that was hidden inside the tire.

Q. And who showed you where that was?

A. Mickey Alexander.

. . .

Q. Also on August 21, 2003, did you receive information involving the location of a key that was in question?

A. Yes, I did.

Q. Who did you receive that information from?

A. Mickey Alexander.

Q. You had a conversation with Mr. Alexander about a key?

A. Yes. It was the same conversation, same statement, as the location of the money.

237

(ECF 83-9, PageID 7112–13, 7115–25.)

The Sixth Amendment's Confrontation Clause protects the right of a
defendant in a criminal prosecution to confront the witnesses against him.
*Crawford*, 541 U.S. at 51. The introduction of witness testimony through the
testimony of a third party, rather than through the witness's first-person account,
deprives a defendant of the opportunity to question the witness about his testimony.
*Id.* at 54–55. A witness's testimony against a defendant is thus inadmissible unless
the witness appears at trial or, if the witness is unavailable, the defendant had a
prior opportunity for cross-examination. *Id.* at 54. "To trigger a violation of the
Confrontation Clause, an admitted statement must be testimonial in nature, and
must be hearsay—that is, a 'statement, other than one made by the declarant while
testifying at the trial or hearing, offered in evidence to prove the truth of the matter
asserted.'" *United States v. Deitz*, 577 F.3d 672, 683 (6th Cir.2009), *quoting United
States v. Gibbs*, 506 F.3d 479, 486 (6th Cir.2007); *see also Ohio v. Clark*, 576 U.S.
237, 243 (2015) ("[W]e defined 'testimony' as 'a solemn declaration or affirmation
made for the purpose of establishing or proving some fact.'") (*quoting Crawford*, 541
U.S. at 51). The statements of a confidential informant like Alexander are
testimonial. *See United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004)
("[S]tatements of a confidential informant are testimonial. . . . Tips provided by
confidential informants are knowingly and purposely made to authorities, accuse
someone of a crime, and often are used against the accused at trial."); *Deitz*, at 683,
*citing Gibbs*, 506 F.3d at 486. But testimonial statements introduced for reasons

238

other than to establish the truth of the statement's substance are not hearsay and thus do not implicate the Confrontation Clause. *Crawford*, 541 U.S. at 59 n.9, *citing Tennessee v. Street*, 471 U.S. 409, 414 (1985).

As Petitioner asserts (ECF No. 86, PageID 9301), and Respondent does not deny, Alexander's statements to police were testimonial and he was available to testify. *See Davis v. Washington*, 547 U.S. 813, 822 (2006) ("[Statements] are testimonial when circumstances objectively indicate that. . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."). The only question is whether the statements were offered to prove the truth of the matter asserted. Respondent argues that Alexander's statements were used to explain why detectives searched where they did. (ECF No. 91, PageID 10456.) Petitioner counters that the testimony was more than simply brief background to explain why the investigation proceeded as it did. He contends that the statements were offered for the truth of the matter asserted, to wit, that Petitioner *told* Alexander where incriminating evidence from the crime was hidden. (ECF No. 86, PageID 9306.)

The repeated references to Alexander's step-by-step directions by Detectives Harbin and Clark were provided in the context of explaining the path they took to locate the bank envelope and money in Zanesville. In general, the use of the testimonial statements of an out-of-court declarant does not implicate the Confrontation Clause when the testimony was offered to explain why an investigation was undertaken or proceeded as it did. *Cromer*, 389 F.3d at 676–78.

239

Yet there is also reason to believe that Alexander's statements were used to show that Petitioner had indeed told Alexander details of the crime. The prosecution elicited testimony from the detectives that Alexander had been in jail since August 9, several days before the murder, repeatedly emphasizing the point seemingly to show that the information Alexander provided could *only* have come from Petitioner. That is, by attempting to prove that Alexander's information came from Petitioner, the state was at least partially using the alleged hearsay to show the truth of Alexander's claim that Petitioner had told him details about the crime.

While it is a closer question whether Alexander's statements were offered for their truth, the Court cannot say that the opposite conclusion would be unreasonable in light of the deference owed to appellate counsel under *Strickland* and to the state court under the AEDPA. A reasonable jurist, considering the appropriateness of appellate counsel's decision not to appeal the issue, could conclude that the statements were not admitted for their truth because neither Petitioner's possession of the cash nor his presence at the Bailey home was disputed. *See Woods v. Etherton*, 136 S.Ct. 1149, 1152 (2016) (*per curiam*) ("A 'fairminded jurist' could conclude that repetition of the tip did not establish that the uncontested facts it conveyed were submitted for their truth . . . by placing weight on the fact that the truth of the facts was not disputed."); *see also United States v. Fountain*, 2 F.3d 656, 669 (6th Cir. 1993) (holding that out-of-court statement purportedly offered to explain why police searched a particular room was hearsay when the reason for searching the room was not at issue). Defense attorney

240

Blakeslee acknowledged in his opening statement that Tina had immediately given the money to Petitioner. (ECF No. 83-8, PageID 6817, 6820.) Showing the truth of Alexander's statements that Petitioner had told him where the money and key were hidden merely proves that he told Alexander facts that he did not contest at trial and that were consistent with the defense argument that the money was a gift.

Yet even if the admission of Alexander's statements had violated Petitioner's Confrontation Clause rights, the violation did not rise to plain error. Petitioner's failure to object to the challenged testimony on the basis of a Confrontation Clause violation at trial waived all but plain error on appeal.[51] *See State v. Hairston*, 2016-Ohio-8495, ¶ 34, 79 N.E.3d 1193, 1201 (holding that objection based on hearsay does not preserve a Confrontation Clause objection, *citing State v. Wallace*, 10th Dist. No. 08AP-2, 2008-Ohio-5260, 2008 WL 4518016, ¶ 25); *State v. Knott*, 2004-Ohio-5745, ¶¶ 9–10 (holding that plain error analysis is appropriate when the evidence was subject only to an objection on other grounds); *cf. Crawford*, 541 U.S. at 51 (distinguishing Confrontation Clause violations from hearsay). Plain error requires (1) an error, (2) that is obvious, and (3) affects substantial rights. *State v.*

---

[51]Ohio's contemporaneous objection rule requires parties to preserve errors for appeal by objecting at trial when the error could have been avoided or corrected. *State v. Mason*, 82 Ohio St. 3d 144, 162 (1998). The failure to object at trial waives ordinary appellate review, and the issue is instead reviewed only for plain error. *State v. Murphy*, 91 Ohio St. 3d 516, 2001 Ohio 112, 747 N.E.2d 765, 788–89 (Ohio 2001). The rule is an independent and adequate state ground of decision barring federal habeas review of the claim. *Wogenstahl*, 668 F.3d at 334, *citing Keith*, 455 F.3d at 673.

*Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. To affect substantial rights, "the trial court's error must have affected the outcome of the trial." *Id.*; *see also Knott*, 2004-Ohio-5745, at ¶ 10 ("Plain error should not be invoked unless it can be said that, but for the error, the outcome of the proceedings would clearly have been otherwise.") (*citing State v. Jackson*, 92 Ohio St.3d 436, 438, 2001-Ohio-1266, 751 N.E.2d 946 and *State v. Sanders*, 92 Ohio St.3d 245, 263, 2001-Ohio-189, 750 N.E.2d 90).

Given that *Crawford* had been decided just two months before Petitioner's trial and there was not yet case law applying the decision, the error was not obvious when it was made. *See Lewis v. Warden, Toledo Corr. Inst.*, No. 1:08-CV-114, 2009 WL 1883766, at *17 (S.D. Ohio June 30, 2009),. More importantly, the error did not affect the outcome of the trial. The state produced multiple independent witnesses who linked Petitioner to the bank envelope and money. In addition to Tina Bailey's account of the robbery (ECF No. 83-9, PageID 6999–7008), bank teller Tiffany Archer testified that Petitioner was with Tina when she cashed the check at the US Bank drive-through and described preparing the envelope of cash and sending it out to Tina's car (ECF No. 83-8, PageID 6885–902); and taxi driver Matt McElroy testified that Petitioner paid his cab fare from a bank envelope (*Id.*, PageID 6947). Moreover, had Mickey Alexander's statements been excluded from trial, Detectives Clark and Harbin would still have been able to testify to finding the bank envelope of money hidden in the area Petitioner was arrested.

Likewise, the fact that Petitioner told Alexander that he had a key to the

242

sliding door of Tina Bailey's house in his wallet is insignificant in light of the fact that detectives were able to find the key in the wallet stored in police evidence and confirm that it fit the sliding door. Petitioner's possession of the Bailey house key was also unnecessary to link him to the house as both Shannon Crawford and Tina Bailey testified to his presence at the house that morning, and Petitioner did not dispute that he was there. The numerous independent witnesses placing Petitioner at the house and tying him to the bank envelope, as well as his own admissions of these facts, dispel any notion that a different outcome was possible had Alexander's statements been excluded.

Petitioner argues that his hearsay objections to testimony regarding Alexander's statements preserved his Confrontation Clause challenge for appeal. (ECF No. 86, PageID 9303.) A preserved Confrontation Clause objection is instead subject to the less stringent harmless error standard, under which a conviction will not be set aside when the reviewing court finds, based on whole record, that the error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall*, 475 U.S. 673, 680–81 (1986) (holding that Confrontation Clause violations are subject to harmless error review); *Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020). As previously explained above, an objection on grounds of hearsay does not preserve a Confrontation Clause objection. *See Hairston*, *supra*, 79 N.E.3d at 1201. But Petitioner's argument is not persuasive for another reason: any Confrontation Clause error here was also undoubtedly harmless error. The "substantial evidence" linking Petitioner to the bank envelope and placing him at the Bailey house mean

243

"there is 'no reasonable probability' that the constitutional violation made a difference to the jury's verdict." *See United States v. Parsons*, 798 Fed.Appx. 922, 926 (6th Cir. 2020), *citing United States v. Henderson*, 626 F.3d 326, 334 (6th Cir. 2010).

Ultimately the same factors that lead to the conclusion that any Confrontation Clause error did not affect the trial outcome and was harmless beyond a reasonable doubt also inexorably lead to the conclusion that trial counsel's failure to object to the alleged error did not prejudice Petitioner under *Strickland*. A successful ineffective assistance claim on appeal must show that trial counsel's decision not to object was both deficient and had a reasonable probability of affecting the outcome. *See Strickland*, 466 U.S. at 687–91. The multiple sources of independent evidence tying Petitioner to the money and Bailey house and the fact that neither of these elements were contested mean there is no realistic chance that the failure to object affected the outcome.

Petitioner argues that trial counsel's failure to object prejudiced him because the state was able to introduce prejudicial information without the ability of the defense to test the credibility of the witness who made the statements. (ECF No. 86, PageID 9303.) But Petitioner does not explain how the uncontested facts contained in the alleged hearsay could have harmed his defense. An unsupported assertion that information was prejudicial is not especially persuasive when the evidence in question was both cumulative to other sources establishing the same facts and not disputed by the defense.

244

Nor is it clear that trial counsel's failure to object was not the result of a strategic decision. Linking Petitioner to the location of the bank envelope and money through Alexander's statements was entirely consistent with the defense argument that a robbery did not occur because Tina gave the money to Petitioner. (*See* ECF No. 83-8, PageID 6817, 6820.) It would have been reasonable for trial counsel to conclude that there was little downside to allowing Alexander's statements in through the testimony of Detectives Clark and Harbin, yet considerable downside to Alexander testifying at trial. Had the prosecution called Alexander as a witness, it is very likely that, in addition to testifying to the location of the bank envelope and house key, he would have repeated his testimony from the pre-trial suppression hearing regarding Petitioner's confessions to him.[52] (*See* ECF 83-2, PageID 5530–35.) Those confessions included potentially damaging details, such as the fact that Petitioner wanted to "get" Tina Bailey by accusing her of participating in the planning of the murder in order to commit insurance fraud and that he told her Daniel would be safe if she had sex with him and gave him $1000. (ECF 83-2, PageID 5533–34.) There is every reason to believe that defense counsel preferred a situation in which the only portion of Alexander's testimony admitted at trial was the directions to the bank envelope and house key, but in which they were still able to introduce evidence going to Alexander's credibility and bias without

---

[52]The trial court had ruled that Alexander's testimony regarding what Petitioner told him was admissible at trial. (ECF No. 82-5, PageID 1711–12.)

incurring the potential harm from his direct testimony. This conclusion is bolstered by the fact that trial counsel did raise *Crawford* as a potential objection to other testimony during trial, indicating that they were well aware of the decision and prepared to specifically object on Confrontation Clause grounds when the need arose. (*See* ECF No. 83-8, PageID 6870, 6967.)

Thus, even if the Alexander hearsay statements violated the Confrontation Clause, it would have been well within the range of reasonably professional judgment for appellate counsel to conclude that the issues did not merit appeal because any error was harmless, Petitioner was not prejudiced, and trial counsel's failure to object was a strategic decision to avoid the possibility of more damaging testimony being admitted if Alexander testified at trial. And it certainly would have been a reasonable application of *Strickland* for the Supreme Court of Ohio to decide that appellate counsel were not ineffective for the same reasons.

Petitioner argues that the depositions of his appellate attorneys Kathleen McGarry and Dennis Sipe obtained during federal habeas proceedings reveal that the decision not to appeal was based on an erroneous understanding of the law and thus cannot be considered strategic. (ECF No. 86, PageID 9305–07.) As previously explained in connection with Petitioner's fourth ground for relief, *supra*, this Court has found that when a petitioner returns to state court to exhaust claims previously raised but bolstered by new evidence, the state court's denial of the claims for a failure to meet the jurisdictional prerequisites of §2253.23 does not lift *Pinholster*'s bar on the use of the new evidence in federal habeas when evaluating the state

246

court adjudication under the auspices of § 2254(d).

Here, the question is instead whether the *Pinholster* bar is lifted when the state court's denial of the newly presented evidence was not due to lack of jurisdiction, but instead the enforcement of a court procedural rule. It is not. *Pinholster* limits "review under § 2254(d)(1) . . . to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. The Supreme Court has explained that the language in § 2254(d) "requires an examination of the state-court decision at the time it was made." *Id.* at 182. Evidence that was presented to the state court only later in a procedurally barred second attempt to raise the same claim cannot be said to have also been before the state court during its earlier merits adjudication. *See Williams v. Houk*, 676 Fed.Appx. 524, 538 (6th Cir. 2017) (holding that review is limited to the record on direct appeal when the state court decided the claim on the merits, excluding evidence presented in state post-conviction when the claim was dismissed as *res judicata*); *c.f. Cone*, 556 U.S. at 466–67 ("[W]hen a state court declines to revisit a claim it has already adjudicated, the effect of the later decision upon the availability of federal habeas is 'nil' because 'a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default.'") (*quoting Ylst*, 501 U.S. at 804 n.3). The new evidence not before the Ohio Supreme Court when it adjudicated Petitioner's first timely application for reopening is therefore barred from consideration in federal habeas.

Regardless, the outcome would be the same with the inclusion of the

affidavits. The new evidence is only relevant to the question of counsel's performance, meaning that even if the affidavits revealed that that performance was deficient, the ineffective assistance claim would still fail for lack of prejudice. But the affidavits also do not establish that counsel's performance was substandard.

Attorney Dennis Sipe reported that he discarded the potential Confrontation Clause claims after concluding that the statements had been admitted not for truthfulness but to explain the course of the investigation. (ECF No. 85-4, PageID 9177–79.) Petitioner argues that Sipe's decision was based on a misunderstanding of *Crawford* and that no such exclusion was supported in federal law at the time. (ECF No. 86, PageID 9305–06.) Petitioner is mistaken. There is nothing in *Crawford* or any other Supreme Court decision at that time to suggest evidence admitted not for its truth but to explain why investigators took specific actions must be considered hearsay for the purposes of the Confrontation Clause. To the contrary, *Crawford* explicitly excepted from the Confrontation Clause non-hearsay testimonial statements, 541 U.S. at 59 n.9—that is, testimonial statements not admitted for the truth of the matter asserted—and the exclusion of such statements from the definition of hearsay was well established by the time *Crawford* was decided. *See, e.g.*, *United States v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990) (testimony of unnamed declarant not hearsay when offered to explain how and why the investigation began); *United States v. Love*, 767 F.2d 1052, 1063–64 (4th Cir. 1985) (testimony offered to explain why law enforcement made certain preparations in anticipation of the defendants' arrest was not hearsay); *cf.* Fed.R.Evid. 801(c)

248

(defining hearsay as an out-of-court statement "offered in evidence to prove the truth of the matter asserted"). Moreover, even if counsel's determination as to the hearsay nature of Alexander's statements was mistaken, counsel could nevertheless have reasonably concluded that appeal was not warranted because the violation did not affect the outcome at trial. Likewise, the Ohio Supreme Court could have reasonably concluded that appellate counsel were not ineffective because Petitioner did not suffer prejudice from their failure to raise unmeritorious claims on appeal. Therefore, Petitioner's thirteenth ground for relief is **DENIED**.

### c. Certificate of Appealability

Notwithstanding the foregoing, the Court finds that Petitioner's thirteenth ground for relief merits consideration on appeal. As previously explained in connection with Petitioner's tenth ground for relief, a petitioner is not entitled to appeal a district court's denial of habeas relief absent a COA based on "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(1)–(2). A substantial showing means "'that reasonable jurists could debate' whether relief should have been granted." *Moody*, 958 F.3d at 488, *quoting Slack*, 529 U.S. at 484. Here, Petitioner has made a substantial showing of a *Crawford* violation at trial concerning evidence that ties him to the Bailey house and robbery of Tina Bailey. Reasonable jurists could differ—and have—on when third-party statements are properly admitted to explain the course of the investigation and not for the truth of the matter asserted. Moreover, the finding that there was no prejudice from either the underlying trial counsel ineffectiveness claim or the appellate counsel

249

ineffectiveness claim relies on the strength of the government's evidence against Petitioner.

14. **Fourteenth Ground for Relief: Petitioner's rights under the Due Process Clause of the Fourteenth Amendment and the Confrontation Clause of the Sixth Amendment are violated when a trial court prohibits defense counsel from reviewing police narratives.**

Respondent previously filed a motion to dismiss procedurally defaulted claims. (ECF No. 15.) Petitioner responded in opposition (ECF No. 18) and the Court ultimately granted Respondent's motion to dismiss as procedurally defaulted Petitioner's fourteenth, fifteenth, twenty-first, and twenty-second grounds for relief. (ECF No. 28.) The parties do not explain, and it is not otherwise apparent to the Court, why they addressed the previously dismissed claims on the merits in the Amended Petition, Return of Writ, and Traverse as if this Court had never issued its procedural default decision. But it did. For the reasons discussed in ECF No. 28, at PageID 387–400, Petitioner's fourteenth ground for relief is **DENIED** as procedurally defaulted.

15. **Fifteenth Ground for Relief: A trial court cannot order a criminal defendant to wear a stun belt absent a hearing at which the prosecution demonstrates the need for the restraint is established.**

As explained in connection with Petitioner's fourteenth ground for relief, *supra*, Petitioner's fifteenth ground for relief was previously denied as procedurally defaulted. (*See* ECF No. 28, PageID 392–400.) The Court provisionally dismissed the claim unless Petitioner was able to show cause for the default and prejudice

from the underlying constitutional violation. (*Id.*) Because Petitioner failed to argue cause and prejudice to overcome the default in his Amended Petition (*see* ECF No. 86, PageID 9308), Petitioner's fifteenth ground is **DENIED** as procedurally defaulted.

> ### 16. Sixteenth Ground for Relief: When a juror indicates by their answers that they cannot be a fair and impartial juror, that juror should be excused for cause.

In Petitioner's sixteenth ground for relief, he argues that his trial counsel were constitutionally ineffective for failing to challenge for cause two members of the jury and that these two jurors were actually biased. (ECF No. 86, PageID 9309.) Petitioner contends that Juror Barbara Grant's statements during voir dire that she supported the death penalty, was concerned about the cost of imprisoning a person for life, and feared that society would not be protected without the death penalty indicated that she "held views that would 'prevent or substantially impair' [her] ability to be fair to Petitioner." (*Id.*, *citing* ECF 83-5, PageID 6241.) He also points to her equivocation over whether she could impose a life sentence for the killing of a child, initially saying that she could not and then saying that she could. (*Id.*, *citing* ECF 83-5, PageID 6241.) He also argues that Juror Sara Danadik's belief that the death penalty would be appropriate for the intentional, premeditated murder of a child, a view she had firmly held for some time and would have trouble setting aside, would prevent or substantially impair her ability to fairly judge Petitioner. (*Id.*, *citing* ECF 83-6, PageID 6522–23.)

Respondent contends that Petitioner's claim does not allege that the state

court's determination that the jurors were not biased is unsupported by the record, but that he is instead asking this Court to step into the shoes of the trial court and overturn the Ohio Supreme Court. (ECF No. 91, PageID 10485.) As such, Respondent maintains that the claim cannot substantiate relief in habeas.

Petitioner initially raised this challenge on direct appeal. (ECF No. 82-10, PageID 2428–30.) The Ohio Supreme Court held that the answers Jurors Grant and Danadik provided during voir dire did not create such an inference of bias that counsel's failure to challenge the two was deficient performance. *Johnson*, 112 Ohio St.3d at 226. The state court laid out the facts and its analysis as follows:

> In his fifth proposition of law, Johnson contends that his trial counsel rendered ineffective assistance by failing to challenge two veniremen, for cause, in response to their answers to defense counsel's questions regarding their ability to consider a life sentence as the penalty for the murder of a child.
>
> In questioning Barbara Grant, the following colloquy occurred between defense counsel and the prospective juror:
>
> "Q. [defense counsel] Would you have difficulty voting for a life sentence if you convicted a person of an intentional and deliberate murder of a child?
>
> "A. Deliberate? *No.*
>
> "Q. So you could vote for a life sentence?
>
> "A. Not if he deliberately killed a child, no.
>
> "Q. That's what I asked. Let me rephrase the question. * * * I've been doing this for 30 years and it's hard for me to get these questions out. So *would you have difficulty voting for a life sentence* if you convicted a person of an intentional and deliberate murder of a child?
>
> "A. *No.*
>
> "Q. So you *could* vote for a life sentence?

252

"A. *Yes, I could. Yes.*" (Emphasis added.)

Grant also said that she could consider mitigating factors, such as mental disease, drug use, child abuse, and parental abandonment.

In order to establish that trial counsel's failure to challenge Grant constitutes ineffective assistance, Johnson must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373.

Grant's responses during voir dire do not suggest or create an inference of bias such that Johnson may claim that trial counsel's failure to challenge Grant constitutes deficient performance. See *State v. Davis* (1991), 62 Ohio St.3d 326, 350, 581 N.E.2d 1362. Thus, counsel's failure to challenge Grant does not constitute ineffective assistance of counsel.

The other venireman challenged here by Johnson, Sara Danadik, stated that the death penalty would be appropriate for the intentional, premeditated murder of a child. However, the record does not show that she said she would automatically vote for such a penalty. In fact, she said she could consider a life sentence in such a case "[i]f the evidence and the circumstances warrant it." As with Grant, Danadik's voir dire responses do not support an inference of bias, and failure to challenge for cause does not amount to ineffective assistance of counsel.

Accordingly, we overrule this proposition of law.

*Id.*, at 226–27.

Petitioner also raised a challenge regarding Juror Sara Danadik in the second ground for relief of his initial state post-conviction petition. (ECF No. 82-14, PageID 2965–67.) Presenting statements from voir dire as well as new evidence in the form of an affidavit from his post-conviction attorney recounting a telephone conversation she had with Juror Danadik, Petitioner claimed trial court error and

argued that Juror Danadik had flipped the burden of proof in the mitigation phase of his trial. The Ohio Court of Appeals affirmed the trial court's dismissal, finding that the affidavit of counsel was not competent evidence and with the only other supporting evidence in the trial record, the claim could have been brought on direct appeal and was thus barred by *res judicata*. *Johnson*, 2007 WL 1098106, at *12. Petitioner argues here that the Court may consider the affidavit from his counsel because it was properly presented in the state courts in support of this trial court error claim.[53] (ECF No. 131, PageID 10857.)

The Court concludes that the affidavit containing Juror Danadik's statements to post-conviction counsel may not be considered in federal habeas. First, the dismissal of Petitioner's post-conviction claim based on *res judicata* procedurally defaults that claim.[54] *See Durr*, 487 F.3d at 432 (holding that Ohio's

---

[53]Respondent previously moved to dismiss Petitioner's sixteenth ground for relief as procedurally defaulted, arguing that the dismissal of Petitioner's trial court error claim as *res judicata* in post-conviction barred subsequent review of the claim in federal habeas. This Court denied the motion to dismiss, finding that the ineffective assistance claim presented here in Petitioner's sixteenth ground for relief mirrored Petitioner's fifth proposition of law on direct appeal. The Court held that the ineffective assistance claim was properly presented on direct appeal and decided on the merits by the Ohio Supreme Court, preserving it for habeas review, and Petitioner's subsequent assertion in state post-conviction of the related trial court error claim did not defeat preservation of the ineffective assistance claim. (ECF No. 28, PageID 400–02.)

[54]The Court finds that the state appellate court's application of *res judicata* was an independent and adequate state ground supporting dismissal of the trial court error claim in state post-conviction. The Ohio Court of Appeals properly excluded the affidavit of post-conviction counsel as incompetent evidence in accordance with Ohio Evid. R. 606(B), which bars evidence of a juror's statements

doctrine of *res judicata* is an adequate and independent state ground barring federal habeas review). Second, the ineffective assistance claim raised on direct appeal and the trial court error claim raised in post-conviction are two conceptually different claims, despite being based on the same or similar facts. Finally, *Pinholster* instructs federal habeas courts to review "the record that was before the state court that adjudicated the claim on the merits," explaining that § 2254(d) "requires an examination of the state-court decision at the time it was made." 563 U.S. at 181–82. Just as evidence presented to the state court in a procedurally barred second attempt to raise the same claim cannot be considered by a federal habeas court reviewing the merits decision on direct appeal, *Williams*, 676 Fed.Appx. at 538, so evidence presented to the state court in a later attempt to raise a *different* claim in post-conviction cannot be considered by a federal habeas court reviewing the merits adjudication of the first claim on direct appeal. For any one alone or for all three of these reasons, the Court may not consider the evidence presented for the first time in support of Petitioner's second ground for relief in his initial state post-conviction.

---

regarding their thoughts or feelings as to deliberations or the verdict in the absence of independent, outside evidence establishing the existence of the improper influence or act. Without the affidavit, the evidence supporting the claim was limited to the trial record, and thus the claim could have been raised on direct appeal rather than in post-conviction. *See Johnson*, 2007 WL 1098106, at *12, *citing State v. Elmore*, No. 2005-CA-32, 2005 WL 2981797, at *23 (Ohio App. Ct. 2005). The state appellate court's dismissal on that basis was an appropriate application of Ohio's doctrine of *res judicata*.

Because Petitioner's claim of ineffective assistance—sans the additional (incompetent) evidence—was adjudicated on the merits in state court, the Court asks whether the Ohio Supreme Court's dismissal of Petitioner's claim was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. § 2254(d). To establish ineffective assistance of counsel, Petitioner must show that counsel's performance during voir dire was objectively unreasonable and that he was prejudiced as a result. *Strickland*, 466 U.S. at 687. In addition to the traditional deference accorded counsel under *Strickland*, counsel is afforded particular deference in conducting voir dire: "An attorney's actions during voir dire are considered to be matters of trial strategy. . . . A strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Miller v. Webb*, 385 F.3d 666, 672–73 (6th Cir. 2004), *quoting Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

To make out a claim for ineffective assistance based on counsel's failure to challenge a biased juror, Petitioner must show that the juror(s) in question were in fact biased against him. *Miller*, 385 F.3d at 674, *citing Hughes*, 258 F.3d at 458. "If a biased juror was impaneled, 'prejudice under *Strickland* is presumed, and a new trial is required.'" *Treesh v. Bagley*, 612 F.3d 424, 437 (6th Cir. 2010), *quoting Hughes*, 258 F.3d at 463.

"Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Hughes*, 258 F.3d at

256

463, *quoting United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (internal quotations omitted). "A juror's express doubt as to her own impartiality on voir dire does not necessarily entail a finding of actual bias. The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on voir dire." *Holder v. Palmer*, 588 F.3d 328, 339 (6th Cir. 2009), *quoting Hughes*, 258 F.3d at 458. "Jurors . . . are presumed to be impartial." *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006). "A mere preconceived notion as to the guilt or innocence of the accused is not enough to rebut the presumption of a prospective juror's impartiality." *Hand v. Houk*, 871 F.3d 390, 410 (6th Cir. 2017), *citing Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961). Ultimately the reviewing court must ask whether the juror swore "that [s]he could set aside any opinion [s]he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Miller*, 385 F.3d at 674, *quoting Patton v. Yount*, 467 U.S. 1025, 1036 (1984). "It is sufficient if the juror can lay aside h[er] impression or opinion and render a verdict based on the evidence presented in court." *Id.*, *quoting Irvin*, 366 U.S. at 723.

The Sixth Circuit has found bias only where prospective jurors' express admissions that they could not be impartial were **not** followed by any attempts to rehabilitate the jurors or obtain assurances that they could be impartial. *See, e.g.,* *Miller*, 385 F.3d at 674–75 (presuming actual bias when juror immediately qualifies her statement that she thinks she could be fair with a statement of partiality); *Hughes*, 258 F.3d at 458–60 (presuming actual bias when the only evidence on the

record as to the juror's impartiality was her express admission of bias, which was not followed by any attempt at clarification or rehabilitation). But where prospective jurors have followed statements of partiality with promises that they could set aside their opinions and decide the case solely on the evidence presented, the court has declined to presume juror partiality based on their previous or initial statements of partiality. *See, e.g., Holder*, 588 F.3d at 340 (jurors not biased when they said they could decide the case based on the evidence despite their expressed discomfort with interracial relationships); *Treesh*, 612 F.3d at 438–39 (juror not biased despite predisposition toward death penalty because she said she could consider mitigating factors); *see also Skilling v. United States*, 561 U.S. 358, 395–96 (2010) (juror not biased despite writing on her questionnaire that defendant "probably knew" he was breaking the law because she later said she "absolutely" presumed defendant innocent and that the government would "have to prove" his guilt).

The comments by Juror Grant of which Petitioner complains came when she was being questioned by defense attorney Blakeslee during voir dire:

BY MR. BLAKESLEE:

Q. Do you feel that the death penalty is a deterrent to further crime?

A. Yes.

Q. Do your religious beliefs support your view of the death penalty?

A. My religious beliefs — I support the death penalty. That's all there is to it. Yes.

Q. Are you concerned about the amount of money that would be used to

258

support a person in prison for the rest of his life? Ever think of that?

A. Oh, yeah.

Q. And are you afraid that society would not be adequately protected if a life sentence is imposed?

A. Rephrase that.

Q. Are you afraid that society will not be adequately protected if a life sentence is imposed?

A. Yes.

. . .

Q. Would you have difficulty voting for a life sentence if you convicted a person of an intentional and deliberate murder of a child?

A. Deliberate? No.

Q. So you could vote for a life sentence?

A. Not if he deliberately killed a child, no.

Q. That's what I asked. Let me rephrase the question. Ask me to rephrase if you don't understand because I've been doing this for 30 years and it's hard for me to get these questions out. So would you have difficulty voting for a life sentence if you convicted a person of an intentional and deliberate murder of a child?

A. No.

Q. So you could vote for a life sentence?

A. Yes, I could. Yes.

(ECF No. 83-5, PageID 6240–42) In continued questioning by Attorney Blakeslee, Juror Grant also confirmed that she could consider the mitigating factors before imposing a death sentence. (*Id*., PageID 6244.)

The statements of Juror Danadik that Petitioner claims demonstrate bias also came while she was being questioned by Attorney Blakeslee during voir dire:

259

BY MR. BLAKESLEE:

Q. Hello Sara. I take it then that you believe that the intentional and premeditated murder of a child would be a case where the death penalty would be appropriate?

A. Yes, I do.

Q. Now, has your views favoring the death penalty has that changed over the years? Is this something that you've just now developed or is this something you've had this belief you've had for a long time.

A. I think I've had it for a long time.

Q. And those views are deeply held?

A. Pretty much, yes.

Q. So it would be difficult to set those views aside at this point in your life?

A. Unless I heard some really good evidence otherwise, you know, what I hear and what I believe.

Q. There's some folks that think that children, some children, are born just bad to the bone and there's some people that think an adult is someone that's a product of his environment, kids aren't born bad but it's something that develops over the course of the years from their childhood on up. What do you think about that?

A. I believe so. I believe everybody is pretty much born good cause my dad use to tell me there's a little bit of good in the worst of us and there's a little bit of bad in the best of us and I kind of live by that.

Q. So, generally, there's not anybody that you know out there that's one hundred percent evil?

A. Oh, no. I don't believe that.

Q. Do you think that you could consider a life sentence for someone who had been convicted for the intentional and premeditated murder of a child?

A. If the evidence and the circumstances warrant it, I could do that.

Q. So I take it that if indeed a person at the second phase — let's say there was evidence presented that a person suffered from paranoia or

schizophrenia or had a bipolar disorder or other mental disease or defect that's something you would consider in determining the appropriate sentence?

A. You would have to prove to me that this was the case.

Q. And if it was done you would consider it?

A. If you could prove it to me, yes, I could consider it.

Q. And what about the fact the person committed these offenses that he or she would have been under the influence of cocaine?

A. Well, I have a problem with that because I think we're responsible. If you take the cocaine then you've got to be held responsible for it because it's something that you choose to do.

Q. Right and I appreciate that and it's not — would not be used as an excuse but as something to consider in determining the appropriate punishment.

A. I could consider it, yes.

Q. And how someone has developed over the course of the years from childhood on up to the present time?

A. Yes, I could.

Q. That would be your character, your background and history.

A. Yes.

Q. Growing up. Child abuse, abandonment, neglect, you would consider all that?

A. Yes.

(ECF No. 83-6, PageID 6522–25.)

Petitioner has not provided any evidence to undermine or question the impartiality of Jurors Grant and Danadik. Despite both expressing initial support for the death penalty, they each stated that they were capable of imposing a life sentence and would consider mitigating factors. "A district court may rely upon

261

juror assurances of impartiality in deciding whether a defendant has satisfied his burden of proving actual prejudice." *Hughes*, 258 F.3d at 459–60, *citing United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984). Any initial equivocation by Juror Grant as to whether she could impose a life sentence for the deliberate murder of a child—whether due to confusion over the wording of the question or genuine hesitancy as to her answer—is irrelevant in light of the fact that she ultimately stated clearly that she could impose a life sentence and was willing to consider mitigating factors. Juror Danadik's comment that the death penalty would be appropriate for the intentional, premeditated murder of a child is insufficient evidence that she believed anything less than death was inappropriate, especially when coupled with her unequivocal statement that she could impose a life sentence in such a case if the circumstances and evidence warranted it. Because Petitioner has not provided any evidence to contradict jurors Grant's and Danadik's sworn assurances of impartiality, the Court finds that the Supreme Court of Ohio's denial of the claim was based on a reasonable determination of the facts. Accordingly, Petitioner's sixteenth ground for relief is **DENIED**.

### 17. Seventeenth Ground for Relief: The trial court's failure to strike unqualified jurors for cause violated Petitioner's rights to an impartial jury and the unimpaired use of his allotted peremptory challenges.

In his seventeenth ground for relief, Petitioner claims that the trial court erred when it denied his challenges of three potential jurors for cause. He asserts that this error violated his right to an impartial jury and that being forced to use

262

three of his peremptory challenges to strike the three prospective jurors violated his right to a fair trial. (ECF No. 86, PageID 9310.) First, Petitioner argues that potential juror James Craig was biased because he said he had a problem with the crime being interracial and that, although he would try to be fair, he was unsure if he could be completely fair due to the memories it brought up of a similar interracial crime involving his sister in 1978. (*Id.*, PageID 9310–11.) He also said that O.J. Simpson was acquitted because there were black people on his jury, and he belonged to social groups known to be all white. (*Id.*, Page ID 9311, *citing* ECF No. 83-6, PageID 6405–06.) As to potential juror Phyllis Kritz, Petitioner points to her statements during voir dire that she was "definitely" in favor of the death penalty and could not think of any circumstance where a sentence other than death would be appropriate in the case of a premeditated murder. After further questioning, she said she thought she could be fair. (*Id.*, PageID 9311–12.) Finally, Petitioner argues that Delbert Bumgardner, a prison guard at Belmont Correctional Institution, should have been removed for cause. He had been charged with assaulting an inmate and fired, but the case never went to trial. (*Id.*, PageID 9312.) During voir dire, Bumgardner repeatedly stated that he would consider a life sentence if the defense proved the mitigating factors outweighed the aggravating factors, but the judge re-explained how to weigh the mitigating factors in an attempt to rehabilitate him. (*Id.*, PageID 9312–13.) When defense counsel challenged Bumgardner for cause, he stated that he had had never felt such hostility coming at him from a juror.

263

Respondent contends that Petitioner has not claimed that the state court's decision misapplied established federal law or that its findings were not supported by the record, the standards under which a federal court could grant habeas relief. (ECF No. 91, PageID 10484–85.) He argues that Petitioner is instead asking the Court "to step into the shoes of the trial court and overturn the Ohio Supreme Court's decision." (*Id.*, PageID 10485.)

Petitioner's seventeenth ground mirrors his sixth proposition of law raised on direct appeal to the Ohio Supreme Court. (ECF No. 82-10, PageID 2431–41.) In response, the Ohio Supreme Court held that a trial court's erroneous denial of a challenge for cause in these circumstances does not implicate the United States Constitution.[55] *Johnson*, 112 Ohio St.3d at 236, *citing Ross v. Oklahoma*, 487 U.S. 81, 88–89 (1988). But it proceeded to consider the merits of Petitioner's claims of trial court error under Ohio state law. *Id.* at 237–39, *citing State v. Group*, 98 Ohio

---

[55]The relevant portion of the decision reads:

In his sixth proposition, Johnson contends that the trial court erred in overruling his challenges for cause of prospective jurors Craig, Kritz, and Bumgardner, which required him to excuse them by preemptory challenge.

Generally, the denial of a challenge for cause does not violate a defendant's constitutional rights. See *Ross v. Oklahoma* (1988), 487 U.S. 81, 88–89, 108 S.Ct. 2273, 101 L.Ed.2d 80. However, because Johnson exhausted his peremptory challenges, we consider the merits of his claim. See *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 60; *State v. Cornwell* (1999), 86 Ohio St.3d 560, 564, 715 N.E.2d 1144.

*Johnson*, 112 Ohio St.3d at 236.

St.3d 248, 256 (Ohio 2002). The state supreme court found that the record

supported the trial court's determinations, and it did not abuse its discretion when

it denied the three challenges for cause. *Id.* at 239.

The Ohio Supreme Court's adjudication was not contrary to or an

unreasonable application of clearly established federal law. Petitioner's use of his

peremptory challenges to strike three jurors after the trial court denied his

challenges for cause does not violate his constitutional rights to an impartial jury

and fair trial—even if the trial court's failure to strike the jurors for cause was

wrong. "So long as the jury that sits is impartial, the fact that the defendant had to

use a peremptory challenge to achieve that result does not mean the Sixth

Amendment was violated." *Ross*, 487 U.S. at 88. Petitioner makes the case that

prospective jurors Craig, Kritz, and Baumgardner were each substantially impaired

and should have been removed for cause. But Craig, Kritz, and Bumgardner did not

sit on the jury; Petitioner chose to remove them by peremptory challenge. Thus, any

biases they held are irrelevant to the question of whether the actual jury was

biased. If the trial court indeed erred by refusing to strike the three for cause, as

Petitioner argues it did, that error was cured by Petitioner's use of peremptory

challenges to remove them. *See United States v. Martinez-Salazar*, 528 U.S. 304,

315 (2000). Peremptory challenges are one method by which the court ensures the

selection of an impartial jury. *See id.* at 315–16. Petitioner does not offer any

argument or evidence that any of the jurors who were actually seated and heard his

265

case were biased.[56]

Nor did Petitioner's choice to use three peremptory challenges to cure the alleged errors of the court unfairly deprive him of his allotted peremptory challenges. He received and used all of the challenges afforded by the state. The right to exercise peremptory challenges in state court is determined by state law, and "[s]tates may withhold peremptory challenges 'altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.'" *Rivera v. Illinois*, 556 U.S. 148, 152 (2009), *quoting Georgia v. McCollum*, 505 U.S. 42, 57 (1992). "Just as state law controls the existence and exercise of peremptory challenges, so state law determines the consequences of an erroneous denial of such a challenge." *Id.* That Petitioner would not have needed to use three peremptory challenges to strike prospective jurors Craig, Kritz, and Baumgardner if the trial court had removed them for cause is not a matter of federal constitutional concern, but a matter for the state to address under its own laws. *See Ross*, 487 U.S. at 88.

In his Traverse, Petitioner argues for the first time that his claim falls under the exception identified in *Ross* and *Martinez-Salazar* for circumstances in which "the trial court repeatedly and deliberately misapplied the law in order to force a defendant to use his peremptory challenges to correct [its] errors," *Martinez-*

---

[56]Petitioner alleged in his sixteenth ground for relief, *supra*, that two seated jurors, Barbara Grant and Sara Danadik, were actually biased. The Court held that the state court's conclusion that there was no evidence of partiality was a reasonable determination of the facts.

266

*Salazar*, 528 U.S. at 316. (ECF No. 131, PageID 10863.) But Petitioner offers no evidence to substantiate the claim that the trial court acted deliberately or misapplied the law. The Ohio Supreme Court held that the record supported the trial court's decisions, and the trial court did not abuse its discretion when it denied the three challenges for cause. *Johnson*, 112 Ohio St.3d at 239. Likewise, this Court cannot identify anything in the record that suggests the trial court acted arbitrarily or irrationally in denying the defense challenges. All three prospective jurors asserted that they would do their best to follow the law. *Id.* at 237–39. Petitioner's disagreement with the trial court and state supreme court that the three prospective jurors were biased is not evidence of court error, let alone evidence that the trial court deliberately misapplied the law. *See United States v. Lawrence*, 735 F.3d 385, 445 (2013) (finding no basis for holding that the district court deliberately misapplied the law when appellant did not identify clear and convincing evidence that the court's acceptance at face value of the prospective jurors' vows to judge the case fairly was clearly erroneous or otherwise an abuse of discretion).

In sum, Petitioner was not unfairly deprived of his peremptory challenges, has not shown that the resulting impaneled jury was biased, and has not produced any evidence that the trial court deliberately and repeatedly misapplied the law. As such, the Supreme Court of Ohio's conclusion that he has failed to make the case for the violation of any federal constitutional right is a reasonable application of clearly established federal law and Petitioner's seventeenth ground for relief is **DENIED**.

267

18. **Eighteenth Ground for Relief: The trial court should have voir dired the jury to ensure that they had not been prejudiced by an outburst by a witness/spectator.**

Petitioner claims, in his eighteenth ground for relief, that the trial court's failure to voir dire the jury after an outburst from a courtroom spectator violated his rights to an impartial jury and fair trial. He argues that there is a reasonable possibility that the outburst affected the jury's verdict, and the trial court erred when it denied defense counsel's request to voir dire the jury to discover if the outburst biased any jury member. (ECF No. 86, PageID 9315–17.) Respondent argues that the state court's decision was a reasonable application of clearly established federal law given that the United States Supreme Court has never applied a presumption of prejudice to misconduct from courtroom spectators or required a trial court to voir dire jurors after a spectator outburst. (ECF No. 91, PageID 10480–81.)

The Ohio Supreme Court recounts the facts in its rejection of Petitioner's claim on direct appeal:

> In his tenth proposition, Johnson contends that an emotional outburst by a spectator, Utelius Barnes, tainted his trial.
>
> While representing himself, Johnson called Tina Bailey as a defense witness. In his final question, he asked her: "Do you recall times after sex with me * * * that you would, after finished, you would get up and go to the window? * * * You remember that feeling? That's what it felt like to beat your son in the f***ing head."
>
> Barnes, a spectator in the courtroom, shouted at Johnson, "I'll kick your f***ing ass." The court ordered him removed, and it admonished the jury to "judge the credibility of the witness that has just testified and not the defendant who was asking questions." Shortly thereafter,

268

the court recessed for the day, but, before adjourning, it addressed the jury:

"Now, ladies and gentlemen of the jury, I need to have your promise and commitment to me under your oath as jurors that you will judge this case fairly and impartially on the facts presented by the testimony of the witnesses and not by any questions that have been asked. Will you promise me that you will do that?" The jurors promised.

Although the court did not, at that time, give a specific instruction to disregard Barnes's outburst, it did so when instructing the jury at the close of the guilt phase. On request of the defense, the court gave the following instruction:

"During the trial we had a witness and an outburst as part of a spectator [Barnes], the witness who had testified in the trial briefly and was seated in the courtroom. The outburst is such that you are instructed to totally disregard what you heard or saw in the courtroom and decide this case only on the basis of the evidence adduced during the course of the trial.

"Ladies and gentlemen of the jury, may I have your individual promises that you will do that by advising me affirmatively or negatively?

"JURORS: Yes."

When an emotional outburst takes place in court, the issue is whether the outburst "deprived the defendant of a fair trial by improperly influencing the jury." *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44. This "is a factual question to be resolved by the trial court, whose determination will not be overturned absent clear, affirmative evidence of error." *State v. White* (1999), 85 Ohio St.3d 433, 440, 709 N.E.2d 140.

"Normally, only the trial judge can make the necessary factual determinations on these questions. '[H]is findings thereon will not be disturbed on review in the absence of evidence on the face of the record clearly and affirmatively showing that the jury was improperly affected * * *.'" *State v. Hill* (1996), 75 Ohio St.3d 195, 204, 661 N.E.2d 1068, quoting *State v. Bradley* (1965), 3 Ohio St.2d 38, 41, 32 O.O.2d 21, 209 N.E.2d 215.

The record does not "clearly and affirmatively" reveal that Barnes's outburst had any effect on the jury. Moreover, the trial court's

269

admonitions focused the jury on the evidence and away from the outburst. Cf. *Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 48 (court cautioned jurors to "focus on the evidence and to disregard extrinsic matters").

Furthermore, we reject Johnson's argument that, pursuant to *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654, the trial court should have conducted a hearing to determine the outburst's effect. A *Remmer* hearing must be held when the trial court learns of "private communication, contact, or tampering * * * with a juror during a trial about the matter pending before the jury." *Remmer*, 347 U.S. at 229, 74 S.Ct. 450, 98 L.Ed. 654.

However, "[w]here the communication is innocuous and initiated by a spectator in the form of an outburst, a hearing is not necessarily required." *White v. Smith* (C.A. 6, 1993), 984 F.2d 163, 166. An in-court emotional outburst directed at the defendant, not the jury, "is a situation quite unlike the private communication with the jury encountered in *Remmer*. The * * * outburst was not 'a purposeful intrusion into the sanctity of the juror's domain.'" *Whitehead v. Cowan* (C.A. 7, 2001), 263 F.3d 708, 724, quoting *Schaff v. Snyder* (C.A.7, 1999), 190 F.3d 513, 534.

We overrule the tenth proposition of law.

*Johnson*, 112 Ohio St.3d at 245–46.

The Court finds that the Supreme Court of Ohio's adjudication is not contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. The Sixth and Fourteenth Amendments guarantee a defendant a fair trial by an impartial jury. *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008), *citing Ristaino v. Ross*, 424 U.S. 589, 595 n. 6 (1976). A trial court has wide discretion to evaluate the prejudicial effect of a spectator's outburst and determine the necessary response. *Stallings v. Bagley*, 561 F. Supp. 2d 821, 859 (N.D. Ohio 2008), *quoting State v. Phillips*, 74 Ohio St.3d 72, 89 (Ohio 1995); *see also Tucker v. Houk*, No. 2:04-CV-0969, 2005 WL 2861214, at *20 (S.D.

270

Ohio Nov. 1, 2005) ("[B]ecause the trial judge is in the best position to evaluate the prejudicial effect of a spectator's outburst, the decision on whether to grant a mistrial lies within his sound discretion.") (*quoting Staton v. Parke*, 12 F.3d 214 (Table), unpublished, 1993 WL 483210, at *2 (6th Cir. Nov. 22, 1993)).

"[N]ot all communications with jurors warrant a hearing for a determination of potential bias." *White v. Smith*, 984 F.2d 163, 166 (6th Cir. 1993). In *White*, the defendant's mother approached the jurors as they were retiring to deliberate and said that she would pray for them. *Id.* at 164. The Sixth Circuit reversed the district court's grant of habeas relief, finding that the presumptive prejudice and hearing required for credible allegations of jury tampering, *Remmer v. United States*, 347 U.S. 227, 229–30 (1954), did not apply to facially nonthreatening communications made inside the controlled conditions of the courtroom. *White*, 984 F.2d at 166–67. "Where the communication is innocuous and initiated by a spectator in the form of an outburst, a hearing is not necessarily required. This is particularly true when, as in this case, the trial judge follows up with a statement to the jury, allaying any apprehensions." *Id.*

In *Rogers v. Howes*, the Sixth Circuit followed *White* to find no violation of due process when the trial court handled a spectator outburst by asking the jury to affirm that they could "render a fair and impartial verdict based on 'the facts that come from the witness stand and the law as I give it to you, without bias, without sympathy, without fear, and without prejudice.'" 64 Fed.Appx. 450, 457 (6th Cir. 2003). The victim's wife had been heard repeatedly saying "murderers and killers"

271

in reference to the defendants. *Id.* at 457 n.1. The court held that the trial judge's comments to the jury were sufficiently curative given the nature of the emotive outburst. *Id.* at 457.

Likewise, in *Stewart v. Wolfenbarger*, the Sixth Circuit held that a trial court had adequately responded by offering a curative instruction to the jury after friends and relatives of the victim accused the petitioner of murder outside the courtroom in the presence of jurors. 468 F.3d 339, 349–50 (6th Cir. 2006). The judge explained that belief of guilt is not evidence and asked if any member believed they could not be fair or impartial due to the spectators' comments, to which none responded. The Sixth Circuit found that the trial court's inquiry as to the jury's impartiality was appropriate in the circumstances and the petitioner had not suffered a violation of his right to a fair trial. *Id.* And in *United States v. Nagi*, a woman in the gallery stood up during the testimony of a cooperating witness, pointed at the defendants, and shouted, "They murdered my son." 541 Fed.Appx. 556, 573 (6th Cir. 2013) The court held that no hearing was needed to determine the effect of the outburst on the jury when the trial court had immediately instructed the jury to disregard the incident and the jury had nodded their heads in understanding. *Id.*

Other federal courts have also declined to require individual voir dire of the jury after spectator outbursts. *See, e.g., Tucker*, 2005 WL 2861214, at *20 (holding that the trial court's admonishment to the jury not to consider the outburst and inquiring of the jurors as a group whether they could be impartial was sufficient after a member of the victim's family began applauding when the prosecutor

concluded his rebuttal closing argument); *Cox v. Ayers*, 414 Fed.Appx. 80, 85–86 (9th Cir. 2011) (holding that petitioner was not prejudiced by inappropriate outburst from spectator in the courtroom when the trial court immediately told the jury to disregard the outburst and not consider it for any purpose).

This case does not involve any of the factors that courts have generally found to produce a higher likelihood of prejudice, thus warranting further investigation or greater curative steps. There was no threat, intimidation, or coercion directed at the jury. *See, e.g., United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000) (holding that a *Remmer* hearing was required after a man approached the defendant and offered to influence a "friend" on the jury in exchange for money); *United States v. Rigsby*, 45 F.3d 120, 124 (6th Cir. 1995) (noting that the post-*Remmer* cases in which the court had found a full evidentiary hearing was required had dealt with "intentional improper contacts or contacts that had an obvious potential for improperly influencing the jury"); *Pennell*, 737 F.2d at 534 (holding that a *Remmer* hearing was appropriate after five jurors received threatening phone calls during deliberations). The outburst occurred inside the controlled conditions of the courtroom and in front of the judge, so there was no need to question jurors as to the facts of what occurred. *See, e.g., White*, 984 F.2d at 166 (noting that the non-threatening comment made to jurors by the defendant's mother was "made inside the courtroom, under controlled conditions, while the trial was in progress"); *Corrado*, 227 F.3d at 536 (hearing required after credible allegation of jury tampering to determine if any of the jurors were approached by the person who had

273

told defendant he could influence the jury's vote in exchange for payment). Nor did Barnes's words convey any new or additional information to the jury that could be relevant to a contested issue in the case. *See, e.g., Sheppard v. Bagley,* 657 F.3d 338, 342 (6th Cir. 2011) (hearing held to determine prejudicial effect of juror's solicitation from outside source of the definition of paranoid schizophrenia in case where defendant argued that his crime did not warrant the death penalty because he was a paranoid schizophrenic). To the contrary, an emotional outburst from a family friend was unsurprising in light of Petitioner's statement while questioning Tina Bailey about what it felt like to kill Daniel—context of which the jury was well aware. *See, e.g., Benge v. Johnson*, 312 F.Supp.2d 978, 1002 (S.D. Ohio 2004), aff'd, 474 F.3d 236 (6th Cir. 2007) (finding no indication of prejudice to the jury when a family member of the victim became upset and left the courtroom during witness testimony because "[t]he fact that a family member became upset during testimony describing the circumstances of [the victim's] death would not necessarily prejudice a jury, since petitioner himself testified that, in a rage, he bludgeoned the victim to death"); *Whitehead v. Cowan*, 263 F.3d 708, 773 (7th Cir. 2001) (holding no evidentiary hearing was required after victim's mother stood and began shouting at the defendant because "[a]ny jury would expect that a close relative of the victim would have strong emotions towards the suspected killer. The outburst directed at the accused in the presence of the jury did not provide any information not admitted at trial that could indicate guilt or innocence."); *Coleman v. Giles*, 140 Fed.Appx. 895, 900 (11th Cir. 2005) (finding that after the grandmother of the victim stated,

274

"'[H]e's a snake, I'm going to kill him, he deserves to burn in hell for what he did to my baby,' the jury would have gleaned nothing new, nor been informed of anything other than the grandmother was understandably upset at the man the state accused of raping her granddaughter"); *Kinnamon v. Scott*, 40 F.3d 731, 734 (5th Cir. 1994) (finding that, upon an outburst from the daughter of the murder victim, the fact that "the young girl was upset and angry at the person accused by the state as the murderer of her father communicated nothing new to the jury").

Petitioner asserts that Barnes's explicit threat is not comparable to the non-threatening language found in *White*, relying on *United States v. Mannie,* 509 F.3d 851 (7th Cir. 2007), to argue that a profanity-laced threat by a prosecution witness is inherently prejudicial. (ECF No. 131, PageID 10868.) *Mannie* extended the inherent prejudice rule articulated for state conduct in *Holbrook v. Flynn*, 475 U.S. 560 (1986), to the conduct of courtroom spectators and a co-defendant. But *Mannie* concerned a federal trial before the Seventh Circuit on direct appeal. As the Supreme Court has noted, it has never applied the *Flynn* test for inherent prejudice to courtroom spectators and thus a state court's failure to apply *Flynn* to such situations cannot be grounds to grant habeas relief because it is not a misapplication of clearly established federal law as determined by the Supreme Court. *Musladin*, 549 U.S. at 77 (reversing federal grant of habeas relief from the application of *Flynn* to private spectator conduct because the lack of relevant Supreme Court cases meant the state court did not "unreasonably apply clearly established Federal law"). In the absence of controlling Supreme Court precedent,

275

this Court may not oblige Ohio's courts to apply the *Flynn* rule to the conduct of private actors through habeas corpus. *See id.*, at 74 ("'[C]learly established Federal law' in § 2254(d)(1) 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'") (*quoting Williams*, 529 U.S. at 412).

Petitioner's reference to *Mannie* is also inapposite for another reason. In *Mannie*, the jury was subjected to a campaign of intimidation by courtroom spectators over a period of several days and witnessed the co-defendant, dressed in his prison jumpsuit, verbally assault his defense attorney during the cross-examination of a witness and then initiate a courtroom brawl by physically attacking the two defense attorneys, throwing them each to the floor. The Seventh Circuit held that the extreme nature of the multiple disruptions was inherently prejudicial and could not be overcome by issuing cautionary instructions and voir diring the jury. *See Mannie*, 509 F.3d at 857. This was especially so in light of the government's theory of the case—that the two defendants were members of a violent street gang. *See id.*

In contrast, the instant case involves a single, isolated incident in which a prosecution witness who was observing the trial in the gallery directed a threat at Petitioner in response to Petitioner's own inflammatory comment while questioning the victim's mother. Both Petitioner and Mr. Barnes were immediately removed from the courtroom. The facts are simply not comparable to a course of intimidation directed at the jury over a period of days, combined with verbal and physical assault

on the defense attorneys in open court by a co-defendant. The conduct of the spectators and Mannie's co-defendant was of such nature as to seemingly reinforce the government's case that the two defendants were violent gang members. Despite Mannie's non-involvement in the courtroom violence perpetrated by his co-defendant, a jury member could easily conclude that if the government was right that the co-defendant was a gang member, it was probably right that Mannie was too.

Petitioner contends that it is unfair to cite the lack of evidence of prejudicial effect given that the trial court denied his request to voir dire the jury. But this complaint merely restates the argument that Barnes's outburst should be considered inherently prejudicial. *See Michael v. Kelly*, No. 4:09-CV-2845, 2011 WL 2579882, at \*12 (N.D. Ohio Apr. 1, 2011), report and recommendation adopted, 2011 WL 2579784 (N.D. Ohio June 29, 2011), aff'd, 520 Fed.Appx. 329 (6th Cir. 2013) ("[T]here is no federal constitutional right to a hearing on the basis of presumed prejudice from a juror contact. . . . A hearing can only be required where the defendant has presented the court with a colorable claim of bias arising from specific knowledge about or a relationship with a juror or witness."). Courts commonly require claims to be grounded in something more than speculation before further fact-finding is sanctioned. *See, e.g., Post v. Bradshaw*, 621 F.3d 406, 425 (6th Cir. 2010) (holding that a district court has discretion to permit discovery in a habeas proceeding when the petitioner has shown good cause, but "bald assertions and conclusory allegations do not provide sufficient ground . . . to require an

277

evidentiary hearing," *quoting Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). The trial court, in its discretion, determined that the risk of prejudice from the incident was low enough that it did not merit further inquiry after the jury as a group confirmed that the outburst would not affect their judgment and they could remain impartial. The Ohio Supreme Court concluded that this was not an abuse of the trial court's discretion. This Court can see no contravention or misapplication of federal law, or unreasonable determination of the facts, in that decision. For the above reasons, Petitioner's eighteenth ground for relief is **DENIED**.

> **19. Nineteenth Ground for Relief: Petitioner was deprived of the effective assistance of trial counsel at the trial and penalty phases of his trial in violation of the Sixth and Fourteenth Amendments.**

In his nineteenth ground for relief, Petitioner claims multiple instances of ineffective assistance of trial counsel. Specifically he claims ineffective assistance due to counsel's failure to adequately manage the issue of Petitioner's competency or obtain an independent expert to evaluate competency, counsel's failure to object when the trial court read a list of the mitigating factors to prospective jurors, counsel's failure to request the pre-trial statements of prosecution witnesses, counsel's failure to ensure the jury instructions were complete, counsel's failure to object to an error on the jury forms, and counsel's weak and unpersuasive opening argument in the mitigation phase. (ECF No. 86, PageID 9317–22.) In addition to the trial record, he primarily relies on statements made by his trial counsel during their habeas depositions.

278

Respondent initially argues that *Pinholster* bars the Court's review of trial counsel's habeas depositions because that evidence was not before the Ohio Supreme Court when it adjudicated Petitioner's claims on direct appeal. (ECF No. 91, PageID 10461.) Petitioner renews his arguments, previously offered on his fourth ground for relief, that the Court may consider the "new" evidence because he presented it to the state courts in his second post-conviction petition.

As previously explained, evidence obtained during federal habeas and presented to the state courts for the first time in Petitioner's second state post-conviction was not before the Ohio Supreme Court when it adjudicated these claims on the merits and thus may not be considered in the Court's review of that decision here. Under § 2254(d), a federal habeas court reviews the last state court decision on the merits (here, the Ohio Supreme Court's adjudication of the claims on direct appeal) asking whether the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Pinholster*, 563 U.S. at 181. Because review of a state court decision under § 2254(d) is necessarily backward-looking, "require[ing] an examination of the state-court decision at the time it was made," the habeas court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181–82. Here, that means the Court may not consider the habeas depositions of Attorneys Blakeslee

279

and Warhola in its review of Petitioner's nineteenth ground.

Petitioner's claims are subject to the *Strickland* standard for ineffective assistance of counsel. To prevail, Petitioner must show that counsel's actions were deficient, in that they "fell below an objective standard of reasonableness," and that he suffered prejudice as a result. *Strickland*, 466 U.S. at 688, 694. Prejudice means that there was a reasonable probability of a different outcome in the absence of counsel's errors. *Id.* at 694. Because the claims in the nineteenth ground have been previously adjudicated on the merits by the state courts, the state court's merits decisions are subject to the heightened deference of AEDPA. *See Thompson v. Skipper*, 981 F.3d 476, 479 (6th Cir. 2020).

### a. Competency Issues

Petitioner claims that his trial counsel provided ineffective assistance in their handling of the issue of his competency. He argues that counsel's withdrawal of their pre-trial motion for a competency evaluation and their failure to request the appointment of an independent expert to assess competency after the guilt phase of trial, instead choosing to rely on the court-appointed expert to conduct a competency evaluation, constituted ineffective assistance. (ECF No. 86, PageID 9317–19.) Petitioner points to statements from trial counsel's habeas depositions, in which they said they did not obtain an independent expert to assess competency because the report from the court-appointed expert appeared to be valid and that Petitioner appeared competent. (*Id.,* PageID 9319, *citing* ECF No. 85-1, PageID 8327, 8408.) Respondent argues that the state court did not contravene or unreasonably apply

280

*Strickland* when it found that the decision as to when and how to raise the issue of competency was a presumptively valid exercise of professional judgment. (ECF No. 91, PageID 10458.)

Petitioner originally raised these claims as part of his nineteenth proposition of law on direct appeal. The Supreme Court of Ohio found the following:

> Prior to trial, defense counsel requested a competency evaluation of Johnson. The court granted the request, but counsel withdrew it before the evaluation took place. Counsel explained that they requested an evaluation because Johnson refused to cooperate in his defense. But because Johnson changed his mind and decided to cooperate, counsel no longer questioned his competence to stand trial.
>
> Johnson alleges that counsel rendered ineffective assistance by withdrawing the request, but he fails to explain why this constitutes deficient performance or how it became prejudicial. Thus, he fails to demonstrate ineffective assistance.
>
> . . .
>
> Johnson contends that when the trial court ordered a competency hearing after the guilt phase, defense counsel should have requested the appointment of a defense psychiatrist, pursuant to *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53. That failure, he claims, resulted in his inability to present evidence at that competency hearing.
>
> Johnson's position is untenable for two reasons. First, though we agree with Johnson that *Ake* "requires that a State provide access to a psychiatrist's assistance" on the issue of his competence, *id.*, 470 U.S. at 74, 105 S.Ct. 1087, 84 L.Ed.2d 53, *Ake* did not entitle Johnson to a psychiatrist of his choice. *Id.* at 83, 105 S.Ct. 1087, 84 L.Ed.2d 53. The trial court directed the Forensic Diagnostic Center to evaluate Johnson's competence, and a psychologist from that facility found Johnson to be competent.
>
> Second, the record reveals that defense counsel did request the appointment of a forensic psychologist by motion on October 6, 2003, and, in response to that motion, the court appointed Dr. Richard E. Jackson on October 20, 2003, more than six months before the

281

> competency hearing occurred. Because Johnson alleges nothing
> regarding Dr. Jackson's competence, and because Johnson stated on
> the record that he did not want to undergo the court-ordered
> competency evaluation at the close of the guilt phase, his defense
> counsel committed no error with regard to Johnson's rights under *Ake*.
> Therefore, the claim of ineffective assistance of counsel fails.

*Johnson*, 112 Ohio St.3d at 227, 231.

Petitioner reprised this claim as the fourteenth ground in his second state post-conviction petition. The Ohio Court of Appeals affirmed the trial court's dismissal of the petition for failure to satisfy the jurisdictional prerequisites governing second or successive post-conviction petitions in § 2953.23(A)(1). *Johnson*, 2013 WL 1400607, at *4–5.

The Court reviews the last state court decision on the merits—in this case, the Ohio Supreme Court's adjudication of the claims on direct appeal. As explained above, the Court's review of the state court's decision is limited to the record that was before the Ohio Supreme Court when it decided Petitioner's claim on the merits. *See Pinholster*, 563 U.S. at 181. The depositions given during federal habeas by Attorneys Blakeslee and Warhola were not in the record before the state court on direct appeal and will not be considered.

As to counsel's withdrawal of their pre-trial motion for a competency evaluation, Petitioner has failed to explain why it constituted deficient performance and how he was prejudiced. The state supreme court credited trial counsel's explanation that they filed the motion when Petitioner refused to cooperate in his defense and withdrew it when he chose to begin cooperating. A determination that a

282

competency evaluation was no longer required because counsel no longer questioned Petitioner's competence is precisely the type of judgment call that falls squarely within the professional discretion of counsel.

Nor has Petitioner alleged how he was prejudiced. There's no evidence that he would have been found incompetent at that time had an evaluation been conducted. When a competency evaluation was later conducted after the guilt phase of trial, he was found to be competent. Any assertion that Petitioner would have been assessed as incompetent if an evaluation had been performed prior to trial is merely speculation. *Strickland* requires more. The state court's conclusion that Petitioner had shown neither deficient performance nor prejudice was a reasonable application of *Strickland* and a reasonable determination of the facts.

Petitioner also complains that counsel failed to request an expert for the defense to assess his competency. The state court's determination that counsel did not commit error because they had in fact requested and been granted a defense psychologist six months before trial was not unreasonable. It is not clear why Dr. Jackson, the psychologist who had already evaluated Petitioner and was working with the defense, would be unable to independently assess Petitioner's competency.

Moreover, Petitioner has not provided any evidence of prejudice. He has not identified any issues in the court-appointed psychologist's competency assessment that he believes a different psychologist would have corrected. He has not offered any evidence to indicate that a different psychologist would have found Petitioner incompetent or provided new evidence to contradict the court-appointed

283

psychologist's report in the competency hearing. As such, the Court finds that Petitioner has failed to establish that his counsel were ineffective in their handling of the competency issue at trial. This claim is **DENIED**.

### b. Recitation of Mitigating Factors to Prospective Jurors

Petitioner argues that counsel's failure to object when the trial court read the full list of statutory mitigating factors to prospective jurors during voir dire constituted deficient performance. (ECF No. 86, PageID 9320.) He claims he was prejudiced as a result because "the jury's attention was brought to the mitigating factors on which [Petitioner's] attorneys were not presenting evidence, rather than the mitigating factors for which evidence would be presented." (*Id.*, PageID 9320–21.)

Petitioner asserts that it is improper for the trial court to instruct the jury as to mitigating factors that are not applicable to the case. (*Id.*, PageID 9320, *citing Combs v. Coyle*, 205 F.3d 269, 292 (6th Cir. 2000).) He also cites the disagreement in opinion on the issue among his trial counsel that was revealed in their habeas depositions. Attorney Blakeslee believed it was appropriate under Ohio law to list the inapplicable mitigating factors to potential jurors, but he acknowledged that a judge had deemed it inappropriate in a different case he worked on. (*Id.*, *citing* ECF No. 85-1, PageID 8328.) Attorney Warhola said that he would want the jury to be focused on the mitigators applicable to the case because he knew that they were not going to present evidence on all of the statutory mitigating factors. (*Id.*, *citing* ECF 85-1, PageID 8445.)

284

Respondent maintains that the Ohio Supreme Court's decision was objectively reasonable, and that Petitioner has offered nothing to challenge the reasonableness of the court's findings. (ECF No. 91, PageID 10458–59.) Respondent describes the court's decision as holding that Petitioner cannot show that he was prejudiced, even assuming the presence of objectionable error. Nor could the court see any apparent prejudice given that the alleged error was not repeated during the remainder of the trial. (*Id.*) Respondent argues that there is nothing in the record to indicate that the jury ever considered the apparent absence of the inapplicable mitigating factors in weighing the aggravating circumstance against the mitigating factors for which it was specifically instructed. (*Id.*, PageID 10459.)

Petitioner initially raised this claim as part of his nineteenth proposition of law on direct appeal, and the Supreme Court of Ohio rejected the claim:

> . . . Johnson claims that his counsel failed to object when the court read a list of all seven statutory mitigating factors to the prospective jurors during voir dire. Cf. *State v. DePew* (1988), 38 Ohio St.3d 275, 289, 528 N.E.2d 542. However, even assuming that *DePew* applies to voir dire, Johnson fails to explain how the alleged error prejudiced him, particularly at such an early stage in the proceedings and when no such error occurred later in his trial or sentencing.

*Johnson*, 112 Ohio St.3d at 228.

Petitioner later reprised the claim as the third ground for relief in his second state post-conviction petition. The Ohio Court of Appeals affirmed the trial court's dismissal of the petition for failure to satisfy the jurisdictional prerequisites governing second or successive post-conviction petitions in § 2953.23(A)(1). *Johnson*, 2013 WL 1400607, at *4–5. As explained above, the Court's review is limited to the

285

record before the Ohio Supreme Court when it adjudicated Petitioner's claim on the merits. *See Pinholster*, 563 U.S. at 181. Thus, the new evidence presented in support of Petitioner's second state post-conviction petition will not be considered.

"The right to have certain statutory mitigating factors considered (or aggravating ones ignored) is a creature of state statute, not the federal Constitution." *Hill*, 400 F.3d at 333, *citing Zant v. Stephens*, 462 U.S. 862, 878–79 (1983). Thus, the fact that the mitigating factors were read to prospective jurors during voir dire, even if erroneous, is not a basis for habeas relief unless counsel's failure to object had a reasonable probability of affecting the outcome. *See id.*

In *State v. DePew*, the Supreme Court of Ohio held that the trial court and prosecution may not refer to or comment upon the mitigating factors not raised by the defendant, but that the trial court's reading of the full list of factors was not prejudicial when no additional comments on the inapplicable factors were made. 38 Ohio St.3d 275, 289–90 (Ohio 1988). Likewise, in *Hill*, the Sixth Circuit found that the trial court erroneously instructing the jury on all the statutory mitigating factors, including those not raised, during the penalty phase "did not 'so infect [] the entire trial that the resulting conviction violates due process,'" especially when "the prosecution did not argue that the jury should draw negative implications" from the fact that Hill did not use all of the mitigating factors. 400 F.3d. at 333, *quoting Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

The Court finds that the Supreme Court of Ohio's conclusion that Petitioner cannot demonstrate prejudice was reasonable. As the Ohio Supreme Court noted,

the alleged error occurred during voir dire and was not repeated later during trial or sentencing. It is questionable whether, by the mitigation phase of trial, any jurors even clearly remembered hearing the court recite the mitigating factors during voir dire when in the interim they had been asked to listen to and consider days of evidence, argument, and instructions on various legal standards. Regardless, even those episodes in which the jury was instructed as to the full list of mitigating factors during the mitigation phase of trial are typically found to be non-prejudicial when no additional comment is made to draw attention to or negative inference from the factors the defendant has not raised. See, e.g., *Hill*, *supra*; *DePew*, *supra*. Accordingly, Petitioner's claim of ineffective assistance for trial counsel's failure to object to the trial court's alleged error is **DENIED**.

### c. Pre-trial Statements of Prosecution Witnesses

Petitioner claims ineffective assistance for trial counsel's failure to request the pre-trial statements of state witnesses at the completion of their direct testimony, as authorized by Ohio Crim.R. 16(B)(1)(g). (ECF No. 86, Page 9321.) Respondent argues that the state court's conclusion that Petitioner could not show prejudice even if counsel erred in not invoking the rule was reasonable. Respondent points out that the state supreme court found nothing in the record to indicate that any of the statements were discoverable or would have been useful for impeachment purposes, a finding which Petitioner does not challenge. (ECF No. 91, PageID 10459.)

Petitioner initially raised this claim as part of his nineteenth proposition of

law on direct appeal. The Supreme Court of Ohio rejected the claim as follows:

> . . . Johnson complains that when the state concluded direct examination of each witness, defense counsel failed to ask to review the witnesses' statements, pursuant to Crim.R. 16(B)(1)(g). "[T]he burden of proving ineffectiveness is on the defendant." *State v. Lott* (1990), 51 Ohio St.3d 160, 175, 555 N.E.2d 293, citing *State v. Smith* (1985), 17 Ohio St.3d 98, 100, 17 OBR 219, 477 N.E.2d 1128. However, Johnson fails to show prejudice because he does not explain whether any of the witness statements would have been discoverable or proven useful for impeachment during the trial. Hence, he fails to show ineffective assistance of counsel on this point.

*Johnson*, 112 Ohio St.3d at 230.

The state supreme court's decision was a reasonable application of federal law. Petitioner has not provided any evidence that indicates any of the pre-trial statements would have provided impeachment material, let alone material that could impeach a key witness or testimony on a critical contested issue.

Moreover, there were very few contested issues during the guilt phase of trial because Petitioner conceded guilt to the aggravated murder from the outset. The issues contested by the defense concerned the death penalty specifications—Daniel's time of death as it related to whether a kidnapping took place, whether the admitted sexual contact between Petitioner and Tina Bailey was consensual, and whether the money withdrawn from US Bank was the object of a robbery or a gift voluntarily given. Other than Dr. Lee (the coroner), Tina Bailey, and Tiffany Archer (the US Bank teller who served Tina and Petitioner that morning), it is unclear whether the testimony of any of the remaining prosecution witnesses were relevant to these contested issues. Trial counsel's failure to review all of the pre-trial

288

statements may have been the result of a trial strategy in which they focused on only those witnesses whose testimony might speak to one of the contested issues, given that they did request to review the pre-trial statement of Tiffany Archer before beginning their cross-examination of her. (ECF No. 83-8, PageID 6902–03.)

Yet even if counsel's lapse was unacceptable negligence, Petitioner has not shown that he suffered *any* harm as a result, let alone that the resulting harm was so great as to create a reasonable probability of a different outcome in its absence. Prejudice under *Strickland* requires more than mere speculation that favorable evidence *might* have been found. *See, e.g.*, *Moreland*, 699 F.3d at 935 (holding that counsel's failure to obtain medical and educational records for use in mitigation was not prejudicial when the petitioner had not explained "what might be included in his records and how those records would have had any bearing on the outcome"); *Hodge*, 579 F.3d at 640 (holding that petitioner's speculation that his trial testimony would have left a favorable impression on the jury did not establish prejudice when he provided no details as to the substance of that testimony, *citing Clark v. Waller*, 490 F.3d 551, 558 (6th Cir. 2007)); *O'Neal v. Burt*, 582 Fed.Appx. 566, 575–76 (6th Cir. 2014) (no prejudice when petitioner failed to explain what evidence he would have found had he been given more time to investigate the report). Petitioner has not attempted to show that the pre-trial statements contained anything that could have been even marginally useful to the defense, and thus has not established that he was prejudiced by counsel's failure to review the statements.

Because Petitioner has failed to provide any evidence that any of the unreviewed statements could have provided impeachment material with the potential to affect the outcome of the trial, his claim of ineffective assistance is **DENIED**.

### d. Possibility of Untruthful Testimony

On the last day of trial when Petitioner announced he wished to testify, defense counsel—outside the presence of the jury—made the following statement to the trial court:

> The defendant has expressed his desire to get it all over and he wants the death penalty. . . . Inasmuch I don't know what he's going to say I believe that the proper method of doing this would be for a narrative account where I simply call him to the stand and ask him to tell the jury, just give him his statement but I don't think I should ask any questions because I don't know the answers to the questions. I don't know what he's going to say, whether it's going to be truthful—whether or not it's going to be truthful. So I believe that under the rules of ethics the safest thing to do is to just give a narrative account. . . .

(ECF 83-11, PageID 7564–65.) Petitioner claims that counsel's accusation that he was a liar, made to the judge presiding over his capital case, constituted ineffective assistance. (ECF No. 86, PageID 9321.)

Respondent argues that the record fully supports the state court's findings that counsel did not imply Petitioner intended to commit perjury, but that Petitioner also cannot show the requisite prejudice because the statement was made outside the presence of the jury. (ECF No. 91, PageID 10459–60.) Respondent also refutes Petitioner's argument that he was prejudiced because the judge heard it,

290

pointing out that "[i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." (*Id.*, PageID 10460, *quoting Harris v. Rivera*, 454 U.S. 339, 346 (1981) (*per curiam*).) In response, Petitioner maintains that the presumption is inapplicable here because "there is no indication the trial court would not, or did not, consider counsel's statement," unlike in the situation where a jury is instructed not to draw any adverse inferences. (ECF No. 131, PageID 10875.)

Petitioner initially raised this claim as part of his nineteenth proposition of law on direct appeal. The Supreme Court of Ohio rejected the claim:

> . . . Johnson contends that his counsel indicated to the trial judge that Johnson could not be truthful. This allegation concerns Johnson's desire to testify during the guilt phase of his trial, and defense counsel's statement to the court—outside the presence of the jury— that ethically, he could not question Johnson on direct examination because he did not know what Johnson intended to say or whether Johnson's testimony would be truthful.
>
> Johnson claims prejudice from his counsel's statement because it implied that he intended to commit perjury. However, the record shows that counsel specifically disavowed knowing what Johnson intended to say and therefore represented to the court his reasons for not wishing to have Johnson testify. Johnson is unable to demonstrate ineffective assistance in this instance.
>
> Johnson also claims that his counsel violated attorney-client privilege when he stated that he did not know what Johnson intended to say, but fails to cite authority for that proposition and gives no explanation of how the statement violated the privilege or amounted to ineffective assistance of counsel.

*Johnson*, 112 Ohio St.3d at 230.

In *Nix v. Whiteside*, the Supreme Court held that an attorney's refusal to present potentially false testimony—as his ethical obligation demands—may not be

the basis for an ineffective assistance of counsel claim. 475 U.S. 157, 174–75 (1986); *see also Thurmond v. Carlton*, 489 Fed.Appx. 834, 840–41 (6th Cir. 2012) (state court not unreasonable in finding that counsel's decision not to call alibi witness was not ineffective assistance given counsel's concern as to the truthfulness of the witness's testimony); *United States v. Hamilton*, 128 F.3d 996, 999–1000 (6th Cir. 1997) (finding no Sixth Amendment violation by defense attorney's disclosure to the trial court that she had reason to believe that defendant was going to commit perjury when testifying at trial); *People v. DePallo*, 96 N.Y.2d 437, 439–41, 754 N.E.2d 751, 752–53 (New York 2001) ("[W]hen confronted with the problem [of potential perjured testimony] during trial, . . . an 'attorney's revelation of his client's perjury to the court is a professionally responsible and acceptable response.'") (*quoting Whiteside*, 475 U.S. at 170). The narrative form of testimony, as proposed by counsel here, is a common and widely accepted response to the problem. *See Foster v. Smith*, No. 1:07-cv-854, 2014 WL 1230551, at *14 (W.D. Mich. March 25, 2014), and the cases cited therein.

Therefore, counsel's disclosure to the trial court and proposed remedy were consistent with his obligations to both the court and his client and did not constitute ineffective assistance. The Ohio Supreme Court's conclusion that counsel did not say Petitioner would be untruthful because counsel expressly disclaimed knowing the content of the planned testimony was also a reasonable determination of the facts. Accordingly, Petitioner's ineffective assistance claim fails both on the law and the facts. This claim is **DENIED**.

292

### e. Jury Instructions

Petitioner claims counsel failed to ensure the jury instructions included all of the necessary elements. As a result, there was no instruction on the capital specification and the finding the jury was to make, nor an instruction on the definition of "while." (ECF No. 86, PageID 9321.) Respondent maintains that the decision of the Ohio Supreme Court, holding that the alleged errors were either not objectionable or not prejudicial, was objectively reasonable. (ECF No. 91, PageID 10460.) Respondent also asserts that the court's interpretations of state law are binding on a federal habeas court. (*Id.*, *citing Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).)

Petitioner initially raised this claim as part of his nineteenth proposition of law on direct appeal, and the Supreme Court of Ohio rejected the claim as follows:

> Johnson also argues that counsel should have sought an instruction on the capital specification, the appropriate findings the jurors were to make, and an instruction defining the term "while." As we discussed in the 15th proposition of law, the court did define the term "while." For the remainder of the alleged errors, Johnson does not set forth what specific instructions counsel should have requested or how they caused him prejudice in light of the evidence against him. Our review does not reveal any ineffective assistance of counsel in this regard.

*Johnson*, 112 Ohio St.3d at 231.

The court made the following relevant findings of fact in its discussion of Petitioner's fifteenth proposition of law on direct appeal:

> In proposition 15, Johnson also challenges the jury instructions for the felony-murder charge in Count 1 and the specification appended to Count 2. Both the charge and specification alleged that Johnson committed the murder "while" committing or "while" fleeing after

committing other felonies. The trial court instructed the jury in this regard that the term "while" means that "the death must occur as part of acts leading up to or occurring during or immediately after the commission of kidnapping, rape, aggravated robbery and the death was directly associated with the commission of the kidnapping, rape *or* aggravated robbery or flight immediately after the commission of those crimes." (Emphasis added.)

*Johnson*, 112 Ohio St.3d at 219.

Petitioner has not presented clear and convincing evidence that the state supreme court erred in finding that the trial court had instructed the jury on the definition of "while." Therefore, his claim that counsel failed to object to the absence of the "while" instruction is not well-taken.

As to the remainder of his complaint, Petitioner again fails to elaborate his objection to the instructions on the capital specification and required jury findings or how he was prejudiced by counsel's failure to object to these parts of the instructions.

Accordingly, the Court finds that the Ohio Supreme Court's adjudication of these claims was not an unreasonable application of clearly established federal law nor an unreasonable determination of the facts. This claim is **DENIED**.

### f. Verdict Form

Petitioner claims ineffective assistance based on counsel's failure to object to the inclusion of an erroneous aggravating circumstance on the verdict form, which resulted in the jury and trial court considering the improper specification in the weighing process. (ECF No. 86, PageID 9322.)

Petitioner initially raised this claim as part of his nineteenth proposition of

294

law on direct appeal. The Supreme Court of Ohio rejected the claim as follows:

> Finally, Johnson points to defense counsel's failure to object to an erroneous verdict form. However, as we discussed in connection with Johnson's 17th proposition, no prejudicial error resulted from this omission.

*Johnson*, 112 Ohio St.3d at 232.

The court detailed the relevant facts to this claim in its discussion of

Petitioner's seventeenth proposition of law on direct appeal:

> In his 17th proposition of law, Johnson argues that his death sentence should be overturned because of an error in the verdict forms. . . .

> We begin by noting that no dispute exists with regard to Johnson's indictment. Count 2 charged him with violating R.C. 2903.01(A), aggravated murder by "prior calculation and design," with a death-penalty specification, pursuant to R.C. 2929.04(A)(7), which contained the aggravating circumstance of felony murder with Johnson alleged to be the principal offender.

> Johnson catalogs three alleged postindictment errors regarding the jury's consideration of the specifications attached to Counts 1 and 2. First, he complains that in the guilt phase of the trial, the jury received a verdict form for the specification under Count 2 that mistakenly omitted the "principal offender" language. Instead of this language, the specification for Count 2 charged that Johnson "committed the aggravated murder with prior calculation and design." Johnson contends that the erroneous substitution of "prior calculation and design" for "principal offender" in the verdict form invalidates his death sentence because the jury returned a verdict finding him guilty of a specification not contained in the indictment presented against him.

> Had Johnson objected to the erroneous verdict form at trial, the court could have corrected it. Because he failed to object, however, he has waived all but plain error. . . .

> The error in this case did not determine the outcome of the trial, as *State v. Bonnell* (1991), 61 Ohio St.3d 179, 573 N.E.2d 1082, illustrates. In *Bonnell*, as in this case, the judge failed to instruct the jury on the principal-offender element of the felony-murder

specification and failed to include it in the verdict form. In our opinion, we stated, "The evidence in this case does not reasonably suggest that [the] murder was committed by more than one offender. Thus, appellant was either the principal offender, or he committed no offense at all." Id. at 184, 573 N.E.2d 1082.

Using similar analysis, the United States Supreme Court, in *Mitchell v. Esparza* (2003), 540 U.S. 12, 124 S.Ct. 7, 157 L.Ed.2d 263, held that omitting the principal-offender allegation from a felony-murder specification constituted harmless error in the context of a habeas corpus action, because the omission could not be considered outcome-determinative. "[T]he jury verdict would surely have been the same had it been instructed to find as well that the respondent was a 'principal' in the offense. After all, he was the only defendant charged in the indictment. There was no evidence presented that anyone other than respondent was involved in the crime or present at the store." Id. at 18, 124 S.Ct. 7, 157 L.Ed.2d 263.

As in *Bonnell* and *Esparza*, the indictment here named only Johnson as an offender, and no evidence presented at trial suggested involvement by anyone other than Johnson in the murder. Thus, in this case, as in *Esparza*, "the jury verdict would surely have been the same" had the verdict form asked the jury to determine whether Johnson was the principal offender. The verdict form's substitution of the prior-calculation-and-design element for the principal-offender element of the specification does not alter this analysis.

*Johnson*, 112 Ohio St.3d at 213–15.

The Supreme Court of Ohio's conclusion that Petitioner did not suffer prejudice from the error in the verdict form was not an unreasonable application of federal law or an unreasonable determination of the facts. The Court separately explained why the error was harmless in its discussion below of Petitioner's twenty-sixth ground for relief. Because there is no indication that the erroneous specification on the verdict form affected the outcome, counsel's failure to object to the error could not have caused prejudice. This claim is **DENIED**.

### g. Opening Argument in Mitigation

Petitioner claims ineffective assistance of counsel based on his trial counsel's allegedly weak and unpersuasive opening statement in the mitigation phase of the trial. (ECF No. 86, PageID 9322.) He cites the following statements from counsel's opening statement as evidence of its deficiency:

- "Now we realize, ladies and gentlemen, even though the State has the burden of proof here that Mr. Blakeslee and I have an uphill battle." (ECF 83-13, PageID 7867.)
- "I'm suppose[d] to know what I'm doing and I think I do." (*Id.*, PageID 7856–57.)
- "[I]t's real you've seen pictures of this boy, you've seen what happened, you are going to be emotionally affected." (*Id.*, PageID 7858.)
- "We are going to try to be as honest with you as we can." (*Id.*, PageID 7859.)

Respondent argues that the state supreme court reasonably applied *Strickland* when it determined that counsel's remarks were within the range of presumptively reasonable professional judgment. (ECF No. 91, PageID 10461.)

Petitioner initially raised this claim as part of his nineteenth proposition of law on direct appeal, and the Supreme Court of Ohio rejected the claim:

> Johnson also contends that his counsel rendered ineffective assistance during opening statements of the penalty phase of the trial. Counsel stated that the defense faced "an uphill battle" and warned the jurors that they were "going to be emotionally affected" by having seen photographs of the victim during the guilt phase. Johnson also complains that his counsel said, "I'm suppose[d] to know what I'm doing and I think I do," and "We are going to try to be as honest with you as we can."
>
> These statements do not reflect deficient performance. Instead, they reflect counsel's attempt to build a rapport with the jury, and even "debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 430, 2006-Ohio-2815,

297

> 848 N.E.2d 810, ¶ 101, citing *State v. Hoffner*, 102 Ohio St.3d 358,
> 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45; *State v. Campbell* (2000), 90
> Ohio St.3d 320, 339, 738 N.E.2d 1178. And "a court must indulge a
> strong presumption that counsel's conduct falls within the wide range
> of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104
> S.Ct. 2052, 80 L.Ed.2d 674.

*Johnson*, 112 Ohio St.3d at 231–32.

An attorney's presentation of their case in an opening statement is generally considered a matter of strategy. Even the decision to forego an opening statement entirely is typically considered a tactical choice that does not constitute ineffective assistance. *See Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004) ("An attorney's decision not to make an opening statement is ordinarily a mere matter of trial tactics and . . . will not constitute . . . a claim of ineffective assistance of counsel."); *Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir. 2002). The Supreme Court of Ohio concluded as much, finding that counsel's statements "reflect[ed] [his] attempt to build a rapport with the jury," *Johnson*, 112 Ohio St.3d at 231, and this Court can see no cause to disagree. Whether counsel's efforts to build trust with the jury were well-advised or well-executed is of no matter; they were well within "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689.

Petitioner argues that the comments merely demonstrated to the jury that his attorneys believed he deserved death, asserting that "[t]he opening statement was a total abandonment of their client and cannot be considered sound trial strategy." (ECF No. 131, PageID 10876.) His claim appears to be, in other words, that the alleged prejudicial nature of counsel's comments takes them outside the

298

range of reasonable trial strategy contemplated by *Strickland*. But Petitioner has not offered any evidence of prejudicial effect. Bald assertions of speculated effect—that, e.g., counsel's comments communicated to the jury Petitioner's own attorneys believed he deserved death—are not evidence.

Trial counsel's comments can be seen as an attempt, however clumsily executed, to acknowledge the gravity of the crime to which Petitioner had both conceded his guilt and been convicted by the jury, as well as the probable emotional effect on the jurors of the evidence they had seen during the trial. Had counsel instead appeared oblivious to those realities, he could have reasoned that he would lose credibility with the jury to effectively argue for a life sentence. As such, the Ohio Supreme Court's determination that counsel's opening statement was permissible trial strategy and not ineffective assistance was a reasonable application of Strickland and a reasonable determination of the facts.

For the above reasons, the claims of ineffective assistance of counsel found in Petitioner's nineteenth ground for relief are **DENIED**.

## 20. Twentieth Ground for Relief: The State failed to present sufficient evidence to sustain a conviction for aggravated robbery.

In his twentieth ground for relief, Petitioner claims that there is insufficient evidence to sustain his conviction for aggravated robbery under O.R.C. § 2911.01(A)(1) because he no longer had the knife on him when he accompanied Tina Bailey to the bank and she gave him $1,000. (ECF No. 86, PageID 9322–24.) Petitioner cites statements made by both defense and prosecution counsel during

299

trial acknowledging the relative weakness of the aggravated robbery charge given the evidence that the knife had been left behind at the house when Petitioner and Tina Bailey left for the bank. (*Id.*, PageID 9323–24, *quoting* ECF 83-11, PageID 7533–34, and ECF 83-12, PageID 7812–13.)

Respondent argues that the state court's adjudication is not contrary to or an unreasonable application of the *Jackson v. Virginia* standard for insufficient evidence claims. (ECF No. 91, PageID 10469.) Respondent contends that Petitioner's argument is merely that the evidence does not satisfy his own interpretation of Ohio's aggravated robbery statute, while the sufficiency of the evidence must be evaluated based on the elements of the crime as defined by state law and interpreted and applied by the Ohio Supreme Court. (*Id.*, PageID 10470.)

Petitioner initially raised this claim on direct appeal. The Ohio Supreme Court found that the evidence in the record that Petitioner held the knife to Tina at the Bailey house when he demanded that she give him money and drive him to the bank was sufficient to support conviction for § 2911.01(A)(1) aggravated robbery:

> In his 14th proposition of law, Johnson contends that the state presented insufficient evidence on which to convict him of aggravated robbery in violation of R.C. 2911.01(A)(1), because he left the knife at the Bailey home when he and Tina drove to the bank and because he did not have the knife when Tina gave him the $1,000. The state counters that Johnson committed the offense when, while holding the knife, he demanded $1,000 from Tina and ordered her to take him to the bank.
>
> Having considered the parties' positions, we agree with the state. R.C. 2911.01(A)(1) provides, "No person, in attempting or committing a theft offense * * * shall do any of the following: * * * Have a deadly weapon on or about the offender's person or under the offender's

control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

The uncontroverted evidence in the record shows that Johnson held the knife to Tina when he demanded that she give him $1,000 and that she drive him to the bank. Thus, sufficient evidence exists to support the jury's finding that Johnson violated R.C. 2911.01(A)(1) by having "a deadly weapon on or about [his] person" while "attempting or committing a theft offense."

*Johnson*, 112 Ohio St.3d at 217.

Petitioner argues that the Ohio Supreme Court improperly expanded the statutory definition of aggravated robbery by inserting the word "while" when it stated that there was sufficient evidence to find Petitioner had a deadly weapon "while" attempting or committing a theft. (ECF No. 131, PageID 10878–79.) He maintains that the theft did not occur until they were at the bank where Tina cashed a check and gave the money to Petitioner, and that brandishing the knife at the Bailey home earlier cannot be considered part of a single theft due to the time that had passed and the distance traveled from Tina's home. (*Id.*, PageID 10879.)

As discussed in connection with Petitioner's fifth ground for relief, *supra*, claims of insufficient evidence are reviewed under the standard set forth in *Jackson v. Virginia*. *Jackson* requires the reviewing court to consider whether a reasonable jury could have found guilt beyond a reasonable doubt on all of the essential elements of the crime based on the record evidence viewed in the light most favorable to the prosecution. 443 U.S. at 319. "[F]ederal courts must look to state law for 'the substantive elements of the criminal offense.'" *Coleman v. Johnson*, 566 U.S. at 655, *quoting Jackson*, 443 U.S. at 324 n.16. While the *Jackson* standard

301

alone is difficult to meet, federal habeas courts reviewing a state court's merits adjudication of an insufficient evidence claim are further constrained by the requirements of the AEDPA. Because Petitioner's claim was adjudicated on the merits by the Ohio Supreme Court on direct appeal, the Court may grant relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined the by Supreme Court of the United States." § 2254(d)(1).

The Court finds that the Ohio Supreme Court's decision was neither contrary to nor an unreasonable application of the *Jackson* test, nor based on an unreasonable determination of the facts. The Ohio Supreme Court found that Petitioner's demand at the Bailey house that Tina drive him to the bank and give him $1,000 satisfied the "attempting or committing a theft offense" element of aggravated robbery. *Johnson*, 112 Ohio St.3d at 217. And Tina's testimony that Petitioner held the knife to her when he demanded the money at her house was sufficient evidence for a jury to find beyond a reasonable doubt that Petitioner did "[h]ave a deadly weapon on or about [his] person or under [his] control and either display the weapon, brandish it, indicate that [he] possesses it, or use it," meeting the second element of § 2911.01(A)(1) aggravated robbery.

Petitioner's contention that the theft offense did not occur until Tina gave him the money at the bank, when he no longer had the knife on him, is not dictated by either the text of the Ohio aggravated robbery statute or the manner in which it has been defined and applied by the Ohio Supreme Court. First, the Ohio Supreme

302

Court held on direct appeal from Petitioner's conviction that the demand for money alone constituted the attempt or commission of a theft offense as defined by the statute, *see Johnson*, 112 Ohio St.3d at 217, an interpretation by which this Court is bound. The United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Richey*, 546 U.S. at 76, *citing McGuire*, 502 U.S. at 67–68; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)).

Nor does the Ohio Supreme Court's interpretation raise any fair notice concerns. It was well established by the time of Petitioner's offense that aggravated robbery did not require the ultimate receipt of goods or money. *See, e.g., State v. Allen*, 115 Ohio App.3d 642, 645, 685 N.E.2d 1304, 1306 (Ohio 1996) ("Attempting to commit a theft offense is sufficient to satisfy an aggravated robbery conviction.") (potentially overruled on other grounds); *State v. Pierce*, 10th Dist. App. Ct., 2003 WL 21805739, slip op. at *5–6 (finding victim's testimony that defendant pointed gun at her through car window and demanded her money sufficient evidence of aggravated robbery even though defendant was startled by another person in the parking lot and ran away without retrieving the money); *State v. Todd*, 1st Dist. App. Ct., 2003 WL 21360642, slip op. at *2–3 (upholding aggravated robbery conviction for demanding victim "give it up" at gunpoint but fleeing without any stolen items); *State v. Charley*, 8th Dist. App. Ct., 2004 WL 1472745, slip op. at *10 (finding sufficient evidence to satisfy aggravated robbery charge when victims

303

escaped after defendant demanded their wallets and thus the theft was not completed). Moreover, this interpretation is reflected in the statutory text, which expressly refers to "attempting or committing a theft offense." See § 2911.01(A). This is not a case where a surprise interpretation of a state statute was imposed for the first time. Unless the Supreme Court of Ohio's interpretation or application of the aggravated robbery statute violates Petitioner's rights under the United States Constitution, this Court may not discard its interpretation of a state statute.

Petitioner further argues that the time and distance separating the demand for money at the Bailey house from Tina handing over the money at the bank means that the two incidents were separate occurrences, not one continuous occurrence. (ECP No. 131, PageID 10879.) But whether the two incidents constituted one continuing occurrence is irrelevant here. The state court found that the element of "attempting or committing a theft offense" was completed while still at the Bailey house where Petitioner concedes he did have the knife. That means the essential elements of § 2911.01(A)(1) aggravated robbery would still have been met had Tina never driven to the bank and never given Petitioner the $1,000. There is no need to construe the events as one continuing occurrence in which the knife displayed at the Bailey house applies to the theft offense committed at the bank.

Finally, Petitioner argues that the Ohio Supreme Court expanded the statutory definition of aggravated robbery by inserting the word "while" in the following paragraph:

The uncontroverted evidence in the record shows that Johnson held

304

the knife to Tina when he demanded that she give him $1,000 and that she drive him to the bank. Thus, sufficient evidence exists to support the jury's finding that Johnson violated R.C. 2911.01(A)(1) by having "a deadly weapon on or about [his] person" **while** "attempting or committing a theft offense."

*Johnson*, 112 Ohio St.3d at 217 (emphasis added). The original text of the statute reads:

No person, **in** attempting or committing a theft offense, shall . . . have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

§ 2911.01(A)(1) (emphasis added).

Petitioner does not explain what he believes to be the significance of the state court's use of "while" or how precisely it expands the scope of the statute. Setting aside whether there are hypothetical situations in which the difference between having a deadly weapon *while* committing a theft offense versus having a deadly weapon *in* committing a theft offense is discernible, this case is not it. Petitioner does not contest that he indeed had a knife at the house when he demanded that Tina drive him to the bank and give him $1,000. That fact alone is enough to satisfy the elements of the statute as written. The Court does not see any significance to the Ohio Supreme Court's choice to describe the statutory text as covering having a deadly weapon *while* committing a theft offense, at least when applied to the facts here.

For the above reasons, the Court finds that the Ohio Supreme Court's adjudication of Petitioner's insufficient evidence claims was not contrary to or an

unreasonable application of federal law, nor based on an unreasonable

determination of the facts. Petitioner's twentieth ground for relief is **DENIED**.

> 21. **Twenty-First Ground for Relief: It violates the Eighth and Fourteenth Amendments to rest an aggravated murder conviction and/or a death sentence on a rape and robbery of a different victim which occurred two hours after the aggravated murder of a separate victim.**

As more fully explained with regard to Petitioner's fourteenth ground for

relief, *supra*, Petitioner's twenty-first ground for relief is denied as procedurally

defaulted. (*See* ECF No. 28, PageID 403–09.)

> 22. **Twenty-Second Ground for Relief: Petitioner was deprived of the right to due process of law and the effective assistance of trial counsel contrary to the Fifth, Sixth, Eighth, and Fourteenth Amendments when counsel failed to properly voir dire jurors that actually sat on Petitioner's case.**

As more fully explained with regard to Petitioner's fourteenth ground for

relief, *supra*, Petitioner's twenty-second ground for relief is denied as procedurally

defaulted. (*See* ECF No. 28, PageID 409–21.)

> 23. **Twenty-Third Ground for Relief: Petitioner was deprived of the right to due process of law and the effective assistance of trial counsel contrary to the Fifth, Sixth, Eighth, and Fourteenth Amendments when counsel failed to present testimony from a forensic pathologist at trial to counter the testimony of the coroner regarding the timing of the victim's death.**

In his twenty-third ground for relief, Petitioner asserts that his trial counsel

were constitutionally ineffective for failing to present testimony from a forensic

pathologist to counter the opinion offered by the coroner as to the victim's time of

death. (ECF No. 86, PageID 9328–31.) Dr. C. Jeff Lee, the forensic pathologist who

performed Daniel's autopsy, testified at trial that the victim may have been alive when he was bound and moved to the basement despite the fatal injuries being inflicted in the living room before he was moved. Petitioner argues that trial counsel's failure to present any rebuttal evidence regarding time of death deprived the jury of evidence that he was innocent of the kidnapping charge and related death specification. Defense counsel had argued at trial that Daniel was dead before he was tied up and moved.

Respondent argues that the state court's conclusion that merely presenting a new expert opinion different from the theory used at trial is not enough to establish that trial counsel's approach was constitutionally inadequate is a reasonable application of *Strickland*. (ECF No. 91, PageID 10465–66.)

Petitioner presented this claim for the first time to the state courts as the fifth ground for relief in his second or successive state post-conviction petition. (ECF No. 85-1, PageID 8253–55.) The Ohio Court of Appeals affirmed the trial court's rejection of the petition on the ground that Petitioner had failed to satisfy the jurisdictional prerequisites of § 2953.23(A)(1) for filing a successive post-conviction petition. *Johnson*, 2013 WL 1400607, at *5. The court also noted that merely presenting a new expert opinion that differs from the theory pursued at trial was not enough to show that trial counsel performed deficiently. *Id.*

As previously explained in connection with Petitioner's ninth ground for relief, *supra*, claims presented to the state courts for the first time in Petitioner's second post-conviction petition are procedurally defaulted. Section 2953.23(A)(1) is

307

an independent and adequate state ground of decision barring federal habeas review, *Stojetz*, 892 F.3d at 205–06, which the state courts enforced to dismiss Petitioner's petition. Only if Petitioner can show cause for the default and prejudice from his underlying claim may the Court review his claim. *Maupin*, 785 F.3d at 138.

Petitioner first argues as cause to excuse the default the fact that the state trial court denied his requests for discovery in support of his initial post-conviction petition, and thus he was unable to obtain the necessary funding to consult an expert until it was provided by the Court here as part of his federal habeas proceedings. Petitioner's argument is foreclosed by prior Sixth Circuit precedent. In *Coleman v. Mitchell*, the Sixth Circuit rejected the petitioner's argument that res judicata was an inadequate state ground for barring habeas review of his claims because he was denied a meaningful opportunity to present his claims in state court. 268 F.3d 417, 427–29 (6th Cir. 2001). The court held that its previous observation that "because of the narrow interpretation placed on § 2953.21 by the Ohio Supreme Court, collateral relief is often unavailable or ineffective as a state remedy," *Keener v. Ridenour*, 594 F.2d 581, 590 (6th Cir. 1979), concerned only forgiveness of the exhaustion requirement for habeas review, and did not render the state's postconviction procedures inadequate to bar federal habeas review of a claim. *Coleman*, 268 F.3d at 427–29. Petitioner's argument here that the state's postconviction process is essentially inadequate to bar habeas review and should constitute cause to excuse his failure to timely raise a claim before the state courts thus appears to have been previously considered and rejected by the Sixth Circuit.

308

Petitioner also argues that "[t]o the extent [his] post-conviction counsel were ineffective by not addressing this issue, this Court may still consider his claim." (ECF No. 131, PageID 10894, *citing Martinez v. Ryan*, 566 U.S. 1 (2012).) *Martinez* recognized ineffective assistance of counsel on a first-review post-conviction petition as legitimate cause to overcome the procedural default of an ineffective assistance of trial counsel claim in federal habeas when, under state law, post-conviction was the first realistic opportunity the petitioner had to raise an ineffective assistance of trial counsel claim. 566 U.S. at 13–15. As the Sixth Circuit has explained, the "narrow exception" identified in *Martinez* is available if four requirements are met: (1) Petitioner has a "substantial" claim of ineffective assistance of trial counsel; (2) Petitioner was either unrepresented or his counsel was ineffective in his collateral-review proceeding; (3) that collateral proceeding was the first review of the ineffective-assistance-of-trial-counsel claim; and (4) either state law requires ineffective-assistance-of-trial-counsel claims to be raised for the first time in a collateral proceeding or the design or operation of state procedure makes it highly unlikely a defendant in a typical case would have a meaningful opportunity to raise an ineffective-assistance of trial-counsel claim on direct appeal. *White v. Warden, Ross Corr. Inst.*, 940 F.3d 270, 276 (6th Cir. 2019), *citing Martinez*, 566 U.S. at 9, 17, and *Trevino v. Thaler*, 569 U.S. 413, 429 (2013).

As for the first requirement, a claim for ineffective assistance of trial counsel is substantial if the petitioner can "demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. An insubstantial claim is one that "does not have any

merit or that [] is wholly without factual support." *Id.*, 566 U.S. at 16. The strength of the underlying ineffective trial counsel claim is also relevant to the second requirement for a *Martinez* exception—that post-conviction counsel's failure to raise the claim was ineffective assistance under the standards of *Strickland*, *id.* at 14— because the failure to raise a meritless claim is not ineffective assistance, *see Richardson*, 941 F.3d at 859 ("[E]ven if we were to consider Richardson's argument that his appellate counsel was ineffective for failing to argue that his trial counsel was ineffective, . . . the argument fails, as we have found that Richardson failed to demonstrate that trial counsel was ineffective."); *Moody*, 958 F.3d at 492, *citing Bennett v. Brewer*, 940 F.3d 279, 286–87 (6th Cir. 2019). Since the first and second requirements for application of the *Martinez* exception thus turn at least partially on the merits of the underlying ineffectiveness-of-trial-counsel claim, the Court will turn to the merits of Petitioner's ineffective trial counsel claim.

To prove ineffective assistance of trial counsel, Petitioner must show that counsel's decisions were not merely mistaken, but were unreasonable in light of prevailing professional norms, and that but for counsel's errors, there was a reasonable probability the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014), *quoting*

310

*Strickland*, 466 U.S. at 690–91.

Here, the record demonstrates that trial counsel opted to challenge the prosecution's time-of-death evidence through cross examination of Dr. Lee. (*See* ECF No. 83-11, PageID 7507–15.) The decision to rely on cross-examination rather than on an expert witness to impeach a medical opinion is "precisely the sort of tactical judgment Strickland counsels against second-guessing." *Esparza*, 765 F.3d at 624 (internal citations omitted). "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Richter*, 562 U.S. at 111. Merely suggesting that a different strategy would have been more effective than counsel's chosen strategy is not evidence that the strategy followed at trial was constitutionally deficient. *See Dovala v. Baldauf*, Case No. 20-4222, 2021 WL 3732338, at * (6th Cir. Aug. 24, 2021) (defense counsel's decision, after informally consulting an expert as to possible causes of death, to rely on cross-examination to counter the state's theory as to cause of death rather than presenting its own expert, was not deficient performance); *Lundgren*, 440 F.3d at 772–73 ("The question before this Court, however, is not whether all [] experts would agree on whether the defense was viable, but whether counsel's decision not to pursue the defense was a reasonable strategic choice.").

That trial counsel's strategic decision to rely on cross-examination to challenge Dr. Lee's opinion was reasonable is further reinforced by the fact that the decision came after investigation. "[I]f a habeas claim 'does not involve a failure to

311

investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation,' the presumption of reasonableness imposed by *Strickland* will be hard to overcome." *Campbell v. Coyle*, 260 F.3d 531, 552 (6th Cir. 2001), *quoting Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir. 1993). As Petitioner acknowledges, trial counsel retained a forensic expert—Dr. William Cox—to examine the time-of-death evidence and produce a report. (ECF No. 86, PageID 9329.) Petitioner merely states that Dr. Cox "did not testify because he was not helpful." (*Id.*) But counsel were entitled to rely on the opinion of Dr. Cox in crafting their strategy for challenging the time-of-death evidence. *See Carpenter*, 802 F.3d at 841 ("Attorneys are entitled to rely on the opinions and conclusions of [medical] experts." (internal citations omitted)). If Dr. Cox's opinion was indeed unhelpful, or even harmful, to the defense, it would be entirely reasonable for trial counsel to choose not to call Dr. Cox to testify and instead attempt to rebut the state's time-of-death evidence through cross-examination.[57] Counsel were not obligated to consult multiple forensic experts until they found one willing to contradict Dr. Lee's opinion. *See*

───────────────

[57]The facts support that this was defense counsel's calculation. Attorney Blakeslee explained to the trial court that this is how defense counsel would wish to respond in the event they received an unfavorable forensic opinion. Prior to trial, defense counsel filed an ex parte motion for funds to consult a forensic pathologist. Attorney Blakeslee argued that an ex parte motion was needed because a court-appointed forensic expert's report would be available to the prosecution. In the event the court-appointed expert agreed with the coroner as to time of death, the prosecutor could call the expert to testify as to his opinion at trial. In contrast, defendants represented by private attorneys who retain an independent expert to review the case do not have to turn over the expert's report to the state should it prove unhelpful or harmful to the defense, instead simply electing not to use the

*Lundgren*, 440 F.3d at 772 ("The Constitution does not require that an indigent criminal defendant be able to retain the expert of his choosing, only that a competent expert be made available.") (*citing Ake*, 470 U.S. at 83); *see also Campbell*, 260 F.3d at 552. And indeed, according to Attorney Warhola in his habeas deposition, that appears to be what occurred here:

> Q. All right. Was one of your — well, why don't I just ask instead of me saying it. What was your theory for the trial phase in the case?
>
> A. Mr. Blakeslee would probably have a better recollection of that than I did, but the — on the first phase, probably the key issue was whether or not the victim was dead before he was transported to another portion of the home.
>
> Q. And so, in trying to make that argument or use that as a theory your argument would be there was no kidnapping?
>
> A. Yes.
>
> Q. All right. And did you, as part of your preparation, hire somebody to review the coroner's report on that issue?
>
> A. Yes.
>
> Q. And do you recall who it was you hired?
>
> A. It was a Dr. Cox who I believe had served as coroner, I believe either in Summit or Stark Counties.
>
> Q. Uh-huh. Do you know who was responsible for hiring him to be on your team?
>
> A. What do you mean by responsible?
>
> Q. Well, who made the contacts? Who was the one that got him on board?
>
> A. As I recall, Mr. Durkin had experience with him. Mentioned his name to Mr. Blakeslee and myself.

expert's testimony at trial. (ECF 83-2, PageID 5549.)

313

Q. Uh-huh.

A. We — one of us — I believe it was me — made contact with Dr. Cox and provided him with information on the case.

Q. Did you know at the time that he had had some previous problems with the court system, being charged with felonies?

A. Yes.

Q. Okay. Did you discuss that with him prior to hiring him?

A. No. What — what we did was to try to verify what was the resolution of those cases and whether that would impair his ability to testify.

Q. You remember when you spoke with [Petitioner's federal habeas attorneys] several weeks ago? Remember the word you used to describe how Mr. Cox — his performance in this matter?

A. Well, he — provided us with a brief, written report. Mr. Blakeslee and I were not satisfied with it. We didn't think that his testimony would assist in the defense, and so we did not call him.

Q. Do you recall indicating that, yeah, he provided you nothing useful, that he was a disaster?

A. Oh, that might have been my opinion. I don't know if I would have told him that straight out. But he — his — his opinion wasn't helpful. I'm not saying it was untrue or unprofessional. I just was disappointed.

(ECF No. 85-1, PageID 8401–03.)

Petitioner argues that Dr. Cox was not competent, and that his "checkered past" should have alerted trial counsel to that fact. Petitioner presents evidence of Dr. Cox's past legal problems, in which he pled guilty in 1996 to two counts of unlawful interest in a public contract (§ 2921.42(A)(1)), two counts of soliciting or accepting improper compensation (§2921.43(A)(1)), one count of improper use of authority to secure a thing of value (§102.03(D)), one count of improper soliciting and receipt of a thing of value (§ 102.03(E)), and three counts of failure to disclose

314

sources and amounts of income required by law (§ 102.02(D)). (ECF No. 85-1, PageID 8541–43.) "A licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary." *Lundgren*, 440 F.3d at 772, *citing Skaggs v. Parker*, 235 F.3d 261, 268 (6th Cir. 2000). Petitioner has not shown that Dr. Cox's previous legal entanglements implicated his medical judgment or expertise, and Petitioner has not otherwise provided any evidence that Dr. Cox performed incompetently or unprofessionally as an expert for Petitioner's defense.

Finally, the opinion from Petitioner's "new" forensic expert, Dr. LeRoy Riddick, as to time-of-death, (ECF No. 85-1, PageID 8549–54), had it been presented as rebuttal at trial, is insufficient to create a reasonable probability of a different outcome. Respondent argues that Dr. Riddick's affidavit does not establish that the ligature marks could not have occurred before death: "[N]otably absent from Dr. Riddick's affidavit are any opinions, to a reasonable degree of medical certainty, that the ligature marks on Daniel's body could *not* have occurred before he died, or that Daniel was dead before being moved to the basement." (ECF No. 91, PageID 10466 (emphasis in original).) Petitioner disputes that assertion, arguing that "Dr. Riddick clearly concluded that Daniel Bailey was brain dead before he was moved from the living room to the basement." (ECF No. 131, PageID 10894.) He cites to the O.R.C. § 2108.40: "An individual is dead if the individual has sustained. . . irreversible cessation of all functions of the brain, including the brain stem, as determined in accordance with accepted medical standards." (*Id.*, *quoting* § 2108.40.)

315

Petitioner mischaracterizes the opinion offered by Dr. Riddick in his affidavit. Dr. Riddick does not say that Daniel was dead when he was tied up. He first says that he agrees with the opinion of the coroner and autopsy pathologist that the ligatures were applied after the lethal injuries had been inflicted. (ECF No. 85-1, PageID 8552.) Then, referring to the opinion of the coroner and autopsy pathologist that the ligatures were applied when Daniel was still alive, based on the presence of faint red lines adjacent to the ligature furrow on the right wrist and ankle which they took to be a vital reaction that the heart was beating when the ligatures were applied, Dr. Riddick said that he questioned the validity of that opinion:

1.      It is well known and documented in the forensic literature that bruising can occur after the heart stops. In the period following cardiac cessation the capillaries in the skin still contain blood, which can with pressure cause redness. The furrows indicate that the bounds were tight.

2.      If a victim is alive while such bonds are being applied they move against the bindings causing bright red abrasions—rope burns on either side of the ligature.

3.      No incision was made into the skin to determine if there was extravasation of blood and an inflammatory reaction.

4.      This could have been confirmed with microscopic examination of that tissue but none was done.

5.      Although both wrists and ankles had ligature furrows, only the right wrist and ankle were described as having the redness of the skin. Certainly, some of the redness on the right wrist could be attributed to postmortem lividity of that hand, which is evident in the photographs of that hand. The mother turned the decedent over to perform CPR so that the non-congealed blood could form lividity of the dependent portion of the body, which would have included the hands.

6.      The injuries to the scalp, skull and central nervous system were lethal. Moreover, the brain was swollen, which causes pressure on the

brainstem with areas that control ventilation. Such injuries cause respiratory failure. The heart, however, has its own supply of energy, glycogen that can cause it to beat even with the lack of oxygen. Given that the head injuries were fatal, the redness next to the ligatures **could have occurred** after the victim was brain dead.

(*Id*., PageID 8552–54 (emphasis added).) In other words, Dr. Riddick opines that the physical evidence that supports the view that Daniel was alive when tied up is also *consistent with* a scenario in which Daniel was brain dead at the time he was restrained. He does not say that Daniel could **not** have been alive at that time.

Because Petitioner has failed to demonstrate that trial counsel's strategy for countering the state's time-of-death evidence was unreasonable in light of the information available to counsel at the time of trial or that he was prejudiced as a result, he also cannot show that post-conviction counsel was ineffective for failing to raise the ineffectiveness of trial counsel during his post-conviction proceedings. Thus, he has not satisfied the first or second requirements of the *Martinez* exception, under which the ineffectiveness of post-conviction counsel may excuse the procedural default of an ineffective-assistance-of-trial-counsel claim. *See White*, 940 F.3d at 276. As a result, Petitioner has not established the cause or prejudice necessary to overcome default. The twenty-third ground for relief is **DENIED** as procedurally defaulted.

24. **Twenty-Fourth Ground for Relief: When the record and other supporting documentation call into question the competency of Petitioner, it is a violation of the Petitioner's constitutional rights to rule that he is not entitled to be competent during post-conviction proceedings.**

In Petitioner's twenty-fourth ground for relief, he claims that his competence

317

during post-conviction proceedings is constitutionally mandated, and to force him to challenge his conviction and sentence while he was incompetent violates his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.[58] He argues that the preparation and presentation of his post-conviction claims required his assistance, which his counsel and the evidence suggest he was unable to provide. (ECF No. 86, PageID 9331–35.) In addition to reciting again the instances from his trial that he has elsewhere claimed demonstrated his incompetence during trial,[59] Petitioner cites as evidence of his incompetence during state post-conviction proceedings the statements of Dr. Robert L. Smith, a psychologist retained by post-conviction counsel to evaluate Petitioner (ECF No. 82-15, PageID 3100–23); Dr. Thomas Boyd, a neuropsychologist also hired by post-conviction counsel to evaluate Petitioner (ECF No. 82-18, PageID 3381–82); and Pam Swanson, the mitigation specialist assisting Petitioner's post-conviction counsel (*Id.*, PageID 3383–84).

Respondent argues that the relief sought by Petitioner depends on "an unprecedented extension of governing Supreme Court precedents," pointing out that the Supreme Court categorically rejected a due process right to competence during

---

[58]Petitioner also claimed a violation of his Ninth Amendment rights. Because he failed to explain the nature of his Ninth Amendment claim and the Court is unaware of any Ninth Amendment claim fitting the facts alleged here, the Court will limit its review to the alleged Sixth, Eighth, and Fourteenth Amendment violations.

[59]The evidence for Petitioner's incompetence at trial is discussed in relation to Petitioner's third ground for relief, *supra*.

post-conviction proceedings in *Ryan v. Gonzales*, 568 U.S. 57 (2013). (ECF No. 91,

PageID 10487.) Respondent also contends that the post-conviction competency right

Petitioner asserts fails to meet *Teague v. Lane*'s exceptions for retroactive

application as it does not protect primary conduct from criminal sanction, insulate a

distinctive group from punishment, or recognize a watershed rule of criminal

procedure. Respondent argues that, in light of *Gonzales*, the state appellate court's

adjudication does not involve the application of any clearly established federal law.

Respondent also points out that Petitioner had relied on *Rohan v. Woodford*, 334

F.3d 803 (9th Cir. 2003), in his argument before the state courts, which is no longer

good law post-*Gonzales*.

Petitioner counters that *Gonzales* was limited to federal habeas litigation,

and the Supreme Court's reasoning does not apply to collateral proceedings in state

courts. (ECF No. 131, PageID 10899–900.) *Gonzales* found that counsel can

generally provide effective representation in habeas proceedings without the

assistance of their client because federal habeas claims are entirely record-based

when reviewed under § 2254(d). 568 U.S. at 60–61, 68. In contrast, counsel

preparing a state post-conviction petition must also investigate for potential

evidence outside the record to support its claims, an endeavor which necessarily

requires the assistance of the client. Petitioner reasons that the due process right to

competence at trial therefore extends to those state post-conviction proceedings in

which client assistance is necessary for effective representation because even the

discretionary actions of a state must accord with due process. (ECF No. 131, PageID

319

10900, *citing Evitts v. Lucey*, 469 U.S. 387, 401 (1985).)

Petitioner moved for a competency evaluation and to stay proceedings before the state trial court hearing his post-conviction petition. (ECF No. 82-18, PageID 3365.) The trial court denied the motion for a competency evaluation on the basis that Petitioner was previously evaluated and found competent, he had no constitutional or statutory right to a competency determination, his refusal to cooperate was not grounds to declare a person incompetent, and the issue of his competency was previously raised in his direct appeal. (ECF No. 82-18, PageID 3417.) Petitioner challenged the trial court's refusal to grant a competency evaluation during his state collateral proceedings as his first assignment of error in his appeal from the trial court's dismissal of his state post-conviction petition. The Ohio Court of Appeals did not decide whether or not Petitioner had a constitutional right to competence during state post-conviction proceedings, instead rejecting the claim because Petitioner had not shown sufficient indicia of incompetence as would trigger the need for a hearing or evaluation:

> In his first assignment of error, appellant contends that the trial court abused its discretion by failing to stay the post-conviction relief proceedings and hold a hearing on his competence to participate in the post-conviction proceedings. We disagree.
>
> Appellant argues that he has a right to be competent during post-conviction proceedings. See, e.g., *Rohan ex rel. Gates v. Woodford* (9th Cir.) 334 F.3d 803. The state counters that under current Ohio law capital post-conviction petitioners do not have a right to be competent during post-conviction proceedings. See, e.g., *State v. Eley*, 7th Dist. No. 99 CA 109, 2001-Ohio-3447. We find that we do not need to reach this question because the evidence submitted by appellant in the trial court fails to raise a colorable claim that he is incompetent.

In the context of a criminal trial a trial court's failure to hold a competency hearing does not rise to constitutional proportions unless the record contains sufficient indicia of incompetency. *State v. Bock* (1986), 28 Ohio St.3d 108, 502 N.E.2d 1016. According to *Bock*, "[i]ncompetency must not be equated with mere mental or emotional instability or even with outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *Id.* at 110, 502 N.E.2d 1016.

A similar standard has been employed to determine whether a defendant is mentally competent to forgo the presentation of mitigating evidence in the penalty phase of a capital case. *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231.

Appellant first argues that his behavior during his criminal trial is evidence of his incompetence. We disagree.

Appellant has in fact raised a similar issue in his direct appeal in the Ohio Supreme Court. See, *State v. Johnson* (2006), 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144. The Ohio Supreme Court held that appellant's indicia of incompetence did not rise to a level that demanded a hearing or an evaluation, and thus, trial court did not abuse its discretion by denying counsel's motion for a competency evaluation; defendant's refusal to heed his counsel's advice and his abandoned request to fire his counsel did not indicate that he was unable to understand [the] nature of [the] charges and proceedings or gravity of [the] situation, or that he could not assist in his defense, and defendant, in his responses to court, expressed his understanding of [the] nature of [the] charges against him, possibility of death penalty, and ramifications of representing himself. *Id.* at 232–234, 2006-Ohio-6404 at ¶ 155–164, 858 N.E.2d at 1170–1172. The Court further noted "[o]n Monday, May 17, 2004, between the guilt and penalty phases of the trial, defense counsel informed the court that they had learned over the weekend that Dr. Jackson, the appointed defense psychologist, had "found symptoms consistent with severe mental illness." Counsel also related to the court that Johnson had called three times and had made statements that led counsel to question his competence. The defense renewed its motion for a mental evaluation of Johnson and a competency hearing, and the court granted it, ordering the Forensic Diagnostic Center to perform the evaluation.

"At the competency hearing, held May 26, 2004, the parties stipulated to Dr. Denise Kohler's report, dated May 22, 2004, in which she found

Johnson competent to stand trial, as he 'is capable of understanding the nature and the objectives of the proceedings against him and of assisting in his defense.'" 112 Ohio St.3d 234, 2006-Ohio-6404 at ¶ 166–167; 858 N.E.2d at 1172.

Accordingly, to the extent that appellant relies upon his behavior during trial to support his claim of incompetency, we find the matter is res judicata, the Ohio Supreme Court having found appellant's indicia of incompetence during the trial did not rise to a level that demanded a hearing or an evaluation.

Appellant next contends that during the post-conviction process the defense hired Dr. Robert L. Smith to evaluate appellant, and Dr. Smith claims that appellant's behavior during his attempts to interview him raise a question of whether appellant is competent to work with his attorneys. [Post-Conviction Petition, Exhibit O, filed July 20, 2005 at 16].

At the outset, we note that Dr. Smith was not retained to conduct a competency evaluation of the appellant. Rather, Dr. Smith was hired to "provide a psychological/chemical dependency assessment …" [Id. at 1]. Appellant was evaluated on April 25, 2005 and June 13, 2005. [Id.]. Dr. Smith noted in his report that "Mr. Johnson demonstrated an understanding of his conviction and the appeal process, as well as the role of his defense counsel, prosecutor and judge. It was explained that the current evaluation was not confidential and that the results would be summarized in a report to defense counsel and potentially the court. Mr. Johnson agreed to proceed under these conditions." [Id.].

Dr. Smith further noted "Mr. Johnson presented as oriented to person, place and time. His memory for recent and remote events was intact. There was no significant evidence of thought disorder …" [Id. at 14].

Several psychological tests were administered during the evaluation. [Id. at 2]. Appellant discussed at length with Dr. Smith his family background [Id. at 3–5]; his health history [Id. at 5]; his psychiatric history [Id. at 5–6]; substance abuse history [Id. at 7–11]; educational history [Id. at 11]; employment history [Id. at 11]; legal history [Id. at 12]; and relationship history [Id. at 12–14].

Dr. Smith further noted that appellant's illogical, irrational and sometimes illusionary behavior "are consistent with the symptoms documented by Dr. Kohler at the time of trial." [Id.].

The Sixth Amendment does not guarantee "rapport" or a "meaningful

relationship" between client and counsel. *Morris v. Slappy* (1983), 461 U.S. 1, 13–14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610, 621.

Lack of cooperation with counsel does not constitute sufficient indicia of incompetence to raise a doubt about a defendant's competence to stand trial. *State v. Vrabel* (2003), 99 Ohio St.3d 184, 190, 2003-Ohio-3193 at ¶ 30, 790 N.E.2d 303, 311. [Citing *State v. Berry* (1995), 72 Ohio St.3d 354, 360–361, 650 N.E.2d 433]. It is noteworthy that neither of appellant's attorneys submitted an affidavit to the trial court claiming that appellant did not have a present ability to consult with his lawyer and aid in the prosecution, so to speak, of his petition.

Dr. Smith did not opine that appellant lacks the ability to understand the nature and objective of the proceedings against him or of presently assisting in his defense; rather he merely suggest [sic] that such is a possibility. However, as noted above, much of Dr. Smith's report refutes this suggestion.

Similarly, appellant's counsel submitted the affidavit of Pam Swanson the mitigation specialist assigned to work on appellant's post-conviction petition. [Notice of Incompetence Pursuant to Entry Filed December 16, 2005 and to Stay Proceedings filed December 28, 2005, Exhibit C]. Ms. Swanson states that she met with appellant "on various occasions" and that on "at least two different occasions" appellant refused to cooperate with her investigation. As previously noted lack of cooperation with counsel does not constitute sufficient indicia of incompetence to raise doubt about a defendant's competence to stand trial. *State v. Vrabel* (2003), 99 Ohio St.3d 184, 190, 2003-Ohio-3193 at ¶ 30, 790 N.E.2d 303, 311. [Citing *State v. Berry* (1995), 72 Ohio St.3d 354, 360–361, 650 N.E.2d 433].

Finally, appellant's counsel submitted the affidavit of Dr. Thomas Boyd, a licensed neuropsychologist. Dr. Boyd's affidavit states: "During my visit with Mr. Johnson he was initially cooperative and fully compliant with the examination procedures I administered to him. In fact, he appeared to put forth a genuine effort and was persistent with the first few tasks. However, his mood and demeanor quickly changed about an hour into my visit. Specifically, Mr. Johnson became irritated when he encountered difficulty with one of the subsets on the Wechsler Adult Intelligence Scale-III (WAIS-III). It was obvious that he felt frustrated by his inability to provide a meaningful response to the task, despite trying, and his final score on the subtest was indicative of marked impairment on the skills being measured. Mr. Johnson reached a ceiling on the subtest and it was discontinued. We then

moved on to the next task, but, Mr. Johnson's irritation continued and when I had to query one of his answers on the new subtest and ask him to elaborate, he became overtly angry and said he did not want to continue with the testing, that is, he did not want to continue with any of the testing.

"I tried to calm Mr. Johnson and explore the reason for his distress. In essence, he indicated that the testing procedures, in general, and his failure to know how to respond to the earlier task, specifically, made him feel stupid. This elicited a further long monologue from him about experiences of being disrespected during his life. It was apparent that Mr. Johnson experienced his difficulties on the testing as a blow to his self esteem and could not tolerate the idea of continuing." Dr. Boyd continued "I believe the behaviors Mr. Johnson showed with me on November 21, 2005 and his refusal to continue with the neuropsychological examination are similar to those he showed with Dr. Smith and strongly suggest the possibility that he is not competent to assist in his own defense."

Dr. Boyd does not opine that appellant is unable to understand the nature of charges and proceedings or gravity of situation, or that he could not assist in his defense, rather he merely suggests such a possibility. A lack of understanding of how the testing could be useful or how any findings from the examination would be relevant to his current legal situation is not the same thing as an inability to understand the post-conviction proceedings. One is certainly left to wonder why two mental health professionals retained during the post-conviction process by the defense failed to conduct a competency evaluation, in addition to the numerous other psychological tests they administered, if they questioned appellant's competency.

Appellant's indicia of incompetence did not rise to a level that demanded a hearing or an evaluation, and thus, [the] trial court did not abuse its discretion by denying counsel's motion for a competency evaluation. Under these circumstances, we will not disturb the trial court's findings, since there was some reliable, credible evidence supporting them. *State v. Williams* (1986), 23 Ohio St.3d 16, 19, 23 OBR 13, 490 N.E.2d 906; *State v. Hicks* (1989), 43 Ohio St.3d 72, 79, 538 N.E.2d 1030. Because we find that the appellant's indicia of incompetence did not rise to a level that demanded a hearing or an evaluation, the question of whether a petitioner has a right to be competent during post-conviction proceedings is not ripe for review.

Accordingly, we find that the petition, the supporting affidavits, the

documentary evidence, the files, and the records do not demonstrate that appellant set forth sufficient operative facts to establish substantive grounds for relief. *Calhoun*, 86 Ohio St.3d at paragraph two of the syllabus; see R.C. 2953.21(C).

Appellant's first assignment of error is overruled.

*State v. Johnson*, No. 2006-CA-04, 2007 WL 1098106, at *5–8.

In *Gonzales v. Ryan*, the Supreme Court held that a prisoner does not have a statutory right to competence during federal habeas proceedings. 568 U.S. at 71, 73. The Court overturned decisions of the Sixth and Ninth Circuits Courts of Appeals that found an implied right to competency during federal habeas in, respectively, 18 U.S.C. §§ 4241 and 3599(a)(2).[60] *Id.* Despite grounding their judgments in different statutory provisions, both appellate courts had found an implied right to competency within statutory guarantees of counsel for legal proceedings. The theories posited that competence was required to fully realize the right to counsel because an incompetent petitioner is unable to effectively assist counsel. *Id.* at 61–64. *Gonzales* rejected that interpretation, noting that the constitutional right to competence at trial derives not from the Sixth Amendment right to counsel, but from the due process rights protected by the Fifth and Fourteenth Amendments. *Id.* at 65–66.

Not at issue in *Gonzales* was a constitutional right to competency in federal

---

[60]§ 3599(a)(2) provides for the appointment of federally funded counsel for indigent federal habeas corpus petitioners challenging a death sentence. § 4241 directs federal district courts to hold a hearing to determine the competency of a federal defendant when there is reasonable cause to believe that he may be

325

habeas, as all parties acknowledged no such right could be found in the Constitution. Petitioner argues that Respondent's reliance on *Gonzales* is misplaced because the decision was limited to federal habeas litigation. (ECF No. 131, PageID 10899.) *Gonzales* reasoned that counsel can generally provide effective representation in federal habeas proceedings even without their client's assistance because habeas review is largely restricted to the existing record that was before the state courts that adjudicated the claims. Petitioner contends that the circumstances are different in state post-conviction as the attorney must investigate and uncover evidence outside the record to present in support of a petitioner's claims, and therefore the reasoning of *Gonzales* is not applicable to state post-conviction petitions. (ECF No. 131, PageID 10899.) Indeed, *Gonzales* did not address the question of a *federal* constitutional right to competence in *state* post-conviction proceedings, the question Petitioner raises here. But despite the different nature of litigating federal and state post-conviction petitions, the Court's reasoning in *Gonzales* together with its prior precedents suggest that the existence of such a right in state post-conviction proceedings is, if not dubious, at most an open question, and therefore insufficient to support habeas corpus relief.

As *Gonzales* emphasizes, a right to counsel does not imply an associated right to competence to assist one's counsel. The ability to work effectively with counsel, cited as part of the standard definition of competency, may affect the benefits of a

incompetent to stand trial.

right to counsel, but its inclusion within the judicial test for competency does not elevate competency to a necessary condition for fully realizing the right to counsel. *Gonzales*, 568 U.S. at 65–66. The constitutional right to competence at trial then is born not from the Sixth Amendment right to counsel but from a defendant's right to due process. *Id.*

Even if the Sixth Amendment was found to include a right to competence within the broader right to counsel, it could hardly imply a right to competence in the context of state post-conviction proceedings because neither the Sixth Amendment nor any other constitutional provision protects a right to counsel in a state post-conviction process. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (no constitutional right to counsel in state post-conviction); *Murray v. Giarratano*, 492 U.S. 1, 10 (1989) (applying *Finley* to death row inmates) (plurality opinion); *accord United States v. MacCollum*, 426 U.S. 317, 323 (1976) (no constitutional right to collateral review) (plurality opinion). The corollary procedures required when there is a constitutional right to counsel have generally not been extended to contexts in which there is no constitutional right to counsel or merely a state-created right to counsel. *See, e.g., Finley*, 481 U.S. at 556 (*Anders* procedure for withdrawal of appointed counsel on direct appeal does not apply to state post-conviction where petitioners only have a state right to counsel); *Coleman*, 501 U.S. at 757 (attorney error in state post-conviction cannot excuse procedural default because there is no constitutional right to counsel in post-conviction proceedings). Even *Martinez*, in which the Supreme Court found a limited exception to *Coleman*

327

for attorney ineffectiveness during state post-conviction to excuse procedural default when post-conviction is the first meaningful opportunity a petitioner has to raise a claim of constitutionally ineffective trial counsel, did not go so far as to recognize a constitutional right to counsel in post. *See Martinez*, 566 U.S. at 11.

The Due Process Clause is also unavailing as a source of Petitioner's claimed right to competence despite guaranteeing the right to competence at trial. In *Hugueley v. Mays*, the Sixth Circuit rejected the argument that a petitioner sentenced to death had been denied due process when the state post-conviction court failed to follow the procedural requirements of *Panetti v. Quarterman*, 551 U.S. 930 (2007), upon his claim that he was incompetent to waive state post-conviction review. *Hugueley*, 964 F.3d 489, 495–96 (6th Cir. 2020). *Panetti* had mandated particular procedural requirements for determining competence when a death-row inmate claimed he was too incompetent to be executed in order to enforce the Eighth Amendment prohibition on execution of incompetent persons. *Id.*, *citing Panetti*, 551 U.S. at 948–49. The court found that there was no "similar constitutional concern . . . animat[ing] a claim that the petitioner is incompetent to waive state post-conviction review." *Id.* at 496. Because states are not constitutionally obligated to offer collateral proceedings to supplement the state's criminal proceedings, "[s]tates are under 'no obligation' to establish procedures for evaluating collateral attacks on a conviction." *Id.*, *citing Finley*, 481 U.S. at 557. The procedures and rights to which Petitioner is entitled as he litigates his state post-conviction petition are a matter of Ohio law, and thus not cognizable in federal

habeas.

Petitioner relies on *Evitts v. Lucey*, 469 U.S. 387 (1985) to argue that once the state has chosen to act in a discretionary space—here by providing a process for post-conviction collateral attacks on state convictions—the state must comply with the procedural mandates of due process. (ECF No. 131, PageID 10900.) The Supreme Court rejected a similar argument in *Finley*, where a petitioner had claimed that the *Anders* procedures that appointed appellate counsel must follow when a case appears to be frivolous also apply in state collateral proceedings based on her state-created right to counsel for post-conviction review. *Finley*, 481 U.S. at 557–58. The Court held that *Anders* procedures, designed to protect the constitutional right to counsel on first appeal, apply only when there exists a previously established constitutional right to counsel. *Id.* at 557. It found that "the substantive holding of *Evitts*—that the State may not cut off a right to appeal because of a lawyer's ineffectiveness—depend[ed] on a constitutional right to appointed counsel that d[id] not exist in state habeas proceedings." *Id.* at 558. The Court also found significant that the petitioner in *Finley* had not suffered any deprivation, whereas *Evitts* concerned an actual deprivation of the state-created right to appeal. *Id.* Likewise, Petitioner has not suffered any deprivation of his state-created right to post-conviction review here, or even deprivation of a hypothetical state right to *competence* for the duration of state post-conviction. The state courts reviewed the evidence of incompetence that Petitioner presented and determined that a competency evaluation was not necessary because he had failed

329

to show sufficient evidence of incompetence. Assuming the existence of a state right to competence, Petitioner has received all the process he is due.

Finally, Petitioner argues that the Eighth Amendment requires that death row inmates be competent to pursue state collateral relief because forcing him to litigate a collateral attack on his conviction and death sentence while he is incompetent would subject him to a capital sentence rendered in an arbitrary and capricious manner. (ECF No. 86, PageID 9331.) In *Furman v. Georgia*, 408 U.S. 238 (1972), the Court held that imposing the death penalty under sentencing procedures that create a substantial risk that it could be imposed in an arbitrary and capricious manner violates the Eighth Amendment's prohibition on cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). To this end, the Court mandated that the discretion of the sentencing body be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189. But in *Giarratano*, the Court rejected the argument that the Eighth Amendment bars the execution of a person while he is unrepresented or that due process requires appointed counsel in post-conviction proceedings for petitioners on death row due to the nature of the punishment and the need for accuracy. 492 U.S. at 8. The Court noted that "the Constitution places special constraints on the procedures used to convict an accused of a capital offense and sentence him to death," but these death penalty-specific rules have been limited to the trial and sentencing proceedings. *Id.* at 8–9, *citing Beck v. Alabama*, 447 U.S. 625 (1980), and *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104

330

(1982); *see also, e.g., Ford v. Wainwright*, 477 U.S. 399, 410 (1986) ("The Eighth Amendment prohibits the state from inflicting the penalty of death on a prisoner who is insane."); *Panetti*, 551 U.S. at 948  (prisoner who has made substantial showing of his incompetence to be executed is entitled to "an adequate means by which to submit expert psychiatric evidence in response to the evidence that had been solicited by the state court"). In contrast, *Giarratano* explained, the Court's precedents have imposed the same standards on habeas review for both capital and non-capital cases alike. 492 U.S. at 9–10. The Court reasoned that "[t]he additional safeguards imposed by the Eighth Amendment at the trial stage of a capital case are, we think, sufficient to assure the reliability of the process by which the death penalty is imposed." *Id.* at 10.

The reasoning of *Giarratano* suggests that a right to competence specifically for those attacking a capital conviction and death sentence in state post-conviction proceedings is unlikely to be found within the Eighth Amendment. The Eighth Amendment's reach to impose heightened standards in capital cases has been confined to the criminal trial and sentencing processes. *Id.*; *see also Ingraham v. Wright*, 430 U.S. 651, 667–68 (1977) (holding that the application of the Eighth Amendment is limited to the criminal process and execution of sentence). Petitioner was convicted and his capital sentence imposed by a jury after a state criminal trial subject to the procedural safeguards prescribed by *Gregg* and its progeny to satisfy the Eighth Amendment. Ohio's post-conviction process "is not part of the criminal process itself, but is instead a civil action designed to overturn a presumptively

331

valid criminal judgment." *Giarratano*, 492 U.S. at 13 (O'Connor, J., concurring). As such, Petitioner is entitled to the same constitutional rights as any other petitioner pursuing post-conviction relief.

Petitioner's argument that the Court should recognize a constitutional right to competence in state post-conviction proceedings ultimately runs headlong into AEDPA. Section 2254(d)(1) bars habeas relief unless the state court's adjudication of the constitutional claim was contrary to or an unreasonable application of clearly established federal law. Clearly established law means the holdings of the United States Supreme Court. *Richter*, 562 U.S. at 100, *citing Williams v. Taylor*, 529 U.S. at 412. As the Supreme Court has never recognized a right to competence during state post-conviction proceedings, this Court may not set aside an otherwise valid decision of the Ohio state courts for failing to enforce such a right regardless of the Court's view of the merits. The refusal of an Ohio appellate court to conduct a competency evaluation or stay post-conviction proceedings in this case does not violate any clearly established federal law and thus is not a claim on which federal habeas relief may be granted.

Petitioner argues that AEDPA does not apply, and the Court may review the merits of his claimed constitutional right *de novo* because the Ohio Court of Appeals declined to address the issue of whether his competency to participate in state post-conviction proceedings was constitutionally mandated. (ECF No. 131, PageID 10899.) But this argument does not take Petitioner very far precisely *because* the state court did not decide whether a constitutional right existed. Instead, the Ohio

Court of Appeals held that *even if* Petitioner had a right to competence, he had not shown the substantial evidence of incompetence necessary to warrant a competency evaluation. The state court's factual determination of competency, *Richardson*, 941 F.3d at 848, is still subject to review under § 2254(d)(2). In other words, even if the Court decided here that Petitioner indeed enjoyed a right to competency in state collateral proceedings protected by the United States Constitution (a determination the Court does not make), he still would not be entitled to relief unless he could also demonstrate that the state court's conclusion as to his factual competence was objectively unreasonable.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding[.]" *Miller-El*, 537 U.S. at 340. A defendant is competent to stand trial if he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402. To prevail, Petitioner would need to present clear and convincing evidence that, based on the evidence before the state court, it was objectively unreasonable to conclude that he was capable of understanding the nature of the post-conviction proceedings and consulting with his attorney.

Petitioner first cites as evidence his behavior during trial, specifically his

333

actions on May 13, 2004. As the Ohio Court of Appeals noted in its adjudication of this claim, the state trial court and the Ohio Supreme Court on direct appeal already considered the evidence of his behavior at trial and determined that Petitioner was competent at that time. This Court reviewed the evidence of Petitioner's behavior at trial in connection with his third ground for relief, *supra*, and found the state courts' conclusion that Petitioner was competent a reasonable determination of the facts. That decision applies here as well.

As to the evidence Petitioner presents of his incompetence during the time period in which he was pursuing post-conviction relief in state court, the Court concludes that it does not establish sufficient cause to believe Petitioner was incompetent at that time. His sole evidence of his incompetence after the conclusion of his trial are the statements of Dr. Smith, Dr. Boyd, and Pam Swanson, each of whom reported that he was paranoid, suspicious, and at times uncooperative, even prematurely terminating a meeting or refusing to see them at all. Each stated that his behavior raised concerns as to his ability to work effectively with his counsel. Yet each one also referred to occasions in which he cooperated with them. While their reports demonstrate that Petitioner was often *unwilling* to assist counsel and others working on his behalf, they do not indicate that he was *incapable* of doing so. Anger, suspicion, and uncooperativeness, without something more, are not evidence of incompetence. That a person makes working with him difficult or impossible is not substantial evidence of incompetence when there is no indication that he cannot rationally understand the proceedings. This is all the more true when there is a

334

record of a similar pattern of behavior in the past, based on which Petitioner was given a competency evaluation and found to be competent. As a result, the state courts' factual determination that Petitioner had not presented substantial evidence of incompetence was not objectively unreasonable.

Petitioner's twenty-fourth ground for relief is **DENIED**, whether because he does not have a constitutional right to competence during state post-conviction proceedings or because he has not presented clear and convincing evidence that the state courts' determination of his competence was unreasonable.

25. **Twenty-Fifth Ground for Relief: In Guernsey County, the death penalty is applied in an arbitrary, capricious, and discriminatory manner and Petitioner was deprived of the effective assistance of counsel due to their failure to present statistical evidence of the arbitrary, capricious, and discriminatory nature of the death penalty in Guernsey County.**

Petitioner claims that his trial counsel were unconstitutionally ineffective for failing to present statistical evidence that the application of the death penalty in Guernsey County is arbitrary, capricious, and discriminatory.[61] He cites statistical evidence that Guernsey County indicts African-Americans for capital crimes at rates vastly disproportionate to their share of the population, and that defendants

---

[61]Petitioner also claimed a violation of the Ninth Amendment but failed to explain the basis for his claim. As the Court is not aware of any causes of action available under the Ninth Amendment that fit the allegations made in Petitioner's twenty-fifth ground for relief, Petitioner's Ninth Amendment claim (to the extent he has one) is not addressed.

charged with killing a white victim are more likely to be sentenced to death.[62] (ECF No. 86, PageID 9335–36.) Petitioner argues that the disproportionate imposition of the death penalty on African Americans proves that it is applied in a discriminatory and arbitrary manner in violation of the Equal Protection Clause and the Eighth Amendment.

Petitioner first presented the allegations contained in his twenty-fifth ground here as the thirteenth ground for relief in his initial state post-conviction petition. (ECF No. 82-14, PageID 2998–99.) The Ohio Court of Appeals held that he could not "demonstrate prejudice from any procedure employed by Guernsey County in light of the independent review conducted by the Ohio Supreme Court." *Johnson*, 2007 WL 1098106, at *19. As a result, the presented evidence did not demonstrate "sufficient operative facts to establish substantive grounds for relief." *Id.*

Respondent argues that the state court's conclusion that Petitioner's statistical evidence could not establish the requisite prejudice under *Strickland* was a reasonable application of *McCleskey v. Kemp*, 481 U.S. 279 (1987), and *Pulley v. Harris*, 465 U.S. 37 (1984). (ECF No. 91, PageID 10467.) Petitioner counters that

---

[62]Specifically, Petitioner cites as evidence the fact that four of the nine (44.4%) indictments for capital crimes in Guernsey County since 1992 have been of African Americans, while African Americans only comprised 1.5% of the county's population in the 2000 Census. In comparison, whites were 96.3% of the county's population and five of the nine (55.6%) capital indictments. Of the six victims in those cases whose race is known, all six were white. A defendant is twice as likely to be sentenced to death in Ohio for killing a white person than an African American person. (ECF No. 86, PageID 9335–36.)

counsel retained a duty to present the information to the trial court because it could have led to relief before the trial took place. (ECF No. 131, PageID 10903.)

The Ohio court's decision is neither contrary to nor an unreasonable application of clearly established federal law. To satisfy the prejudice prong of *Strickland*, Petitioner has to show a reasonable likelihood of a different outcome in the absence of counsel's alleged error. *Robbins*, 528 U.S. at 285–86, *citing Strickland*, 466 U.S. at 694. Here, that means that Petitioner must show that if the statistical evidence he presented for the first time in his state post-conviction petition had instead been presented to the trial court by his trial counsel, it could have changed the outcome. Thus, the success of Petitioner's ineffective assistance claim necessarily depends on the strength of his Equal Protection and Eighth Amendment claims.

As the Sixth Circuit has observed, "any statistically-based argument. . . concerning racial disparities in the application of the death penalty must confront *McCleskey v. Kemp*, 481 U.S. 279 (1987)." *Coleman*, 268 F.3d at 441. In *McCleskey*, the Supreme Court rejected a challenge to Georgia's death penalty scheme based solely on statistical evidence of the disproportionate application of the death penalty to African American defendants and defendants (of any race) who murdered white victims. The Court held that a petitioner "must prove the decisionmakers in *his* case acted with discriminatory purpose" to successfully make out a claim under the Equal Protection Clause. *McCleskey*, 481 U.S. at 292. Dismissing the petitioner's argument that the aggregate racial disparities found by the statistical analysis

337

compelled an inference of purposeful discrimination in his case, the Court differentiated the capital sentencing decision from the limited scenarios in which it had accepted statistical disparities as proof of discriminatory intent. *Id.* at 294–95. In the capital sentencing context, a unique jury must base its decision "on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense," whereas the jury venire selection and Title VII employment contexts in which the Court had allowed statistical disparities to prove discriminatory intent involve identifiable and verifiable selection criteria used to make decisions or policy directly attributable to a single known entity. *Id.*

As to the petitioner's Eighth Amendment claim that the risk of racial bias infecting the sentencing decisions rendered the application of the death penalty arbitrary and capricious, *McCleskey* held that the statistical evidence of racial disparities "[did] not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process" given the safeguards built into the system to channel and limit jury discretion and the importance of discretion to deliver the individualized consideration of the particular crime and defendant as was also required by the Eighth Amendment. *Id.* at 308–13.

Much like the petitioner in *McCleskey*, Petitioner has not presented any evidence that decisionmakers in his case were influenced by racial considerations. Without any evidence specific to his own case that racial considerations may have infected the prosecution and sentencing decisions, Petitioner's statistical evidence

338

showing a discrepancy between the share of African Americans in the general population and the share of African Americans who receive capital charges or convictions does not entitle him to relief. *See, e.g., Keene v. Mitchell*, 525 F.3d 461, 464 (6th Cir. 2008); *Coleman*, 268 F.3d at 441. Because there is no reasonable possibility that the evidence would have affected the outcome of his trial had Petitioner's counsel presented it to the trial court at that time, Petitioner is unable to demonstrate the requisite prejudice under *Strickland*.

Petitioner argues that this case differs from *McCleskey* because the statistical analysis at issue there primarily concerned discrimination against defendants based on the race of the victim, not the race of the defendant, whereas Petitioner is claiming discrimination based on defendants' race. (ECF No. 131, PageID 10905.) First, the Baldus study at the center of *McCleskey* correlated death sentences with both victim race and defendant race, and the petitioner argued that "[a]s a defendant who killed a white victim, . . . he was discriminated against because of his race and because of the race of his victim." *McCleskey*, 481 U.S. at 292. But regardless of the accuracy of Petitioner's characterization of the Baldus study as focusing primarily on victim race, the distinction between discrimination based on defendant race and that based on victim race is entirely irrelevant to the Supreme Court's judgment. The petitioner in *McCleskey* lost because he had not presented any evidence that racial considerations had played a role in his own case. Here, Petitioner's statistical evidence suffers the same defect that proved fatal in *McCleskey*. He shows that African Americans are charged with capital murder and

339

sentenced to death in Guernsey County and Ohio in numbers disproportionate to their representations in the general population. But Petitioner has not presented any "evidence specific to his own case that would support an inference that racial considerations played a part in his sentence." *See id.*, at 292–93.

Petitioner also argues that Respondent's reliance on *McCleskey* and *Pulley* to refute his claim for relief is misplaced because "[w]hen race is a determining factor in whom the State seeks the death penalty against, the fundamental right to a fair trial is jeopardized." (ECF No. 131, PageID 10903.) Petitioner's argument begs the question. He has the burden of proving that "race [was] a determining factor" in his prosecution and sentencing, a burden he has not met.

Because Petitioner has not demonstrated that he was prejudiced by trial counsel's failure to submit statistical evidence of racial disparities in capital cases, the Court finds that the Ohio Court of Appeals denial of relief was reasonable. This claim is **DENIED**.

### 26. Twenty-Sixth Ground for Relief: The trial court's independent review of whether to impose the death sentence violated the Eighth and Fourteenth Amendments.

Petitioner's twenty-sixth ground for relief concerns the independent sentencing opinion the trial court judge must prepare, in accordance with Ohio law, after a jury has returned a death sentence. Petitioner claims that the trial court made several errors in its sentencing opinion that mandate reversal of his sentence. Specifically, he asserts that (1) the trial court weighed a different aggravating circumstance than did the jury, (2) the court weighed two aggravating

340

circumstances rather than the single circumstance that [Petitioner was indicted on],

(3) the court's review was too expansive and erroneously considered facts about the

death of the victim, and (4) the court discounted a number of mitigating factors

presented by the defense. (ECF No. 86, PageID 9337–39.)

Respondent argues that the Ohio Supreme Court's adjudication of

Petitioner's claim on direct appeal was a reasonable application of federal law. The

Ohio Supreme Court held that Petitioner waived any errors when he failed to object

to the sentencing opinion, but regardless any errors were harmless and corrected by

the Supreme Court's independent sentencing review. (ECF No. 91, PageID 10488.)

Petitioner presented the claims that comprise his twenty-sixth ground on

direct appeal to the Ohio Supreme Court. (ECF No. 82-10, PageID 2380.) The Ohio

Supreme Court rejected the claims as follows:

> In his 20th proposition, Johnson argues that flaws in the trial court's sentencing opinion constitute reversible error.
>
> Johnson argues that the trial court "weighed a wholly different aggravating circumstance than the jury found in Count Two." The basis for this claim is the error in the verdict form for Count 2. As we previously discussed, Johnson waived that error by failing to object. Further, as we also discussed, nothing in the record suggests that the jury could have found someone else to be the principal offender, and in fact, the jury found Johnson to be the principal offender with regard to the specification to Count 1, for which the jury received an accurately drafted verdict form.
>
> Thus, the court did not commit prejudicial error by considering his principal-offender status when weighing the felony-murder specification.
>
> Johnson further contends that the trial court erroneously weighed two aggravating circumstances against his mitigation. The record supports Johnson's claim, as the trial court appears to have weighed the

kidnapping and rape convictions as separate aggravating circumstances in its sentencing opinion. As we observed in *State v. Spivey* (1998), 81 Ohio St.3d 405, 420, 692 N.E.2d 151, fn. 2, when a single R.C. 2929.04(A)(7) specification charges two or more predicate felonies, those felonies must be weighed together as a single aggravating circumstance.

However, our independent review cures this error by the trial court. See, generally, *Clemons v. Mississippi* (1990), 494 U.S. 738, 745–746, 110 S.Ct. 1441, 108 L.Ed.2d 725; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293.

Johnson also complains that the sentencing opinion discussed the facts surrounding his offenses. But discussing those facts does not necessarily constitute error, as we held in *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684–685, 687 N.E.2d 1358: "While the trial court discussed the facts surrounding the crime * * * in its opinion, it did not weigh those facts as aggravating circumstances. Instead the court reviewed the nature and circumstances of the crime, as it was required to do pursuant to R.C. 2929.03."

Here, the trial court did not weigh the facts as aggravating circumstances in contravention of *Reynolds*. Moreover, our independent review cures any error in the trial court's sentencing opinion. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 125, citing *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124.

Finally, Johnson contends that the trial court improperly minimized the weight of the mitigating factors. However, "[i]n imposing sentence, the assessment of and weight given to mitigating evidence are matters within the trial court's discretion." *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 76. Our independent review cures any error here, as well. *State v. Ashworth* (1999), 85 Ohio St.3d 56, 67, 706 N.E.2d 1231, citing *State v. Lott* (1990), 51 Ohio St.3d 160, 173, 555 N.E.2d 293.

We overrule Johnson's 20th proposition.

*Johnson*, 112 Ohio St.3d at 248–49.

### a. Incorrect Aggravating Circumstance

As part of an earlier motion filed with the Court in these habeas proceedings,

342

Respondent moved to dismiss the portion of Petitioner's twenty-sixth ground[63] complaining that the trial court weighed a different aggravating circumstance in its sentencing opinion than that weighed by the jury. Respondent argued that the claim was procedurally defaulted on the basis of Ohio's contemporaneous objection rule because Petitioner had not objected to the sentencing decision at trial. (ECF No. 15, PageID 156–62.) The Court denied Respondent's motion because the Ohio Supreme Court had not made a clear and express statement enforcing Petitioner's waiver of the issue. (ECF No. 28, PageID 421–26.) The state supreme court had instead held that Petitioner waived his objection to the *sentencing report* when he failed to object to the *incorrect verdict form and jury instructions*. (*Id.*) Because an objection to the verdict form is factually and legally distinct from an objection to the sentencing report, this Court found that the state court's enforcement of Petitioner's waived objection to the verdict form could not also enforce a separate waived objection to the sentencing report. (*Id.*)

While Petitioner's claim that the trial judge considered a different aggravating circumstance than did the jury is a factually and legally distinct claim from his allegation on direct appeal that the jury had considered the wrong aggravating circumstance, the two are related. Both arise from an error in the

---

[63]Petitioner renumbered his grounds for relief in his amended petition, (ECF No. 86). The Court's order granting in part and denying in part Respondent's motion to dismiss procedurally defaulted claims uses the numbering in Petitioner's original petition. (ECF No. 13). As a result, the twenty-sixth ground for relief here was the twenty-fifth ground for relief in the Court's order. (ECF No. 28, PageID

verdict form given to the jury during the guilt phase deliberations. Count 2 of the indictment charged Petitioner with aggravated murder by "prior calculation and design," under O.R.C. § 2903.01(A), with a death-penalty specification under § 2929.04(A)(7) for the aggravated circumstance of felony murder in which Petitioner was the principal offender. But the verdict form on which the jury found Petitioner guilty omitted the "principal offender" language under the death-penalty specification, instead charging Petitioner with "committ[ing] the aggravated murder with prior calculation and design." The trial judge weighed the correct "principal offender" aggravating circumstance in his sentencing opinion. (*See* ECF 82-9, PageID 2246.)

In response to Petitioner's seventeenth proposition of law on direct appeal objecting to the error on the verdict form, the Ohio Supreme Court held that Petitioner had waived the verdict form error when he failed to object at trial, but that he was not prejudiced because the error was not outcome-determinative and it was cured by the state supreme court's independent review of the sentence. *Johnson*, 112 Ohio St.3d at 214–15. The court relied on *Mitchell v. Esparza*, 540 U.S. 12 (2003), in which the United States Supreme Court held that omission of principal-offender language from an Ohio felony-murder death specification was harmless error when the omission was not outcome-determinative. *Id.* at 18. The state supreme court reasoned that similar to *Esparza*, the jury verdict in this case

421–26.)

would have been the same had the verdict form correctly asked whether Petitioner was the principal offender given that Petitioner was the only person named in the indictment, there was no evidence presented that anyone else was involved, and the jury did find Petitioner to be the principal offender under the specification contained in Count 1. *Johnson*, 112 Ohio St. 3d at 214–15, 248–49. Based on its finding on Petitioner's seventeenth proposition of law that the error on the verdict form was not clear error, the Ohio Supreme Court found that the trial judge's consideration of a different aggravating circumstance than the jury—Petitioner's principal offender status—when he weighed the felony-murder specification for Count 2 could not be prejudicial. *Id*. at 249.

The threshold issue is whether the state court's plain error review receives AEDPA deference. *Compare Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009) (holding that opinion of state court on plain error review is still entitled to AEDPA deference if the federal court reaches the merits despite the procedural default), *with Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015) (noting that Sixth Circuit precedent is uncertain on whether plain-error review qualifies as an adjudication on the merits subject to AEDPA deference). The Court need not decide the issue because Petitioner's claim cannot survive even *de novo* review.

In *Esparza*, the Supreme Court found that the erroneous exclusion of principal-offender language from the indictment and jury instructions in an Ohio death penalty case was harmless error when the petitioner was the only person charged in the indictment and no evidence was presented that anyone other than

345

petitioner was involved in the crime. 540 U.S. at 18–19. As the Ohio Supreme Court explained, the same facts apply here: Petitioner was the sole defendant charged and there was no evidence presented of another person's involvement. *Johnson*, 112 Ohio St.3d at 214–15. If, based on *Esparza*, the difference between considering and not considering the principal-offender element does not affect the outcome on these facts, the fact that the trial court here considered principal-offender status while the jury did not must be harmless error. For the use of different factors to be constitutionally problematic, the difference between the factors must be capable of affecting the outcome. *See Esparza*, 540 U.S. at 17–18 ("A constitutional error is harmless when 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'") (*quoting Neder v. United States*, 527 U.S. 1, 15 (1999)). Petitioner's claim does not entitle him to habeas relief.

### b. Consideration of Multiple Aggravating Circumstances

Petitioner next claims that the trial court incorrectly weighed two aggravating circumstances in its sentencing decision, rather than one. The Ohio Supreme Court found that the trial court's opinion indeed seemed to weigh the rape and kidnapping convictions as separate aggravating circumstances, despite state case law instructing that when a single § 2929.04(A)(7) felony-murder death specification is based on multiple predicate felonies, those felonies must be considered together as one aggravating circumstance. *Johnson*, 112 Ohio St.3d at 249, *citing State v. Spivey*, 81 Ohio St.3d 405, 420 (Ohio 1998). The court went on to hold that the trial court's error was cured by the Ohio Supreme Court's independent

346

review. *Id.*

The state supreme court's resolution was consistent with established federal law. "[T]he Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless error review." *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990). But "[w]hen the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence." *Stringer v. Black*, 503 U.S. 222, 230 (1992). Petitioner has not identified any error of federal law in the independent reweighing performed by the Ohio Supreme Court. In fact, he failed to mention *any* federal law in his discussion of this claim in his petition.[64] Because Petitioner has not demonstrated that the state supreme court's sentencing review was contrary to or an unreasonable application of clearly established federal law, he is not entitled to habeas relief.

### c. Consideration of the Nature and Circumstances

Petitioner's third claim alleges that the trial court improperly considered facts about the crime beyond the mere presence of the aggravating circumstance, such as "the possible weapon that was used, the fact that the victim had been

---

[64]In his Traverse, Petitioner argues the illegitimacy of the Ohio Supreme Court's independent review based on *Hurst v. Florida*, 577 U.S. 92 (2016). That claim is discussed separately below.

347

beaten, the acute pain of his last moments, gagging, [and] the cover-up of the blood spatters and blood as it related to the kidnapping." (ECF No. 86, PageID 9338.) The Ohio Supreme Court found that the trial court did not weigh the facts about the crime and death of the victim as additional aggravating circumstances, but rather considered the nature and circumstances of the crime in accordance with § 2929.03. *Johnson*, 112 Ohio St. 3d at 249. Regardless, it held that any error was cured by the Ohio Supreme Court's independent review. *Id.*

As the Sixth Circuit explained in *Hill v. Mitchell*, when a court identifies the correct aggravating circumstance, "that court is presumed to rely only on that circumstance, and not on non-statutory aggravating circumstances." 400 F.3d at 334–335, *citing State v. Rojas*, 64 Ohio St.3d 131, 592 N.E.2d at 1386 (Ohio 1992).

> Neither the court of appeals' description of Hill's crime as "heinous," nor the trial court's alleged "disgust" for Hill's offense created nonstatutory aggravating circumstances. The facts of the robbery form part of the aggravating circumstance. *State v. Lott* (1990), 51 Ohio St.3d 160, 555 N.E.2d 293, 305. Moreover, a court "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

*Id.* at 334.

Yet even if the Court assumes the trial court *did* rely on non-statutory aggravating circumstances, that would be, at most, a violation of state law, rising to a federal constitutional claim "only when the state-law error 'so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 335, *quoting McGuire*, 502 U.S. at 72. "[T]he Constitution does not require the jury to ignore

348

other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Id.*, *citing Zant*, 462 U.S. at 878–79. As the Sixth Circuit proceeded to conclude,

> Here, however, no error occurred under state law, as explained by the Ohio Supreme Court, and accordingly neither did any error occur under the Federal Constitution. Even if a state-law error had occurred, moreover, the Ohio Supreme Court's reweighing of the aggravating and mitigating factors would cure the error, and indeed Hill does not argue that the Ohio Supreme Court's reweighing suffered from any defects.

*Id.* Accordingly, Petitioner's claim does not warrant relief.

### d. Consideration of Mitigating Factors

Petitioner also complains that the trial court disregarded and discounted the mitigating factors. The Ohio Supreme Court noted that the "'the assessment and weight given to mitigating evidence are matters within the trial court's discretion,'" *Johnson*, 112 Ohio St. 3d at 249, *quoting State v. Cunningham*, 105 Ohio St.3d 197 (Ohio 2004), but held that any errors in the trial judge's opinion were cured by its own independent review. *Id.*

The United States Supreme Court has explained that the Constitution requires only that "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998) (internal citations omitted). So long as a sentencer has not refused to consider mitigating evidence, the relative weight and

349

significance to be assigned the mitigating circumstances is within its discretion. Thus, the Supreme Court has found constitutionally permissible even death penalty schemes that allow a jury complete discretion to weigh mitigating factors. *See Tuilaepa v. California*, 512 U.S. 967, 978-79 (1994); *Zant*, 462 U.S. at 875.

In *Eddings v. Oklahoma*, the Supreme Court found that the refusal of both a trial and appellate court to consider specific mitigating evidence as a matter of law violated the rule announced in *Lockett v. Ohio* that a state may not preclude the consideration of any relevant mitigating factor. *Eddings*, 455 U.S. at 113–14. The Court likened it to a situation in which the judge had instructed a jury to disregard mitigating evidence, a clear violation of *Lockett*. *Id.* at 114. The Court emphasized the fact that "the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather, he found that *as a matter of law*, he was unable even to consider the evidence." *Id.* at 113. It held that "[t]he sentencer, and the [appellate court] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." *Id.* at 115.

There is no indication in the sentencing opinion that the trial judge impermissibly discarded mitigating evidence without consideration. That the trial judge here, after consideration, assigned little weight to Petitioner's mitigation evidence does not run afoul of the established federal law in *Lockett* and *Eddings*. Accordingly, the Court finds that the Ohio Supreme Court's rejection of Petitioner's claim was a reasonable application of established federal law.

### e. Validity of the Ohio Supreme Court's Independent Sentencing Review

Finally, Petitioner argues for the first time in his Traverse that the Ohio Supreme Court's independent sentencing review could not correct the errors in the trial court's opinion because "neither the trial court nor the Ohio Supreme Court had the assistance of a jury's findings of fact with respect to sentencing issues." (ECF No. 131, PageID 10907.) He relies on *Hurst v. Florida*, a case in which the Supreme Court held unconstitutional a Florida law providing for the judge, not the jury, to make the factual findings regarding the existence of aggravating circumstances necessary to impose a death sentence. 577 U.S. 92, 98–99 (2016). This type of sentencing scheme violates defendants' Sixth Amendment right to have a jury determine any facts on which an increase in punishment depends. *See Ring v. Arizona*, 536 U.S. 584, 604 (2002) (invalidating death sentence where a judicial finding of an aggravated circumstance exposed the defendant to a punishment more severe than that authorized by the jury's guilty verdict alone).

First, *Hurst* announced a new rule that does not apply retroactively to Petitioner's case. Generally, a new rule announced after a defendant's conviction and sentence become final may not be the basis for federal habeas relief unless it falls within one of two narrow exceptions.[65] *Stringer*, 503 U.S. at 227; *Teague v. Lane*, 489 U.S. 288 (1989). *Hurst* was decided on January 12, 2016, while

---

[65]Neither exception applies here. *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).

351

Petitioner's conviction and sentence became final upon direct appeal when the United States Supreme Court denied his petition for certiorari on October 1, 2007. (ECF No. 82-13, PageID 2877.) Thus, if *Hurst* indeed was a new rule, it cannot be the basis for habeas relief here. This Court has held on numerous occasions that *Hurst* did announce a new rule that may not be applied retroactively in habeas corpus, a position the Court again adopts here. *See, e.g.*, *Davis v. Shoop*, Case No. 2:16-cv-495, 2020 WL 3255145, at *30 (S.D. Ohio June 16, 2020); *McKnight v. Bobby*, Case No. 2:09-cv-059, 2017 WL 631411, at *4–5 (S.D. Ohio Feb. 15, 2017); *Fears v. Jenkins*, Case No. 2:17-cv-029, 2017 WL 1177609, at *3 (S.D. Ohio Mar. 30, 2017).

Second, even if *Hurst* applied to Petitioner's case, his argument could not survive the Supreme Court's subsequent opinion in *McKinney v. Arizona*, 140 S.Ct. 702 (2020). In *McKinney*, the Court held that a state supreme court could independently reweigh the aggravating and mitigating factors to reaffirm a death sentence even *after* habeas relief was granted, without the need for jury resentencing, in accordance with *Clemons*. *Id*. at 706–07. The Ninth Circuit had granted habeas relief due to the state courts' failure to properly consider a mitigating factor in violation of *Eddings*. *Id*. at 706. McKinney argued that *Ring* and *Hurst* barred such appellate reweighing because they entitle capital defendants to a jury determination of any fact capable of increasing sentence. *Id*. at 707. The Supreme Court refuted that characterization of the holdings of *Ring* and *Hurst*:

Under *Ring* and *Hurst*, a jury must find the aggravating circumstance

352

that makes the defendant death eligible. But importantly, in a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range. . . . And in the death penalty context, as Justice Scalia, joined by Justice Thomas, explained in his concurrence in *Ring*, the decision in *Ring* "has nothing to do with jury sentencing. What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed." 536 U.S. at 612, 122 S.Ct. 2428; see also *Kansas v. Carr*, 577 U.S. ----, 136 S.Ct. 633, 193 L.Ed.2d 535 (2016) (slip op., at 9–11). Therefore, as Justice Scalia explained, the "States that leave the ultimate life-or-death decision to the judge may continue to do so." *Ring*, 536 U.S. at 612, 122 S.Ct. 2428.

In short, *Ring* and *Hurst* did not require jury weighing of aggravating and mitigating circumstances, and *Ring* and *Hurst* did not overrule *Clemons* so as to prohibit appellate reweighing of aggravating and mitigating circumstances.

*Id.* at 707–08. Accordingly, *Ring* and *Hurst* do not render the Ohio Supreme Court's independent reweighing constitutionally problematic as a method for curing errors in the trial court's sentencing opinion.

For the above reasons, the Court finds that the Ohio Supreme Court's adjudication of the claims included in Petitioner's twenty-sixth ground for relief was not contrary to or an unreasonable application of clearly established Federal law. Petitioner's twenty-sixth ground for relief is **DENIED**.

### 27. Twenty-Seventh Ground for Relief: Ohio's death penalty statute is unconstitutional.

In his twenty-seventh ground for relief, Petitioner makes a number of claims as to the unconstitutionality of Ohio's death penalty statute, arguing generally that it is imposed in a discriminatory manner, that its sentencing procedures are

353

unreliable, that the felony murder specifications violate *Zant v. Stephens*, and that §§ 2929.03(D)(1) and 2929.04 are unconstitutionally vague. Respondent argues that the Sixth Circuit has consistently held similar constitutional challenges to Ohio's capital punishment laws to be meritless and thus the Ohio Supreme Court's rejection of Petitioner's claims does not contravene or unreasonably apply clearly established federal law. (ECF No. 91, PageID 10489.)

The Ohio Supreme Court summarily dismissed the claims on the ground that the issues raised had all been considered and decided in previous cases by that court. *Johnson*, 112 Ohio St.3d at 250. The Court reviews the state court's disposition under the standards of § 2254(d). *Cf. Richter*, 562 U.S. at 99–100 (holding that a state court's denial of relief is presumed to be on the merits for the purposes of § 2254(d) absent an indication of alternative grounds).

### a. Arbitrary and Unequal Punishment

Petitioner makes several allegations that Ohio's death penalty system results in arbitrary and unequal punishment. First, Petitioner claims that prosecutors' "virtually uncontrolled indictment discretion allows arbitrary and discriminatory imposition of the death penalty" in violation of the Equal Protection Clause and the Eighth Amendment. (ECF No. 86, PageID 9339.) He likens the lack of standards and individual discretion governing prosecutors' indictment decisions to the lack of standards found in mandatory death penalty statutes that ultimately rendered such schemes unconstitutional. (*Id.*, citing *Woodson v. North Carolina*, 428 U.S. 280 (1976).) Petitioner's argument is foreclosed by *Gregg v. Georgia*, 428 U.S 153 (1976).

In *Gregg*, the Court held that *Furman*, which had required the use of standards to guide the sentencing decision for a person convicted of a capital crime, does not apply to indictment decisions in which a prosecutor may choose to show mercy to an individual defendant by "remov[ing] [him] from consideration as a candidate for the death penalty." 428 U.S. at 199; *see also Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003) ("[T]he Supreme Court held in [*Gregg*] that these 'discretionary stages' do not implicate the concerns expressed in *Furman v. Georgia*.").

Second, Petitioner claims that the death penalty is imposed in a racially discriminatory manner. (ECF No. 86, PageID 9340.) This argument fails for the reasons explained in response to Petitioner's twenty-fifth ground for relief, *supra*. In short, an equal protection violation requires evidence of "purposeful discrimination." *McCleskey*, 481 U.S. at 292. Statistics that merely demonstrate racial disparities in the overall application of the death penalty are therefore insufficient to infer the existence of purposeful discrimination. *Id*. at 292–99. Nor do such disparities "demonstrate a constitutionally significant risk of racial bias" under the Eighth Amendment when the capital sentencing process already contains safeguards to minimize racial bias and guide discretion. *Id*. at 313. Because Petitioner has not presented any evidence that racial discrimination played a role in his case, the Ohio Supreme Court's dismissal of this claim was a reasonable application of federal law.

Finally, Petitioner claims that the death penalty is neither the least restrictive nor most effective means of achieving the "compelling governmental end[s]" of deterrence and retribution. (ECF No. 86, PageID 9341.) The Supreme

355

Court has consistently held that the death penalty is a legitimate means for satisfying the social purposes of deterrence and retribution when it is not disproportionate to the crime, *see, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 441 (2008), *citing Gregg*, 428 U.S. at 173, 183, 187, and this Court is bound by its decisions.

### b. Reliability of Sentencing Procedures

Petitioner claims that the sentencing procedures in Ohio's death penalty statute are, in several aspects, unreliable and result in arbitrary and capricious imposition of the death penalty in violation of the Due Process and Equal Protection Clauses. First, he argues that the law does "not require the state to prove the absence of any mitigating factors or that death is the only appropriate penalty." (ECF No. 86, PageID 9341.) He also objects to the manner in which the mitigating and aggravating circumstances are weighed because the jury only needs to determine that "the aggravating circumstances are marginally greater than the mitigating factors." (*Id.*) Finally, Petitioner attacks the statutory mitigating circumstances as unconstitutionally vague. He maintains that leaving the weighing process and the weight assigned to each factor to the jury's discretion risks the possibility that constitutionally mandated mitigating factors will not be factored into the jury's decision. (*Id.*)

As the Sixth Circuit has noted in response to similar complaints, "[t]he Supreme Court only requires that the statutory scheme requires that the aggravating circumstances outweigh the mitigating ones." *Greer v. Mitchell*, 264

F.3d 663, 691 (6th Cir. 2001), *citing Blystone v. Pennsylvania*, 494 U.S. 299 (1990). Specifically, the Supreme Court has held that the Eighth Amendment is satisfied when a state uses aggravating circumstances to limit the pool of defendants eligible for death and allows consideration of all relevant mitigating evidence to ensure an individualized sentence. *Blystone*, 494 U.S. at 306–07. Indeed, once a defendant is found to be eligible for a death sentence, "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed.'" *Tuilaepa*, 512 U.S. at 979–80, *quoting Zant*, 462 U.S. at 875; *see also California v. Ramos*, 463 U.S. 992, 1008 ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment."). The Supreme Court has demanded that states not preclude juries from considering and giving mitigating effect to any mitigating evidence presented by the defendant. *Blystone*, 494 U.S. at 306–07. At the same time, the states are not required to direct the jury as to how to weigh the mitigating evidence. *Tuilaepa*, 512 U.S. at 974. Ohio's statutory scheme is well within these constitutional parameters.

### c. Constitutional Validity of § 2929.04(A)(7) Aggravating Factors

Petitioner next claims that Ohio's death penalty scheme is unconstitutional because Ohio Rev. Code § 2929.04(A)(7) fails to genuinely narrow the class of individuals eligible for the death penalty beyond the definition of aggravated felony murder in § 2903.01(B). (ECF No. 86, PageID 9342–43.) Section 2929.04(A) lists aggravating factors any one of which may qualify a defendant for death if proved

beyond a reasonable doubt in conjunction with § 2903.01 aggravated murder. O.R.C.
§ 2020.04(A) (2003 ver.). Petitioner argues that because the § 2929.04(A)(7)
aggravating factor merely repeats part of the definition of aggravated felony
murder, it does not serve its purpose of distinguishing those eligible for the death
penalty from the larger category of aggravated felony murderers as required by
*Zant v. Stephens*, 462 U.S. 862 (1983).

"To pass constitutional muster, a capital sentencing scheme must 'genuinely
narrow the class of persons eligible for the death penalty and must reasonably
justify the imposition of a more severe sentence on the defendant compared to
others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988),
*quoting Zant*, 462 U.S. at 877. This narrowing function can be achieved by adopting
a list of aggravating circumstances the presence of which will qualify a defendant
for the death penalty, but it can also be achieved by classifying only specific
categories of murders, defined in statute, as death eligible. *Id.* at 245–46, *citing
Jurek v. Texas*, 428 U.S. 262, 270–71 (1976). Both means of narrowing the persons
who may be eligible for the death penalty have been upheld by the Supreme Court.
*See, e.g., Gregg*, 428 U.S. 153 (statutory aggravating circumstances); *Proffitt v.
Florida*, 428 U.S. 242, 258 (1976) (statutory aggravating circumstances); *Jurek v.
Texas*, 428 U.S. 262, 270–71 (1976) (statutory categories of death penalty eligible
murders). In other words, "[t]he use of 'aggravating circumstances' is not an end in
itself," but merely one means by which a state can genuinely narrow the class of
death-eligible persons. *Lowenfield*, 484 U.S. at 244.

Because the use of aggravating circumstances is not constitutionally required to distinguish capital offenses from other murders, *Lowenfield* held that "an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself." *Williams*, 529 U.S. at 392 n.16, *citing Lowenfield*, 484 U.S. at 244. Applying *Lowenfield* to the Ohio statutory provisions for aggravated felony murder to which Petitioner objects, the Sixth Circuit concluded:

> [I]t would be entirely within constitutional bounds for Ohio to provide similar definitions for both "aggravated murder" (in Ohio Rev. Code § 2903.01(B)) and "aggravating circumstances" (in Ohio Rev. Code § 2929.04(A)(7)). What matters is that Ohio has, *in the first instance*, narrowed the class of those eligible for the death penalty by requiring some aggravated form of murder.

*Cooey v. Coyle*, 289 F.3d 882, 901 (6th Cir. 2002).

Regardless, O.R.C. § 2929.04(A)(7) does in fact narrow the pool of § 2903.01(B) aggravated felony murders for which death may be imposed. Section 2903.01(B) defines as aggravated murder "purposely caus[ing] the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape."[66] O.R.C. § 2903.01(B) (2003 ver.). In contrast, § 2929.04(A)(7) makes death-eligible only those aggravated murders committed while also "committing, attempting to

---

[66]All statutory references and language quoted here are based on the 2003 version of the Ohio Code in operation at the time of Petitioner's trial.

commit, or fleeing immediately after committing. . .kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary" **and** where the offender was either "the principal offender . . . of the aggravated murder or, . . . committed the aggravated murder with prior calculation and design." O.R.C. § 2929.04(A)(7) (2003 ver.). Thus, the state has limited the use of the death penalty to only a subset of the range of felonies included in the broader definition of aggravated felony murder and has added an additional culpability requirement as well.

Petitioner also argues that the state lacks a legitimate interest in subjecting felony murder to more severe punishment because the state courts have interpreted § 2929.04(A)(7) as not requiring that intent to commit the felony precede the murder. (ECF No. 86, PageID 9344.) He maintains that not requiring prior felonious intent undermines the relationship between the state interest in deterrence and the harsher penalty for felony murder, which has traditionally been justified on the basis of deterring the commission of dangerous felonies.

Petitioner's objection might make sense if Ohio's aggravated felony murder death penalty specification shared the characteristics of the traditional felony murder rule which the deterrence-of-dangerous-felonies rationale has at times been cited to justify. Traditional felony murder imposes what is essentially strict liability on all participants in a felony for any resulting deaths. The result is that a co-conspirator in the felony could be charged with murder for a death that was accidental or that he did not directly cause. The severity of this outcome has at times been justified as deterring dangerous felonies in which risk of death is great.

360

But Ohio's aggravated felony murder death specification does not cover this type of scenario.[67] As previously explained, it specifically limits eligibility for the death penalty to defendants who committed one of five specified felonies **and** were "the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." § 2929.04(A)(7). Thus, the statute restricts the most severe penalty to only those who are the most culpable.

Finally, Petitioner complains that punishing felony murder more severely than a murder committed with prior calculation and design is nonsensical given the greater moral culpability of the latter. (ECF No. 86, PageID 9343–44.) Under Ohio law, aggravated murder committed with prior calculation and design, covered by § 2903.01(A), must also satisfy one of the aggravating circumstances in §2929.04 to be eligible for the death penalty. In contrast, aggravated felony murder, covered by § 2903.01(B), may be more readily eligible for the death penalty because §2929.04(A)(7) does not substantially narrow the pool of aggravated felony murderers eligible for death from the larger group of all aggravated felony murderers. Petitioner argues that the state lacks a rational basis for treating these

---

[67]Traditional felony murder is covered by the statutory provision for involuntary manslaughter in Ohio. *See* § 2903.04(A). "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony. . . .Whoever violates this section is guilty of involuntary manslaughter. Violation of division (A) of this section is a felony in the first degree." § 2903.04(A), (C).

two types of murder differently.

The Supreme Court has held that death is not a disproportionate punishment for "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death." *Tison v. Arizona*, 481 U.S. 137, 157 (1987). Ohio's aggravated felony murder death specification, which limits the death penalty to defendants who were either the principal offender in the murder or acted with prior calculation and design, falls well within this boundary. It is not unconstitutional for Ohio to deem the principal offenders of some aggravated felony murders as meriting the same penalty as those who murdered with prior calculation and design.

### d.  Constitutional Vagueness of §§ 2929.03(D)(1) and 2929.04

Petitioner's next argument is that provisions in O.R.C. §§ 2929.03(D)(1) and 2929.04(B) that instruct the factfinder to consider the "nature and circumstances" of the crime when examining *both* the aggravating circumstances *and* the mitigating factors render the law unconstitutionally vague because it allows the jury "unfettered discretion to weigh a statutory mitigating factor as an aggravator." (ECF No. 86, PageID 9345.) Section 2929.01(D)(1) says that, in its consideration of sentence, "the trial jury . . . shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing. . . ." O.R.C. 2929.01(D)(1). Section 2929.04(B), on the other hand, directs the jury to "consider . . . the nature and circumstances of the offense" as mitigation against the aggravating circumstances for which the

362

defendant was found guilty. O.R.C. § 2929.04(B). In other words, Ohio law instructs the jury to consider the nature and circumstances of the crime both in mitigation for the defendant and as part of the aggravating circumstances.

The Sixth Circuit has previously considered and found meritless this precise argument against Ohio's death penalty statute. *See Cooey*, 289 F.3d at 927–28. "The only conceivable way for a court properly to weigh all the aggravating and mitigating circumstances is to take a hard look in both instances at the 'nature and circumstances of the offense.' . . . We cannot even imagine a constitutional violation here." *Id.*

Petitioner further argues that § 2929.03(D)(1) renders the aggravating circumstances listed in § 2929.04(A) "too vague" because allowing the jury to consider the aggravating circumstance as well as "the nature and circumstances of the aggravating circumstance" eliminates any narrowing achieved by precisely delineating the aggravating circumstances and instead allows the jury "open discretion." (ECF No. 86, PageID 9346, *citing Walton v. Arizona*, 497 U.S. 639, 654 (1990).)

Petitioner mistakes breadth for vagueness. "For purposes of vagueness analysis, . . . our concern is that the [aggravating selection] factor have some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'" *Tuilaepa*, 512 U.S. at 975, *quoting Jurek*, 428 U.S. at 279 (White, J., concurring in judgment). Instructing the jury to consider not only the bare existence of an aggravating circumstance but the nature and circumstances

363

surrounding it broadens the jury's ambit of inquiry, but it does not make the assigned task unclear. In a challenge to a California provision instructing a capital jury to consider the "circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true," the Supreme Court held that the selection factor addressed "a relevant subject matter and does so in understandable terms. The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence." *Tuilaepa*, 512 U.S. at 975–76.

Because the Ohio Supreme Court's dismissal of Petitioner's claims regarding the constitutionality of Ohio's death penalty laws was not contrary to or an unreasonable application of established federal law, Petitioner's twenty-seventh ground for relief is **DENIED**.

### 28. Twenty-Eighth Ground for Relief: Cumulative error.

In his twenty-eighth and final ground for relief, Petitioner claims that the cumulative effect of the errors identified in his petition resulted in a conviction and death sentence in violation of his constitutional rights. (ECF No. 86, PageID 9346.) Respondent argues that Petitioner's claim is without merit because the Supreme Court has not held that constitutional claims that cannot individually support habeas relief may be cumulated to support relief. (ECF No. 91, PageID 10490, *citing Keith*, 455 F.3d at 679.) As a result, Respondent asserts, Petitioner's claim "necessarily assumes and depends upon an unprecedented extension of governing

Supreme Court precedents, which is barred by *Teague v. Lane*." (*Id.*) Moreover, the Ohio Supreme Court's adjudication could not have contravened or unreasonably applied established federal law. (*Id.*)

Petitioner initially raised this claim on direct appeal, and the Ohio Supreme Court summarily denied relief: "In his 21st proposition, Johnson claims that the cumulative effect of the errors alleged in his brief denied him a fair trial. He fails to support this proposition, however, and we overrule it." *Johnson*, 112 Ohio St.3d at 249. Petitioner then raised it during his initial post-conviction proceedings, and the Ohio Court of Appeals affirmed the trial court's denial of relief. The court acknowledged that relief can be granted for cumulative error but found it inapplicable because the court had not identified any errors in Petitioner's case. *Johnson*, 2007 WL 1098106, at *21.[68]

Before this Court, Petitioner did not offer any arguments to support his claim of cumulative error, or to dispute the decisions of either the Ohio Supreme Court or Ohio Court of Appeals. Regardless, Petitioner is not entitled to relief based on this claim because cumulative error is not cognizable in habeas.

"[P]ost-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore*, 425 F.3d at

---

[68]Petitioner also raised it as the fifteenth ground in his second state post-conviction. (ECF No. 85-1, PageID 8283.) The trial court dismissed the petition for failure to satisfy the jurisdictional prerequisites of § 2953.27(A), but Petitioner did not raise the issue in his appeal. The Ohio Court of Appeals affirmed the trial court's dismissal of the petition. *Johnson*, 2013 WL 1400607, at *2–3.

256, *citing Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002). Because there is "no Supreme Court precedent obligating the state court to consider the alleged trial errors cumulatively," *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), the judgment of the state courts is not contrary to clearly established federal law. *See, e.g.*, *Moreland*, 699 F.3d at 931; *Sheppard*, 657 F.3d at 348, cert. denied, 132 S.Ct. 2751 (2011); *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006). Yet even if relief were available for claims of cumulative error, Petitioner's claim would not entitle him to relief because the Court has not found any errors to accumulate. *Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007), *citing Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004).

Accordingly, Petitioner's twenty-eighth ground for relief is **DENIED**.

## V. CONCLUSION

For the above reasons, the Court **DENIES** Petitioner's habeas corpus claims, **DISMISSES** this action, and **DIRECTS** the Clerk to enter judgment dismissing this action.

The Court further **CERTIFIES FOR APPEAL** grounds for relief ten and thirteen.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**